**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **VIASAT, INC.,** | |
| **Plaintiff,** | |
| **vs.** | **Case No.:  6:21-cv-01231-ADA** |
| **KIOXIA CORPORATION and KIOXIA AMERICA, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | ██████████████ |

**<u>PLAINTIFF VIASAT, INC.'S OPENING BRIEF IN SUPPORT
OF ITS MOTION TO EXCLUDE AND/OR STRIKE OPINIONS OF
DR. STEPHEN MELVIN</u>**

**TABLE OF CONTENTS**

Page

BACKGROUND ............................................................................................................................. 2

ARGUMENT .................................................................................................................................. 5

I.      Dr. Melvin Should Be Precluded From Offering Non-Infringement Opinions
        Based On Erroneous Claim Constructions ........................................................................ 5

        A.      Decoding Limitation .............................................................................................. 5

                1.      Dr. Melvin's Opinions Cannot Be Reconciled With Kioxia's IPR
                        Positions ..................................................................................................... 6

                2.      Dr. Melvin's Opinions Contradict Kioxia's IPR Position That
                        "Decoding" Includes Derandomizing ......................................................... 7

                3.      Dr. Melvin's Opinions Also Contradict Kioxia's IPR Position That
                        "Decoding" Includes Distinguishing ECC Bits From Data Bits ................ 9

                4.      Dr. Melvin's Opinions Are Inconsistent With The Plain Meaning
                        Construction Adopted By The Court In Claim Construction ................... 11

        B.      Physically Separate ............................................................................................. 13

II.     Dr. Melvin's Opinions Based On Conversations With Mr. Mori Should Be
        Stricken .......................................................................................................................... 14

III.    Dr. Melvin Should Not Be Permitted To Rely On Undisclosed Performance Data ......... 17

CONCLUSION ............................................................................................................................. 20

## TABLE OF AUTHORITIES

Page

**Cases**

*Certain Underwriters at Lloyd's v. Axon Pressure Prods. Inc.*,
  951 F.3d 248 (5th Cir. 2020) ................................................................. 16

*Cordis Corp. v. Boston Sci. Corp.*,
  561 F.3d 1319 (Fed. Cir. 2009) ............................................................. 14

*Cordis Corp. v. Boston Sci. Corp.*,
  658 F.3d 1347 (Fed. Cir. 2011) ............................................................. 12

*Ergo Sci., Inc. v. Martin*,
  73 F.3d 595 (5th Cir. 1996) ................................................................... 7

*Gabarick v. Laurin Mar. (Am.) Inc.*,
  753 F.3d 550 (5th Cir. 2014) ................................................................. 7

*Honey-Love v. United States*,
  664 F. App'x 358 (5th Cir. 2016) .......................................................... 16

*Intel Corp. v. XMTT, Inc.*,
  No. 2021-2127, 2022 WL 1152312 (Fed. Cir. Apr. 19, 2022) ............... 7, 9

*Liquid Dynamics Corp. v. Vaughan Co.*,
  449 F.3d 1209 (Fed. Cir. 2006) ............................................................. 5

*Maguregui v. ADP, LLC*,
  No. EP-16-CV-121-PRM, 2017 WL 5473484 (W.D. Tex. Apr. 10, 2017) .............................. 17

*Mobile Equity Corp. v. Walmart Inc.*,
  No. 2:21-CV-00126-JRG-RSP, 2022 WL 19917854 (E.D. Tex. Sept. 23, 2022) .............. 13, 14

*Personalized User Model, L.L.P. v. Google Inc.*,
  No. 09-525-LPS, 2014 WL 807736 (D. Del. Feb. 27, 2014) ................... 5

*Tomax AS v. Turbo Drill Indus., Inc.*,
  No. 6:21-CV-00260-ADA, 2023 WL 3171744 (W.D. Tex. Apr. 6, 2023) .................. 16, 19

*Treehouse Avatar LLC v. Valve Corp.*,
  54 F.4th 709 (Fed. Cir. 2022) ................................................................ 12

*Trustees of Columbia Univ. in City of New York v. NortonLifeLock, Inc.*,
  No. 3:13CV808, 2019 WL 7040931 (E.D. Va. Dec. 20, 2019) ............... 9

*Varta Microbattery GmbH v. Audio P'ship LLC*,
  No. 2:21-CV-00400-JRG-RSP, 2023 WL 5192986 (E.D. Tex. Aug. 11, 2023) .............. 5

Kioxia seeks to litigate this case with loaded dice. Kioxia prevailed before the PTAB by advancing broad claim constructions, but its expert, Dr. Melvin, now seeks to introduce non-infringement opinions at trial that contradict those very constructions. Dr. Melvin's rebuttal report also relies on new facts that Kioxia previously hid from Viasat during discovery. Both efforts are improper and should be excluded.

Dr. Melvin's very first non-infringement opinion directly contradicts positions Kioxia has successfully taken both before the PTAB and this Court about what "decoding" means in the asserted claims. Kioxia prevailed in its claim construction arguments in both instances. It should not be allowed a do-over now through Dr. Melvin's much narrower constructions that seek to avoid infringement. This type of conduct is exactly why basic principles of estoppel exist.

Dr. Melvin does something similar with his opinions of what it means to be "physically separate." The parties disputed this during claim construction, where Kioxia had a full opportunity to convince the Court that some meaning other than the ordinary one should apply. Kioxia seeks a re-do of that decision as well, using Dr. Melvin to trot out prosecution-history arguments that are not proper for the jury.

Kioxia's "heads I win; tails you lose" litigation strategy also involves hiding critical information from Viasat during fact discovery, but then selectively relying on such unproduced information in its expert reports. Most notably, Kioxia refused to make one of the key engineers responsible for an accused product, ███████, available for a deposition despite multiple other witnesses testifying that ███████ could answer detailed questions about how an accused product operates that they could not. But after fact discovery, Kioxia facilitated a conversation between ███████ and Dr. Melvin so that Dr. Melvin could claim support for one of his non-infringement arguments. Kioxia also produced only a subset of the performance data that Viasat requested

1

during discovery, only to provide selected "actual" data to Dr. Melvin (but still not to Viasat) so that he could criticize Viasat's damages theories. These games should not be tolerated.

Dr. Melvin's opinions on these issues should be stricken, and he should be precluded from presenting these theories and his evidence allegedly supporting them to the jury.

## BACKGROUND

This case is about error correction in flash memory systems. Viasat—a world leader in forward error correction in satellite communications—drew connections between error correction in noisy satellite communications channels and error-prone flash memory that others had not. That innovative leap led to the inventions in the asserted patent, U.S. Patent No. 8,615,700, that allow for sophisticated error-correction techniques to be performed in flash memory.

Viasat asserts claims 6, 11, 13, and 16 of the '700 patent. The asserted claims are dependent claims that depend from claim 1 and claim 15. Claim 1 recites:

> 1. A flash memory decoder comprising:
>
> > a decoding module configured to:
> >
> > > receive encoded data from the flash memory; and
> > >
> > > decode the received encoded data to generate a plurality of partially decoded data streams;
> >
> > an error detection module communicatively coupled with the decoding module, and comprising a plurality of error detection sub-modules operating in parallel, each error detection sub-module configured to:
> >
> > > receive a different one of the plurality of partially decoded data streams;
> > >
> > > detect whether a portion of the respective received stream contains an error; and
> > >
> > > forward the portion of the respective received stream containing an error to an error correction module; and

2

> the error correction module, communicatively coupled with and physically separate from the error detection module, and configured to correct the received portions of the respective received streams containing an error.

Ex. 1, U.S. Patent No. 8,615,700. The dependent claims then provide for advanced error correction techniques that allow the system to adapt depending on the conditions of the data coming out of the flash memory. When there are fewer errors, the claims allow unneeded error correction hardware to be bypassed (claim 13). When there are more errors, the asserted claims bring online features that can address the increased errors—additional error correction sub-modules (claim 6) or adjusting the error correction coding (claims 11 and 16).

Kioxia's accused products are flash memory products, like solid-state drives, that incorporate the technology of the asserted patents in their flash-memory controllers. Kioxia makes and sells a range of products with a variety of controllers, and the parties have agreed to treat four controllers as representative. *See* Dkt. 118 at 1. Those controllers are named Canopus, Deneb, Elnath, and Olympos (and the parties sometimes refer to them as C, D, E, and O).

3



*Id.*

Viasat served expert reports from three experts who discussed Kioxia's infringement (Dr. Marwan Hassoun), the value of the infringing features (Mr. Edward Doller), and the damages that Kioxia owes for its infringement (Dr. Nisha Mody). Kioxia's expert, Dr. Melvin, responded to aspects of those opinions. But portions of his report are improper. He takes positions on the meaning of claim terms that directly contradict what Kioxia told the PTAB during IPRs. He seeks to construe the claims using the prosecution history, a task for the Court, not jury. His understanding of how the accused Olympos products operate is based on conversations with a Kioxia engineer that Kioxia refused to make available for a deposition. And his response to the value of the infringing features relies on performance data that Viasat asked for during fact

4

discovery but still has not received. All of these improper opinions should be stricken from Dr. Melvin's report, and he should not be allowed to present them to the jury.

**ARGUMENT**

**I.      Dr. Melvin Should Be Precluded From Offering Non-Infringement Opinions Based On Erroneous Claim Constructions**

Kioxia improperly seeks to present non-infringement opinions based on incorrect constructions of several claim terms. Expert opinions based on incorrect claim constructions are by definition unhelpful to the jury and must be excluded. *See, e.g.*, *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) (affirming the exclusion of expert testimony that utilized an incorrect claim construction); *see also Varta Microbattery GmbH v. Audio P'ship LLC*, No. 2:21-CV-00400-JRG-RSP, 2023 WL 5192986, at *3 (E.D. Tex. Aug. 11, 2023) (excluding expert testimony that was inconsistent with the proper claim construction, and noting that such testimony "is unreliable and unhelpful to the finder of fact" and "may confuse the jury") (citations omitted); *Personalized User Model, L.L.P. v. Google Inc.*, No. 09-525-LPS, 2014 WL 807736, at *1 (D. Del. Feb. 27, 2014) ("As expert testimony inconsistent with the Court's claim construction is unreliable and unhelpful to the finder of fact," it must be excluded under the *Daubert* standard.).

**A.      Decoding Limitation**

Claim 1 of the '700 patent (on which asserted claims 6, 11, and 13 depend) includes "a decoding module configured to: receive encoded data from the flash memory; and decode the received encoded data to generate a plurality of partially decoded data streams." Ex. 1, '700 patent at 10:48-51. In its infringement expert report, Viasat has asserted (in part) that Kioxia's products include "decoding modules" that perform the "decode" limitation of Claim 1 by:

███████████████████████████████████

5

███████████████████████████████████████████████████████ *See, e.g.*,

Ex. 4, Hassoun Report at ¶¶ 148-149, 261.

Kioxia's expert, Dr. Melvin, opines that the accused products do not infringe (in part) because the claimed "decoding" cannot be met by ███████████████████████████ ██████████████. Ex. 5, Melvin Report at ¶¶ 141, 149, 158, 161, 171, 175, 181, 182, 189, 191; *see also* Ex. 6, Melvin Dep. at 10:1-10 ("in the context of the '700 patent, and the way I have interpreted partial decoding in the context of that patent is it would not include derandomizing"); *id.* at 173:20-174:6 (agreeing that he had no factual dispute with Dr. Hassoun about the functionality of the "████████," his only dispute was whether "the interpretation" of decoding included "determining the boundary between data bits and – and parity bits"); 129:20-24 (agreeing that the product feature "██████ determines the boundary between the data and parity bits").

Dr. Melvin's non-infringement opinions regarding what it means to "decode" should be excluded because they directly contradict the constructions that Kioxia successfully advanced previously—both in its IPRs and during claim construction in this case.

### 1.     Dr. Melvin's Opinions Cannot Be Reconciled With Kioxia's IPR Positions

Kioxia filed two IPRs challenging the asserted '700 patent.[1] In one, Kioxia succeeded in invalidating some claims by asserting that the "decoding" limitation *could* be met by derandomizing the encoded data. In the second IPR, the parties both agreed that "decoding" could be met by distinguishing ECC bits from data bits. While Kioxia's second IPR did not ultimately succeed in invalidating any claims, the PTAB explicitly adopted Kioxia's view that the "decoding" limitations could be met by distinguishing data bits from ECC bits. *Infra* at 9. Despite successfully

---

[1] Kioxia first filed IPR2022-01067. After Western Digital's separate IPR was instituted, Kioxia filed IPR2023-00408, which joined and adopted Western Digital's petition.

advocating before the PTAB that the "decoding" limitations could be met by derandomizing data or by distinguishing ECC bits from data bits, Kioxia now seeks to present expert testimony that those operations do not suffice. Basic principles of fairness—and judicial estoppel—should preclude Kioxia from taking these inconsistent positions.

Judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014) (quoting *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996)). In the Fifth Circuit, judicial estoppel applies if "the estopped party's position [is] clearly inconsistent with its previous one," and the estopped party "convinced the court to accept that previous position." *Id.* (citations and quotations omitted). Both of those requirements plainly apply here. *Cf. Intel Corp. v. XMTT, Inc.*, No. 2021-2127, 2022 WL 1152312, at *1 (Fed. Cir. Apr. 19, 2022) (holding that "Intel is judicially estopped from raising its claim construction argument," because it was inconsistent with the position it previously advocated before the PTAB).

### 2.    Dr. Melvin's Opinions Contradict Kioxia's IPR Position That "Decoding" Includes Derandomizing

In IPR2023-00408, Kioxia argued that the "Wu" prior art performed the claimed "decoding" limitations by de-interleaving and/or de-scrambling data received from the flash memory. Ex. 7, IPR2023-00408 Pet. at 27-29 ("[t]he 'partial decoding' is disclosed by the intra-channel rearrangement performed by scrambler 103," and/or "by the inter-channel rearrangement performed by multiple memory access module 104," which is a form of "de-interleaving"). Kioxia's IPR expert further explained that "descrambling corresponds to decoding." Ex. 8, IPR2023-00408 Dolecek Decl. at ¶ 86; *see also id.* at ¶¶ 87-88 (opining that Wu's inter-channel rearrangement "de-interleaved data streams" and thereby also met the claimed decoding limitation).

Viasat did not contest Kioxia's assertions that the decoding limitation could be met by de-scrambling or de-interleaving data. In light of Kioxia's uncontested claim construction position, the PTAB found that "the term 'partially decoded' is broad enough to encompass both scrambler 103's intra-channel rearrangement (descrambling) and multiple memory access module 104's inter-channel rearrangement (de-interleaving)." Ex. 9, Final Written Decision at 15. Based on that finding, the PTAB granted Kioxia's challenge to six of the claims in the '700 patent. *Id.* at 59.

Dr. Melvin's opinion that derandomizing cannot constitute the claimed "decoding" is irreconcilable with Kioxia's IPR positions.[2] Dr. Melvin testified that he "would understand descrambling, deinterleaving, derandomizing to be essentially the same: Rearrangements of bits." Ex. 6, Melvin Dep. at 10:25-11:5. He further testified that "the way I have interpreted partial decoding in the context of [the '700] patent is it would not include derandomizing." *Id.* at 10:1-6; *see also id.* at 10:11-19 (testifying that, like derandomizing, de-interleaving also "would not constitute partial decoding").

While Kioxia strategically shielded Dr. Melvin from its IPR filings, when confronted with the "Wu" prior art at his deposition, Dr. Melvin testified that it did not perform the claimed decoding under his construction:

Q. Dr. Melvin, in your opinion, does Wu's scrambler disclose the decoding module element of the '700 patent?

A. In my opinion, it does not.

---

[2] Dr. Melvin's opinions are also irreconcilable with Kioxia's invalidity expert in this district court litigation. Kioxia's invalidity expert mimics the Kioxia's IPR theories based on Wu in his expert report. Ex. 10, Sechen Am. Report at ¶¶ 293-298. Dr. Sechen agrees with Kioxia's IPR argument that Wu's scrambler, which performs "intra-channel disarrangement/arrangement" to "scramble/unscramble the data of the ECC engine codewords (i.e., information bits and parity/ECC bits)," satisfies the decoding module limitation. *Id.*

*Id.* at 22:3-6. Dr. Melvin thus conceded that his construction of the claimed decoding cannot be squared with the position that Kioxia's successfully advanced before the PTAB. "[A]llowing [Kioxia] to take a position before this Court so contrary to that it took before the PTAB . . . would result in [Kioxia] having an unfair advantage in this litigation." *Trustees of Columbia Univ. in City of New York v. NortonLifeLock, Inc.*, No. 3:13CV808, 2019 WL 7040931, at \*6 (E.D. Va. Dec. 20, 2019). The Court should prevent that unfair advantage by striking the offending portions of Dr. Melvin's report.[3]

### 3. Dr. Melvin's Opinions Also Contradict Kioxia's IPR Position That "Decoding" Includes Distinguishing ECC Bits From Data Bits

In IPR2022-01067, Kioxia argued that the claimed decoding could be met by "distinguish[ing] error correction bits from information bits in the received encoded data." Ex. 11, IPR Pet. at 14-15; *see also* Ex. 12, Koralek Decl. at ¶ 64. In its response, Viasat agreed that the claimed decoding "can be satisfied by distinguishing 'error correction bits from information bits in the received encoded data.'" Ex. 13, Patent Owner's Resp. at 4. Unsurprisingly, the PTAB found that, consistent with Kioxia's arguments, "'decoding' can be satisfied by distinguishing error correction bits from information bits in the received encoded data." Ex. 14, Final Written Decision at 16-17. While Kioxia ultimately failed to prove that the prior art distinguished error correction bits from data bits, *id.* at 26, estoppel still applies given its success in advancing a construction adopted by the PTAB, *see Intel Corp.*, 2022 WL 1152312, at \*1 (precluding Intel from advancing a construction that was inconsistent with the construction it successfully advanced before the PTAB, even though the PTAB ultimately concluded that the prior art did not include the relevant limitation under Intel's construction).

---

[3] To the extent that the Court permits Dr. Melvin to present any non-infringement opinions that are contrary to Kioxia's IPR statements, Viasat requests that the Court permit Viasat to cross examine Dr. Melvin with Kioxia's prior statements from the IPR.

Dr. Melvin's opinions plainly contradict Kioxia's IPR positions. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

Here too, when confronted for the first time with Kioxia's IPR statements, Dr. Melvin admitted that they were inconsistent with his views:

Q. Kioxia has previously taken the position that a person of ordinary skill in the art would understand distinguishing error correction bits from information bits to be a form of the decoding disclosed in the '700 patent, correct?

A. Well, I think you already asked that question, and I've said I don't know if they've taken the position. I'm saying here's an expert report, and I'm looking at paragraph 64, and that's what the expert stated, that a POSITA would understand that term to cover distinguishing error correction bits. So that's all it says. I can agree with that.

Q. In your opinion, does distinguishing error correction bits from information bits constitute a form of the decoding discussed in the '700 patent?

A. Not to the extent that "distinguishing" means just merely separating.

Q. Did you know before submitting your report that a different one of Kioxia's paid experts had previously taken the position that a person of ordinary skill in the art would consider distinguishing error correction bits from information bits to be a form of partial decoding?

MR. HAWES: Objection. Asked and answered.

THE WITNESS: I don't recall. I don't think so.

10

*Id.* at 34:18-35:20. Kioxia should not be permitted to advocate non-infringement opinions based on a construction that is inconsistent with the construction it successfully advocated to the PTAB.

### 4.    Dr. Melvin's Opinions Are Inconsistent With The Plain Meaning Construction Adopted By The Court In Claim Construction

During claim construction, Kioxia prevailed on the Court to adopt a "plain and ordinary" meaning construction of the decode limitation. *See* Dkt. 49 at 1 (Kioxia requesting "plain and ordinary meaning"); Dkt. 83 at 3 (Court adopting the "plain and ordinary meaning"). Notably, Kioxia presented a number of dictionaries supporting its construction, including one that explicitly included descrambling as an example of decoding. *See* Dkt. 49-7 (Wiley Elec. & Elecs. Eng'g Dictionary defining "decode" as "[t]o unscramble information, such as data, with the use of a key"). Other dictionary definitions Kioxia offered similarly contemplated broader constructions than Kioxia now seeks to advance. *See, e.g.*, Dkt. 49-6 (IEEE Dictionary defining "decode" as "[t]o convert data by reversing the effect of previous encoding"). Kioxia also acknowledged during claim construction that its then-pending IPR petition "states that the claimed decode could be completed by three functions," including both de-interleaving and distinguishing ECC bits from data bits. Dkt. 55 at 1 (quoting Dkt. 54, Ex. 3 at 14-15). Kioxia should not be permitted to advance non-infringement positions that are inconsistent with the "plain meaning" claim construction it successfully obtained earlier in this case.

Kioxia's belated attempt to narrow the scope of the claimed decoding beyond the plain and ordinary construction the Court adopted is not proper. To the extent Kioxia believed the plain and ordinary meaning of "decode" did not include derandomizing, or distinguishing parity from data, it should have raised the issue during claim construction. Viasat's initial infringement contentions made clear that it understood the claimed decoding to cover both of those operations. *See* Ex. 15, Viasat Prelim. Infringement Contentions, Ex. A at 8. In claim construction, Kioxia advocated a

11

"plain and ordinary" construction that it never intimated could be read to exclude the operations identified in Viasat's infringement contentions. To the contrary, Kioxia supported its "plain meaning" construction with dictionary definitions that explicitly included descrambling. Kioxia also supported its "plain meaning" construction by quoting portions of its IPR petition that described the "decode" operations as including both de-interleaving and distinguishing data bits from ECC bits—operations that Dr. Melvin now says are outside the meaning of "decode." Kioxia's own claim construction evidence demonstrates that the "plain meaning" of "decode" includes operations that Dr. Melvin now disavows.[4]

The positions previously taken by both parties, and their experts, make clear that the "plain and ordinary" meaning of the "decode" limitation includes operations like derandomizing data or distinguishing ECC bits from data bits. Kioxia advanced a "plain and ordinary" construction of the term, and it should not be permitted now to present expert opinion testimony based on a different, narrower construction. *See Treehouse Avatar LLC v. Valve Corp.*, 54 F.4th 709, 715 (Fed. Cir. 2022) (affirming exclusion of expert testimony "based on a claim construction that is materially different from the construction adopted by the parties and the court"); *see also Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011) ("we must disregard the testimony of Cordis's expert" because it was "based on an incorrect understanding of the claim construction").

---

[4] Dr. Melvin's report demonstrates that the parties dispute the scope of the claimed "decode" limitations. Viasat requests that the Court resolve this dispute by striking the portions of Dr. Melvin's report that seek to present Kioxia's improperly narrow view of the "decode" limitation. In the alternative, Viasat requests that the Court hold that the plain meaning of "decode" includes (a) derandomizing data, and (b) distinguishing error correction bits from information bits.

**B.      Physically Separate**

The asserted claims of the '700 patent all require an error detection module that is "physically separate" from an error correction module. During claim construction, this Court adopted a "plain and ordinary meaning" construction of physically separate. Dkt. 83 at 5. Dr. Melvin now opines that the "physically separate" detection and correction modules must utilize the same error correction code (i.e., the algorithmic scheme for locating and fixing errors). Ex. 5, Melvin Report at ¶¶ 80-81. Dr. Melvin seeks to present numerous non-infringement opinions based on this construction. *Id.* at ¶¶ 379, 399, 401, 407, 415, 420, 428, 436, 443, 449. These opinions are improper and should be excluded.

Dr. Melvin does not opine that the plain meaning of "physically separate" somehow requires that the modules use the same error correction code. Nor could he. The claims are silent as to the error correction code used in the physically separate modules, and the specification nowhere limits them to using the same code. Instead, Dr. Melvin opines that Viasat is estopped from accusing modules that use different codes because of a statement it made during prosecution of the '700 patent. *Id.* at ¶¶ 80-81. Dr. Melvin repeats his prosecution history estoppel theory throughout his report. *See, e.g.*, *id.* at ¶ 399 ("the prosecution history shows that the claimed detection and correction must be performed in error detectors and error correctors *for a respective FEC code*").

Experts "cannot rely on statements in the prosecution history to limit the ordinary meaning of the term. That is for the Court." *Mobile Equity Corp. v. Walmart Inc.*, No. 2:21-CV-00126-JRG-RSP, 2022 WL 19917854, at *2 (E.D. Tex. Sept. 23, 2022) (citations omitted); *see also id.* at *2 (excluding "any opinions that rely on [the expert's] analysis of the prosecution history"). The Federal Circuit has also long recognized that "[i]t is improper for experts to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim

13

construction.'" *Id.* (quoting *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009)). For these reasons, Dr. Melvin's opinions regarding the prosecution history should be excluded.[5]

## II.   Dr. Melvin's Opinions Based On Conversations With Mr. Mori Should Be Stricken

Dr. Melvin's non-infringement positions are based at least in part on information that Viasat asked for repeatedly in discovery but was never given—namely, access to Mr. Takayuki Mori. *See* Ex. 5, Melvin Report at ¶¶ 126, 133, 135, 148, 168, 208, 214, 225, 226. Those opinions should be stricken.

During fact depositions in Japan, Mr. Mori's name came up repeatedly. ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[5] Viasat requests that the Court exclude all of Dr. Melvin's opinions that address the prosecution history, not just those related to the "physically separate" limitation. *See, e.g.*, Ex. 5, Melvin Report at ¶¶ 72, 76, 216.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

Mr. Mori's centrality to the case was news to Viasat. Kioxia did not name Mr. Mori on its Rule 26 initial disclosures or any of the amendments to the initial disclosures. Exs. 19-21, Kioxia Rule 26 Initial Disclosures. Kioxia did not name Mr. Mori in response to an interrogatory asking for the individuals most knowledgeable about the accused products. Ex. 22, Defs.' Resps. to Viasat's Fourth Set of Interrogs. at 15 (Interrog. No. 19). Mr. Mori's name appears in only *one* document that Kioxia produced. And, of course, Mr. Mori was not one of Kioxia's representatives under Rule 30(b)(6). Mr. Mori's relevance was a secret kept from Viasat.

After the first deposition in which Mr. Mori's name was mentioned, Viasat requested that Kioxia make Mr. Mori available for deposition. Ex. 23, 9/7/2023 Knobloch Email. Kioxia refused. Viasat renewed that request after Mr. Mori's knowledge was front and center in a second deposition. *Id.* at 9/12/2023 Knobloch Email. Kioxia refused to make him available, even though the parties were then in Japan and had additional, unused days reserved at the Embassy during which his deposition could take place. Kioxia's excuse was that the parties had previously agreed to a "final" deposition schedule (albeit before Viasat even knew Mr. Mori existed). *Id.* at 9/8/2023 Hawes Email.

Compounding Kioxia's inexcusable refusal to allow Viasat discovery of Mr. Mori, it subsequently decided to make Mr. Mori available to Dr. Melvin for purposes of his expert work. Ex. 5 at 280, Melvin Materials Considered. Dr. Melvin had a conversation with Mr. Mori about

15

the data path in the Olympos controller. Ex. 6, Melvin Dep. at 175:8-23. That is, Mr. Melvin had the chance to talk with Mr. Mori about the very subject matter on which Viasat sought to depose him.

Dr. Melvin's opinions based in any part on conversations with Mr. Mori should be stricken. Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires Kioxia to provide "the name . . . of each individual likely to have discoverable information—along with the subjects of that information— that the disclosing party may use to support its claims or defenses." And Rule 26(e)(1)(A) requires Kioxia to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Rule 37(c)(1) in turn provides a sanction for failing to abide by Rules 26(a) and 26(e)—"the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Four factors control whether to exclude expert evidence as a sanction for a discovery violation: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Tomax AS v. Turbo Drill Indus., Inc.*, No. 6:21-CV-00260-ADA, 2023 WL 3171744, at *2 (W.D. Tex. Apr. 6, 2023) (quoting *Certain Underwriters at Lloyd's v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 270 (5th Cir. 2020)).

Kioxia has no excuse. Kioxia withheld Mr. Mori from its initial disclosures and other responses to discovery requests. Even when it became undeniable that Mr. Mori has relevant information, Kioxia did not update its discovery responses and did not allow Viasat to depose him. But when Kioxia needed information for its own expert, Mr. Mori was one of the engineers Kioxia turned to. Kioxia's conduct is simply improper, and it should be precluded from presenting expert opinions based on Dr. Melvin's conversation with Mr. Mori. *See, e.g.*, *Honey-Love v. United*

16

*States*, 664 F. App'x 358, 362 (5th Cir. 2016) (expert testimony properly excluded when the sanctioned party "did not provide any justification for the deficiencies in [the expert witness's] report"); *Maguregui v. ADP, LLC*, No. EP-16-CV-121-PRM, 2017 WL 5473484, at *2 (W.D. Tex. Apr. 10, 2017) (excluding witnesses because of "Defendant's violation of Rule 26(a) and its failure to demonstrate that the violation was harmless or substantially justified").

Making matters worse, the conversation with Mr. Mori is critical to parts of Dr. Melvin's report. It is the *only* evidence that Dr. Melvin cites to support some of his opinions about how Olympos operates and why, in his view, Olympos does not infringe the asserted claims. Ex. 5, Melvin Report at ¶¶ 126 n.2, 148 n.8, 168 n.10, 225, 226 n.14. But Viasat has had no opportunity to test the truth and accuracy of what Mr. Mori told Dr. Melvin. Viasat's infringement expert did not have the ability to consider what Mr. Mori has to say. The prejudice to Viasat is extreme— Viasat bears the burden of proving infringement but was denied the chance to ask *any* questions of Mr. Mori. Viasat's only understanding of Mr. Mori's knowledge has been filtered through what other Kioxia witnesses could recollect about what he told them. The only cure for this prejudice is to strike the portions of Dr. Melvin's report that rely on Mr. Mori.

### III. Dr. Melvin Should Not Be Permitted To Rely On Undisclosed Performance Data

In addition to his non-infringement opinions, Dr. Melvin offers opinions rebutting Viasat's damages-related experts. *See* Ex. 5, Melvin Report at §§ XIII-XV. But these opinions, in part, suffer from the same issue as Dr. Melvin's discussion with Mr. Mori: Dr. Melvin relies on information that Viasat requested during fact discovery but was denied.

During fact discovery, Viasat sought data from Kioxia about the performance of the accused products. In RFP No. 63, Viasat specifically requested production of "documents sufficient to show the performance data associated with each product," and then identified exemplary performance metrics. Ex. 24, Defs.' Resps. to Viasat's Third Reqs. for Produc. of Docs.

17

at 8. Kioxia agreed to produce responsive documents "within Kioxia's possession, custody, or control as they are kept in the ordinary course of business." *Id.* at 9.

In Interrogatory No. 18, Viasat requested a narrative explanation of the performance data as well. Ex. 25, Defs.' Suppl. Resps. to Viasat's Fourth Set of Interrogs. at 14. Kioxia responded by identifying 24 ███████████ documents in which the performance data could be found. *Id.* at 15-17.

Viasat then requested corporate testimony about performance data of the accused products. Ex. 26, Viasat's Notice of Rule 30(b)(6) Dep. at 13 (Topic 48). ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Viasat took Kioxia at its word that Kioxia had produced the performance data that it had available. Viasat's expert, Edward Doller, used the produced performance data to construct a model to demonstrate how the infringing features of Kioxia's accused products provide significant value. *See, e.g.*, Ex. 28, Doller Report at ¶¶ 125-131, 136.

In Kioxia's rebuttal reports, Viasat learned for the first time that Kioxia, in fact, has available actual performance data—not just performance data projections—available. Dr. Melvin was tasked with responding to Mr. Doller's model and opinions. Ex. 5, Melvin Report at § XIV.

Dr. Melvin opines that "[a]ctual drive performance data clearly refutes Doller's analysis and conclusions." *Id.* at ¶ 565; *see also* ¶¶ 567-571 (discussing additional new data). Dr. Melvin "requested the above data from Kioxia." *Id.* at ¶ 566. Dr. Melvin confirmed that "[t]he only actual data [he] rel[ies] upon to support that statement is data that [he] obtained from Kioxia after Mr. Doller wrote his report." Ex. 6, Melvin Dep. at 201:21-202:4. And he received the requested data within "weeks or maybe days" of asking for it. *Id.* at 204:3-21. An example of this data is reproduced below, from paragraph 565 of Dr. Melvin's report:



That data was not produced during fact discovery, despite *Viasat* making the exact same request as Dr. Melvin. Kioxia did not even produce the data Dr. Melvin relies on with his report. Apart from the hand-selected excerpts reproduced in Dr. Melvin's report, Viasat still does not have the data.

Kioxia's failure to produce this "actual" performance data is neither justified nor harmless. *See Tomax AS*, 2023 WL 3171744, at *2 (striking expert opinions based on discovery violation). All along, the actual data that Viasat asked for was easily accessible to Kioxia. Yet Kioxia chose

19

not to identify the data until it came time to rebut Viasat's expert reports. That is far too late and too prejudicial to Viasat. Viasat asked for performance data during fact discovery and months before expert discovery even began. Dr. Melvin should not be allowed to rely on this new "actual performance" data to criticize Mr. Doller's model and conclusions.

## CONCLUSION

Viasat respectfully requests that the Court strike the foregoing portions of Dr. Melvin's report and preclude him from advancing such positions to the jury. Kioxia should not be permitted to present testimony from Dr. Melvin that contradicts positions it took—and won—in the PTAB. Dr. Melvin also should not be allowed to present the prosecution history to the jury, all but inviting the jury to construe the claims anew. And Kioxia should not be rewarded for shirking its discovery obligations. Dr. Melvin should not be allowed to present theories resting on a witness or data that Kioxia withheld during fact discovery.

Dated: January 18, 2024

Respectfully submitted,

*/s/ Meg E. Fasulo*

Melissa R. Smith, State Bar No. 24001351
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

J. Scott McBride (*Pro Hac Vice*)
Matthew R. Ford (*Pro Hac Vice*)
Nevin M. Gewertz (*Pro Hac Vice*)
Tulsi E. Gaonkar (*Pro Hac Vice*)
Jessica Bernhardt (*Pro Hac Vice*)
BARTLIT BECK LLP
54 W. Hubbard Street, Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
scott.mcbride@bartlitbeck.com
matthew.ford@bartlitbeck.com
nevin.gewertz@bartlitbeck.com
tulsi.gaonkar@bartlitbeck.com
jessica.bernhardt@bartlitbeck.com

Nosson D. Knobloch (*Pro Hac Vice*)
Meg Fasulo (*Pro Hac Vice*)
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
nosson.knobloch@bartlitbeck.com
meg.fasulo@bartlitbeck.com

*Counsel for Plaintiff Viasat, Inc.*

21

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing

document has been sent to all counsel of record via electronic mail on January 18, 2024.

*/s/ Melissa R. Smith*

**CERTIFICATE OF CONFERENCE**

Counsel for Plaintiff met and conferred with counsel for Defendants about the relief sought

in this Motion. Counsel for Defendants informed counsel for Plaintiff that Defendants oppose the

relief sought in this Motion.

*/s/ Melissa R. Smith*