**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **VIASAT, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No.:  6:21-cv-01231-ADA** |
| **KIOXIA CORPORATION and KIOXIA AMERICA, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | ▓▓▓▓▓▓▓ |

**<u>VIASAT, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
CERTAIN OPINIONS OF DR. RUSSELL FUERST, DR. NISHA MODY, MR. EDWARD
DOLLER, AND DR. SUNIL KHATRI</u>**

**TABLE OF CONTENTS**

I.    ARGUMENT ...............................................................................................................3

    A.    Dr. Fuerst's Opinions About The Comparability Of The Semtech
    Agreement Should Not Be Excluded .......................................................................3

        1.    The Technology Licensed Under The Semtech Agreement Is
        Comparable ...................................................................................................3

        2.    Dr. Fuerst's Apportionment Is Based On Which Technologies Are
        Differentiated In The Marketplace ...............................................................9

    B.    The Court Should Not Exclude Mr. Doller's Opinions Valuing the '700
    Patent's Infringing Features As Compared To The Kioxia-Identified Non-
    Infringing Alternative ............................................................................................12

        1.    Viasat's Experts Tie The Two Features Mr. Doller Analyzed To
        The Asserted Claims ...................................................................................14

        2.    Mr. Doller Then Compared The Infringing Features To A Kioxia-
        Identified Non-Infringing Alternative That Lacked Both Features ...........16

    C.    Dr. Mody's Opinions About Viasat's Damages Should Not Be Excluded ...........17

    D.    Dr. Khatri's Opinions Regarding Written Description Comply With
    Federal Circuit Law And Should Not Be Excluded ...............................................21

II.    CONCLUSION ........................................................................................................24

i

## TABLE OF AUTHORITIES

**Federal Cases**

*ActiveVideo Networks v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ................................................................................ 3

*Alacritech Inc. v. CenturyLink, Inc.*,
  No. 2:16-CV-00693-RWS-RSP, 2023 WL 6553832 (E.D. Tex. Oct. 8, 2023)........................ 12

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) ................................................................ 2, 21, 24

*Arigna Tech. Ltd. v. Nissan Motor Co.*,
  No. 2:22-CV-00126-JRG-RSP, 2022 WL 14328350 (E.D. Tex. Oct. 24, 2022) ..................... 14

*AstraZeneca AB v. Apotex Corp.*,
  782 F.3d 1324 (Fed. Cir. 2015) ................................................................................ 17

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020) ....................................................................... passim

*Capon v. Eshhar*,
  418 F.3d 1349 (Fed. Cir. 2005) ................................................................................ 21

*Chrimar Holding Co. v. ALE USA Inc.*,
  732 F. App'x 876 (Fed. Cir. 2018) ......................................................................... 12

*Droplets, Inc. v. Yahoo! Inc.*,
  No. 12-CV-03733-JST, 2021 WL 9038355 (N.D. Cal. Aug. 9, 2021).................................. 17

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ........................................................................... 3, 20

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018) ......................................................................... 16, 17

*Freeny v. Murphy Oil Corp.*,
  No. 2:13-CV-791-RSP, 2015 WL 11089599 (E.D. Tex. June 4, 2015) ................................. 11

*Gables Condo. & Club Ass'n, Inc. v. Empire Indem. Ins. Co.*,
  No. 18-23659-CIV, 2019 WL 1317824 (S.D. Fla. Mar. 22, 2019) ......................................... 8

*Grain Processing Corp. v. Am. Maize-Products Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ................................................................................ 17

*Immunex Corp. v. Sandoz Inc.*,
  964 F.3d 1049 (Fed. Cir. 2020) ......................................................................... 21, 23

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
  No. 17-CV-5096 (WMW/BRT), 2020 WL 5512507 (D. Minn. Sept. 14, 2020),
  *aff'd,* 30 F.4th 1339 (Fed. Cir. 2022) ....................................................................................... 24

*PerdiemCo, LLC v. Industrack LLC*,
  No. 2:15-CV-726-JRG-RSP, 2016 WL 6611488 (E.D. Tex. Nov. 9, 2016) .............................. 3

*Ravgen, Inc. v. Lab. Corp. of Am. Holdings*,
  No. 6:20-CV-00969-ADA (W.D. Tex. Oct. 4, 2022) ................................................................. 8

*Saint Lawrence Commc'ns LLC v. ZTE Corp.*,
  No. 2:15-CV-349-JRG, 2017 WL 679623 (E.D. Tex. Feb. 21, 2017) ..................................... 11

*Skillz Platform Inc. v. AviaGames Inc.*,
  No. 21-CV-02436-BLF, 2023 WL 8438738 (N.D. Cal. Dec. 5, 2023) ...................................... 7

*Solas OLED Ltd. v. Samsung Elecs. Co.*,
  No. 2:21-CV-105-JRG-RSP, 2022 WL 1912868 (E.D. Tex. May 30, 2022) ............................ 9

*SPEX Techs., Inc. v. W. Digital Corp.*,
  No. SACV 16-01799-JVS(AGRx), 2023 WL 6922860 (C.D. Cal. Oct. 3, 2023) .............. 15, 16

*SSL Servs., LLC v. Citrix Sys., Inc.*,
  769 F.3d 1073 (Fed. Cir. 2014) ............................................................................................... 7

*Virnetx, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ............................................................................................. 20

*Wisconsin Alumni Research Found. v. Apple, Inc.*,
  No. 14-CV-062-WMC, 2015 WL 13547000 (W.D. Wis. Sept. 30, 2015) ................................ 7

*WNS Holdings, LLC v. United Parcel Serv., Inc.*,
  No. 08-CV-275-BBC, 2009 WL 2136961 (W.D. Wis. July 14, 2009) .................................... 24

*Zoltek Corp. v. United States*,
  815 F.3d 1302 (Fed. Cir. 2016) ............................................................................................. 21

**Rules**

Fed. R. Civ. P. 26 ....................................................................................................................... 8, 9

**Regulations**

37 C.F.R. § 42.80 .......................................................................................................................... 17

This case concerns advanced forward error correction technology in flash memory, technology Viasat developed after years of research and work on forward error correction in other communication channels, such as satellite and fiber optics. Given the error prone nature of NAND flash memory, the implementation of advanced forward error correction technology enables improvements in performance and reliability. Like in the satellite and optical communications spaces, such improvements have real dollar value to manufacturers like Kioxia.

Kioxia takes a scattershot approach to challenging the value proposition of Viasat's patented advanced forward error correction technology. It challenges the opinions of four of Viasat's five experts, even though it does not argue that any single Viasat expert is unqualified. Because Viasat's damages and validity theories are based on a reliable foundation, this Court should reject Kioxia's efforts to exclude otherwise relevant testimony to the trier of fact.

To begin, Viasat's damages analysis follows three accepted ways to value Kioxia's use of the patented technology: a comparable-license, a cost-based, and an incremental-value approach. These three methods are all methodologically sound, have been accepted severally and together by courts across the country, and are in fact the same approaches put forward by Kioxia's own damages expert.

Dr. Nisha Mody is an economist who opines on the ultimate damages Kioxia owes for its infringement. Her analysis is supported by input from two other experts. First, Dr. Russell Fuerst, who is an inventor of the '700 patent and the Viasat executive who was responsible for negotiating contracts related to the development and sale of technologies like the advanced forward error correction claimed in the asserted '700 patent. Second, Mr. Edward Doller, who is a former Chief Technology Officer at Intel and Chief Strategist of the NAND Solutions Group at Micron (both Kioxia competitors).

Kioxia says that Dr. Fuerst's opinions are "plucked from thin air" and are "not tied to the facts of this case." Opening Br. at 1. Neither is true. Dr. Fuerst is a hybrid fact-expert witness who opines about the comparability and relative value of technology licensed to a company called Semtech. Dr. Fuerst uses his years of experience selling and negotiating licenses on the very technology at issue in both this case and when Viasat negotiated the Semtech agreement to explain why those technologies are similar.

Kioxia next says that Mr. Doller's analysis "does not account for the incremental value of the asserted claims." That's false too. Mr. Doller constructed quantitative models to compare the value of the infringing features (called iterative and variable error correction coding (ECC)) to products lacking those features, notably the non-infringing alternative that Kioxia itself identified (a product called Daikoku2). Mr. Doller relied on Viasat's infringement expert's conclusion that iterative ECC and variable ECC are features of the asserted dependent claims. But Kioxia's own documents serve as the starting point of Mr. Doller's model quantifying the value of those features.

Because Dr. Fuerst's and Mr. Doller's underlying opinions are sound under *Daubert*, Dr. Mody's reliance on them is reasonable and her opinions are admissible. Kioxia's remaining objection to Dr. Mody's opinions is little more than a quibble about whether Dr. Mody has apportioned the Semtech agreement *enough*. But that's a factual question for the jury to consider.

Finally, Kioxia tries to find an issue with Viasat's validity expert, Dr. Sunil Khatri, who opines (in part) on why the '700 patent has sufficient support in its written description. The written-description test requires an "objective inquiry into the four corners of the specification *from the perspective of a person of ordinary skill in the art*." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (emphasis added). That is what Dr. Khatri did—he evaluated the '700 patent disclosures based on what a skilled artisan would have known at the time.

I.    **ARGUMENT**

A.    **Dr. Fuerst's Opinions About The Comparability Of The Semtech Agreement Should Not Be Excluded**

There is no dispute that the '700 patent has not been licensed in any agreement. Viasat's damages analysis therefore does what is entirely typical—it looks at other ways to value the technology claimed.

One way is to identify sufficiently similar license agreements. The Semtech agreement is such a comparable license. Viasat and Semtech entered into the license agreement around the time of the hypothetical negotiation and the technology licensed is similar to that claimed in the '700 patent—it concerns Viasat's advanced forward error correction (FEC) technology. Dr. Fuerst—the general manager of Viasat's Cleveland division who was responsible for negotiating the Semtech agreement—offers opinions on the comparability of the Semtech agreement, explaining how it is similar and different from the '700 patent and how to assess the value of the technology licensed. Those opinions will be helpful to the jury.

Kioxia raises nothing more than "disagreements with the conclusions and factual assumptions and considerations underlying those conclusions [that] go to the weight to be afforded the testimony, not its admissibility." *PerdiemCo, LLC v. Industrack LLC*, No. 2:15-CV-726-JRG-RSP, 2016 WL 6611488, at *4 (E.D. Tex. Nov. 9, 2016) (citing *ActiveVideo Networks v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012)); *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility.").

1.    **The Technology Licensed Under The Semtech Agreement Is Comparable**

3

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

      ████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ But the Semtech agreement was negotiated in the same time frame as the hypothetical negotiation and involved similar subject matter—namely, Viasat's forward error correction technology.

Dr. Fuerst offers opinions that the technology of the Semtech license is comparable to that of the '700 patent. *See* Kioxia Ex. D at 1-2 ("Dr. Fuerst is expected to present expert evidence regarding the technical comparability of the '700 patent and ASIC implementation designs for Forward Error Correction (FEC) in the fiberoptic communication industry, the latter of which were the subject matter of licenses between Viasat and fiberoptic-communication companies and that included license rights to relevant Viasat patents."). Dr. Fuerst is well situated to offer such

opinions: he is both an inventor of the '700 patent and was involved in the Semtech agreement.

Dr. Fuerst is "the vice president and general manager of [Viasat's] Cleveland division." Ex. 1, 12/7/2023 Fuerst Dep. at 71:2-3. His "job is to do business development, go out and sell [Viasat's] technology capability to the customers." *Id.* at 71:4-6. He "would be the one who would put the technical presentations in front of the Semtech equivalents to provide them with what [Viasat] can develop for them in terms of value for coherent modem/DSP technology as well as the forward error correction technology." *Id.* at 71:6-11. He would also "work with those same companies to develop the contract, negotiate the terms of the agreement, any kind of payments, any kind of enteree [sic], any kind of licensing." *Id.* at 71:11-15. And he "would also work with [Viasat's] technical team to put together the statement of work to describe what [Viasat] would be delivering to the customer, and then [he] would work with the technical team to ensure that they've got all the resources necessary to execute on the program." *Id.* at 71:16-22. Dr. Fuerst served in that very role with respect to the Semtech agreement. *Id.* at 70:10-20.

Dr. Fuerst is well-positioned and qualified to provide the type of "baseline comparability" analysis that is required under the law. *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374 (Fed. Cir. 2020) (affirming denial of new trial where "the district court concluded that [the expert] had met a showing of 'baseline comparability' and that the 'degree of comparability is a factual issue best addressed through cross examination'"). The Semtech agreement licensed technology for ███████████████████████████, which Dr. Fuerst recognized, based on his experience, is comparable to the claims of the '700 patent that include decoders (implemented in hardware, such as an ASIC) for forward error correction. *See, e.g.*, Ex. 1, 12/7/2023 Fuerst Dep. at 44:19-45:2 ████████████████████████████████████████████

████████████████████████████████"), 47:24-48:6 ("████████████

5

████████████████████████████████████████████████████████████████

████████████████████████████ ”), 63:12-14 (“████████████████████████

████████████████████████████████████████████████ .”). Dr. Fuerst is also

generally familiar with the patents his division has received across the satellite, optical

communication, and flash memory channels, and was able to identify two patents embodying

technology covered in the Semtech agreement that is comparable to that in the '700 patent. *See,*

*e.g.*, *id.* at 20:9-15, 22:2-7, 33:9-19.

Nevertheless, Kioxia takes issue with Dr. Fuerst's straightforward analysis. Kioxia first

says that the two patents Dr. Fuerst identified "did not even exist when the Semtech Agreement

was negotiated and signed" and therefore could not have been part of what the parties bargained

for. Opening Br. at 9. That's wrong on two fronts, as Dr. Fuerst explained. First, one of the patents

was filed as an application in August 2011—well before the first Semtech agreement was signed.

The other application was filed in March 2013, ████████████████████████

████████████████████████ . Ex. 1, 12/7/2023 Fuerst Dep. at 94:21-95:2. And second, the

precise timing of those applications is irrelevant. Viasat ████████████████████

████████████████████████████████████████████████████████████

███████ . Kioxia Ex. B at §§ 1.13, 1.21, 3.1. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Ex. 1, 12/7/2023 Fuerst Dep. at 96:19-97:8 ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ ”).

And Kioxia further complains about the process by which Dr. Fuerst identified the two patents in the first place. Dr. Fuerst considered the technology licensed to Semtech and Viasat's patents embodying that technology. He received a list of Viasat patents that "were tied to the optical communications field," since that was the field of the Semtech agreement. Ex. 1, 12/7/2023 Fuerst Dep. at 26:1-6. He looked through those patents to determine whether any "may be applicable or comparable technology to the '700 patent." *Id.* at 29:15-19. His review included "looking through the patent documents themselves, reading through the abstracts, reading through the backgrounds, the summaries, looking at the diagrams." *Id.* at 34:18-24. Dr. Fuerst found two patents whose underlying technology he determined were comparable to the technology of the '700 patent. *Id.* at 41:11-16; *see also* Kioxia Ex. D at 2.

Kioxia next says that Dr. Fuerst's analysis provides only "a loose or vague" comparison of the technology licensed to Semtech because he did not perform a detailed claim-to-claim comparison. Opening Br. at 9-10. But no such analysis is required in the law to show comparability. For instance, licenses that provide *no* patent rights may nonetheless be comparable, an impossibility under the erroneous test Kioxia advances. *See SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1093 (Fed. Cir. 2014); *Skillz Platform Inc. v. AviaGames Inc.*, No. 21-CV-02436-BLF, 2023 WL 8438738, at \*7 (N.D. Cal. Dec. 5, 2023); *Wis. Alumni Rsch. Found. v. Apple, Inc.*, No. 14-CV-062-WMC, 2015 WL 13547000, at \*17 (W.D. Wis. Sept. 30, 2015). What the law requires is a showing of "baseline comparability," *Bio-Rad Labs.*, 967 F.3d at 1374, which, as noted above, Dr. Fuerst explained at his deposition and will explain again at trial. In support of its argument, Kioxia quotes from Dr. Fuerst's deposition. But the question Kioxia cites is a nonsense question: "█████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

Finally, Kioxia accuses Viasat of "hiding" behind its Rule 26(a)(2)(C) disclosure. No such thing has happened. As noted above, Dr. Fuerst is both a fact and expert witness in this case. Viasat appropriately disclosed the potential Rule 26(a)(2)(C) subject matter of Dr. Fuerst's trial testimony, and Dr. Fuerst sat for a second deposition as a result. Viasat also produced a list of patents that Dr. Fuerst reviewed to evaluate intellectual property that the Semtech agreement would cover. *See* Ex. 4, VIASAT_FEC_00032057. There are no other "materials Dr. Fuerst relied upon in forming [his] opinions," besides his own factual knowledge of the technologies at issue in the '700 patent and Semtech agreement. Opening Br. at 11. What Kioxia seeks instead are Viasat's communications with Dr. Fuerst—communications that are protected. *See Gables Condo. & Club Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 18-23659-CIV, 2019 WL 1317824, at \*7 (S.D. Fla. Mar. 22, 2019) (hybrid fact/expert witnesses "are entitled to work product protection for [] the period after litigation was reasonably anticipated").

There also is nothing problematic about Viasat's attorneys drafting Dr. Fuerst's Rule 26(a)(2)(C) disclosure with him. To begin, the disclosure required under Rule 26(a)(2)(C) of "[w]itnesses who do not provide a written report" is different than that required of expert witnesses who do under Rule 26(a)(2)(B). *Compare* Rule 26(a)(2)(C) *with* Rule 26(a)(2)(B). If anything, the express language of Rule 26(a)(2)(C) contemplates that the witness will not be providing a "written report" themselves. Moreover, Dr. Fuerst testified his analysis "was all done prior to" his conversations with Viasat's lawyers. Ex. 1, 12/7/2023 Fuerst Dep. at 41:17-23. And he also testified that he reviewed the disclosure. *Id.* at 10:9-14, 17:2-9. Kioxia's cited case, *Ravgen*, is inapposite and in any event, would not require exclusion. *Ravgen* suggests that it would have been insufficient for Dr. Mody to rely on Dr. Fuerst's disclosure alone. *See* Mem. Op. at 13*, Ravgen,*

8

*Inc. v. Lab. Corp. of Am. Holdings*, No. 6:20-CV-00969-ADA (W.D. Tex. Oct. 4, 2022), ECF No. 228. But here Dr. Fuerst had multiple conversations with Dr. Mody about his opinions, Ex. 1, 12/7/2023 Fuerst Dep. at 65:2-8, and Dr. Mody appropriately relied on those conversations, Dr. Fuerst's deposition as a fact witness, *and* the 26(a)(2)(C) disclosure, *see, e.g.*, Ex. 5, Mody Report at 50 n.288, 51 n.289. And at trial, Dr. Mody will rely on Dr. Fuerst's trial testimony.

At bottom, Kioxia's real complaint is that it disagrees that the technology of the Semtech license is sufficiently comparable to the '700 patent. That type of disagreement is a "factual issue[] best addressed by cross examination and not by exclusion." *Bio-Rad Labs.*, 967 F.3d at 1374.

### 2.    Dr. Fuerst's Apportionment Is Based On Which Technologies Are Differentiated In The Marketplace



Kioxia Ex. B at -717. To account for those differences, Dr. Fuerst explained how the ██████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████ The purpose of Dr. Fuerst's analysis was to isolate the value associated with technology comparable to the '700 patent from other technology that Viasat licensed. *See* Kioxia Ex. D at 1-2. The law requires nothing more. *See, e.g.*, *Solas OLED Ltd. v. Samsung Elecs. Co.*, No. 2:21-CV-105-JRG-RSP, 2022 WL 1912868, at *3 (E.D. Tex. May 30, 2022) (declining to strike opinions where the expert's apportionment "compensates for differences between the subject technology of the [comparable] license agreement and the hypothetical negotiation of the instant suit").

First, Dr. Fuerst acknowledged that some of the value Semtech received was based on Viasat's know-how and similar intangibles.

9

██████████████████████████████ Ex. 1, 12/7/2023 Fuerst Dep. at 104:12-105:9.

Dr. Fuerst then addressed the relative value of ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████[1]

Finally, Dr. Fuerst accounted for Viasat's legacy technology versus newer, more advanced technology that would be comparable to the '700 patent. Here too, Dr. Fuerst explained that "██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ The two comparable patents Dr. Fuerst identified are examples of the advanced FEC technology that its customers value highly. Dr. Mody then used Dr. Fuerst's opinions as inputs for how to apportion the Semtech license. Ex. 5, Mody Report at ¶ 116.

---

[1] Kioxia suggests that there is some disagreement between Dr. Fuerst's apportionment analysis and Dr. Mody's. Opening Br. at 6, 11 n.7. There is not. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Dr. Fuerst's analysis is not "plucked out of thin air." As he testified repeatedly, Dr. Fuerst's opinions about how a customer like Semtech would value Viasat's advanced FEC technology are based on his 15 years' experience actually licensing Viasat's FEC technology and negotiating real IP agreements, including the Semtech agreement itself. Ex. 1, 12/7/2023 Fuerst Dep. at 71:2-22, 104:18-105:25, 115:7-23, 116:16-117:8. And Dr. Fuerst explained precisely what he learned over 15 years—that Viasat's customers view Viasat's advanced FEC technology as the differentiator over other products. *Id.* at 109:18-110:17 █████████████████████████████

█████████████████"), 111:3-13 ████████████████████████████████

██████████████████████████████."), 115:7-23, 117:1-8, 135:23-136:1

(" ███████████████████████████████████████████

████████████████████").

Kioxia seems to demand a level of precision that is neither reasonable nor required. "A reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty,' and accordingly '[m]athematical precision is not required.'" *Saint Lawrence Commc'ns LLC v. ZTE Corp.*, No. 2:15-CV-349-JRG, 2017 WL 679623, at *2 (E.D. Tex. Feb. 21, 2017) (citations omitted); *see also Bio-Rad Labs.*, 967 F.3d at 1377 ("[W]e note that we have never required absolute precision in [applying the principles of apportionment]; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty."); *Freeny v. Murphy Oil Corp.*, No. 2:13-CV-791-RSP, 2015 WL 11089599, at *2 (E.D. Tex. June 4, 2015) ("a damages calculation in the patent infringement context is not an exact science"). Dr. Fuerst has done what the law requires—he has accounted for the differences between the technology licensed to Semtech and what is claimed in the '700 patent.

Kioxia also criticizes Dr. Fuerst for not assigning patent-by-patent value to the Semtech

technology. But Dr. Fuerst explained why that analysis would not have been reasonable based on the Semtech license. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

Dr. Fuerst explained in his deposition what the various technologies licensed to Semtech are (████████████████████████████████████████████

████████████████████████████) and how he valued those technologies based on which were marketplace differentiators. Dr. Fuerst also identified two patents that were inherently licensed to Semtech that, like the '700 patent, fall into the category of Viasat's more advanced FEC technology. That is, he provided a basis for separating out the value of non-patented features. *See Chrimar Holding Co. v. ALE USA Inc.*, 732 F. App'x 876, 887 (Fed. Cir. 2018). While Kioxia may have "questions regarding the correctness" of his apportionment, "assessments as to credibility and correctness are for the factfinder, not the Court." *Alacritech Inc. v. CenturyLink, Inc.*, No. 2:16-CV-00693-RWS-RSP, 2023 WL 6553832, at *5 (E.D. Tex. Oct. 8, 2023) (citations omitted).

**B.    The Court Should Not Exclude Mr. Doller's Opinions Valuing the '700 Patent's Infringing Features As Compared To The Kioxia-Identified Non-Infringing Alternative**

Kioxia gives short shrift to Mr. Doller's opinions in its efforts to understate his analysis.

12

Viasat's expert Ed Doller examines the market for SSD drives to determine the value to Kioxia of two infringing product features called iterative ECC ████████ and variable ECC (or "████"). Ex. 6, Doller Report at 3-4. To do so, he conducts two separate analyses that rest on the same technical insight. If Kioxia could not use the two patented features, its SSDs would take a performance hit. To overcome that, Kioxia would need to add flash memory to its SSD products (called overprovisioning) to meet the product's specified performance level.[2] *Id.*

To determine how much worse performance would be absent infringement, Mr. Doller compares the performance of SSDs using each infringing feature to a non-infringing alternative that lacked both features. *Id.* Specifically, Mr. Doller compares these two features to a Kioxia product (called Daikoku2) that Kioxia contends is a non-infringing alternative. Ex. 7, Kioxia's 2d Suppl. Resps. to Interrogs. at 24-25. This comparison yielded data that allowed Mr. Doller to calculate the amount of flash Kioxia would need to overcome the performance hit from removing the two infringing features. Ex. 6, Doller Report at 3-4.

Kioxia largely accepts Mr. Doller's methodology and expertise. Its complaint focuses on two inputs that Mr. Doller obtained from Dr. Hassoun, another Viasat expert. As described in Mr. Doller's report, Dr. Hassoun explained to Mr. Doller that the iterative ECC (or ████) feature infringes the then-asserted dependent claims 4, 6, 10, 11, 13, 14, 16, and 21. *Id.* at ¶ 84. Dr. Hassoun also explained that variable ECC (or ████████) feature infringes dependent claims 10, 11, and 16. *Id.*

Kioxia complains that Mr. Doller failed to connect the iterative ECC and variable ECC

---

[2] Mr. Doller's first analysis calculates how much more physical flash memory Kioxia would need to add to its SSDs to maintain the same level of performance. His second approach keeps the amount of flash in an SSD constant but calculates how much less flash would be available for consumer use to make up for the drop in performance. Either way, worse performance from the lack of the infringing features requires more flash memory to compensate. *Id.* at 3-4.

13

features to the claims and, even if he had, he should have compared the dependent claims to independent claims to assess the features' value. These arguments are meritless.

### 1. Viasat's Experts Tie The Two Features Mr. Doller Analyzed To The Asserted Claims

Kioxia says that Mr. Doller did not tie the two features he analyzed to the claims. Opening Br. at 16. For example, Kioxia says Mr. Doller did not "conduct any analysis or comparison of the claims of the '700 patent to the accused products." *Id.* But that's irrelevant because Mr. Doller relied on Viasat's infringement expert, Dr. Hassoun, for that analysis. Ex. 6, Doller Report at ¶¶ 83, 90, 92-93, 101 & n.59. After reviewing the source code of the accused products, Dr. Hassoun explained to Mr. Doller that the asserted dependent claims reflected the iterative ECC ( █████ ) and variable ECC ( ████████ features. *See, e.g.*, *id.* at ¶ 84. In addition, Dr. Hassoun confirmed that the error correction scheme practiced by the non-infringing alternative did *not* infringe the asserted claims. *Id.* at ¶ 93. Mr. Doller could and did accept the qualified opinions of another expert in conversations on the scope of infringement and how features relate to claims. *Arigna Tech. Ltd. v. Nissan Motor Co.*, No. 2:22-CV-00126-JRG-RSP, 2022 WL 14328350, at *3 (E.D. Tex. Oct. 24, 2022) ("Since Mr. Gutzler is permitted to rely on the conversation with Dr. Neikirk, the conversation provides a basis for the apportionment methodologies."). He did not need to conduct a redundant analysis of his own. As Mr. Doller testified, he would have similarly relied upon engineers at Micron to describe how features worked when doing the same kind of modeling there as the company's Chief Technology Officer. Ex. 8, Doller Dep. 25:11-27:1.

Kioxia also argues that Dr. Hassoun never conveyed this analysis to Mr. Doller, but that is based on selective parsing of his deposition transcript. Dr. Hassoun answered Mr. Doller's questions about █████ (iterative ECC) and ████████ (variable ECC)—the two features that are tied to the asserted dependent claims. Ex. 9, Hassoun Dep. at 67:13-68:22; Ex. 8, Doller Dep. at

14

36:18-38:14, 76:14-19 (" █████████████████████████████████████████

████████████████████████████████████████████████████████████

████ "). Kioxia block-quotes portions of Dr. Hassoun's deposition that discuss iterative and

variable ECC to argue that Dr. Hassoun never discussed the infringing features with Mr. Doller.

Opening Br. at 18. But Kioxia's ellipses remove nearly a *full page* of questioning in which

Dr. Hassoun testified he discussed ██████ and " ████████ " with Mr. Doller. Ex. 9, Hassoun

Dep. at 68:8-70:4. For example:



*Id.* at 68:23-69:7, 69:15-21. These are Kioxia's proprietary terms for iterative and variable ECC,

respectively. Ex. 6, Doller Report at ¶¶ 83-84. Kioxia hides behind synonyms, ellipses, and

selective quoting for its claim that Dr. Hassoun never connected the claims to the features that

Mr. Doller examined. The Court should reject these games.[3]

---

[3] For that reason, this case bears no resemblance to *SPEX Techs., Inc. v. W. Digital Corp.*, No. SACV 16-01799-JVS(AGRx), 2023 WL 6922860, at *3 (C.D. Cal. Oct. 3, 2023). There, the expert

### 2. Mr. Doller Then Compared The Infringing Features To A Kioxia-Identified Non-Infringing Alternative That Lacked Both Features

Kioxia also argues that "Mr. Doller's failure to compare the asserted dependent claims with the unasserted and invalidated independent claims is a fatal flaw." Opening Br. at 19. But Mr. Doller did exactly what the law requires and Kioxia said he should have done when he compared the two infringing features to Kioxia's identified non-infringing alternative, called Daikoku2.

Kioxia and its expert opine that "Daikoku2 discloses each limitation of Claims 1, 14, 15, and 17 of the Asserted Patent," *i.e.*, the independent claims. Ex. 10, Sechen Am. Report at 102. Mr. Doller compared both the infringing iterative ECC and variable ECC features to the ECC scheme contained in Daikoku2. He did so to quantify the "significant value" of the asserted dependent claims. Ex. 6, Doller Report at ¶ 125 (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). In so doing, Mr. Doller isolates the value of the two infringing features as compared to a product that Kioxia says both (i) practices the independent claims; and (ii) is a non-infringing alternative—exactly what Kioxia says he failed to do.

Regardless, Kioxia is moving the goalposts and saying Mr. Doller missed in order to manufacture a *Daubert* motion. Kioxia does not provide any case-law support showing that Mr. Doller did anything improper. Because in fact, Mr. Doller did exactly what the Federal Circuit required in *Exmark*: he "apportion[ed] or separate[d] the damages between the patented improvement and the conventional components of the multicomponent product" by comparing the infringing features to a Kioxia product that lacked those features. *Exmark Mfg. Co. v. Briggs &*

---

imported his prior opinions about different claims to newly asserted claims. But the new claims had limitations missing from the originally asserted claims. And the technological expert who was relied on discussed different accused functionality between the previous and newly asserted claims and "did not say that the same accused functionality implicates both limitations. *Id.* at *5.

*Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018). The same is true with the Federal Circuit's *Grain Processing Corp. v. Am. Maize-Products Co.* decision. 185 F.3d 1341, 1356 (Fed. Cir. 1999). Mr. Doller provided "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id.* at 1350. He compared the two infringing features to a product that Kioxia identified as non-infringing. That alone defeats Kioxia's motion.

Moreover, the premise of Kioxia's motion is faulty. The independent claims were found not patentable by the PTAB nearly a month *after* the experts submitted their reports. Opening Br. at 17 n.10. That decision is being appealed and is thus not final. 37 C.F.R. § 42.80. The claims are therefore not invalid, and it certainly was not Mr. Doller's fault for failing to use the presumed-valid independent claims as a comparator. Kioxia identified a non-infringing alternative, and, as the law permits, he used that instead. *See, e.g.*, *Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733-JST, 2021 WL 9038355, at *6 (N.D. Cal. Aug. 9, 2021) ("Dr. Bergman's comparison with noninfringing alternatives also apportions the 'incremental value [of] the patented invention' over other technologies.").

### C.    Dr. Mody's Opinions About Viasat's Damages Should Not Be Excluded

Dr. Mody presents three approaches to damages: a comparable-license approach, a cost-based approach, and an incremental-value approach. Ex. 5, Mody Report at 14-60; *see, e.g.*, *Bio-Rad Labs.*, 967 F.3d at 1374 (affirming license approach); *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334-35 (Fed. Cir. 2015) (affirming cost-based approach); *Exmark Mfg.*, 879 F.3d at 1348 (affirming incremental-value approach). Dr. Mody reasonably relies on conversations and opinions from Dr. Fuerst and Mr. Doller in reaching her various opinions under each of these approaches. As explained above, the underlying opinions from Dr. Fuerst and Mr. Doller are reliable and admissible, and Dr. Mody's opinions relying on them are likewise reliable and

admissible.

Dr. Mody's opinions on the Semtech agreement are part of her comparable-license analysis. Dr. Mody's detailed analysis of the Semtech agreement and her ultimate royalty determination adjusted for the circumstances of the hypothetical negotiation took into account the differences between Semtech's products and Kioxia's, as well as the respective markets they are each sold into. Kioxia's argument reduces to a complaint about whether Dr. Mody did this accounting correctly—an argument about the weight of her opinions, not its admissibility.

In her analysis, Dr. Mody conducted a thorough examination of comparable licenses to determine an appropriate royalty rate for a hypothetical negotiation between Viasat and Kioxia (then Toshiba). Dr. Mody considered four technically comparable agreements between Viasat and ███████████████████████████████████████████████████████████████. Ex. 5, Mody Report at ¶ 104. Dr. Mody acknowledged that these agreements concerned technology developed for the optical communication industry instead of flash memory. But Dr. Mody used these agreements anyways because they "███████████████████████████████████████████████ ███████████████████████████████████████████████████████████." *Id.* at ¶¶ 104, 117 (███████████████████████████████████████ ███████████████████████████████████████████████████ ████████. With respect to the Semtech agreement, Dr. Mody noted that the agreement is an important benchmark because it is closest in time to the hypothetical negotiation. *Id.* at ¶ 110.

Dr. Mody examined the royalties provided in the Semtech agreement, among others. *Id.* at ¶ 115. Under the Semtech agreement, ████████████████████████████████████████

18



But Dr. Mody did not stop there. Contrary to Kioxia's complaint, Dr. Mody does not simply apply the apportioned royalty rate from the Semtech agreement directly to the hypothetical negotiation. She explicitly considers the difference in price between the sales of Semtech devices and the average price of the accused Kioxia products and explains why the royalty should be modified. Those adjustments account for the differences between Semtech's products and Kioxia's. *See* Ex. 11, Mody Dep. at 231:5-16 ███████████████████

███████████████████████████████████████████

███████████████████████████████████████ ") (emphasis added); *see also id.* at 234:9-20

("███████████████████████████████████████████

---
[4] █████████████████████████████████████████

███████████████████████████████████████████

████████████████████ Kioxia Ex. B at -702.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████.") (emphasis added). And as a result of these further modifications, Dr. Mody opines that a ████ royalty rate is ultimately appropriate. Ex. 5, Mody Report at ¶ 135. In other words, Dr. Mody did what Kioxia claims she did not. Kioxia's arguments are reduced to a complaint that it does not like the results of her analysis, a subject properly raised on cross-examination and not grounds for excluding her opinion.

Kioxia's complaints about Dr. Mody's failure to use a comparable royalty base are similarly off. Dr. Mody drew the comparison based on the best information available to her. ███████

████████████████████████████████████████████████████

████████████████. *See, e.g.*, Ex. 11, Mody Dep. at 124:19-22 ("████████████████████

████████████████████████████████████████████."). Given that

"████████████████████████████████████████████████████

████████████████," *id.* at 124:23-125:3, Dr. Mody's focus on adjusting the royalty rate rather than the royalty base is reasonable. *See id.* at 235:12-236:2 ("████████████████████

████████████████████████████████████.").

The differences between the Semtech agreement and the hypothetical negotiation—and Dr. Mody's efforts to account for all of those differences—are not a basis to exclude Dr. Mody's opinions. In reality, Kioxia's complaints again concern the degree of comparability of the Semtech agreement. But "the issue of comparability is often one of sufficiency of the evidence, not admissibility." *Bio-Rad Labs.*, 967 F.3d at 1373; *see also Ericsson*, 773 F.3d at 1227 ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility."); *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1331 (Fed. Cir. 2014).

**D.     Dr. Khatri's Opinions Regarding Written Description Comply With Federal Circuit Law And Should Not Be Excluded**

Kioxia claims that the '700 patent lacks written description for several claim terms. It asks the Court to exclude testimony on this quintessential fact issue based on a misreading of Dr. Khatri's expert report and deposition, saying Dr. Khatri misunderstood the standard for incorporating materials by reference into a patent. But Dr. Khatri's opinion has *nothing* to do with the incorporation of references in a patent. He identified the portions of the specification that demonstrate the '700 patent's inventors possessed the invention at the time of patenting. And for support, he identified references cited in the '700 patent that reflect the knowledge of a person of ordinary skill. Both demonstrate that Kioxia's section 112 challenge is meritless.

The written-description requirement reflects the quid pro quo inherent in a patent. The public gets the benefit of the knowledge from the specification, and the patentee gets the right to exclude others from practicing the invention. *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005). All that is required is to provide reasonable clarity to a person of ordinary skill in the art that the patentee possessed the claimed invention. *Id.* As such, the written description "need not include information that is already known and available to the experienced public." *Zoltek Corp. v. United States*, 815 F.3d 1302, 1308 (Fed. Cir. 2016). Prior art often demonstrates how a person of ordinary skill in the art would understand the written description. As Kioxia's own cited authority notes, part of the inquiry includes "the extent and content of the prior art." *Ariad*, 598 F.3d at 1351; *see also Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1064 (Fed. Cir. 2020).

Dr. Khatri's opinions apply this standard, and Kioxia's motion ignores most of Dr. Khatri's actual opinions on written description. Kioxia challenges four claim terms. Opening Br. at 22. For each, Dr. Khatri first identifies the portions of the written description that demonstrate the inventors' possession of the inventions. For example, in showing adequate written-description

21

support for the terms "error detection modules" and "error correction modules," Dr. Khatri identifies cites where the written description describes these limitations. Ex. 12, Khatri Report at ¶¶ 471-473; Ex. 13, Khatri Dep. at 260:5-262:22. As Dr. Khatri opined, the specification discloses ample evidence that the inventors possessed the claimed inventions:

- The specification discusses the error detection modules at length, including various features associated with their implementation. Ex. 12, Khatri Report at ¶ 471; Kioxia Ex. Q, '700 patent at 3:65-67, 3:50-52, 5:55-57, 6:61-63, 6:64-65, 5:15-18, 9:33-35 (Dr. Khatri's cited portions of specification).

- The specification discusses error correction modules at length. Ex. 12, Khatri Report at ¶ 472; Kioxia Ex. Q, '700 patent at 3:50-52, 3:60-62, 5:3-5, 5:15-18, 7:1-5, 7:5-7 (Dr. Khatri's cited portions of specification).

- And the specification identifies specific error correcting codes that are implemented to detect and correct errors. Ex. 12, Khatri Report at ¶ 473; Kioxia Ex. Q, '700 patent at 4:7-10, 4:10-15, 4:18-24, 5:42-46 (Dr. Khatri's cited portions of specification).

Only after discussing the written description of the '700 patent does Dr. Khatri analyze prior art cited in the patent. For example, Dr. Khatri identifies "substantial additional information about error correction codes, and hardware for implementing these codes" in the prior art cited in the '700 patent. Ex. 12, Khatri Report at ¶ 476. Dr. Khatri also describes "[a]dditional examples of contemporaneous literature" informing a POSA's understanding of the specification that are *not* cited in the '700 patent. *Id.* at ¶ 487. Dr. Khatri did not predicate his discussion of the prior art on the '700 patent formally incorporating it by reference. Incorporated or not, the cited references describe "known prior art concepts" that a person of ordinary skill in the art would understand

22

when reading the specification and that reinforce the disclosures in the written description itself. *Id.* at ¶¶ 485-486; Ex. 13, Khatri Dep. at 263:6-264:5; *Immunex Corp.*, 964 F.3d at 1064.[5]

Kioxia's motion targets an opinion that Dr. Khatri never gave. And during his deposition, Dr. Khatri made clear that his opinions did not rest on any assumption that the prior art was incorporated by reference. Whatever the legal status of the cited prior art, "a person of ordinary skill in the art reading the spec and the claims of the '700 patent would readily understand . . . the terms used" based on knowledge reflected in the prior art. Ex. 13, Khatri Dep. at 247:23-248:2. Indeed, "a person of ordinary skill in the art would readily understand [the terms] even without these [prior art] documents." *Id.* at 258:4-13, 258:14-260:18. Dr. Khatri discussed the prior art for the very reasons the Federal Circuit says it is relevant: "We couldn't just simply say, . . . you know, there's no description of a certain item here and that's bad, because a person of ordinary skill in the art would know what these things mean because they are . . . qualified in the field." *Id.* at 259:13-260:2. The prior art proves the understanding of a person of skill in the art when reading the portions of the specification that Dr. Khatri identifies.

Kioxia's motion seems to recognize at one point that Dr. Khatri did not rest his written-description opinions on prior-art documents being incorporated by reference. Opening Br. at 24 ("Dr. Khatri makes conclusory assertions that his opinions would not change even if those materials were not considered . . . ."). Without any citation, however, Kioxia concludes that an expert's assumption about the legal status of cited prior art in a patent is dispositive of his opinions' admissibility. *Id.* It's not: "[A] challenge to an infringement expert's expertise in *patent law* may

---

[5] Kioxia's sudden allergy to citing prior art in support of written description arguments is hard to square with its own expert's use of extrinsic evidence. Kioxia's expert Dr. Sechen cites prior-art references as supposedly showing a lack of written description in the specification. Ex. 10, Sechen Am. Report at 249-50. He also cherry picks inventor testimony to the same end. *Id.*

not undermine the expert's qualifications and testimony in the area of expertise in which the expert is offered." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, No. 17-CV-5096 (WMW/BRT), 2020 WL 5512507, at *5 (D. Minn. Sept. 14, 2020), *aff'd,* 30 F.4th 1339 (Fed. Cir. 2022); *WNS Holdings, LLC v. United Parcel Serv., Inc.*, No. 08-CV-275-BBC, 2009 WL 2136961, at *4 (W.D. Wis. July 14, 2009). Dr. Khatri explained that his understanding of the law of incorporation by reference did not impact his technical opinions.

The single written-description case that Kioxia cites does not show otherwise. *Ariad* does not limit the written-description inquiry to the "four corners of the specification." Opening Br. at 24. On the contrary, the court discussed several publications in finding inadequate evidence of disclosure at trial. It rejected those publications because they post-dated the patent—not because they were outside of the specification. *Ariad*, 598 F.3d at 1355 ("evidence of what one of ordinary skill in the art knew in 1990 or 1991 cannot provide substantial evidence to the jury that the asserted claims were supported by adequate written description" in 1989). It certainly did not refuse to consider those references based on the expert's understanding of patent law.

Kioxia's motion to exclude Dr. Khatri is based on a fiction. His opinions do not rest on knowledge of the MPEP or the vagaries of patent prosecution. He testified to the technical understanding of the disclosure in the '700 patent's specification, and he pointed to prior art on the face of the patent in support of that understanding. That is the exact proper inquiry, and the Court should deny Kioxia's motion.

## II. CONCLUSION

None of the challenged opinions warrant exclusion, and Kioxia's motion should be denied in its entirety.

Dated: February 8, 2024

Respectfully submitted,

*/s/ Meg E. Fasulo*

Melissa R. Smith, State Bar No. 24001351
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

J. Scott McBride (*Pro Hac Vice*)
Matthew R. Ford (*Pro Hac Vice*)
Nevin M. Gewertz (*Pro Hac Vice*)
Tulsi E. Gaonkar (*Pro Hac Vice*)
Meg E. Fasulo (*Pro Hac Vice*)
Jessica Bernhardt (*Pro Hac Vice*)
Ravi Shah (*Pro Hac Vice*)
BARTLIT BECK LLP
54 W. Hubbard Street, Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
scott.mcbride@bartlitbeck.com
matthew.ford@bartlitbeck.com
nevin.gewertz@bartlitbeck.com
tulsi.gaonkar@bartlitbeck.com
meg.fasulo@bartlitbeck.com
jessica.bernhardt@bartlitbeck.com
ravi.shah@bartlitbeck.com

Nosson D. Knobloch (*Pro Hac Vice*)
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
nosson.knobloch@bartlitbeck.com

*Counsel for Plaintiff Viasat, Inc.*

25

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing

document has been sent to all counsel of record via electronic mail on February 8, 2024.


/s/ *Melissa R. Smith*

26