**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **VIASAT, INC.,**<br><br>        **Plaintiff,**<br><br>**vs.**<br><br>**KIOXIA CORPORATION and KIOXIA AMERICA, INC.,**<br><br>        **Defendants.** | **Case No.:  6:21-cv-01231-ADA**<br><br>**JURY TRIAL DEMANDED**<br><br>████████████<br><br>PUBLIC VERSION |

**DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE
CERTAIN OPINIONS OF DR. RUSSELL FUERST, DR. NISHA MODY,
<u>MR. EDWARD DOLLER, AND DR. SUNIL KHATRI</u>**

███████████████████████████████████████

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................1

II. ARGUMENT.........................................................................................................2

    A. Viasat Fails to Identify Any Methodology Supporting Dr. Fuerst's Opinions and His Opinions Are Not Tied to the Facts of the Case. ..............................................2

        1. Viasat fails to show that Dr. Fuerst's opinions regarding technological comparability of the ██████████ are tied to the facts of this case. ..................2

        2. Viasat fails to identify a single apportionment methodology used by Dr. Fuerst..........6

    B. Mr. Doller Failed to Account For the Incremental Value of the Asserted Claims. .............8

        1. Mr. Doller's "analysis" of Iterative ECC fails to distinguish between the unasserted independent claims and the asserted dependent claims. .............................9

        2. Mr. Doller's comparisons based on Daikoku2 fail to show the incremental value of the invention. .....................................................................................................10

    C. Dr. Mody's Opinions Based on the ██████████ Should Be Excluded Because Dr. Mody Used the Wrong Royalty Base. .........................................................................13

    D. Dr. Khatri's Opinions Regarding the '700 Patent's Compliance With the Section 112 Written Description Requirement Should be Excluded Because They Are Based on a Flawed Understanding of That Requirement. ..................................................................14

        1. Dr. Khatri's written description opinions are based on a fundamental misunderstanding of patent law. ...............................................................................15

        2. Dr. Khatri's flawed basis for his written description opinions cannot be cured..........17

            i. Dr. Khatri's legal errors are inseparable from the rest of his analysis...................17

            ii. Even if separable, the remainder of Dr. Khatri's analysis is insufficient to support his opinions. ........................................................................................18

III. CONCLUSION......................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ariad Pharms., Inc. v. Eli Lilly & Co.*
598 F.3d 1336 (Fed. Cir. 2010)......................................................................................16, 17

*Bio-Rad Lab'ies, Inc. v. 10X Genomics, Inc.*
396 F. Supp. 3d 386 (D. Del. 2019)........................................................................................3

*Bio-Rad Lab'ies, Inc. v. 10X Genomics Inc.*
967 F.3d 1353 (Fed. Cir. 2020)......................................................................................2, 3, 4

*Bio-Rad Lab'ies, Inc. v. 10X Genomics, Inc.*
No. l:15-cv-00152-RGA, 2018 WL 4691047 (D. Del. Sept. 28, 2018)...................................3

*Biogen Int'l GmbH v. Mylan Pharms. Inc.*
18 F.4th 1333 (Fed. Cir. 2021) .............................................................................................16

*BMC Software, Inc. v. Servicenow, Inc.*
No. 2:14-CV-903-JRG, 2016 WL 379620 (E.D. Tex. Feb. 1, 2016) ...................................6, 8

*Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*
809 F.3d 1295 (Fed. Cir. 2015)..............................................................................................13

*Droplets, Inc. v. Yahoo! Inc.*
No. 12-cv-03733-JST, 2021 WL 9038355 (N.D. Cal. Aug. 9, 2021)....................................13

*Ericsson, Inc. v. D-Link Sys., Inc.*
773 F.3d 1201 (Fed. Cir. 2014)....................................................................................3, 6, 13

*Finalrod IP, LLC v. John Crane, Inc.*
No. MO:15-CA-00097-ADA (W.D. Tex. Feb. 21, 2020) .......................................................6

*Forest Lab'ies, LLC v. Sigmapharm Lab'ies, LLC*
918 F.3d 928 (Fed. Cir. 2019)................................................................................................16

*Grain Processing Corp. v. Am. Maize-Prods. Co.*
185 F.3d 1341 (Fed. Cir. 1999)..............................................................................................12

*LaserDynamics, Inc. v. Quanta Comput., Inc.*
694 F.3d 51 (Fed. Cir. 2012)...................................................................................................8

*Lockwood v. Am. Airlines, Inc.*
107 F.3d 1565 (Fed. Cir. 1997)..............................................................................................17

*Lucent Techs., Inc. v. Gateway, Inc.*
  580 F.3d 1301 (Fed. Cir. 2009)..................................................................................14

*Mannion v. Coors Brewing Co.*
  No. 04 Civ. 1187(LAK), 2007 WL 3340925 (S.D.N.Y. Nov. 7, 2007) ..................................14

*McDavid, Inc. v. Nike USA, Inc.*
  892 F. Supp. 2d 970 (N.D. Ill. 2012) ........................................................................17

*Moore v. Ashland Chem. Inc.*
  151 F.3d 269 (5th Cir. 1998) ...................................................................................17

*Omega Pats., LLC v. CalAmp Corp.*
  13 F.4th 1361 (Fed. Cir. 2021) ................................................................................10

*ResQNet.com, Inc. v. Lansa, Inc.*
  594 F.3d 860 (Fed. Cir. 2010).....................................................................................8

*Skyhook Wireless, Inc. v. Google, Inc.*
  No. 10-11571-RWZ, 2015 WL 13620764 (D. Mass. Feb. 18, 2015)...................................3, 6

*SSL Services, LLC v. Citrix Systems, Inc.*
  769 F.3d 1073 (Fed. Cir. 2014)....................................................................................5

*SSL Servs., LLC v. Citrix Sys., Inc.*
  769 F.3d 1073 (Fed. Cir. 2014)....................................................................................5

*VirnetX, Inc. v. Cisco Sys., Inc.*
  767 F.3d 1308 (Fed. Cir. 2014).....................................................................................8

*Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*
  No. 10-cv-10578, 2016 WL 5956325 (E.D. Mich. Oct. 14, 2016)...........................................9

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 26(a)(2) ................................................................5, 6, 7

Federal Rule of Evidence 702................................................................................1, 2, 6, 7

████████████████████████████████████████

## I.    INTRODUCTION

To prop up its exorbitant damages claim, Viasat continues to rely on theories that have no relationship to the asserted '700 Patent. Viasat's various experts fail to tie those theories to the '700 Patent or the incremental value of the asserted patent claims. Such unreliable expert testimony cannot be allowed at trial.

Regarding Viasat's damages theory based on the ██████████████ Viasat suggests that Dr. Fuerst need not consider the claims of licensed patents or the '700 Patent or use a methodology to apportion the license because of his experience and qualifications. But Federal Rule of Evidence 702 separately requires that experts have sufficient qualifications **and** that they apply "reliable principles and methods" in forming their opinions. Viasat would collapse these two requirements into one, relying solely on Dr. Fuerst's experience without identifying any methodology that he used. Even if Dr. Fuerst's experience in negotiating licenses for Viasat qualifies him as an expert, that experience cannot double-count as a methodology. Viasat's opposition confirms that Dr. Fuerst's opinions are nothing more than guesses about the value that ██████ may have ascribed to different technologies, and "broad brush strokes" on what the allegedly licensed patents were about. Even if his opinions are based on his experience, they lack any testable principles or methods. Thus his opinions, as well as Dr. Mody's opinions that rely on Dr. Fuerst, must be excluded at trial.

Viasat also continues to rely on a non-infringing alternative for its cost-based and incremental value theories, but Mr. Doller's analysis fails to account for the incremental value of the asserted, dependent claims. Thus, Viasat's cost-based and incremental value theories are not supported by the facts of the case, and thus Mr. Doller's and Dr. Mody's opinions about those theories must be excluded.

1

███████████████████████████████████████████████

Finally, Viasat argues that Dr. Khatri uses the prior art merely to show how a person of skill in the art would understand the patent and to provide "additional information" about error correction and detection that is not present in the specification, but this both misapplies the legal standard for using extrinsic evidence in the written description context and contradicts Dr. Khatri's testimony.

## II. ARGUMENT

### A. Viasat Fails to Identify Any Methodology Supporting Dr. Fuerst's Opinions and His Opinions Are Not Tied to the Facts of the Case.

Viasat attempts to distract the Court from the deficiencies of Dr. Fuerst's opinions by detailing Dr. Fuerst's qualifications and experience negotiating licenses for Viasat. (Viasat, Inc.'s Opposition to Defendants' Motion to Exclude Certain Opinions of Dr. Russell Fuerst, Dr. Nisha Mody, Mr. Edward Doller, and Dr. Sunil Khatri, Dkt. No. 152 ("Resp. Br.") at 4-5). But Kioxia has not challenged Dr. Fuerst's qualifications or experience. Rather, his opinions are not "the product of reliable principles and methods" and do not "reflect[] a reliable application of the principles and methods to the facts of the case." *See* Fed. R. Evid. 702(c) & (d). Because Dr. Fuerst did not issue an expert report, Kioxia and the Court must rely on Dr. Fuerst's deposition to assess whether he has met these requirements. However, Dr. Fuerst failed to meet them in both steps of his analysis—(1) his opinions regarding the technological comparability of the ████████ ████████ and (2) its apportionment.

#### 1. Viasat fails to show that Dr. Fuerst's opinions regarding technological comparability of the ████████████████ are tied to the facts of this case.

Viasat argues that Dr. Fuerst need only assess whether technology licensed in the ████████ ████████ has a "baseline comparability" to the '700 Patent, and need not perform a "claim-by-claim comparison" to do that. (Resp. Br. at 5 & 7) (citing *Bio-Rad Lab'ies, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374 (Fed. Cir. 2020)). But that "baseline comparability" analysis still

2

███████████████████████████████████████████

requires a reliable methodology tied to the facts of the case. *Id.* In other words, Dr. Fuerst must establish that the technology licensed to ██████ has baseline comparability *to the claims* of the '700 Patent. *See Skyhook Wireless, Inc. v. Google, Inc.*, No. 10-11571-RWZ, 2015 WL 13620764, at *2 (D. Mass. Feb. 18, 2015); *cf. Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (must focus on incremental value of the asserted patent claims "and no more.") (citation omitted). Nothing in *Bio-Rad* or the other cases Viasat cites suggests that the "baseline comparability" of a license can be assessed totally divorced from the asserted patent's claims. But that is exactly what Dr. Fuerst did; he assessed "technology" and not patent claims at all. In other words, the critical flaw in Dr. Fuerst's analysis is not that he failed to establish a *particular degree* of comparability to the '700 Patent. Dr. Fuerst failed to consider *any* degree of comparability to the '700 Patent because, as Viasat concedes, he did not consider its claims at all. This is particularly problematic in this case since Viasat has only asserted certain dependent claims of the '700 Patent. Since Viasat cannot claim damages based on the value of the independent claims, Viasat must establish that the technology licensed in the ███████████████ is technologically comparable to the asserted dependent claims or otherwise apportion for the dependent claims' scope. Dr. Fuerst did neither.

Moreover, the *Bio-Rad* court affirmed a district court finding that the proffering party "met a showing of 'baseline comparability'" (*Bio-Rad Lab'ies*, 967 F.3d at 1374 (citing *Bio-Rad Lab'ies, Inc. v. 10X Genomics, Inc.*, 396 F. Supp. 3d 386, 388 (D. Del. 2019)) when the expert alleged *more than* a "loose or vague comparability" between the proffered license and the hypothetical license (*Bio-Rad Lab'ies, Inc. v. 10X Genomics, Inc.*, No. l:15-cv-00152-RGA, 2018 WL 4691047, at *4 (D. Del. Sept. 28, 2018)). Here, Dr. Fuerst has not alleged anything more than a loose and vague comparability between the technology licensed under the ████████████████

3

███████████████████████████████████████████

and the '700 Patent. Nothing in *Bio-Rad* indicates that Dr. Fuerst's analysis is sufficient. Viasat simply parrots *Bio-Rad*'s language, but does not explain how Dr. Fuerst's analysis is similar to the expert opinion that was permitted in that case.

Dr. Fuerst asserts that the '664 and '789 Patents were "inherently licensed" under the ████████████████ and opines that those patents are comparable to the '700 Patent. Although the '664 and '789 Patents did not exist when the ████████████ was signed, Viasat argues the ████████████ included a blanket patent license for any future invention resulting from Viasat's development of IP cores, and thus would have included the later-issued '664 and '789 Patents. (Resp. Br. at 6). Even if that were so, ███████ could not have known about those specific patents (because they did not yet exist) and, by Viasat's logic, ███████ could have anticipated that any number of other future patents might be included in the license. That is why Dr. Fuerst must identify a clear methodology for how he determined that the '664 and '789 Patents were actually licensed under the ███████████████[1] and that they represent "the bulk of the value (████)" of Viasat's forward error correction technology licensed to ███████ Dr. Fuerst identifies none.

Apparently recognizing this disconnect, Viasat also backpedals from the '664 and '789 Patents, asserting that Dr. Fuerst need not assess whether any specific patents in the ███████ ███████ are comparable to the '700 Patent because "licenses that provide no patent rights may be comparable" to the hypothetical negotiation in a patent case. (Resp. Br. at 7) (citing cases). As an initial matter, Viasat—not Kioxia—used the '664 and '789 Patents as its sole basis for asserting

---

[1] Viasat argues that the license granted in the ████████████████ necessarily includes the '664 and '789 Patents because it includes all intellectual property rights "████████ ███████ █ ███████ ████████████'" (*See* Resp. Br. at 4 & 6). However, neither Dr. Fuerst nor Viasat offers any opinions or other evidence that any ████████████ would have read on the '664 and '789 Patents' claims. Even if Viasat's attorney's argument is correct, that does not mean that Dr. Fuerst reached that same conclusion or applied any reliable methodology to do so.

4

████████████████████████████████████████████████████

that the ████████████████ is technologically comparable to this case. (Ex. C to Defendants' Opening Brief, Dkt. No. 137 ("Opening Br."), at ¶ 53; Ex. D to Opening Br., at 2-3). Therefore, any expert opinions that Dr. Fuerst gives about technological comparability must be based on the scope of these patents.[2] Moreover, the cases that Viasat cites do not indicate that Dr. Fuerst can assess technological comparability of the ████████████████ based merely on its general field of technology divorced from specific patents. For example, in *SSL Services, LLC v. Citrix Systems, Inc.*, the Federal Circuit affirmed use of a non-patent license agreement that ***expressly referenced the asserted patent as relevant to the licensed technology***. 769 F.3d 1073, 1093 (Fed. Cir. 2014).[3] Thus, *SSL Services* still involved a link to the asserted patent itself. The ████████████████ contains no such link to the '789 Patent or the '664 Patent.

Instead, Viasat and Dr. Fuerst assert that the ████████████████ is technologically comparable to the '700 Patent because both involve implementing forward error correction on hardware such as an ASIC. (Resp. Br. at 5). But that opinion cannot help the jury to determine whether the ████████████████ is technologically comparable to the '700 Patent at least because, as Viasat concedes, the '700 Patent does not claim all methods of forward error correction. Ex. DD, Thesling Dep. Tr. at 137:13-19 ████████████████████████████████████ ███████); (Ex. C to Opening. Br., at ¶ 18). Viasat also cites Dr. Fuerst's deposition testimony about the "parallel nature of the processing" (Resp. Br. at 5-6), but nothing linking that to the '700 Patent

---

[2] Indeed, Dr. Fuerst's Rule 26(a)(2)(C) disclosure only states that "the '789 and '664 patents are technologically comparable to the '700 Patent," and does not disclose any opinion that any other technology under the ████████████████ is comparable to the '700 Patent. To the extent Viasat is suggesting that Dr. Fuerst may opine that the ████████████████ is technologically comparable to the '700 Patent based on something other than the '789 and '664 Patents, Viasat failed to disclose any such opinions in accordance with Federal Rule of Civil Procedure 26(a)(2).

[3] Additionally, the challenged agreement in *SSL Services* involved both the patent owner and the defendant, and was close in time to the date of the hypothetical negotiation between those parties. *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1093 (Fed. Cir. 2014).

████████████████████████████████████

claims. And, in those same answers, Dr. Fuerst eschews any comparison to the '700 Patent claims. (Ex. E to Opening Br., at 41:24-42:21, 42:23-44:4). Therefore, Dr. Fuerst's opinions regarding technological comparability of the ████████████ to the '700 Patent are not tied to the relevant facts of this case, and must be excluded.

### 2. Viasat fails to identify a single apportionment methodology used by Dr. Fuerst.

Rather than identifying any apportionment methodology in Dr. Fuerst's Rule 26(a)(2)(C) disclosure or his deposition, Viasat hides behind Dr. Fuerst's experience. But "experience" does not count as "sufficient facts or data" or "reliable principles and methods" required for Dr. Fuerst to testify about apportionment. Fed. R. Evid. 702; *see BMC Software, Inc. v. Servicenow, Inc.*, No. 2:14-CV-903-JRG, 2016 WL 379620, at \*2 (E.D. Tex. Feb. 1, 2016).

Viasat concedes that Dr. Fuerst only valued technology, not patent claims. (Resp. Br. at 12). But apportionment requires Viasat's experts to ensure that the damages reflect value of the claimed invention ***and no more***. *See Ericsson*, 773 F.3d at 1226; *Finalrod IP, LLC v. John Crane, Inc.*, No. MO:15-CA-00097-ADA, Hr'g Tr. at 12:10-19 (W.D. Tex. Feb. 21, 2020) (noting plaintiff's technical expert did not do the "hard work . . . to explain the value of the patented feature").[4] Dr. Fuerst must isolate the value of the asserted patent claims, not just the "technology." *See Skyhook Wireless*, 2015 WL 13620764, at \*2. Dr. Fuerst failed to do any such apportionment for comparable patents licensed under the ████████████ Viasat makes the excuse that it "would not have been reasonable" for Dr. Fuerst to assign value to any specific patents under the ████████████ because its license is so broad. (Resp. Br. at 11-12). But if it was not "reasonable" to do a proper apportionment on the ████████████ then Viasat should not

---

[4] Ex. CC, Hr'g Tr. from *Finalrod IP, LLC v. John Crane, Inc.*, No. MO:15-CA-00097-ADA (W.D. Tex. Feb. 21, 2020), at 12:10-19.

██████████████████████████████████████████

have relied on it.  Dr. Fuerst's approach may be easier, but it does not pass muster for an expert in a patent case.

Dr. Fuerst's attempts to quantify the value of different components of the ██████ ████████ are mere lip service, unsupported by any reliable principles or methodology.  Dr. Fuerst allegedly apportioned ████████████████████████████████████████ ██████ to patents comparable to the '700 Patent.  To explain how Dr. Fuerst got to that number, Viasat's Responsive Brief only reprises Dr. Fuerst's "█████████████" from his deposition (Ex. E to Opening Br., at 134:13-23) that "█████████████████████████████████████" (*id.*), and that the comparable patents represent the "█████████" (*id.*).  *See* Resp. Br. at 10 (discussing "Viasat's legacy technology versus newer, more advanced technology") & 12 (discussing "older FEC technology, more advanced FEC technology").  But that generalization does not explain how Dr. Fuerst assigned ██████—as opposed to some lesser amount—to the "█████████" leaving Kioxia and the trier of fact no opportunity to understand or test Dr. Fuerst's methodology.  Nor does Viasat explain how Dr. Fuerst picked ████ for the value of FEC technology and ████ for the value of "█████████" and "████████"[5] and so those opinions fail to satisfy Rule 702 for similar reasons.  Although Viasat argues that Dr. Fuerst is not required to apportion with "mathematical precision," Viasat apparently intends to have Dr. Fuerst include these specific numbers in his testimony.  But Dr. Fuerst should not be permitted to present

---

[5] Viasat attempts to reconcile Dr. Fuerst's testimony regarding this ████ apportionment factor with Dr. Mody's report, citing his statement that ████ of the running royalty of the ████████████████ was attributed to "█████████" (Resp. Br. at 9-10).  But Dr. Fuerst also testified that that same ████ was attributable to "intangibles" associated with the "███████████████████████" of Viasat's "█████".  (Ex. E to Opening Br., at 106:1-17, 113:12-22).  Viasat would lump these disparate concepts together as "█████████" without explaining how Dr. Fuerst apportioned the same ████ to both Viasat's technical "█████████" and its marketing "█████"  At minimum, the inconsistency of Dr. Fuerst's testimony, both internally and with Dr. Mody's report, on what is actually included in that ████ confirms Dr. Fuerst's failure to articulate what methodology he applied.  This is particularly problematic since Dr. Fuerst did not issue an expert report and his Rule 26(a) disclosure does not mention this apportionment at all.

such specific numbers to the jury under the guise of expert testimony when he plucked them out of thin air. *See, e.g.*, *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012); *BMC Software*, 2016 WL 379620, at *2.

Dr. Fuerst also failed to show how that ▮▮▮ value is attributable to the patents he alleges are comparable to the '700 Patent, as opposed to other Viasat patents relating to advanced forward error correction. Even if Dr. Fuerst is not required to do a patent-by-patent analysis in his apportionment, he still must isolate the value of allegedly-comparable patents from other patents and technology in the license. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("a patentee must take care to seek only those damages "attributable to the infringing features"). Dr. Fuerst made no effort to do so. Dr. Fuerst merely identified two allegedly comparable patents (the '664 and '789 Patents) and assumed they reflected the value of the entire "category" of "newer patents" about forward error correction. As noted above, the fact that those two patents did not exist when the ▮▮▮▮▮▮▮ was signed makes it all the more important that he explain ***how*** he was able to distinguish their value from that of the existing and future patents and other technology that could have been included in that license.

For all of the reasons discussed above, the Court must exercise its role as a gatekeeper and exclude Dr. Fuerst's opinions regarding the ▮▮▮▮▮▮▮ in their entirety. Since Dr. Mody's opinions regarding her license-based approach depend on Dr. Fuerst's opinions regarding the ▮▮▮▮▮▮▮ her opinions regarding that licensed-based approach must be excluded for at least those same reasons.

**B. Mr. Doller Failed to Account For the Incremental Value of the Asserted Claims.**

Viasat bears the burden to tie any expert testimony regarding its reasonable royalty calculation to the actual incremental value of the patented features. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) ("it was [the patentee's] burden . . . to persuade

8

the court with legally sufficient evidence regarding an appropriate reasonable royalty") (internal citation omitted); *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-cv-10578, 2016 WL 5956325, at *7 (E.D. Mich. Oct. 14, 2016) ("it is [the patentee's] burden . . . to tie its reasonable royalty damage calculation to the actual incremental value of the patented features").

Mr. Doller's analysis, however, can apply equally to the unasserted independent claims, because one of the features he assumes infringes and attempts to isolate, Iterative ECC, is alleged by Viasat's infringement expert to infringe the ***unasserted*** independent claims as well as the ***asserted*** dependent claims. Any analysis rooted in this illogical theory cannot establish the incremental value of the claimed invention and must be excluded.

### 1. Mr. Doller's "analysis" of Iterative ECC fails to distinguish between the unasserted independent claims and the asserted dependent claims.

Viasat concedes that Mr. Doller does not connect the Iterative ECC and Variable ECC features to the asserted dependent claims. (*See* Resp. Br. at 14). Mr. Doller relies on Dr. Hassoun to connect his damages analysis to the '700 Patent claims, but Dr. Hassoun provides no factual basis for how the limitations added by the dependent claims contribute the value ascribed by Mr. Doller. There is simply no analysis by either Mr. Doller or Dr. Hassoun that connects the limitations added by asserted dependent claim 6 to Iterative ECC, a feature Dr. Hassoun already alleges infringes independent claim 1. Mr. Doller does not have any opinion about what does or does not practice the independent claims. He only assumes a set of ECC schemes as infringing or non-infringing. (*See* Ex. P to Opening Br., at 4).

Mr. Doller states, " ███████████████████████████████████████

████████████████████████████████████ " (Ex. P to Opening Br., at 51 & FN. 59).

" ███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████.” *Id.* at FN. 62.  In his infringement report, Dr. Hassoun alleges the Accused Products read on claim 1 based on these very features, BCH and RS ECC in tandem and/or RS-iteration.  *See* Ex. T, Exhibit 5 to Hassoun Report at 24-26, Deneb; Ex. U, Exhibit 6 to Hassoun Report at 32, Elnath; Ex. V, Exhibit 7 to Hassoun Report at 54 & 101, Olympos; Ex. W, Hassoun Report at ¶ 226 (explaining that RS correction combined with BCH correction is an example of Iterative ECC).

Mr. Doller equates the value of Iterative ECC to the incremental value of the asserted dependent claims.  However, since Dr. Hassoun alleges that Iterative ECC practices **unasserted and invalidated** independent claim 1, Mr. Doller's analysis comparing Iterative ECC to other ECC schemes cannot account for the limitations of the asserted dependent claims.  *See Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1379-80 (Fed. Cir. 2021) ("[W]e fail to see how this patent/claim-independent approach accounts for apportionment.") (footnote and citation omitted).  Mr. Doller's analysis could equally apply to the unasserted independent claims, irrespective of whether those claims were invalidated by the PTAB.  Viasat bears the burden to prove the value of the claims they **asserted** by providing a technical factual basis that the limitations in those claims are responsible for the value asserted.  Viasat failed to meet their burden, and for at least that reason, Mr. Doller's opinions should be excluded.

   **2.  Mr. Doller's comparisons based on Daikoku2 fail to show the incremental value of the invention.**

Recognizing this gap in Mr. Doller's analysis, Viasat now attempts to rely on **Kioxia's** experts to fill it.  Viasat asserts that because Kioxia's invalidity expert Dr. Sechen opines that Daikoku2 anticipates claim 1, Mr. Doller may compare a feature against Daikoku2 to capture the incremental value of the feature over claim 1.  There are several problems with this argument.

████████████████████████████████████████

As an initial matter, Viasat's theory is not disclosed in its experts' reports.  Mr. Doller cannot rely on Kioxia's invalidity position because Mr. Doller makes no reference to Dr. Sechen's report, Kioxia's invalidity contentions, or any other opinions that Daikoku2 practices any of the independent claims.[6]  In fact, Viasat disputes the very opinions of Dr. Sechen that it attempts to rely upon.  Its own rebuttal expert, Dr. Khatri, asserts that Daikoku2 ***does not anticipate*** claim 1.  Ex. X, Khatri Report at ¶ 137.  Viasat cannot meet their burden through its Responsive Brief by pointing to an invalidity expert report its own expert disagrees with.  And even if Mr. Doller could rely on Kioxia's invalidity arguments regarding claim 1, that still would not tie Mr. Doller's analysis to the incremental value of the asserted dependent claims.  For example, asserted dependent claim 6 depends on dependent claim 4, and no party or expert asserts that dependent claim 4 is anticipated by Daikoku2.  Thus, even if Daikoku2 were a proper comparison, Mr. Doller's analysis would still fail to apportion the value of asserted claim 6 over unasserted claim 4.

Another issue with Viasat's post hoc argument regarding Daikoku2 is that Dr. Mody's opinions that rely on the Doller Report do not even rely on Mr. Doller's comparison between the accused features and Daikoku2.  Rather, Dr. Mody's opinions rely on Mr. Doller's analysis of the accused features and what he calls the next best alternative available to Kioxia for each product generation.  *See* Ex. Y, Mody Dep. Tr. at 268:17-19 ("████████████████████████████ ████████████████████████").  Dr. Mody further confirms in discussing Mr. Doller's analysis that she used his spreadsheet titled "Best Hypothetical Non-Inf Alt," which compares the

---

[6] In fact, Mr. Doller admits his analysis does not even compare the accused features to the performance of Daikoku2.  He instead used "████████████████████████████████." (Ex. P to Opening Br., at 52 & FN. 59).  Mr. Doller also did not consider evidence that showed Daikoku2 actually included Iterative ECC as defined in his report.  Ex. Z, Doller Dep. Tr. at 76:25-80:21.

accused features to his "Best Hypothetical" non-infringing alternative – which is not Daikoku2. *See* Ex. Y, Mody Dep. Tr. at 273:9-276:15. In fact, none of the non-infringing alternatives listed in Mr. Doller's spreadsheet are Daikoku2. Mr. Doller admits in his deposition that he has a separate spreadsheet called "Daikoku2 Case" that was not used in Mody's analysis. *See* Ex. Z, Doller Dep. Tr. at 145:10-146:10.

Finally, Viasat makes no attempt to show that its incremental value analysis measures against the next-best non-infringing alternative. Merely testing the non-infringing alternative identified by Kioxia is inadequate because it may not capture the true incremental value of the asserted claims. The law requires "comparing the patented invention to its ***next-best available alternative(s)***[,]" and not just ***any*** product that lacks the infringing features. *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1351 (Fed. Cir. 1999) (emphases added). Viasat's brief suggests it met its burden by "comparing the infringing features to a Kioxia product that lacked those features." (Resp. Br. at 16). By that logic, ***any*** Kioxia product that doesn't contain the infringing feature, such as raw NAND chips, could be a non-infringing alternative. That is not the law.

Here, none of Viasat's experts assert that Daikoku2 is the next-best non-infringing alternative. Even more, Dr. Mody relied on a spreadsheet created by Doller titled "Best Hypothetical Non-Inf Alt" that didn't even list Daikoku2. Viasat's only justification for relying on Daikoku2 is that ***Kioxia*** identified it as a non-infringing alternative. That is not enough. Thus, Viasat failed to use the proper non-infringing alternative to calculate the incremental value of the invention.

"[W]here a reasonable royalty analysis is not 'based on the incremental value that the patented invention adds to the end product' . . . the expert opinion does not reliably measure the

12

████████████████████████████████████████████

invention and must be excluded." *Droplets, Inc. v. Yahoo! Inc.*, No. 12-cv-03733-JST, 2021 WL 9038355, at *4 (N.D. Cal. Aug. 9, 2021) (quoting *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (quoting *Ericsson*, 773 F.3d at 1226)).  Thus, Mr. Doller's reasonable analysis must be excluded.  Since Dr. Mody's "cost based" and "incremental value" theories depend on Mr. Doller's unreliable analysis, Dr. Mody's testimony on those theories must be excluded for the same reasons.

**C. Dr. Mody's Opinions Based on the ██████████ Should Be Excluded Because Dr. Mody Used the Wrong Royalty Base.**

Viasat concedes that the running royalty in the ██████████ is based on a completely different royalty base from what Dr. Mody used for her royalty for the '700 Patent. Recognizing this disconnect, Viasat argues that Dr. Mody adjusted for it because she "explicitly considers the difference in price between the sales of ███████ devices and the average price of the accused Kioxia products[.]" (Resp. Br. at 19).  However, ███████ never made or sold any products or paid any running royalties under the ██████████[7] and so Dr. Mody could not have accounted for their prices in her analysis.  At her deposition, Dr. Mody simply confirmed that she used the ████████████████████████████████████ ████████ Ex. Y, Mody Dep. Tr. at 231:5-16.  She does not explain why a ██ royalty rate based on ███████ sales of integrated circuits such as ASICs and/or FPGAs can be applied to Kioxia's sales of SSDs, based on product pricing or anything else.

Viasat also cites paragraph 135 of Dr. Mody's report as disclosing her "modifications" to account for the different royalty base in the ██████████ (Resp. Br. at 20).  However, this

---

[7] *See* Ex. Y, Mody Dep. Tr. at 225:11-16 ("████████████████████████████ ████████."); *see also* Ex. C to Opening Br., at ¶ 73 (noting that "███████ terminated the agreement, however, 'before the development was completed.'") & ¶ 107 ("████████ ████████████████████████████ ████████████████████" citing Dr. Fuerst).

13

███████████████████████████████████████████

summary paragraph at the end of her report merely states that the royalty rate range from her three different theories was ██████████████████ as a compromise in the middle of that range "[a]s a result of the negotiation, and a consideration of relevant Georgia-Pacific Factors." Dr. Mody does not say or imply that she chose ███ because the █████████████ and hypothetical license have different royalty bases. This is not an issue of whether Dr. Mody *sufficiently* accounted for the difference between the royalty base of the ███████████████ and Kioxia's accused sales. She did not account for that difference *at all*.[8]

### D. Dr. Khatri's Opinions Regarding the '700 Patent's Compliance With the Section 112 Written Description Requirement Should be Excluded Because They Are Based on a Flawed Understanding of That Requirement.

Dr. Khatri's written description opinions disclosed in Sections IX.A, IX.C, and IX.E of his report are based on a critical misunderstanding of patent law: that references listed on the face of the '700 Patent are "cited" by the specification and incorporated by reference. *See* Ex. AA, Khatri Dep. Tr. at 257:11-19 ("█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ "); 247:5-22 ("████████████████████████

███████████████████████████████████████████

---

[8] Viasat's attempt to blame Kioxia for not correlating some of its SSD products with a specific controller model is a red herring. (Resp. Br. at 20). Dr. Mody did not adjust the royalty base for *any* of Kioxia's accused SSDs, including those for which Kioxia identified the corresponding controllers. If Dr. Mody needed more information about Kioxia's products to properly apportion the royalty base for the ██████████████ Viasat should have sought it during fact discovery. Nor can Viasat shift its burden to establish the reliability of Dr. Mody's opinions simply because Kioxia does not possess the information that Viasat needs to make them reliable. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("The burden of proving damages falls on the patentee."); *Mannion v. Coors Brewing Co.*, No. 04 Civ. 1187(LAK), 2007 WL 3340925, at *5 (S.D.N.Y. Nov. 7, 2007) ("The lack of appropriate data, whatever the reason, does not justify the receipt in evidence of unreliable, unsubstantiated expert testimony. To whatever extent plaintiff was dissatisfied with defendants' compliance with discovery requests, it was entitled to seek relief from the Court.").

████████████████████████████████████████████

████████████████████████████████████████████ ”); *id.* at 248:8-15 (“█

████████████████████████████████████████████

██████ ”).

Viasat does not dispute that Dr. Khatri's legal understanding is wrong. Instead, Viasat attempts to bury the error and rewrite Dr. Khatri's disclosed bases to replace the reliance on this flawed understanding. But Dr. Khatri was abundantly clear that the basis for his opinions regarding the sufficiency of the written description of the '700 Patent was that references listed on the front of the patent were part of the '700 Patent. *See* Ex. AA, Khatri Dep. Tr. at 247:11-22, 257:11-19, 248:8-15, 249:12-14. This critically flawed understanding of patent law pervades Dr. Khatri's written description opinions and their bases, rendering them improper.

Viasat rewrites the expert report actually served by disregarding Dr. Khatri's improper reliance on cited references and pretending that his discussion of the specification and the knowledge of a person of skill in the art was independent, but this is legally and factually unfounded. First, Dr. Khatri's written description opinions cannot be retroactively separated from the flawed bases he disclosed that highly detailed prior art references were part of the specification of the '700 Patent. Second, even if the improper reliance on those references could be disentangled and severed from the rest of Dr. Khatri's analysis, the remaining analysis is inadequate to support Dr. Khatri's opinions.

### 1. Dr. Khatri's written description opinions are based on a fundamental misunderstanding of patent law.

Viasat argues that Dr. Khatri uses the prior art merely to show how a person of skill in the art would understand the patent and to provide "additional information" about error correction and detection that is not present in the specification. (Resp. Br. at 22-24). But this both misapplies the

15

legal standard for using extrinsic evidence in the written description context and contradicts Dr. Khatri's testimony.

It is axiomatic that the hallmark of written description is the disclosure of the specification, and that "the *specification itself* [ ] must demonstrate possession." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) (en banc) (emphases added); *see also Biogen Int'l GmbH v. Mylan Pharms. Inc.*, 18 F.4th 1333, 1341-42 (Fed. Cir. 2021) (the written-description "requirement is satisfied only if the inventor 'convey[s] with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and *demonstrate[s] that by disclosure in the specification of the patent*.") (emphases added; internal citations omitted). This is especially critical here, where the patent claims generic modules defined by their function. In *Ariad*, the Federal Circuit explained that the requirement that the specification provide the written description is particularly important in cases where the patent claims a "function or result," to ensure that there is sufficient disclosure to accomplish that function. 598 F. 3d at 1352. It is undisputed that the '700 Patent claims error detection and correction "sub-modules" and "modules" and focuses on the functions they perform. Ex. BB, Sechen Report at ¶¶ 529-32.

Viasat correctly notes that because the written description inquiry is conducted from the perspective of a person of ordinary skill in the art, extrinsic evidence regarding how a person of ordinary skill would understand what is disclosed in the patent specification can, at times, be relevant. *See, e.g., Forest Lab'ies, LLC v. Sigmapharm Lab'ies, LLC*, 918 F.3d 928, 937–38 (Fed. Cir. 2019) (affirming sufficient written description based on expert testimony about how a specification's disclosure would have been understood in view of what was known in the art). But that does not sanction the use of extrinsic evidence to *expand* the scope of the patent specification

16

and fill in gaps in the '700 Patent's disclosure, as Dr. Khatri does.  *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) ("It is not sufficient for purposes of the written description requirement of § 112 that the disclosure, when combined with the knowledge in the art, would lead one to speculate as to modifications that the inventor might have envisioned, but failed to disclose."); *see also McDavid, Inc. v. Nike USA, Inc.*, 892 F. Supp. 2d 970, 986 (N.D. Ill. 2012) (rejecting reliance on extrinsic evidence showing that a person of skill in the art would be familiar with the claimed elements as immaterial to the written description requirement) (citing *Ariad*, 598 F.3d at 1352).

### 2. Dr. Khatri's flawed basis for his written description opinions cannot be cured.

### i. Dr. Khatri's legal errors are inseparable from the rest of his analysis.

Dr. Khatri's opinions cannot be remedied by carving out the discussion based on his legally flawed understanding because his opinions unavoidably rely on his improper understanding of the legal standard for the written description requirement.  Dr. Khatri's opinion regarding written description support for the "module" limitations begins: █████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████  Ex. X, Khatri Report at ¶¶ 471 & 488.  In between, Dr. Khatri discusses both language from the specification of the '700 Patent *and over five pages of discussion of prior art* that Dr. Khatri improperly thought was part of the '700 Patent.  *Id.* at ¶¶ 472-487.  This error infects Dr. Khatri's opinions in Sections IX.A, IX.C, and IX.E in their entirety and renders his opinions unreliable and unhelpful  to the jury.  *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 n. 10 (5th Cir. 1998) ("Under *Daubert*, any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.") (cleaned up).

17

### ii. Even if separable, the remainder of Dr. Khatri's analysis is insufficient to support his opinions.

Viasat suggests that if Dr. Khatri's reliance on the prior art references is somehow extracted, his remaining analysis would be sufficient to support his opinions. But the remainder of Dr. Khatri's analysis is based on inadequate discussion in the specification that simply parrots the claim language, along with conclusory references to other "contemporaneous literature" that Dr. Khatri argues, without explanation, would similarly provide the structure that is missing from the '700 Patent. Ex. X, Khatri Report at ¶ 487. These fail to provide support for his written description opinions.

For example, as Kioxia's expert Dr. Sechen explains, the language Dr. Khatri relies upon from the '700 Patent provides no guidance as to how the claimed "error detection module" and "error correction module" determine if errors are present in data or correct errors in portions containing an error. Ex. BB, Sechen Report at ¶¶ 529-32. Similarly, the '700 Patent provides no guidance as to how the claimed "forward[ing] the portion of the respective received stream containing an error to an error correction module" could be done by indirectly sending data containing an error to an error correction module. *Id.* at ¶¶ 539-41. Instead, the '700 Patent simply parrots the claimed "forwarding" language throughout the specification.

Apparently recognizing these inadequacies in the specification, Dr. Khatri chose to include five pages of discussion of five prior art references in forming his opinion regarding written description support for the claimed error detection and correction modules. Moreover, Dr. Khatri's choice to discuss "cited prior art" in his written description opinions for some claim elements, but not others, confirms his understanding that the specification alone was insufficient to provide written description support for those terms. *Compare* Khatri Report at Sections IX.A, IX.C, IX.E

███████████████████████████████████████████████████

*with* Khatri Report at Sections IX.B, IX.D.  Clearly, Dr. Khatri recognized that the written description requirement demanded something more.

For these reasons, Dr. Khatri's opinions in Sections IX.A, IX.C, and IX.E are unreliable and misleading to the jury, and Dr. Khatri should be precluding from opining on the sufficiency of the written description of those claims terms.

## III. CONCLUSION

For the foregoing reasons, Kioxia respectfully requests that the Court to exclude Mr. Doller's opinions regarding the cost of a design-around and the incremental value of the invention, Dr. Khatri's opinions regarding the asserted patent's compliance with the written description requirement, and Dr. Mody's and Dr. Fuerst's opinions in their entirety.

███████████████████████████████████████

Dated: February 20, 2024

Respectfully submitted,

*/s/  Michael Hawes*
Michael Hawes
Texas State Bar No: 24010761
Robinson Vu
Texas State Bar No: 24047046
Roger Fulghum
Texas State Bar No. 00790724
Elizabeth D. Flannery
Texas State Bar No. 24045815
Michael Silliman
Texas State Bar No: 24093152
Spencer Packard
Texas State Bar No: 24125823
**Baker Botts L.L.P.**
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
Facsimile: (713) 229-1522
Email: michael.hawes@bakerbotts.com
Email: robinson.vu@bakerbotts.com
Email: roger.fulghum@bakerbotts.com
Email: liz.flannery@bakerbotts.com
Email: michael.silliman@bakerbotts.com
Email: spencer.packard@bakerbotts.com

Nolan McQueen
Texas State Bar No. 24125322
**Baker Botts L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
Telephone: (214) 953-6525
Email:  nolan.mcqueen@bakerbotts.com

Lute Yang (*pro hac vice*)
California State Bar No: 341813
**Baker Botts L.L.P.**
101 California Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 291-6200
Email: lute.yang@bakerbotts.com

**Attorneys for Defendants**
**Kioxia Corporation and Kioxia America, Inc.**

20

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on February 20, 2024, a true and correct copy of the foregoing was served on all counsel of record who have appeared in this case via email.

_/s/  Michael Hawes_
Michael Hawes