UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

VIASAT, INC. ) Docket No. WA 21-CA-1231 ADA
)
vs. ) Waco, Texas
)
KIOXIA CORPORATION, )
KIOXIA AMERICA, INC. ) March 28, 2024

TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
VIA VIDEOCONFERENCE
BEFORE THE HONORABLE ALAN D. ALBRIGHT

APPEARANCES:

For the Plaintiff:
Ms. Jessica R. Bernhardt
Ms. Meg E. Fasulo
Mr. Nevin M. Gewertz
Mr. J. Scott McBride
Mr. Navi D. Shah
Bartlit Beck, LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654

Mr. Nosson D. Knobloch
Bartlit Beck, LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202

Ms. Melissa R. Smith
Gillam and Smith, LLP
303 South Washington Avenue
Marshall, Texas 75670

For the Defendant:
Ms. Lute Yang
Baker Botts, LLP
101 California Street, Suite 3200
San Francisco, California 94111

**(Appearances Continued:)**

For the Defendant: Ms. Elizabeth L. Flannery
Mr. Roger J. Fulghum
Mr. Michael Hawes
Mr. Spencer Packard
Mr. Michael A. Silliman
Mr. Robinson Vu
Baker Botts, LLP
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002

Mr. Nolan E.S. McQueen
Baker Botts, LLP
2001 Ross Avenue, Suite 900
Dallas, Texas 75201

Mr. Mark D. Siegmund
Cherry, Johnson, Siegmund, James, PLLC
400 Austin Avenue, 9th Floor
Waco, Texas 76701

Court Reporter: Ms. Lily Iva Reznik, CRR, RMR
501 West 5th Street, Suite 4153
Austin, Texas 78701
(512)391-8792

Proceedings reported by computerized stenography, transcript produced by computer-aided transcription.

09:01:12 THE COURT: Good morning, everyone.
09:01:13 Jen, would you call the case, please.
09:01:16 THE CLERK: A civil action in Case 6:21-CV-1231, 09:01:21 Viasat, Incorporated vs. Kioxia Corporation, Et Al. Case 09:01:24 called for pretrial conference.
09:01:25 THE COURT: Announcements from counsel, please.
09:01:28 MS. SMITH: Good morning, your Honor.
09:01:29 This is Melissa Smith on behalf of the plaintiff 09:01:31 this morning. I'm joined by my lead counsel, Mr. Scott 09:01:34 McBride, also some of his partners, Mr. Nosson Knobloch, 09:01:39 Ms. Meg Fasulo, Mr. Nevin Gewertz, Mr. Ravi Shah, and Ms. 09:01:45 Jessica Bernhardt. And, your Honor, we're ready to 09:01:47 proceed.
09:01:48 THE COURT: And for defendant. I see Mr. Fulghum 09:01:53 there.
09:01:54 MR. FULGHUM: Good morning, your Honor.
09:01:56 Thank you. Roger Fulghum for the Kioxia 09:01:59 defendants and with me are my colleagues, Michael Hawes, 09:02:01 Robinson Vu, Elizabeth Flannery, Michael Silliman, Nolan 09:02:06 McQueen, Spencer Packard and Lute Yang. Also with us is 09:02:10 the newest member of our team, Mark Siegmund. And we have 09:02:14 two client representatives on the line and that is Rick 09:02:18 Lin and Julius Christensen. And we're ready to proceed, 09:02:22 your Honor.
09:02:23 THE COURT: Okay. I'm getting a little bit of

09:02:25 feedback on your -- maybe it's mine. My line. So why
09:02:31 don't you say one more thing to me just to see how it
09:02:35 goes.
09:02:35 MR. FULGHUM: You know, I will also point out
09:02:37 that we have client representatives on the call. If we
09:02:42 get into confidential information, we can allow them to
09:02:45 drop off and we can address that as it comes up.
09:02:48 THE COURT: Okay. Give me one second.
09:02:55 MR. FULGHUM: Is it still fuzzy, Judge?
09:02:59 THE COURT: That was much better for me. I'm
09:03:03 just trying to get -- here we go. Okay.
09:03:15 The first issue we have to take up is Viasat's
09:03:19 motion to exclude and/or strike the opinions of Dr. Melvin
09:03:23 with respect to his construction of the decoding
09:03:27 limitation.
09:03:30 MR. MCBRIDE: Yes, your Honor. Scott McBride on
09:03:32 behalf of Viasat.
09:03:32 And so, we have -- in docket 130, we had a motion
09:03:35 with those three grounds. Dr. Melvin is defendants'
09:03:39 technical expert for noninfringement. We're moving to
09:03:42 strike certain parts of his opinions in those -- in three
09:03:45 categories and the first is a category you mentioned. He
09:03:48 has two opinions involving incorrect claim constructions,
09:03:51 one of the word "decode" and then, second, of the term
09:03:55 "physically separate."

So Dr. Melvin has unambiguously in his opinions stated that he understands the word "decode," which is in claim 1, and the context of that is that the claim requires -- again, we're talking about data that is being encoded and decoded from flash memory systems. And the claim requires that the flash memory decoder decode the received encoded data to generate a plurality of partially decoded data streams.

And what Dr. Melvin has said is that that decoding, it does not and cannot include derandomizing, descrambling or deinterleaving, which are all synonyms for essentially the same thing of unscrambling data that has been scrambled when it was encoded. And the problem here, your Honor, is that his position there on the meaning of decode is irreconcilably inconsistent with the positions that Kioxia took successfully before the PTAB in an IPR and that the PTAB adopted. They ruled for Kioxia on the meaning of decode to include derandomizing and deinterleaving for the purposes of invalidating that claim 1, which is still relevant because we are assert ing dependent claims that depend upon that.

And so, our position is that Dr. Melvin should be estopped from taking these contradictory positions. Estoppel's designed for exactly this purpose: Prevent a party from asserting one position in a proceeding and

then, an inconsistent position later. And here, they've done exactly that. They've taken a broad position for purposes of invalidity successfully and a narrow position for the purposes of infringement.

In terms of the way Kioxia thinks this doesn't apply, it's clear that the PTAB did adopt this. They adopted this in the final written decision, which is our Exhibit 9 to our motion. And IPR 126, at page 15, they specifically adopted this for purposes of their ruling.

Secondly, the idea that somehow because Viasat agreed to this position as part of the PTAB as defeating estoppel would, frankly, defeat the entire purpose of requiring consistency and would, in fact, reward their behavior while penalizing our agreement and consistency, which creates obviously some fairly perverse incentives and is not what estoppel is designed to accomplish. And they've cited no case that has allowed them to do what they're doing to successfully go broad for invalidity and then, narrow for infringement. So we believe estoppel for that purpose is appropriate because this is exactly what it is designed to address.

They're going to raise the idea that this is improper because we also have inconsistencies. But as we've noted in our reply, unlike what they've done where there's a very clear inconsistency in construction, what

they're pointing to is simply the way in which we looked at wildly different systems in the prior art and identified how they were not actually partially decoding. And we did not create inconsistent claim constructions in terms of things like forwarding, which I think is what they specifically said.

And again, in the alternative, your Honor, we've asked that if you were to deny this motion, we'd at least like to be allowed to cross Dr. Melvin with those inconsistent statements and we can do so without coming afoul of your motion in limine with respect to not referencing the IPR. We can reference simply a prior proceeding and focus on the inconsistent statements with no mention of the IPR.

With respect to physically separate, if your Honor wishes to wait for that and deal with it one term at a time or --

THE COURT: Let's go one term at a time.

MR. MCBRIDE: Understood.

THE COURT: And I didn't -- I was studying this term. Is the argument essentially the same as it also is with the judicial estoppel argument that --

MR. MCBRIDE: No, your Honor --

THE COURT: If it's a different argument, let's take them one at a time.

MR. MCBRIDE: It's a different argument, your Honor.

THE COURT: Okay. And for defendant.

MR. SILLIMAN: Yes, your Honor. Mike Silliman for defendant.

There's a couple of issues that were glossed over there that I want to address and one is the standard here for judicial estoppel has been a bit obscured. A lot of the cases that Viasat cites here are not applying Fifth Circuit law which applies to a procedural issue like this. And those -- the factors under judicial estoppel are whether a party's taken a position inconsistent with a prior position, whether a court accepted that prior position, and whether the party taking that position derives an unfair advantage or imposes an unfair detriment.

And as an initial matter, the PTAB did not adopt any of Kioxia's arguments regarding this decoding limitation. In fact, it rejected on multiple occasions and the only time it did adopt a part of it, it actually rejected the majority of Kioxia's version of it, changed it and adopted a different portion that Viasat suggested and agreed to.

So to say that Kioxia convinced the PTAB --

THE COURT: Let me ask you this. If you -- if

your client were to take the same position on this claim term in my court with respect to why the patent was invalid, would it be inconsistent with the position you're taking on why you don't infringe? I'm saying you take the position you took with regard to the claim term at the PTAB and you use the same one here for invalidity in my court, would it be inconsistent with what that same expert is saying with respect to infringement?

MR. SILLIMAN: Understood, your Honor. Yes, there are differences in the application of the decoding limitation, but the claim construction -- the context is different. The PTAB was -- had interpreted that language at the institution decision level and then, were applying -- the experts were applying those claim constructions. So the PTAB constructions and the environment, the art that it was being applied to is significantly different than the situation here and the experts are applying plain and ordinary meaning.

We have got two different experts that differ on their understanding of plain and ordinary meaning in the context of the PTAB, and we don't believe that applies here where the -- our expert was applying your plain and ordinary meaning construction of those terms without the context that was added by the PTAB.

THE COURT: I interrupted you. Is there anything

else you wanted to say on this issue?

MR. SILLIMAN: Yes, your Honor.

We also, in addition to disagreeing on that point, we disagree with Viasat's suggestion that they can somehow sanitize this and cross our experts without creating, you know, significant jury confusion and potentially misleading the jury. What they propose is to cross our litigation infringement expert with an expert from a different proceeding, who is a different expert on statements that he said about different references, and somehow say that this is a -- some ambiguous, other proceeding involving the 700 patent but necessarily that would -- a jury could be informed that there was another proceeding involving the 700 patent, Kioxia, Viasat, and they will be left to draw their own conclusions about what that proceeding was, why there was another proceeding. You know, perhaps they'll draw the conclusion that Kioxia has been sued before by Viasat and this is -- now they're infringing again.

So the confusion and the potential to mislead the jury even with their sanitized version of the -- this cross-examination would be too prejudicial to -- and far outweighs any scant probative value.

THE COURT: Any response?

MR. MCBRIDE: Your Honor, I don't think there's

any question that the positions are inconsistent. I mean, they took the position or the agreed position in the IPR that decode can include descrambling and deinterleaving, which are two forms of derandomization. Their expert's taking the position now and even was asked about the same exact prior art reference, he's taking the position now that those would not constitute decode. So it's clearly inconsistent.

And I'm confident that we can avoid any confusion if, in the alternative, we are allowed to cross him with that inconsistency.

THE COURT: I'll be right back.

If we could go back on the record.

The Court is going to grant the motion and the Court is going to judicially estop defendant from arguing, one, that derandomizing is not decoding and, two, from distinguishing error correction bits from data -- arguing that distinguishing error correction bits from data correction bits is not decoding.

The next issue up I have is -- regards physically set -- the physically separate limitation and I think the history it is over whether or not there can be an argument with regard to whether or not this is prosecution history estoppel. I'll hear from the plaintiff on this.

MR. MCBRIDE: Yes, your Honor. Scott McBride

09:20:58 again.

09:20:58 Yes, that is exactly the issue. Dr. Melvin
09:21:01 specifically looks at the prosecution history and what
09:21:04 Viasat said in the prosecution history and makes a
09:21:07 determination that physically separate requires that these
09:21:10 two modules, the detection module and the correction
09:21:13 module, that they have to be operating on the same
09:21:17 underlying error correction code.

09:21:19 THE COURT: And just to make sure I understand
09:21:21 it.

09:21:22 MR. MCBRIDE: Yeah.

09:21:22 THE COURT: Your argument is -- the heart of your
09:21:25 argument is that this is an issue that should have been
09:21:28 raised at -- during claim construction -- either claim
09:21:32 construction or sometime before the expert report and have
09:21:36 the Court weigh in on whether or not there was prosecution
09:21:40 history estoppel.

09:21:41 MR. MCBRIDE: Yes, your Honor.

09:21:42 THE COURT: And as I understand, it's basically
09:21:44 because, the way I see the world -- and I'll hear from the
09:21:49 other side, of course. The way I see the world is it's
09:21:52 very difficult to cross-examine Dr. Melvin or any expert
09:21:55 and say about that -- about what's essentially an issue of
09:22:00 law. You know, he would argue that it's prosecution
09:22:02 history estoppel and you say nuh-uh, it isn't. It's

really hard for someone at cross to do this is the way I see it.

MR. MCBRIDE: Yes, your Honor. It's not an issue for the jury either, which creates all sorts of problems. So yes, there's nothing more I can add to that and whether or not -- they didn't use the word "estoppel" but that's the substance of what he's doing, your Honor.

THE COURT: Okay. A response.

MR. SILLIMAN: Yes, your Honor. Mike Silliman again for Kioxia.

The crux of our response is that Dr. Melvin's noninfringement positions are primarily based on the lack of evidence that was shown by Dr. Hassoun, Viasat's expert on the physically separate limitation. He does separately discuss --

THE COURT: I don't think the plaintiff -- I don't think the plaintiff is asking me to prohibit him from doing that. I mean, I think my understanding -- and plaintiff can correct me if I'm wrong. My understanding of the plaintiff's concern is limited to the issue that I just raised about the issue of prosecution history estoppel and the difficult -- whether or not it should have been raised earlier.

I don't think and I'm not intending to prevent Dr. Melvin from doing something that is, I think, what you

just suggested.
MR. MCBRIDE: Correct. To the extent you're asking, your Honor, that is entirely consistent with what plaintiff is asking.
THE COURT: So does the defendant want to argue anything with respect to this issue that the plaintiff has raised with regard to Dr. Melvin's ability to discuss the concept of prosecution history estoppel or that issue with respect to the claim term of physically separate?
MR. SILLIMAN: Your Honor, we are not proposing to say that Dr. Melvin will give any testimony about prosecution history estoppel.
THE COURT: Okay. Then that's granted or moot. One or the other.
Next up I have is -- and I'm still not sure, I'm sorry, exactly how to pronounce your client's name. Is it Kioxia?
MR. FULGHUM: Yeah. We sometimes call it Kioxia. You'll hear a couple of different pronunciations. Kioxia is fine, your Honor.
THE COURT: I'll go with Kioxia. So the next up I have, reliance on un-deposed Kioxia employee M-O-R-I, which I would assume is Mori. It appears to be Japanese. Hope I'm getting that right.
MR. MCBRIDE: Yes, your Honor. Scott McBride

again.

Yes. This has to do with opinions that were based on conversations with Mr. Mori. Mr. Mori's a Kioxia employee that Kioxia refused to make available for a deposition. Your Honor may recall, we went through months of process to line up depositions in Japan, which requires an order from the Court. It's based at the embassy and it's extremely procedurally difficult and requires a lot of exactitude. And so, we did months of discussion to line up those depositions, including the names of the witnesses, and Mr. Mori is someone that Kioxia never identified. He was not on a Rule 26. He was never identified as someone with relevant information.

And in the time period we were doing this work, he did not show up on any documents that Kioxia had produced. What did happen is that suddenly, after the schedule had been or the --

THE COURT: Let me ask you this. If you were to have the opportunity to depose Mr. Mori and if the deposition were to take place here, would you still feel equally prejudiced?

MR. MCBRIDE: No, your Honor, we would not be as prejudiced if we were able to get a deposition of him here in the United States, frankly. It's not what we asked for but that would be -- that would remove the prejudice, yes.

THE COURT: Let me hear from defendant why that isn't a solution.

MR. SILLIMAN: Your Honor, we think this is a, you know, a day late and a dollar short, frankly. You know, Viasat had the opportunity to raise this as a discovery issue for a very long time at this point.

THE COURT: When did you disclose Mr. Mori?

MR. SILLIMAN: Mr. Mori was disclosed on several different occasions. The earliest of which was when he was actually listed on a -- raised as a potential deponent on July -- I'm sorry, June 28th of 2023, and then, again, when we produced the document that listed him on the sole -- as the sole author in July 21st, 2023.

THE COURT: Did you make him known -- that wasn't the impression I got from plaintiff. Did you make his identity and relevance known in advance of scheduling the Japanese depos?

MR. SILLIMAN: Your Honor, I would argue that we did by him being listed as a sole author of the 300-page specification and listing him on a list of potential deponents. And then, the issue came up at the -- during the depositions, actually, we were given a two-day window, two days on which we could present him. That did not work for our schedules and for Mr. Mori's.

THE COURT: I don't think anyone's at fault here.

09:27:29 If you want to use Mr. Mori, it's solely up to you, but he has to be deposed before he can appear. And it's very -- I understand it's very difficult. Look, I like going to Japan for depositions, but I understand it was not much fun to be kicked out of the embassy at 11:45 every day. I get that.

09:27:51 So if defendant wants to have Mr. Mori testify, you can -- he has to be deposed and I'll -- because I don't think anyone's at fault. You guys you could split the cost of getting him here to America and take his deposition if you want to take his deposition.

09:28:10 MR. FULGHUM: Your Honor --

09:28:12 MR. MCBRIDE: I'm sorry, go ahead, Roger.

09:28:13 MR. FULGHUM: Yeah, my apologies, Mr. McBride.

09:28:16 I'd like to have Mr. Vu speak to this issue. The issue is not Mr. Mori testifying. It's an argument about reliance.

09:28:26 THE COURT: Okay.

09:28:27 MR. FULGHUM: Mr. Vu, would you speak to that?

09:28:30 THE COURT: Oh, I see. It's about Dr. Melvin relying on what Mr. Mori told him.

09:28:36 MR. VU: That's correct.

09:28:38 MR. FULGHUM: That's right. And there's some duplicative issues here with regard to reliance, but Mr. Vu will speak to that.

MR. VU: Yes, your Honor. I'm just going to make a quick point, your Honor, and put up a page from our briefing, if I may. It appears what the issue is is that Mr. Mori was cited for -- for some points. Conversations with Mr. Mori were cited for some --

THE COURT: I got it.

MR. VU: -- technical issues with in our noninfringement report, Kioxia's noninfringement report. These are the five areas that Viasat appears to take issue with. And Mr. Mori was cited in addition to this other -- these other references, your Honor. So his -- the conversation with him is not critical and we would agree to not reference -- to not have Mr. Melvin testify that he had conversations with Mr. Mori or to use conversations with Mr. Mori as backup to any of his opinions.

THE COURT: And what does plaintiff say to that?

MR. MCBRIDE: My response, your Honor, would be that if we go through the actual report and look at, for example, you know, paragraph 126 with this footnote 2, you know, there are sentences and paragraphs, for example, paragraph 225 and 226 where he says, you know, based on discussions with Kioxia's engineers, I understand X and the only person cited is Mr. Mori. So from our position, there's a significant numbers of his opinions where if we remove Mr. Mori, they have no basis for those opinions

09:30:15 and, therefore, they should be excluded, as well.

09:30:19 So that's part of -- I mean, that's the basis for 09:30:21 us actually asking to exclude it is because we were 09:30:24 deprived of the ability to depose Mr. Mori on these 09:30:27 issues. Now he's the sole reliance for many of those 09:30:29 issues and so, I don't think that --

09:30:33 THE COURT: Well, let me ask -- I'm not sure who 09:30:36 wants to answer this for defendant. Anyone can. I get 09:30:42 that Dr. Melvin wants -- I don't know what he's saying 09:30:48 here but let's say he's saying -- whatever he's talking 09:30:52 about, he's talking about decoding and his opinion on 09:30:56 decoding has to do with conversation with Mr. Mori. Well, 09:30:59 for that opinion to come in, the defendant has to have 09:31:05 some evidence of -- from Mr. Mori that he gave that 09:31:08 evidence. How is the defendant intending to put that 09:31:11 evidence in at trial?

09:31:14 MR. FULGHUM: Your Honor, it will come in -- 09:31:17 there's complete duplication here between reliance. It 09:31:20 will come in through the documents. You see in the center 09:31:23 section, he will put in his testimony without any reliance 09:31:27 on any conversation with Dr. Mori. He will not mention 09:31:30 Dr. Mori. He will not rely on Dr. Mori; instead, he'll 09:31:33 rely on materials other than Dr. Mori.

09:31:37 Dr. Mori was never intended to be the sole 09:31:41 reliance --

09:31:42 THE COURT: So if for the plaintiff, if Dr. Melvin can get in everything the defendant wants him to get in, I'm not sure why you need to have this deposition. And what I mean by that is there's independent support for it other than just what Mr. Mori said.

09:32:00 MR. MCBRIDE: If they could do that, your Honor, then I agree. I guess then where that would leave us is we just have to deal with it at trial in the sense of, you know, the basis -- we'll see where the basis is in his report and if there's an actual document he relies on for that versus simply conversations with the engineers.

09:32:19 Because just, for example, I mean, in paragraph 225, he says, based on my discussions with Kioxia engineers, I understand that the FC is a message to firmware which includes the results of L1 ECC, and the only cite for that -- it does include a document, but the only engineer cited is Mr. Mori. So we're left with an uncertainty as to how they can square that with what they intend to do at trial since he's just -- as based on my discussions.

09:32:46 THE COURT: Well, I made it clear for the defendant to get Dr. Melvin -- an opinion from Dr. Melvin, there would have to be evidentiary basis for it and if -- if the defendant intends for Dr. Melvin to rely on something Mr. Mori told him, Mr. Mori is going to need to

be there. Mr. Mori will need to have been deposed. If the defendant can put in what -- everything they want from Dr. Melvin without relying on what Mr. Mori said, then I don't think we have a problem and Mr. Mori doesn't need to be deposed.

MR. MCBRIDE: Understood, your Honor. Yes.

MR. FULGHUM: Your Honor, that's understood for defendants so we could live with that certainly.

THE COURT: Next up, I have reliance on unproduced actual performance data. I'll hear from the plaintiff on that.

MR. MCBRIDE: Scott McBride again, your Honor.

In paragraphs 565 to 571 of Dr. Melvin, he gives opinions that are in reliance on screen shots of specific data, performance data that was never produced to Viasat despite being squarely within multiple discovery requests, including RFP 10, 63, 65, 74. They did produce instead of actual data, they produced projections and simulations of this performance and reliability data. And, you know, their 30(b)(6) witness was prepared with just these projections and simulations, which we used in our expert reports.

But then, Dr. Melvin went to Kioxia and asked for performance data and they gave him actual performance data in the form of screen shots that were never produced to

us. There's no question it's responsive and there's no question that we'd been prejudiced by it because obviously, we don't get any kind of a reply report to deal with this. And so, we would just ask that Kioxia -- that Dr. Melvin's paragraphs and reliance on that data be excluded or that, in the alternative, that we be permitted to -- that they be required to produce the data and then, our experts be permitted to comment on it during trial.

THE COURT: Of course, I'll hear from Mr. Fulghum or whoever, but it seems to me, we're in the same situation we were on the previous issue, which is it's pretty clear that if Dr. Melvin wants to rely -- if he wants to say an opinion on X, you all need to have had that, and if at trial, if you were to challenge an opinion Dr. Melvin is attempting to give and plaintiff were to argue it was based on information that they didn't have, that would be problematic for the defendant.

So I'm assuming Mr. Fulghum's going to tell me that anything that they have produced to you or will produce to you immediately, or whatever, anything that would form the foundation for what Dr. Melvin is going to say.

MR. FULGHUM: Let's hear from Mr. Vu on this. I think the background on this is interesting, as well, your Honor.

THE COURT: Okay.

MR. VU: So, your Honor, you know, this is in the briefing, but we obviously disagree that this data was responsive to their discovery requests. You know, we go through their requests in detail. And, frankly, you know, we have never faced a motion to compel in front of this court in this case. We've sort of bent over backwards. And frankly, it makes no sense that we wouldn't produce something, you know, that would obviously help show that this feature's not important.

So we get to the end of this case, they produce an expert report that relies on, you know, certain levels of encoding being reached, and our expert asks the client, you know, do we know whether those levels are reached? And they dig into -- you know, they dig into their files to provide the data to the expert to rebut their expert's opinion.

Now, this expert that used the data is, you know, essentially a damages expert. And again, we served a damages interrogatory. This theory that use this Hyosung (phonetic) coding level -- that relies on this Hyosung coding level was never disclosed to us. So that's sort of how we get to this point where, you know, the data is used in connection with a rebuttal expert report.

THE COURT: Anything else from the plaintiff?

09:37:08 MR. MCBRIDE: Yes, your Honor.
09:37:09 Our Request For Production 63 asks for performance data including endurance data for the accused products. What Dr. Melvin said in his report at paragraph 566 is that he received an endurance RDT report, which is specific to one of the accused products. This is directly responsive. They didn't give it to us during production. They didn't prepare their 30(b)(6) witness on it. We would ask that those paragraphs be excluded or, in the alternative, you know, they give it to us. They let us depose the 30(b)(6) witness on this again, Mr. Cohen, and then, our experts be allowed to comment on it at trial if it's not excluded.
09:37:48 MR. VU: If I could respond to that, Judge.
09:37:49 THE COURT: Sure.
09:37:52 MR. VU: So they did depose Mr. Cohen, Judge. They also deposed him on these curves that their expert used. They never asked him about whether certain levels were reached or how often they were reached. We completed that deposition. There was no complaint about his level of preparedness or what he was being offered for.
09:38:10 THE COURT: Okay. Anything else --
09:38:13 MR. VU: So I see this, your Honor -- I'm sorry, just one last point. They made a bed, a discovery bed, and I think they should lie in it.

MR. MCBRIDE: Your Honor, we made a bed in which they took the sheets away and we didn't know there were any. I mean, we can't be -- they can't tell us that we have to lie on the hard floor when we asked for a bed and they refused to give it to us.

THE COURT: Any other bed analogy before I make up my mind? Okay. I'll be back in just a second.

Okay. One of my law clerks -- so give you an idea of the quality of law clerks I get -- told me that I should say I should put this issue to bed. I wouldn't have done that without that prompt.

So to the extent there is any actual drive performance data that was made -- that has been made available to Dr. Melvin that has not been produced, it needs to be produced. If it turns out after the plaintiff receives the additional data they believe that they need for the defendant to do any additional supplemental report -- anything additional in a supplemental report to lay a foundation for Dr. Melvin to say something at trial about it, they can let defendant know. Defendant can do the supplemental reporting. Depositions could be taken and then, I can only imagine that it could lead to associates making a lot more money billing a lot more hours because God knows how many -- and I'm all for that. I'm all for young associates having their fork. And so, whatever

09:40:41 number of supplemental reports this engenders, so be it.
09:40:49 MR. MCBRIDE: Your Honor, if I could have one clarification on this because it will overlap with a motion in limine, which we will get to, but the person who provided and explained this data, Mr. Cohen, is one of their trial witnesses, he's the 30(b)(6). Can I assume we would be allowed to depose him on that data --
09:41:02 THE COURT: Yes.
09:41:03 MR. MCBRIDE: -- for 30(b)(6)?
09:41:04 THE COURT: Yep.
09:41:05 MR. MCBRIDE: Okay. Thank you.
09:41:07 THE COURT: If I didn't make that clear, yes.
09:41:09 Next up, I have the motion to exclude Mr. Bakewell.
09:41:17 MR. KNOBLOCH: Your Honor, Nosson Knobloch from Bartlit Beck here on behalf of Viasat. May I proceed?
09:41:24 THE COURT: Yes, please.
09:41:25 MR. KNOBLOCH: Thank you, your Honor.
09:41:26 What we're moving to strike here is one of three license agreements that Mr. Bakewell relies upon. Mr. Bakewell is Kioxia's damages expert. The license we're moving to strike and his reliance on it that we're moving to strike is a settlement agreement reached very early in litigation. It is an agreement for far below the cost of litigation. It is a $350,000 settlement and the amount

and timing alone strongly suggests that this was a cost of litigation settlement. It was not an agreement that actually reflects the outcome of a hypothetical negotiation for a patent that is assumed valid and infringed.

And the limited record that we have about this agreement casts additional doubt on its relevance. Most importantly, because at the time this agreement was reached, there was a pending Rule 11 sanctions motion against the plaintiff for an inadequate pre-suit investigation. And we attached this motion at Exhibit 3 to our motion and the reason we attached the whole thing, your Honor, is because looking over it, this does not appear to just be a boilerplate challenge to a complaint.

This appears to be a substantive and serious motion challenging the sufficiency of what the plaintiff there had done. For example, the patent at issue in that case clearly covered flash memory, but the complaint accused a magnetic hard disc, old pre-flash memory technology as the infringing device. You know, clearly there were some problems with the complaint and before this Rule 11 motion sanction -- this Rule 11 sanctions motion gets decided, the parties settled for below the cost of litigation.

This is a license between Toshiba was the

09:43:21 defendant and eDigital, a company I'd never heard of, was the plaintiff. And, you know, I can tell you from experience and I'm sure everyone on this Zoom call understands, it costs a lot more than $350,000 to litigate a patent case against a company like Toshiba.

09:43:36 And so -- and I think the reason that exclusion is especially appropriate here, your Honor, is that Kioxia's own discovery conduct, it has prevented either party from developing a record on which the Court or the jury could really fully assess the comparability of this agreement to the hypothetical negotiation. Remember this is a Toshiba agreement. Kioxia used about to be a part of Toshiba and they're closely related companies. Kioxia got its hands on this agreement, presumably because they asked Toshiba for it, and what they didn't do, though, is ever disclose it or discuss it in discovery.

09:44:13 So we had an interrogatory -- we served an interrogatory on them. And I'll share my screen so I can show the Court the interrogatory I'm talking about. The interrogatory plainly asked for exactly this information. We said please send us -- please identify to us any license agreements that you think are comparable to the hypothetical negotiation. Kioxia did not identify this license.

09:44:37 And then, we had a 30(b)(6) deposition where they

09:44:40 did -- after they produced this agreement and a bunch of other documents relating to licensing, they had a 30(b)(6) deponent show up. And the deponent who was designated to talk about these issues did not know anything about the license or the litigation that led to it. We asked -- and I have on the screen, your Honor, this is from Exhibit 10 to our motion, two excerpts of the deposition of Kioxia's 30(b)(6) witness. And when she was asked, do you know anything about the underlying patents that are at issue in that license? Answer, no. Question, do you know anything about the litigation that precipitated this settlement? Answer, no.

09:44:43 09:44:46 09:44:51 09:44:57 09:45:00 09:45:03 09:45:09 09:45:12 09:45:15 09:45:18 09:45:21

09:45:21 And so -- and this is a situation where Kioxia could have had a different answer, right? They have access to Toshiba. They could have had their witness go to Toshiba and ask them these kinds of questions, get some background information, so that the jury could actually assess whether these agreements are -- whether this agreement is comparable to the agreement that the parties will be -- you know, assumed to have done in the hypothetical negotiation and they chose not to do that.

09:45:26 09:45:31 09:45:35 09:45:37 09:45:41 09:45:44 09:45:47 09:45:49

09:45:53 And so, we're left with a lot of unanswered questions. Was Toshiba even using the patented invention? We don't know. Did Toshiba have strong invalidity defenses? Again, we don't know. Did eDigital have the

09:45:56 09:45:59 09:46:02

09:46:06 financial resources to litigate the case? We don't know.
09:46:09 And further compounding the problem here, your Honor, is I
09:46:13 put on the screen, the one paragraph in Mr. Bakewell's
09:46:16 report that discusses the status of the litigation. This
09:46:20 is the sum total of what he has to say about it and he
09:46:24 says, I considered the status of the litigation and the
09:46:27 potential role of the litigation in the agreement; but
09:46:30 then, he doesn't actually explain what he considered, how
09:46:33 that was factored in, or anything about how he reached a
09:46:38 decision that this agreement from -- this settlement
09:46:41 agreement was actually relevant.
09:46:43 And I think, most importantly, he's completely
09:46:46 silent about the elephant in the room, which is the fact
09:46:48 that the settlement amount here was below the cost of
09:46:51 litigation and strongly indicated that it's not actually a
09:46:56 reflection of a hypothetical negotiation that reflected
09:46:59 the value of the patent.
09:47:02 And I don't think, your Honor, that
09:47:04 cross-examination is going to fix the problem here. The
09:47:08 jurors here are not -- unlike everyone on this Zoom call
09:47:11 who knows how much it costs to litigate a patent case
09:47:14 against a company like Toshiba, the jurors don't know
09:47:16 that, and getting into that sort of information is going
09:47:20 to take a lot of time and create a distraction.
09:47:23 And there's -- I don't think -- there's a lot of

09:47:26 other issues I think that we'd have to get into in front
09:47:28 of the jury to question the relevance of this agreement
09:47:31 that -- and it will just be better to exclude it entirely.
09:47:36 One final point, your Honor. I was looking over
09:47:38 the cases. Both parties cite a bunch of cases. There's
09:47:43 lots of case law dealing with this issue of, you know, the
09:47:46 comparability of patent settlement agreements to a
09:47:49 hypothetical negotiation and the one case really jumped
09:47:53 out to me, which is the Plexxikon case out of the Northern
09:47:56 District of California. And I know it's just another
09:47:57 district court, but the facts there are very similar to
09:48:02 what we have here. And what the Court there said is he
09:48:05 was not going to let a -- an expert talk about a
09:48:09 settlement agreement that was entered early in the case
09:48:13 indicating that the transaction cost of litigation were a
09:48:16 dominant factor in the license value, number one, and,
09:48:19 number two, where there was no evidence of the extent to
09:48:21 which the licensee was actually infringing.
09:48:24 And that's the exact same circumstance we have
09:48:26 here and that's why we request that this opinion -- and,
09:48:29 again, it's just one small part of Mr. Bakewell's opinion.
09:48:32 He has two other licenses here that he relies on. He has
09:48:35 other damages opinions that he can present to the jury.
09:48:37 But this opinion, we think, should be excluded.
09:48:41 THE COURT: Response.

09:48:44 MS. FLANNERY: Yes, your Honor. Liz Flannery for the Kioxia defendants.

09:48:47 So we just heard a lot from Mr. Knobloch, but I think it all goes to their arguments about the weight of this agreement. All of those facts that Mr. Knobloch talked about, the timing of the settlement, the amount of the settlement, all of those things are things that they certainly can talk to Mr. Bakewell about on cross-examination.

09:49:07 One thing I would point out is that Mr. Bakewell does not look at this and say, well, $350,000, that's the amount that should be the license here. The patent in that case had limited life on it and Mr. Bakewell looked at that and he appropriately scaled that license agreement to what the 700 patent license -- and in fact, the number that he got is very close to the number that he got relying on other license agreements that Viasat has no complaint on.

09:49:38 So again, that just sort of demonstrates here that all of these facts aren't about the agreement being somehow infirm or unreliable. They go to the weight and those are things that they can certainly cross-examine him on. There's no reason for that. There's no reason to exclude based on that. They talk about --

09:49:55 THE COURT: I agree with you. I'm going to deny

the motion.

Next up, I have motion for partial summary judgment based on IPR estoppel. I'll hear from the defendant on that, please.

MR. PACKARD: Yes, your Honor. Spencer Packard here for Kioxia.

Your Honor, Viasat's motion should be denied for three reasons. First, the prior art references that are at issue here, the system art, specifically, the Daikoku2 system, it's not describing the same product that's described by the printed art. Now, Viasat's motion for IPR estoppel is challenging the Daikoku2 because it discloses the same claim element that's disclosed by the printed art. But, your Honor, that's not a sufficient basis to trigger estoppel: reason being it wouldn't leave any room for a system art to ever proceed in a district court litigation if it's challenging the same claim that was challenged in an IPR, and this is because the art used in both forms is necessarily going to challenge the same claim elements.

If you look at all of the claims or all of the cases that Viasat had listed in their reply brief where system art estoppel was triggered, there was a relationship between the system art and the printed art that showed that the two were different embodiments of the

same invention.

That's not the case here. The Daikoku2 is a system that was invented in -- it was developed in Japan by Toshiba in 2008 and the printed art at issue here that Viasat is focused on is the Wu reference, that was filed and issued in the United States or published in the United States around 2011. And if you look at the face of the Wu reference, all of the inventors there were not shown to have any relationship with Toshiba. They weren't shown to have any knowledge of the Daikoku2 reference.

If you look at all of the printed art that's at issue in this case, if you look at the Wu reference in its entirety, there's no mention of the Daikoku2 at all; and so, there's no showing that they are describing the same product.

Another point, your Honor, is that the documents that Kioxia's expert relied on in describing the Daikoku2, those documents provide more detail about the element from the Daikoku2 that is being used. Specifically, it's the randomizer. They provide more details about that randomizer than what the Wu reference or what the printed art shows about that same element.

And lastly, your Honor, the documents that are used to describe the Daikoku2, those documents are confidential. They're nonpublic. And the CliniComp case

from this district distinguished from -- well, they found that fact to be dispositive. In a situation where an expert relied -- did not rely solely on printed publications in describing a system art product, system art estoppel did not apply. In this case, the same situation is present. Dr. Sechen, Kioxia's expert, didn't rely on any printed publication to describe the Daikoku2 randomizer. And for those reasons, Viasat's motion should be denied.

THE COURT: A response.

MS. FASULO: Yes. Good morning, your Honor. Meg Fasulo on behalf of Plaintiff Viasat.

Kioxia is concerned that Viasat's argument here would sort of wipe out all available system art and it absolutely would not. They are making an argument about Daikoku2 separately from this particular combination that we have no argument is subject to 315 estoppel. But what really matters here are the highly specific ways that they are trying to use Daikoku2 and how that overlaps with art that was in front of the patent office.

I'm going to share my screen quickly just to give you a sense of this. What I have on the screen right now is Kioxia's combination of Lee plus Daikoku2. You can see that on the left. It has those red boxes. The red boxes are randomizers and those are the only thing that is drawn

from Daikoku2 for this combination. On the right, we have the combination of Lee plus randomizers for Wu. Now, there's no dispute that the combination on the right is fully subject to 315 estoppel. Both Lee and Wu are printed publications that could have been raised in front of the PTAB. And in fact, Wu was actually raised to the PTAB and it was raised for the exact reason that Daikoku2 is raised here. It teaches a randomizer in a particular location and the data path that teaches a decoding module.

And under Wasica, under Hoffman, cases like that, this is the inquiry that we are supposed to be undertaking. What do the references teach and were they available to the PTAB? Here, they were and so, this combination should be subject to estoppel.

THE COURT: I wasn't sure if you were done.

MS. FASULO: I am done. Thank you, your Honor.

THE COURT: You're very welcome. Anything else?

MR. PACKARD: Yes, your Honor.

I just want to underscore that the randomizer that was highlighted in those images, it's not the same randomizer. It's not source from the same product. The Daikoku2 isn't related to the Wu reference and it is a feature that Viasat put in the spotlight of this case. They identified randomizers as meeting the decoding limitation. So trying to minimize it by saying it's just

09:55:40 a single component or just a small component, that doesn't change the fact that it is a necessary limitation for them to prevail on this case. So it is a critical feature.

And considering the Wasica case, in that case, the printed art that was the reason why the system art was estopped, the printed art was describing that very system art product. And again, we don't have that situation here.

MS. FASULO: Your Honor, if I can just be very brief. Their expert agreed that randomizers as a principle and a structure were known beyond Daikoku2 and there is nothing about the particular randomizer that was selected for Daikoku2 that matters for their combination. It is simply a generic randomizer that was also taught in another reference. Thank you. I am done.

THE COURT: Anything else?

MR. PACKARD: Nothing further, your Honor.

THE COURT: Okay. I'll be back just a second.

Okay. The Court is going to deny that motion.

Next up, I have motion for summary judgment of no infringement. I'll hear from the defendant. Thank you.

MR. FULGHUM: So, your Honor, for the defendant, this is Kioxia's motion for summary judgment of no infringement. We're content, your Honor, to stand on our papers on this one unless your Honor has specific

questions. We don't think we could do a lot better than what we put on the printed page here.

THE COURT: Okay. I don't have any additional questions. The Court is going to deny the motion and continue to apply plain and ordinary meaning.

Next up, I have a motion for partial summary judgment of no infringement of claim 6, 11 and 16. I'll hear again from defendant.

MR. SILLIMAN: Yes, your Honor. Mike Silliman on this one.

Briefly, your Honor, Kioxia is requesting a claim construction of the term "rate of errors" here in light of the fact that the -- that term was not at issue during the Markman hearing and that the way that that term has been applied by the infringement expert that Viasat has presented in this case is contrary to the 700 patent's usage of that term and how it would be understood to a person of ordinary skill in the art in light of the 700 specification.

And specifically, you know, we request that that term be construed as a number of errors translated by a time period or other metric. And this is critical in this case because the -- Viasat's infringement positions are based on an amount of errors. Their infringement expert points to variety of things that he claims are monitored

rate of errors, but each one of those amount to, at most, an amount of errors and not any rate of errors as properly understood by the 700 patent. And I'd be happy to go through our support for that if the Court would like.

THE COURT: Let me just -- what I would like to hear a little more argument on is with respect to claim 11 and if there's a factual dispute, how I should deal with that at this time.

MR. SILLIMAN: With regard to which aspect of claim 11?

THE COURT: Claim 11, my notes show there's a factual dispute based on the documents as to whether the raw bit error rate is monitored by the controller and if you want to address that issue.

MR. SILLIMAN: Yes, your Honor. I'm happy to do that.

So the evidence that Viasat has pointed to there is -- effectively amounts to the fact that raw bit error rate rises with coding rate and that as raw bit error rate rises in some cases, error correction modules can be powered up. But Viasat fails to show any evidence that the accused controllers monitor that error rate and that is the dispute of these claims and that is missing from their evidence. They've not presented anything remotely close to substantial evidence that the accused products

monitor bit error rate.

They also fail to show that bit error rate is a triggering condition. At most, the evidence they provide shows the correlation between bit error rate and code rate increasing or powering up error correction sub-modules, but correlation does not equal causation. These two things happening in tandem is not sufficient to create a material dispute that there is infringement here.

And bit error rate is a term -- the presentations they're providing are presentations to customers. Bit error rate is a term that's used to just refer to errors increasing as, for example, flash memory ages. And so, that's -- it's more akin to saying something like as hurricanes get more powerful, we expect more damage to occur. But of course, we don't monitor hurricane power, we monitor things like wind speed and that's a similar issue here.

It's not dispositive that you talk about bit error rate rising and you also talk about the fact that coding rate can change. They must also show specifically that bit error rate is something that's monitored and they have not done that with the evidence they've shown.

THE COURT: Response.

MR. KNOBLOCH: Yes, your Honor. Nosson Knobloch for Bartlit Beck for Viasat.

10:03:38 So what I shared here, your Honor, because I
10:03:43 thought this might come up, is a collection of excerpts
10:03:46 from our expert's report where at the very top is a
10:03:51 discussion of the Canopus product, one of the main three
10:03:54 accused products, and our expert says that the Canopus
10:03:57 products monitor the rate of errors detected by the L1 ECC
10:04:01 and the NAND. And then, right underneath that is just a
10:04:05 small excerpt of one of the many pieces of evidence that
10:04:08 he cites to support that opinion. This is right
10:04:12 underneath that in that first box. The sequencer
10:04:14 collectively notifies error occurrence information for one
10:04:18 cluster. That's a direct quote. That is an excerpt from
10:04:23 a Kioxia document. And he presents those opinions for
10:04:27 every one of the accused products.

10:04:28 So there is absolutely a factual dispute, at a
10:04:32 minimum, and I think the overwhelming evidence that
10:04:36 Kioxia's products monitor an error rate and in response to
10:04:41 the monitored error rate, change the encoding level.

10:04:44 And what I have here on the screen now, your
10:04:46 Honor, is a -- one slide from a Kioxia presentation to its
10:04:51 own customers where what does it say to its customers? It
10:04:55 says the length of the L1 media ECC, that's the amount of
10:04:58 encoding -- of error correction encoding that's used in
10:05:01 their products, grows according to increase of raw bit
10:05:06 error rate of NAND.

10:05:07 Based on the raw bit error rate, that's what causes the ECC encoding level to increase. It's in Kioxia's own documents almost word-for-word of what's in our -- what's in Viasat's patent claims. And so, I think there's, at a minimum, a factual dispute here. And, your Honor, I'm happy to stop there. If you want, I can talk more about our disagreements with the proposed construction, but it sounds like the Court was mainly interested in the factual dispute here.

10:05:34 THE COURT: I think the jury is going to be very excited by this slide. I think this will probably win or lose the entire case. No. I'm --

10:05:48 MR. KNOBLOCH: We have our work cut out for us certainly.

10:05:54 MR. SILLIMAN: Your Honor, if I could just respond on two brief points.

10:05:57 THE COURT: Please.

10:05:58 MR. SILLIMAN: So on the previous slide that Mr. Knobloch showed, those elements are exactly what we're talking about. Their expert there is pointing to things that are -- at most, disclose an amount of errors, not at all a rate of errors. They're talking about sequencer and it's got symbols that come out and they're purely an amount of errors and that's exactly what the 700 patent distinguishes from a rate of errors. The specifications

10:06:19 are clear that those are two separate concepts.
10:06:22 And then, as -- and then, on that second slide,
10:06:24 again, that's showing this correlation and they do not
10:06:29 have anything else to show the explicit link where there,
10:06:33 it is both monitored and then, action is taken based on
10:06:36 the monitored raw bit error rate as required by the
10:06:41 claims.
10:06:43 THE COURT: Give me just one second. Do you have
10:06:57 any arguments other than claim construction arguments you
10:06:59 want to take up?
10:07:01 MR. SILLIMAN: Your Honor, this motion is based
10:07:03 on the claim construction argument.
10:07:05 THE COURT: Okay. And if we reject -- I asked it
10:07:09 that way because I wanted to ask this question, which is
10:07:13 if we reject your claim construction argument, then you
10:07:19 lose the motion, right? That's the thrust of the motion,
10:07:22 right?
10:07:23 MR. SILLIMAN: Yes. That is the thrust of the
10:07:25 motion, your Honor.
10:07:26 THE COURT: Anything else anyone wants to argue?
10:07:29 MR. KNOBLOCH: Your Honor, I'm happy to talk more
10:07:31 about why we disagree with the construction, but we also
10:07:34 explain that in our papers. So unless the Court has any
10:07:37 questions, that's all.
10:07:38 THE COURT: No. I'm good on that.

10:07:40 MR. SILLIMAN: We'll stand on our papers, as well, your Honor.
10:07:42 THE COURT: Okay. I'll be back in just a second.
10:09:33 The Court's going to deny the motion.
10:09:36 Next up, I have the motion to exclude the opinions of Dr. F-U-E-R-S-T, Fuerst, perhaps Dr. M-O-D-Y, Mody, Mr. Doller, and Dr. Khatri, K-H-A-T-R-I.
10:09:55 MR. FULGHUM: Your Honor, this is Roger Fulghum.
10:09:57 Going back to the rate of errors.
10:09:59 THE COURT: Yes.
10:09:59 MR. FULGHUM: Can we inform the jury that the rate of errors are events over time and not merely an amount?
10:10:12 THE COURT: Let me see.
10:10:17 MR. FULGHUM: Miles per hour versus miles.
10:10:22 MR. KNOBLOCH: Your Honor, I think the issue here is that there is also a rate -- the rate that is used in Kioxia's products can be thought of in terms of time but is mainly thought of in terms of a number of errors per unit of data. So it's like they used to call them sectors, which is a unit of data, and it's the number of errors per that unit of data that matters. And so, what I want to avoid is a situation where we're arguing about whether, you know, as a matter of claim construction that sort of --

10:10:51 THE COURT: I get it. So here's what we're going to have to do. I think we're going to have to have a short clam construction argument. We're going to just have to set this for claim construction and I'm going to have to resolve it. I can't do it -- I'm not going to wing it here but we'll get something set. And I think you guys have sufficiently covered us with us the arguments of what -- we will get a Zoom hearing set up where the Court either construes it or explains why it thinks that doesn't need to be construed.

10:11:32 And I'm going to pocket veto for now -- or at least pocket. Take off veto. I'm going to pocket the motion for summary judgment. Let's have a hearing on that specific issue. It doesn't work for me either at trial to have you all fighting -- arguing past each other with experts. So we'll get that set up and -- on those specific claim -- that term or claim terms.

10:12:00 MR. FULGHUM: Thank you, your Honor.

10:12:02 I interrupted the Court. With regard to the motion to exclude, we're going the break that up in terms of speakers. Ms. Flannery's going to handle Dr. Fuerst and Dr. Mody.

10:12:21 MS. FLANNERY: Thank you, your Honor.

10:12:21 So I'm handling, as Mr. Fulghum said, the first parts of that motion. To set a little bit of context,

10:12:28 Viasat's damages expert, Dr. Mody, has three different damages theories. She has a theory based on comparable licenses and for that one, she relies on opinions from Dr. Fuerst. For her other two theories she relies on, she has cost -- damages opinions based on cost and incremental value analysis. Those are the opinions that she relies on for Dr. Doller.

10:12:48 So to the extent that Dr. Fuerst's opinions are struck, then Dr. Mody's opinion on her license agreement -- I just wanted to make sure the Court understands sort of the relationship between those two different theories that Dr. Mody is sort of her opinions depend on the other one we're going to talk about.

10:13:01 With regard to the comparable license theory, that's the one I'd like to talk about first --

10:13:06 THE COURT: Let me interrupt. Because of the way -- the point you just made and the way things are going to be structured, I'm going to -- I apologize for interrupting you but let me -- whoever is going to argue Doller, I'd like to hear the Doller argument before I hear the others.

10:13:27 MS. FLANNERY: That's fine. That's my colleague, Mr. Vu.

10:13:30 MR. VU: Your Honor, this is Robinson Vu.

10:13:34 So essentially, your Honor, the problem with what

Mr. Doller does, he analyzes what he calls features and one is iterative error correction. The other is called variable ECC. He attempts to analyze those and get to a value of those two features and his understanding of how those features relate to the asserted claims is entirely based on Viasat's noninfringement expert. He does no analysis of the claims whatsoever.

THE COURT: You said Dr. Hassoun says this and --

MR. VU: Yeah. Dr. Hassoun tells me -- yes.

THE COURT: Hassoun, I'm sorry.

MR. VU: Yeah. Claim XYZ, iterative error correction, you know, utilizes claims XYZ. Variable error correction uses claim XYZ. So what we have here is a regime where only the dependent claims are being asserted. Only the dependent claims are being asserted. And the problem is that what Doller does equally applies to the unasserted independent claims, period, stop.

So it doesn't matter what he does, what he compares his analysis against, what he compares the features against, you know, what noninfringement alternatives he compares it against, plain and simple, iterative error correction is being accused of also infringing unasserted independent claim 1.

And I'll just show the Court very quickly the patent, if I may, and how this is pretty clear that this

10:15:00 is what's going on. I'm just going to go to the claims,
10:15:06 your Honor. And here, we have independent claim 1, again,
10:15:09 not asserted, okay? But we have asserted dependent claim
10:15:13 6 with these additional limitations, an error monitoring
10:15:17 module, you know, a power controller. So dependent claim
10:15:20 6 is being asserted. We also have dependent claim 13 also
10:15:24 being asserted. Totally different limitation than claim
10:15:27 6. It's an error detection sub-module configured to
10:15:31 direct error-free portions, to bypass the error correction
10:15:35 module. So you've got claim 6, claim 13, both assumed by
10:15:40 Mr. Doller to include iterative error correction, but they
10:15:44 add completely different limitations to claim 1.

10:15:47 So we know from Hassoun's report that he says
10:15:51 claim 1 reads on iterative error correction. And we know
10:15:55 just from the fundamental assumptions that Mr. Doller uses
10:15:58 where no one analyzes the value that claim 6's limitations
10:16:02 are adding. No one analyzes the additional value that the
10:16:06 limitations of claim 13 are adding. He just says they
10:16:09 both use iterative error correction. And so, we have an
10:16:12 entire analysis directed at claims being asserted that
10:16:15 also apply to claims not being asserted.

10:16:18 And so, what we don't have is a damages analysis
10:16:22 for Mr. Doller that is directed to the claims being
10:16:25 asserted in the case and the limitations of the claims
10:16:28 being asserted in the case. And that's the fundamental

problem with what Mr. Doller does and that he comes up with a couple of numbers and Dr. Mody interprets those numbers into dollar figures, for lack of a better word.

THE COURT: I couldn't tell if you were done.

MR. VU: I'm finished, your Honor.

THE COURT: Okay. A response.

MR. MCBRIDE: Scott McBride again on behalf of Viasat.

So I just want to be clear what Mr. Doller did is he took the infringing features that were being analyzed, this iterative ECC and variable ECC, and he ties them to the asserted dependent claims by relying on Dr. Hassoun, which is -- no one disputes is an acceptable way to do it. He then compared those infringing features to the identified acceptable non-infringing alternative that contains the so-called conventional elements but not the infringing features. This is Daikoku2. It was identified by Kioxia. It does not contain either iterative ECC or variable ECC.

This is exactly what the law requires, whether it's under AstraZeneca or Exmark, that apportionment requires the value of the infringing product over the conventional elements standing alone. And this position that we have to show the difference to the unasserted claims or parse out the specific elements of dependent

10:17:49 versus independent claims is not what is supported in the law. It's whether the value of the infringing features over the conventional features are appropriately apportioned and that's what we did.

10:18:00 The fact of the matter is that as a practical matter, what they've done is tried, again, to put us in a box where we literally can't do what they want us to do because they said even if it were required by the law -- because we asked them in our Interrogatory 6, we asked them what are acceptable non-infringing alternatives, and the only one they identified is Daikoku2. They never identified or produced documents on anything else that would have been a non-infringing alternative specific to just the dependent claims or any of these so-called best non-infringing alternatives that we could then compare it to.

10:18:36 So the fact of the matter is that we took the information that we were given by them in response to our interrogatory and conducted the analysis that is required under the law.

10:18:47 I also want to make one point clear that at least with respect to what Mr. Vu is actually describing, we do have and Mr. Doller did, you know, a module of the iterative ECC and the variable ECC separately in his paragraph 113, which even if Mr. Vu focused entirely on

claim 6 and 13, there is work in our expert's report specific to claims 11 and 16 if the Court were to find itself in agreement with what Mr. Vu said.

Can we pull down the shared screen for me, please?

MR. VU: Yeah. Guys, I'm sorry, I'm trying to. I'm just going to close this and hopefully that will stop the share. I don't know why my Zoom is not configured properly. Here we go. Did that work?

MR. MCBRIDE: It did. Yes.

So again, we took the non-infringing alternative that have the conventional features that were identified and this is, you know, not information that Viasat has because these features in question are only accessible using the design documents and the confidential source code that is available only to, in this case, Kioxia and we conducted the analysis based on that. It's reminiscent of the performance data. Again, we used the data they gave us to satisfy the requirements under the law.

So unless your Honor has any questions about other portions, that's all I would have to say.

THE COURT: Anything else?

MR. VU: Yes, your Honor.

I just want to point out that they bear the burden if they're going to do this kind of analysis, you

10:20:24 know, to compare it to the best non-infringing alternative
10:20:27 available. There's no evidence that Daikoku2 is the best
10:20:32 non-infringing alternative available. And in addition to
10:20:35 that, I mean, all they have really is a comparison of a
10:20:38 feature that could apply to an unasserted claim 1 against
10:20:41 Daikoku2, which still doesn't get them there.
10:20:42 So, you know, what we're not hearing is why
10:20:48 doesn't your analysis apply to claim 1, which we're free
10:20:51 to use, right, at this point in the case.
10:20:56 THE COURT: Okay. Anything else?
10:20:58 MR. MCBRIDE: No, your Honor.
10:20:59 THE COURT: I'll be back in a second.
10:24:55 So I don't think -- and I'm not sure who's
10:25:03 responsible for this, but I don't think that between
10:25:10 Doller and Hassoun, there's been an adequate disclosure of
10:25:17 how the iterative ECC actually reflects only limitations
10:25:27 of the asserted claims versus the unasserted claims, so
10:25:34 I'm granting the motion.
10:25:37 I'm going to give the plaintiff an opportunity to
10:25:42 clarify it. I'm not sure if it's in Dr. -- that Dr.
10:25:46 Hassoun needs to clarify if that's the approach plaintiff
10:25:50 is taking, and then, Doller -- and Doller, by the way, is
10:25:55 D-O-L-L-E-R. Not like an American dollar. I don't know
10:25:59 if -- who needs to fix this in a report but someone does;
10:26:05 and then, once it is fixed, then the defendant will have

an opportunity to supplement their reports and do whatever rebuttal they need. And if there are any additional depositions that need to take place of anyone on either side, because of any additional reports, you all will have my permission to do that.

Now, having said that, if we want to go back to the argument that was being made, if you would help me here. I'm not sure I remember who y'all were arguing about. Let me see if I can find it in my notes.

MS. FLANNERY: Dr. Fuerst.

THE COURT: Yes. Dr. Fuerst. Okay. Back to Dr. Fuerst.

MS. FLANNERY: Yes, your Honor.

And one thing before I get into it -- sorry. This is Liz Flannery for the Kioxia defendants. Before I get into it, this is probably the only part of the argument that I think is going to involve some Viasat confidential information. So, Mr. Christensen, and, Mr. Lin, it might make sense for you guys to hop off and we can let you know when we're finished with this part.

MR. CHRISTENSEN: Will do. Thank you.

MS. FLANNERY: All right. So moving --

THE COURT: I have to tell you all, too, after last couple of trials I've had, watching you all actually be courteous to each other, I'm going through a little

10:27:33 PTSD. I had two lawyers at the bench last week during trial shoving each other out of the way. So it's nice to see lawyers conducting themselves in the way that you all are -- the way I was trained and the way that you all were doing. I wanted to compliment you. I shouldn't have to compliment people on that but that's where we've gotten to.

10:27:56 MR. MCBRIDE: Thank you.

10:27:57 MS. FLANNERY: No problem, your Honor. We all want to live right, I think, here and so, that's my plan.

10:28:01 So moving to the comparable license theory, as I mentioned, there is a license agreement that Dr. Mody relies on for her analysis between Viasat and a company called Semtech Corporation. And in using that as a comparable license, she relies solely on Dr. Fuerst for two opinions. First of all, that that Semtech agreement is technologically comparable to the hypothetical negotiation in this case. And secondly, she relies on Dr. Fuerst for apportionment of the value of the license in that Semtech agreement to apportion it to a license for the 700 patent. And we believe that there are significant problems with Dr. Fuerst's opinions on both of those that neither of his opinions meet the requirements of Rule 702.

10:28:51 So let's talk about the first of those opinions, the technological comparability. So as explained in our

motion, Dr. Fuerst opines that the technology in the Semtech agreement is comparable to the 700 patent because, as he says, there are two patents. I believe it's the 689 and the -- or the 789 and 664 patents of Viasat's that were inherently licensed there and he says those are technologically comparable to the 700 patent.

Now, one thing to bear in mind that the Semtech agreement doesn't mention any patents at all much less these two patents that he says are inherently licensed. And in fact, those two patents that he mentions didn't exist at the time of the Semtech agreement. The other important point about the Semtech agreement is that it's not in the area of technology relevant to this case. It's not relating to flash memory or SSDs. That technology is in a completely different technological field, the area of fiber optic communications. And both of those patents that he says are technologically comparable are in that separate field.

So that's why Dr. Fuerst has to really explain his methodology, explain how he got to this opinion that these two patents in a completely different technological area are still comparable to the 700 patent. The problem is that Dr. Fuerst didn't actually look at the claims of those patents. And I'm going to share my screen to show you.

So just as a backdrop, Dr. Fuerst is a hybrid fact expert witness. He's an inventor on the patent, an employee of Viasat, but they have disclosed him as being an expert in the case and he's going to provide expert opinions. They provided no expert report for Dr. Fuerst. They provided a two-page disclosure that states what his opinions are going to be, but none of the analysis is provided there. So we have to rely on his deposition for what his methodology was.

And so, when you look at what he said in his deposition about the methodology he applied, sorry, one moment, Dr. Fuerst admits that with regard to those two patents that he says are comparable, he didn't look at the claims. He said he was just looking for a higher level of comparable technology and he thought that based on the spec and the drawings, and all of that, it was comparable. But he didn't look at the technology that was actually captured in the claims and he didn't compare that to the 700 claims either.

Now, Viasat says he doesn't need to do this. They cite the Bio-Rad case, which talks about how experts need to establish more than just a loose comparability, that they just need to establish a baseline comparability. The problem with that line of cases is that in Bio-Rad and in cases that follow it, they're all talking about license

10:31:39 agreements that are in the same field of technology. So
10:31:42 yeah, if you're in the same field of technology if this
10:31:44 was a license that involved flash memory, then maybe he
10:31:47 wouldn't have to do that, but that's not the case here.
10:31:49 This is a license in a completely different area of
10:31:53 technology, so we know the technology isn't the same and
10:31:54 he doesn't establish that the claims are similar.
10:31:56 So he doesn't have a basis, no reliable
10:32:00 methodology for saying that the technology that's in the
10:32:03 Semtech agreement is technologically comparable. And
10:32:08 also, just for completion, confirming that, again, he also
10:32:12 didn't -- not only did he not look at any of the claims of
10:32:15 those two patents and compare them to those of the 700
10:32:17 patent, he didn't look at the specific dependent claims in
10:32:20 this case.
10:32:20 And this is important, as well, because as the
10:32:22 Court has already found, Viasat is only entitled to the
10:32:26 incremental value of those dependent claims. And so, if
10:32:29 he doesn't compare the value of those dependent claims to
10:32:33 what he says is technically comparable in the Semtech
10:32:37 license agreement, that's just going to be confusing for
10:32:39 the jury. He's just kind of waving his hands and saying
10:32:41 that they sound technologically comparable to him. That's
10:32:44 not sufficient under Rule 702.
10:32:46 So the other opinion that he gives that we talked

10:32:52 about is the apportionment opinion. So Dr. Mody relies exclusively on Dr. Fuerst for taking the license, the royalty rate in the Semtech agreement, and apportioning that to what she says would be a reasonable royalty for the 700 patent. And so, this is the sum total of the disclosure that we got of Dr. Fuerst's opinions on this.

10:33:13 And so, we asked him in his deposition, what methodology did you apply to get to an apportionment? And just to -- I'm sorry, just to level set, so when Dr. Mody says what her apportionment analysis is relying on Dr. Fuerst, she actually says that Dr. Fuerst said, well, it's 10 percent for know-how. So he subtracts 10 percent for that. He subtracts 25 percent for some other DSP-related technology, and then, he subtracts another 20 percent for other patents not comparable to the 700 patent. So those are the numbers that he gave Dr. Mody that she relies on.

10:33:48 So when we saw this in her report, we asked Dr. Fuerst during his deposition, well, how did you come up with these numbers? And all he points to is his experience. Nothing in any of the briefing points to any methodology for how he got to any of those numbers that we talked about. And he flat admitted in the deposition that all of this is just based on his experience in negotiating licenses for Viasat.

10:34:11 One thing I'll point out, Dr. Fuerst's

10:34:15 experience, he may have a lot experience in negotiating 10:34:17 these licenses for Viasat, he has no experience in doing 10:34:20 apportionment or valuations, at least none that he 10:34:23 disclosed. And so, this notion that he can sort of just 10:34:27 pluck these numbers out of what he thinks customers value, 10:34:32 this is beyond what we can challenge in cross-examination. 10:34:35 This is just because he says so, trust him based on his 10:34:37 experience. That's something that this court and other 10:34:40 courts have repeatedly found that we can't effectively 10:34:44 cross-examine him on because there just isn't a basis. 10:34:47 There isn't a methodology that we can test, have our 10:34:49 expert look at and rebut. This is just a statement of his 10:34:53 experience.

10:34:54 And in the cases that we've cited, the BMC 10:34:57 Software case as well as the CloudofChange case, that's 10:35:00 just not sufficient to put forward an apportionment 10:35:03 analysis to mathematically apportion a rate the way Dr. 10:35:07 Mody has tried to do in her opinion. And again, we have 10:35:10 similar deposition testimony here on the 25 percent. He 10:35:13 says it's based on his experience with customers. They 10:35:15 had a sense, he says, of what they thought customers 10:35:18 attribute the value -- how much value they attributed the 10:35:21 DSP technology.

10:35:22 Again, how are we supposed to cross-examine him 10:35:25 on what his sense is? That's just not -- that's not

10:35:27 something we can meaningfully challenge at
10:35:30 cross-examination. And he admits that he doesn't have any
10:35:32 sort of database analysis for this. It's all just sort of
10:35:35 a broad brushstroke, he says, that he apportioned that
10:35:40 80-20 split for different patents just based on old stuff
10:35:44 being less available than new stuff. That's a high-level
10:35:46 generalization, essentially amounts to a lay opinion and
10:35:48 it just isn't going to be helpful to the jury at all. It
10:35:51 doesn't pass muster here.
10:35:54 I do have one final point about Dr. Mody's
10:36:00 analysis. It doesn't -- this is a part of her analysis
10:36:03 that doesn't depend on Dr. Fuerst. It has to do with the
10:36:07 royalty rate. But I'd like to stop there and just ask the
10:36:10 Court if you have any questions about that, if you'd like
10:36:13 to seek argument about that. I do want to come back to
10:36:14 the royalty base issue that Dr. Mody has.
10:36:17 THE COURT: I don't have any questions.
10:36:18 MS. FLANNERY: So on the royalty base issue with
10:36:23 Dr. Mody, the other problem with her reliance -- and this
10:36:25 is a problem that is only with her analysis. Doesn't
10:36:29 depend on Dr. Fuerst. So the Semtech agreement that she
10:36:32 relies on has a royalty base of the sale of controllers.
10:36:36 So that's a component of what is her ultimate royalty base
10:36:41 in this case, an SSD drive. She makes absolutely no
10:36:45 attempt to account for that mismatch in the royalty base.

10:36:49 And so, their only argument for this really is that, well, we didn't provide -- Kioxia didn't provide any sales data based on controllers and said, well, Dr. Mody just did the best she can. That's not good enough. The Federal Circuit in the LaserDynamics case has expressly rejected that idea that even though that's the only sales data you have in the case, that that somehow lessens the plaintiff's burden to do a proper apportionment.

They also claim in their briefing that Dr. Mody looked at sales data and looked at -- pricing data, excuse me, and compared pricing data for the Kioxia products to what Semtech had. I don't understand that argument, frankly, because as Viasat admits, Semtech never sold any products under that license agreement. So there really can't be any pricing information that they would have compared the Kioxia pricing information to.

This is just sort of a failure of proof on -- failure to address this apportionment issue. It's pretty clear that they're trying to put the burden of proof on us to say, well, we should have produced data, but that's not how the law works here. And so, for that independent reason, Dr. Mody's royalty base -- her license theory fails because she did not appropriately apportion royalty base on that issue. And I'm finished.

THE COURT: Response.

MR. MCBRIDE: I can go in reverse order. I mean, the argument on Dr. Mody is overlooking the entirety of what she said she did, which is she did apportion. She apportioned based on the royalty rate because she didn't have the data on the base itself. She took the smallest salable unit of that base and used it as is compared to Semtech; and then, she took the royalty rate of 10 percent and apportioned it down all the way, including to apportion for the difference between the controller and the SSD, among all of the factors we listed in our brief.

But on the pricing point, what Dr. Mody did is that she looked at public disclosures of Semtech on their revenues and pricing overall to get a sense of the pricing differences for purposes of making sure she was not overcompensating.

So there's no question that at least with respect to the apportionment that Dr. Mody did, we're fighting over the degree of the apportionment, not the apportionment not existing at all. And I can circle back to that as needed, but I want to go back to Dr. Fuerst where we started and clear a few things up.

So Dr. Fuerst is an inventor on the 700 patent. He is the head of the Cleveland office where the 700 patent and the forward error correction facilities are located and centered, has 15 years of direct experience

and personal knowledge of Viasat's licensing technology, including direct personal knowledge of the Semtech license. And he is testifying at trial, including about the 700 patent, Viasat's licensing, and about the comparability of those licenses and their technology to the 700's technology.

And one thing that's missing from counsel's statements and argument was that the overwhelming majority of what he's testifying to is based on his personal knowledge and experience as a fact witness, which he described in his deposition around page 70 in the second dep, including very specific experience with this license.

But some of that testimony bordered on expert opinion, which makes him a hybrid witness. And out of an abundance of caution, we did execute a Rule 26(a)(2)(C) declaration to make sure there's no dispute over the specific parts of his testimony that might have an expert flavor. It's not nefarious. The two-page declaration is exactly according to the rules of what was supposed to happen and he sat for an extra deposition. Of course he didn't submit a report. He's not a 26(a)(2)(B) witness. He's a 26(a)(2)(C) witness. This is not his job to be hired and paid as an expert witness.

So that, I wanted to clear up with respect to what Dr. Fuerst is going to testify to and the difference

10:40:44 between what's in his declaration versus the sum of his 10:40:47 testimony. But secondly, the Semtech license has also 10:40:50 been -- has not been properly characterized here. To say 10:40:53 that it is outside -- completely outside the technology 10:40:57 field is to simply almost assume that it is a -- that it 10:41:01 is not related to the technology of comparability as a 10:41:06 matter of fact, but it's, in fact, very comparable because 10:41:09 Semtech is a license to creating forward error correction 10:41:14 technology, just like the comparable license would be here 10:41:16 or just like the hypothetical negotiation would produce 10:41:18 here.

10:41:19 So it is in a field of technology that is 10:41:22 distinctly and directly related. Secondly, it does 10:41:24 include patents. It just doesn't include patents by 10:41:27 number. It is a patent -- or a license where the 10:41:30 definition of the licensed intellectual property describes 10:41:34 and specifically says patents. And as Mr. Fuerst 10:41:37 testified to, over and over again, Viasat creates its 10:41:41 licenses in this way because it is -- it wants to give its 10:41:45 customers comfort that any patents, past, present and 10:41:48 future, that are necessary are, in fact, licensed.

10:41:51 So what we're left with then is a Kioxia demand 10:41:56 for a level of precision that's not reasonable nor 10:41:58 required under the law. The comparability of licenses 10:42:03 always involves -- including with apportionment involves

this element of approximation and uncertainty and it's a baseline comparison of the comparable technology. And that comparable nature of the technology does not have to be explicit patent licenses and it does not have to be tied to the asserted claims. It's about general baseline comparability with which Dr. Fuerst described in his deposition and will describe at trial both based on his facts of personal knowledge and on expert opinion.

But I want to point out something else, which is the standard that they're holding us to here would be almost impossible to meet because, again, it's forward error correction, as Ms. Flannery said correctly, in optical patents or in optical space with optical devices. And the claim is to flash memory. So a direct comparison to the claims would simply not be possible.

So he did the kind of comparison of baseline technological comparability that he is required to do under the law. So we're talking about a question of degree, not a question of whether it was compared at all. And they got to depose him specifically on this and they get to cross him about this at trial.

So turning to apportionment, again, they say no reliable method, but they're demanding a level of precision that's not in the law. As the St. Lawrence case indicated and the Bio-Rad Labs case indicated, there's a

10:43:30 degree of approximation and uncertainty. It's not about mathematical precision. And to be clear, because in this level of apportionment, as your Honor knows, there's no textbook-defined procedure with some explicitly understood set of steps. Nor has Kioxia articulated what that supposed methodology would be that he did not follow. It's a very fact-specific situation and there's no dispute that Dr. Fuerst is very well-versed and positioned to describe the facts and the situation.

10:43:59 And they make it sound like he didn't talk about this at all, but they deposed him for about 35 pages on the way he did this apportionment where he says he very specifically took the 10 percent and then, he identified different components contributing to that 10 percent value, including intangible know-how of the Viasat brand, including amounts attributable to other technology.

10:44:25 The DSP that was mentioned, that's digital signal processing technology. It's not forward error correction. He also made an effort to pull out what was attributable to so-called legacy technology versus the kind of advanced technology that he considers comparable to what is being described in the 700 patent. And it is an approximation but that's what the law requires and they will get to cross him on this.

10:44:51 So, your Honor, it ultimately is not a question

10:44:54 of whether he did an apportionment by a method that is
10:44:58 reliable. It's whether or not they agree with the outcome
10:45:00 of that apportionment and the factors that he pulled out,
10:45:03 which they can, of course, cross him about at trial.
10:45:09 MS. FLANNERY: If I could just briefly, your
10:45:10 Honor.
10:45:10 THE COURT: Sure. Of course.
10:45:11 MS. FLANNERY: Yes. So, first of all, with
10:45:13 regard to the technical comparability, we heard pretty
10:45:16 much exactly what I thought we were going to hear about in
10:45:18 terms of the baseline comparability issue. Well, if the
10:45:22 baseline comparability issue isn't the -- if you're not --
10:45:26 this isn't really an issue of degree because it's a matter
10:45:28 of what are you comparing to? Are you comparing apples to
10:45:33 oranges? Are you comparing apples to boats? What are you
10:45:35 actually comparing it to?
10:45:36 Well, we're not comparing it to the field of --
10:45:39 Semtech field of technology because that's different.
10:45:41 They said that that's flash memory or SSD, so that's going
10:45:46 to be different. They say, well, the claims are
10:45:48 necessarily going to be different so we can't do that
10:45:50 comparison. Well, what is it that we're comparing then?
10:45:54 That's what we asked Dr. Fuerst to describe.
10:45:56 And all he could articulate was, I'm just looking
10:45:59 for high -level areas of technology. If those patents

10:46:03 truly do address forward error correction, that should be
10:46:06 in the claims. And so, there was nothing that prevented
10:46:09 Dr. Fuerst from looking at the claims of these patents
10:46:12 that he says were licensed under the Semtech agreement and
10:46:15 saying, look, this is similar forward error technology,
10:46:18 similar error correction technology steps that are in the
10:46:21 700 patent. He didn't do that. And so, that's not
10:46:25 enough.

10:46:25 They can't just wave their hands and say, well,
10:46:27 Dr. Fuerst, the inventor, says it's about forward error
10:46:30 correction technology so it must be about this. He didn't
10:46:33 do the appropriate analysis.

10:46:34 To be clear, we are not intending to prevent Dr.
10:46:38 Fuerst from talking about his personal experience that he
10:46:41 negotiated these Viasat licenses. What they're using his
10:46:44 expert disclosure to do is to allow him to speculate about
10:46:47 what was important to the customers, what was important to
10:46:50 the counterparties. He can't know that. He doesn't have
10:46:53 personal percipient knowledge of that because that would
10:46:56 be based on hearsay. And so, what they want to do is give
10:46:59 him a license as an expert to speculate about that.
10:47:02 That's why they need that disclosure, but that's clearly
10:47:05 the stuff that he hasn't provided any methodology on. He
10:47:09 doesn't even have any experience in doing that outside of
10:47:12 Viasat and he doesn't disclose a methodology we can test.

10:47:14 This is not -- so moving on to the apportionment analysis, again, Mr. McBride talked about how they don't have to provide mathematical precision and apportionment. Well, they're the ones that are putting forward these 80 percent, 75 percent, you know, 90 percent numbers. And so, if they're going to have Dr. Fuerst talk about, you know, quantitative numbers to support an apportionment, then they have to be able to support them.

10:47:39 And that's the only way he gets to this opinion about the significant portion of value, you know, of the Semtech agreement being attributable to comparable technology. It's not based on the math that they gave that we really have no idea what it's based on. And again, I would just commend your Honor to the fact that, again, it's not a matter of the degree of his methodology. His methodology that he stated -- we asked him specifically what his methodology was. All he points to is his experience. None of the briefing points to any other methodology that's reproducible, testable, or rebuttable in our way. This is squarely within the CloudofChange and BMC Software agreements that we cited in our briefing, and so, I'd commend your Honor to those.

10:48:28 MR. MCBRIDE: If I could just make one quick response.

10:48:30 THE COURT: Sure. Please.

MR. MCBRIDE: I don't want to let it go that somehow the Semtech license is not in the same field of technology. It is because Viasat's expertise is in bringing forward error correction architectures and chips to communication channels. Their forward error correction expertise was the core of the Semtech agreement. It is the same field of technology, it's just being applied to a different communication channel.

And again, your Honor, I would just say, they deposed him at length about what his specific methodology was in that he was taking identifiable components out of the 10 percent. They can cross him on what else is present in there, what else is not accounted for; and otherwise, they're just criticizing the level of approximation that he brought to this without saying what specific level of precision should he have done other than rely on his extensive personal experience to provide him a baseline for understanding how those different technologies are valued. So unless your Honor has any questions, that's all I have.

THE COURT: I'm going to deny the motion with respect to Dr. Fuerst.

Who else -- given my earlier ruling with respect to Doller, who else do we need to take up? I'm thinking perhaps that Dr. Mody, we may need to wait on him, as

10:49:53 well. But if we need to take up Dr. Mody, I'm happy to do
10:49:56 that.

10:49:56 MS. FLANNERY: I think, your Honor, so the -- I
10:49:59 had addressed the Dr. Mody issue is the issue on failure
10:50:02 to apportion the royalty base. I think we argued it.
10:50:05 Maybe your Honor just needs to rule on that part.

10:50:07 THE COURT: And that's denied, as well.

10:50:10 MS. FLANNERY: Okay.

10:50:11 THE COURT: Is there anything else with regard to
10:50:14 those four -- have I gotten to Dr. --

10:50:23 MR. MCBRIDE: I think Khatri is the remainder if
10:50:26 that's right, Liz.

10:50:27 MS. FLANNERY: I think that's the one we haven't
10:50:29 argued yet.

10:50:29 THE COURT: Okay. I'll take up Dr. Khatri.

10:50:34 MR. HAWES: Thank you, your Honor. Michael Hawes
10:50:35 for the Kioxia defendants.

10:50:37 This one is fairly narrow. It's specific
10:50:40 portions of Dr. Khatri's opinions regarding written
10:50:46 description. So just for the record, his Section 9 of his
10:50:50 report addresses written description and we are only
10:50:55 challenging and asking for the exclusion of Sections 9A,
10:50:58 9C and 9E. We are not challenging 9B or 9D.

10:51:04 The other thing that's different here is that we
10:51:07 basically have agreement that he included legally improper

reliance on cited prior art as a basis for written description. In a sentence, written description needs to be based on the specification of the patent, not on prior art that might be cited by the patent office or the inventors with respect to the prosecution of that patent. But he did that and Viasat doesn't seem to challenge that that's improper.

So really, what we have left is in these three sections, we have Dr. Khatri saying there's language in the specification that it's the same as --

THE COURT: Can you hold on one second. I'll be right back.

Okay. I apologize for that. You could continue. Thank you.

MR. HAWES: No problem, your Honor.

So we're left with the question of in these three sections, what is there beyond this legally improper analysis? And what we have is the experts saying the claim language is found in multiple places in the specification and then, moving on to the legally improper reliance on these cited references as a basis for written description.

We are not asking the Court to exclude the expert saying that the claim language is found in other parts of the specification; but that is not a basis to then give

10:53:08 opinions that there's written description. That's not a basis for saying that there's adequate written description just because there's carbon copies of the language in the claims.

10:53:20 And so, while we're fine with Dr. Khatri testifying that the language in the claims is also found in the specification, which is more a factual matter really than an expert matter, given that his analysis that goes beyond that is all based on this legally improper support of using prior art references that are cited, we would ask the Court to exclude otherwise his testimony and those three specific subsections. And unless the Court has questions, I'm finished.

10:53:56 THE COURT: A response.

10:54:00 MR. MCBRIDE: So, your Honor, in the briefing, they talked a lot about the idea that Dr. Khatri is relying on the legal status of the listed references as incorporated by reference, which is not what he's doing. He misspoke and was incorrect about that legal status. But the fact is that his opinions, as Mr. Hawes conceded, were based first and foremost on disclosures in the specification, but they were also based correctly in accordance with the law on known prior art concepts that a person of skill would have, that they would know and understand, which would reenforce what's disclosed in the

10:54:34 specification.

10:54:34 And that's the law that the description does not
10:54:36 need to include information already known and available to
10:54:39 the experienced public, which is what Dr. Khatri was
10:54:43 describing about those prior art references. He's not
10:54:46 talking anywhere in his report or even in his deposition
10:54:49 about the significance of his mistaken legal
10:54:52 understanding. He's just talking about those documents
10:54:54 reflecting the knowledge of a person of skill at the time
10:54:58 of the application, which means that this is basically
10:55:00 what amount to a gotcha for an expert's misunderstanding
10:55:04 of legal status, an expert who's not a patent lawyer or a
10:55:08 patent law expert, but ignores that the substance of what
10:55:10 he's saying is entirely in accordance with the law. And
10:55:14 unless your Honor has questions, that's all we have.

10:55:17 THE COURT: Anything else?

10:55:19 MR. HAWES: Just, your Honor, that the expert
10:55:21 report does not include that revision of analysis that we
10:55:26 just heard. The expert report says that these cited
10:55:31 references, because they're cited references, are the
10:55:33 basis for written description. And that's not the law and
10:55:36 we're just asking that the expert report be limited with
10:55:40 respect to the portions that specifically state a basis
10:55:44 that's outside the law. And again, to the extent he just
10:55:48 wants to identify that the claim language is used in the

10:55:52 specification, he can do that. It's a factual matter. The problem is his analysis behind his legal opinions.

10:55:59 THE COURT: I think y'all are fighting over something that probably won't come up at trial. So if, for some reason, plaintiffs when they are putting on Dr. Khatri have him discuss something that relates to this issue, you can raise it at that time. But I think at this time, what I think I heard plaintiff counsel say is, I doubt we'll hear anything at trial in his direct from that.

10:56:30 Next up, I have the issue of willfulness and I'll hear from the defendant on that.

10:56:40 MR. FULGHUM: Thank you, your Honor.

10:56:41 This issue only relates to post-filing willfulness. There is not a claim for pre-filing willfulness. There's no evidence -- everyone agrees that there's no evidence that Kioxia had the awareness of these patents before this lawsuit was filed. In our motion, we addressed both Rule 12(c) issues and Rule 56 issues. And I'll start off by talking about Rule 12(c) and I'm going to share my screen here.

10:57:13 With regard to Rule 12(c), what the Court relies on in resolving a Rule 12(c) motion are the substance of the pleading in any judicially noticed facts. And we do have some judicially noticed facts that are going to be

important to the resolution of this motion. The most important of which is that claim 1 and the other independent claims of the 700 patent have been determined to be unpatentable, and they were determined to be unpatentable recently and they were determined to be unpatentable after this willful infringement claim was asserted.

However, one thing the Court need not consider are any facts in the complaint that are contradicted by judicially noticed facts. So if the judicially noticed facts contradict what is pled, the Court need not accept as true those allegations in the complaint. And that's going to be important because I think what we see here in this exercise or in this set of facts is something different than what we typically see in a normal case of post-filing willfulness, and that's because of the way that this claim was structured and some intervening events the Court can take judicial notice of.

The entire willfulness allegation is on the screen and this is simply rote language, especially with regard to the deliberate infringement prong. The deliberate infringement prong is highlighted here and all it says is --

THE COURT: Counsel, I'm going to save us all some time. So the way I handle these -- and everyone will

be unhappy about this probably, but the way I handle these is I allow the plaintiff to put on its case. I don't rule on it at this point. I allow the plaintiff to put on -- hold on one second. I allow the plaintiff to put on their case, but as a general rule if I -- unless there's something unique about this case, if at the end of the plaintiff's evidence, there's nothing more to the plaintiff's case than an argument that the defendant continued to intentionally infringe the 700 patent because they kept selling the products after the lawsuit was filed, I am going to grant it at that point. And so, it's just -- but let me -- sometimes I'm too quick.

MR. FULGHUM: Yeah.

THE COURT: Let me go ahead and just hear if the plaintiff would like --

MR. FULGHUM: Okay. Let me move forward and talk about the thing that makes this case different.

THE COURT: Okay.

MR. FULGHUM: And that is that in the first amended complaint, which follows the usual methodology. You file a first amended complaint, you say, hey, we notified the defendant of the patent in our original complaint. But if you look at the original complaint, the claim that is identified is claim 1 of the 700 patent and it's identified and described by Viasat as being a

11:00:21 representative claim. So what Kioxia knows now, according to Viasat, is that claim 1's at issue and it's a representative claim.

11:00:31 The problem is -- and this is why I believe the motion should be granted and I'll give you one other reason -- is that claim 1 is no longer asserted in the case. On the screen is a copy of the pretrial order. We're only going forward with regard to dependent claims. And even more troublesome, claim 1 is unpatentable as are all of the independent claims.

11:00:50 So here's the problem. If this is put at issue, we're going to have to defend ourselves by pointing out this fact regarding claim 1 and putting at issue the fact that in terms of Kioxia's state of mind during this period, it reasonably relied upon the fact that claim 1 is unpatentable as determined by the patent office, and that's the claim that is referenced in the original complaint.

11:01:14 I would submit, your Honor, that this may be an instance where we do not want all of this IPR procedural history to come in in front of the jury. And this may be an instance where the Court would be best served by resolving this issue before trial rather than resolving at the Rule 50 stage where I'm confident it will be dismissed.

But in any event, that's our view on this. There's no evidence that we did anything other than just continued to sell products that were designed years and years and years ago. I think we're going to hear an argument that an expert for Viasat determined that we could have turned something off for $600,000. That sounds like a pretty good argument for damages for us, quite frankly, but, you know, there's no evidence that we knew that or we had that in mind for us at any time.

And I would suggest this evidence not go before the jury for all of those reasons, Judge. And I'll conclude my comments there.

THE COURT: Response.

MR. SHAH: Sure, your Honor. Good morning. This is Ravi Shah for Plaintiff Viasat.

I'd just like to make three points in response to that argument. The first is that this case is precisely in line with other cases this court has dealt with regarding post-suit willfulness. And so, the amended complaint here, it alleges that Kioxia has known of the 700 patent and its infringement of the patent since no later than December 7th, 2021. That's from paragraph 67 of the amended complaint at docket 33.

Second, Kioxia has continued to intentionally infringe the 700 patent through the continued sales of the

accused products. Again, that's at paragraph 67 of the amended complaint. And third, Kioxia has done so despite the fact that it knows its continued use or sales of the accused products infringe the 700 patent. Again, that's at paragraph 67 of the amended complaint.

These three facts are precisely in line with cases that this court has held, over and over again, are all that's required to adequately allege post-suit willfulness. So in Flypsi vs. Google, this court held that serving a complaint has been found to be sufficient to establish post-suit knowledge of issued patents. This conclusion is not a novel one. And this court held the same language in Neonode Smartphone vs. Samsung as well as SpaceTime3D vs. Apple. So these cases are completely in line with the facts present here and there's no reason for the Court to depart from what it's routinely ruled in this exact situation.

And if I could just respond to Mr. Fulghum's argument about claim 1. So it's not true that claim 1 is all that's asserted in the original complaint. Although that is the example that we used in the original complaint, the original complaint explicitly alleges any and all claims under the 700 patent. In its prayer for relief, Viasat requests the Court enter judgment in favor of Viasat that Kioxia has infringed one or more claims of

the 700 patent. That's in the original complaint at docket 1, page 22. The original complaint also states Kioxia has infringed and continues to infringe at least claim 1 of the 700 patent. Again, that's at docket 1, page 16, paragraph 54.

And the original complaint alleges that the accused products meet the limitations of at least claim 1 of the 700 patent. That's at paragraph 55 of the original complaint. So it's simply incorrect to say that Viasat only alleges claim 1 in the original complaint. And that all times since December 7th, 2021, the Kioxia has been aware that they're infringing at least one claim of the 700 patent.

And, your Honor, with regards to Kioxia's argument about bringing up proceedings from the IPR or the PTAB determinations, that argument is really putting the cart before the horse. What Kioxia plans on doing if they lose this argument in terms of bringing up what happened at the IPR proceedings and the PTAB's determinations, it's getting far ahead of the question of whether willfulness can remain in the case.

And the question of what Kioxia can say if that happens is addressed by some of the motion in limine arguments on this issue, also addressed by the Court's standing motion in limine No. 6. One of my colleagues is

happy to address that argument when the Court reviews the motions in limine.

And just the last point I'd like to make, your Honor, and in terms of the summary judgment argument, there is a dispute of material fact here. And so, one of Kioxia's experts, Kioxia's infringement expert, Dr. Stephen Melvin, has opined that the infringing features could have been disabled in all of the accused controllers. That's at paragraph 550 of Dr. Melvin's report. And doing so in Dr. Melvin's estimation would have only taken, at most, six months and cost no more than approximately $600,000 through Kioxia.

This isn't just one line from Dr. Melvin's opinion. It's an argument that Kioxia's relying on for its damages case, as Mr. Fulghum just mentioned. And Dr. Melvin, in coming up with this opinion, spoke to Kioxia's 30(b)(6) witness, Randy Cohen, who developed this opinion, in addition to various engineers at Kioxia. It also impacts their damages expert, Mr. Bakewell's report at paragraph 209.

So Viasat disagrees with this calculation and with how easy Kioxia claims it would have been to avoid infringement, but there is some evidence that Kioxia was aware of the infringement and deliberately chose to continue infringing. And there's a dispute of material

11:06:31 fact regarding the ease with which Kioxia could have
11:06:34 avoided infringement. So there are multiple disputes of
11:06:36 material fact here that would preclude a grant of summary
11:06:39 judgment on this issue.
11:06:43 THE COURT: Anything else?
11:06:45 MR. FULGHUM: Your Honor, at least one or more,
11:06:49 that just doesn't sound like enough to go to the jury
11:06:52 under the facts of this case involving this intervening
11:06:54 PTAB ruling. And that's going to open the door and we
11:06:58 will have to raise this as part of our state of mind
11:07:02 defense and I don't think that -- anyway, that's -- I
11:07:06 think this is a unique circumstance that that would merit
11:07:12 the Court addressing this at an early stage.
11:07:17 THE COURT: I'll be back in just a second.
11:09:22 If we could go back on the record.
11:09:23 I am persuaded that if I wait and this is a
11:09:28 unique situation, I have not -- that was a situation where
11:09:32 the PTAB has ruled in a way that they've ruled here and I
11:09:36 don't want to interject what went on there in this case.
11:09:40 So I am going to grant the motion of no willfulness.
11:09:46 What I have left now, I think, is --
11:09:50 MR. SHAH: Sorry, your Honor, could I just ask
11:09:52 one question about that?
11:09:53 THE COURT: Sure.
11:09:54 MR. SHAH: In terms of bringing in -- not wanting

11:09:56 to bring in what the PTAB had said -- actually, I'm sorry.

11:10:05 THE COURT: You're welcome to ask or not.
11:10:09 Whatever you'd like to do.

11:10:11 MR. SHAH: Thank you.

11:10:12 THE COURT: Here's the problem is if you guys
11:10:14 have willfulness -- let me say this. Here's what -- I'll
11:10:17 put on the record, actually. I am of the opinion, for
11:10:23 example, you said earlier, they continued to willfully
11:10:27 infringe by continuing to do so. Well, they've certainly
11:10:32 continued -- their actions had been intentional if they
11:10:35 continued. But I am of the firm opinion until the Federal
11:10:41 Circuit tells me I'm wrong that once a company is notified
11:10:47 in a lawsuit by the plaintiff of infringement, if they
11:10:50 vigorously defend the case, they hire experts, they defend
11:10:55 the case that they're acting willfully. They are
11:10:59 continuing to act intentionally but not with regard to
11:11:02 what the law means.

11:11:03 But here, we have the additional problem of they
11:11:05 went and filed an IPR. I understand you had other reasons
11:11:11 for filing this suit and independent claim 1. But the
11:11:16 bottom line is I don't -- I can't figure out a way to
11:11:25 allow the defendant to defend itself from your claim of
11:11:29 willfulness without allowing in information about the PTAB
11:11:32 and I'm not going to do that. So I'm granting that
11:11:35 motion.

11:11:36 Now, on motions in limine, with regard to the first one, the first one is the defendant should not be allowed to present expert testimony or undisclosed data through its designee, Randy Cohen. And has that been addressed in an earlier motion I've taken up?

11:12:02 MR. KNOBLOCH: Part of it has, your Honor, and I think the other part can probably be addressed in the same way. So already, your Honor on an earlier motion ruled that Viasat will be able to depose Mr. Cohen in connection with the performance data. So that resolves that issue. And if the deposition were allowed to take, also is allowed to encompass this issue of information that Mr. Cohen provided the experts that was beyond what he said he knew about in his fact witness deposition, then I think that will resolve it entirely.

11:12:34 THE COURT: You can do that. So that resolves that.

11:12:37 MR. KNOBLOCH: Thank you, your Honor.

11:12:38 THE COURT: Next, I have defendant should not be permitted to refer to plaintiff's independent claims as invalid. That's not going to -- now, that's not going to come in without the defendant approaching the bench. I doubt it will come in at all but I don't know what -- you know, I don't know how the case is going to go. And this seems to be one where there is a potential for a door

opening that -- but before the defendant raises it, you should -- the defendant should approach the bench.

Next up --

MR. FULGHUM: Your Honor --

THE COURT: Yes.

MR. FULGHUM: Can we explain claim 1's not asserted?

THE COURT: Well, to the extent -- I think we should talk about that not today. But if you all -- if the parties would like to get together and add -- what I would suggest you do first is this. Come up with agreed language that can be read -- would be unique to the case in the Court's initial instructions to the jury that in cases that -- I know, obviously, we all know in the jury charge I read at the end has independent claims and dependent claims and the fact that we don't have independent claims here might be an issue.

So I would suggest that you all get together in a neutral way of explaining to the jury that the patent has independent claims, it has dependent claims, the dependent claims have an initial element that, you know, however you want to say it. You might look at the jury charge that's used at the end and model it on that, but explain that the plaintiff is not asserting any independent claims here.

And I'm thinking ahead now. I don't know what

y'all have, but it seems to me that when the defendants' putting on their invalidity case, we may have to figure out what to do there. I mean, it seems to me that the way something isn't invalid if -- the independent claim is, it's only through the addition of that -- of the extra element and we might have to figure out a way to explain that.

MR. FULGHUM: Yeah. Understood. There's going to be some challenging door-opening issues here because what I hear in the case lot, your Honor, there's a lot of the value is in what's in independent claim 1 and not what's in these dependent claims. So we'll manage that as it comes.

THE COURT: And when the case gets started, if you'll remind me, we'll work towards making sure we do something that's neutral.

By the way, I haven't been paying attention. I just saw Lily's here. I want to thank her for helping out as the court reporter for today. I've been so engaged in the lawyers, I didn't even notice. I apologize.

Next up, the defendant should not be allowed to introduce inventor testimony related to the meaning of claim terms. No one should be allowed to introduce testimony relating to the meaning of claim terms other than what the Court has said the claim terms are. Now, if

11:16:06 there is a fight that's coming about what the inventor
11:16:10 believes the plain and ordinary meaning is of something,
11:16:11 maybe that's what's coming and I just don't understand.

11:16:16 MR. FULGHUM: Yeah. I think this breaks down
11:16:18 into a couple of categories. One category concerns Dr.
11:16:23 Fuerst. Dr. Fuerst is going to be testifying at trial.
11:16:26 He's one of five inventors. He is going to carry all
11:16:30 their water with regard to their invention story, and
11:16:35 then, he's going to put on his expert hat and he's going
11:16:39 to link up the 700 patent, which is in the flash memory
11:16:43 space, to two other patents in the optical communication
11:16:47 space so that Dr. Mody can provide her analysis.

11:16:52 His understanding of claim -- of the claims of
11:16:56 the 700 are directly at issue. So I'm going to
11:17:01 cross-examine him on what these claims mean and I'm going
11:17:03 to go over with him what a module is. I'm going to go
11:17:07 over with him how it's applied. I'm going to go over with
11:17:10 him the issue of separateness that's claimed. His
11:17:14 understanding of the claims, because he did this linking,
11:17:17 this is directly at issue, directly at issue, and we have
11:17:20 to be able to cross-examine him on this.

11:17:22 For the other four inventors, we did ask them
11:17:26 about what their understanding of claim terms meant, what
11:17:32 the issue of separateness was, physically separate as to
11:17:36 certain modules, and we got a lot of I don't know, I'm not

11:17:40 sure, I don't know. We're going to play some of that
11:17:44 testimony because that bears on the invention story and it
11:17:47 bears on the written description requirement. If you have
11:17:51 inventors who don't know what the claims mean --
11:17:53 THE COURT: Let me hear from the plaintiff. What
11:17:57 is it from the plaintiff, what is it that you want me to
11:18:02 keep the defendant from doing?
11:18:06 MR. KNOBLOCH: So, your Honor, I've shared my
11:18:07 screen to give you an example of the kinds of testimony
11:18:09 that we're talking about here. So this is deposition
11:18:12 testimony that defendants have designated that they intend
11:18:16 to play at trial and it's going directly to this issue of,
11:18:20 you know, what is the meaning of a claim term, in this
11:18:23 instance, the module claim term. And it actually is not
11:18:27 only going -- it's actually trying to revisit the Court's
11:18:30 claim construction where the Court rejected Kioxia's
11:18:34 argument that the module terms were indefinite and that's
11:18:37 clearly exactly what they're trying to relitigate to the
11:18:40 jury here.
11:18:40 This was Mr. Fulghum, I believe, took this
11:18:43 deposition, asked Mr. Dave, what's a module? It's kind of
11:18:48 fuzzy, isn't it? That's exactly -- what are they trying
11:18:51 to get at there? They're trying to get at indefiniteness
11:18:53 and that's because this court has already ruled on --
11:18:56 THE COURT: Was module construed as being plain

11:18:58 and ordinary meaning?
11:18:59 MR. KNOBLOCH: Yes, your Honor.
11:19:00 MR. FULGHUM: Yes.
11:19:00 THE COURT: So if you're going to have this
11:19:06 gentleman testifying about this and he is unaware that I
11:19:13 construed it, it seems to me that that's something the
11:19:18 jury should understand in terms of the quality of his -- I
11:19:27 mean, it seems to me, you're kind of trying to do the
11:19:31 shield and sword thing here where you want your inventor
11:19:35 to be a lay expert, but you want to protect him from
11:19:38 having to know other things a lay expert would know.
11:19:42 MR. KNOBLOCH: Your Honor, this is not the
11:19:44 inventor who we're proposing to bring in as the lay
11:19:46 expert. This is a different inventor who we're not
11:19:49 planning to bring to trial, but who Kioxia is planning to
11:19:52 play portions of his deposition testimony at trial.
11:19:55 That's what -- Mr. Dave is not Mr. Fuerst. It's a
11:19:59 different person and not the person we're planning to
11:20:02 bring to trial.
11:20:03 THE COURT: Okay. Well, now, in that case, if --
11:20:10 so I will take this up when we get to trial, if the
11:20:17 defendant who wants to -- whatever the defendant wants to
11:20:20 play from someone who is not going to appear -- I'm sorry,
11:20:23 I misunderstood. I thought it was the gentleman who was
11:20:26 going to testify.

11:20:32 Given how this is important, if you all -- if the defendant will get to the plaintiff the deposition testimony it wants to play from any of the inventors who are not going to appear, if the plaintiff will highlight what it is they object to not under the other stuff y'all do, you know, leading, blah, blah, blah, that stuff, but anything where we're having this fight over whether or not the plaintiff thinks it's appropriate for an inventor to be asked these questions and it to be played to the jury. If you'll get that to me by the time the trial begins, I will -- I'll have a ruling on it. I'll go through it and read it and give you a ruling very early in the trial.

11:21:22 Next up --

11:21:24 MR. KNOBLOCH: Your Honor, may I just -- on the issue of Mr. Fuerst, there's also -- so there's Mr. Dave. There's other inventors that we can address the way your Honor just described. With Russell Fuerst, he's going to be at trial. He's going to be testifying at trial. He's not going to be testifying about infringement. He's not going to be testifying about the meaning of claim terms when we put him on. And what we don't want is --

11:21:52 THE COURT: I'm sorry, if you don't -- you will be the governor here. If you don't put him on to talk about a claim term -- for example, if this were his -- I know it's not, but if this were Mr. Fuerst's testimony --

if this were Mr. Fuerst's deposition testimony, unless you put on -- him on to testify in a manner that would open the door, I would not allow this kind of evidence to come in against him because he's an inventor. And as long as he doesn't put himself forward at trial as testifying on infringement or knowing what these claim terms should mean, then there's no reason he should know what these mean.

MR. KNOBLOCH: Okay. Thank you, your Honor.

THE COURT: Next up, I think I'm on four. Defendant should not be permitted to tell the jury it invented Daikoku, D-A-I-K-O-K-U, Daikoku2. I have no idea what --

MR. FULGHUM: You got it, Judge, right on the money with that pronunciation. Daikoku2. Mr. McQueen's going to handle this one.

THE COURT: Okay.

MR. KNOBLOCH: And, your Honor, so Nosson Knobloch for Viasat.

This is our motion in limine. And I think there's two problems with what -- with what Kioxia's trying to do now. First of all, it is a factual matter. It is not true that Kioxia, the defendant in this case -- there's two companies that are the defendants in this case. Two Kioxia entities. Neither of these entities

11:23:36 invented Daikoku2. That is undisputed. And there was
11:23:42 another entity named Toshiba Information Systems that was
11:23:48 the entity in which this prior art was invented. And what
11:23:54 Kioxia wants to do now is in the context of trial sort of
11:23:57 blur the corporate distinctions and say, well, you know,
11:24:03 and intimate to the jury that it was Kioxia that had
11:24:05 invented Daikoku2. And this is going to be the
11:24:08 centerpiece of their invalidity case, right? Daikoku is
11:24:11 their main prior art because it's a product prior art,
11:24:15 it's not a printed publication; and so, this is the
11:24:18 centerpiece of their invalidity case and they want to tell
11:24:20 the jury, hey, we invented this.

11:24:23 And it's, first of all, not true and I'll share
11:24:27 my screen just to show a couple of excerpts of deposition
11:24:29 testimony. This is deposition testimony from the 30(b)(6)
11:24:35 designee who was designated by Kioxia to talk about
11:24:38 Daikoku2. And what he said is that it's his understanding
11:24:42 that Mr. Kuzui is the inventor of the error correction
11:24:45 system implemented in Daikoku2. That's the thing at issue
11:24:49 here. Answer, yes. And what else does he say? He says
11:24:53 that Mr. Kuzui works for a different company, works for
11:24:57 this company called Toshiba Jouhou Systems, which is
11:25:02 Information Systems. It's not Kioxia. It is a separate
11:25:05 company from Kioxia.

11:25:08 And this matters also because what Kioxia did

during discovery in this case was preclude us from getting information about exactly how Daikoku2 operates. Hiding behind these very same corporate formalities. Mr. Kuzui was never provided to us, never made available to us for deposition. He still works at this other Toshiba entity. He's not -- he wasn't a party to the case. He wasn't made available for deposition. Source code was not produced for Daikoku2 even though we asked for it, presumably because the source code lives with this Toshiba company, not with Kioxia.

And so, Kioxia, you know, took advantage of these corporate differences --

THE COURT: Guys, guys, so let me hear from Mr. McQueen and then, I'll be able to deal with this.

MR. MCQUEEN: Yes, your Honor. Nolan McQueen on behalf of Kioxia.

To be quick, Viasat wishes to rely on Mr. Uchikawa's testimony when it's helpful for them but wishes to forbid Kioxia from doing the same when it hurts their position. Viasat can't have it both ways. This is plainly a fact issue that should go to the jury. The only evidence that Viasat cites to support its position that only Toshiba Information Systems invented Daikoku2 is Mr. Uchikawa, and Mr. Uchikawa never said that Mr. Kuzui was the sole person responsible for Daikoku2, or that only

Toshiba Information Systems invented Daikoku2.

Kioxia does not dispute that Mr. Kuzui may have also contributed to the invention of Daikoku2, but the evidence shows that others contributed to Daikoku2, including those at Kioxia; thus, Kioxia should be allowed to tell the jury that it invented Daik -- that Daikoku2 prior art reference. Thank you, your Honor.

THE COURT: This is -- just sounds to me like something that y'all can take up at trial. A fight y'all will have at trial. I'm going to deny that motion.

Next up, preclude from referring to V-I-A-S-A-T, Viasat as a nonpracticing entity. So with Viasat, the way I deal with both -- in both directions is Viasat -- is Viasat not a nonpracticing entity?

MR. KNOBLOCH: Your Honor, Viasat does not practice the asserted patent. But Viasat does have many other patents that it practices regularly and is, therefore, not a nonpracticing entity generally. It's a functioning company that does a lot things.

THE COURT: So your -- I got your -- okay. So here's the way I handle this just generally. Whatever the plaintiff is, it is. Whatever defendant is, it is. As long as what Mr. Fulghum says about Viasat is accurate, he gets to say. If it's inaccurate, you can object and vice versa. You know, there's nothing -- if I feel that either

side in what they're saying is saying it in a way that is pejorative, I will intervene without the lawyers having to help.

And so, if -- to the extent that if, for example, here, defendant wants to say that the plaintiff doesn't practice the patent, well, that goes to one of the Georgia Pacific factors, anyway, so that's just a fact. But I don't anticipate, knowing the lawyers in this case who I think are very good, I don't anticipate you all stepping outside the bounds of what I would think is acceptable in either direction about what you say.

Now, I'm turning to defendants' motions. The PTAB stuff is not coming in. Now, there is an exception that I don't know whether it needs to apply or not because I don't know what the overlap is in the experts between the PTAB and this trial, but the PTAB, my understanding is, I'm assuming it's sworn testimony that was given and if there is testimony where the same question is about the same patent, or whatever, is asked in my trial where a different answer was given at the PTAB, then that's another sworn answer that can be used.

And the way it will be used in my court would just be simply to say, Mr. Expert or Mr. Witness, whoever you are, I think it's just experts in the PTAB, do you remember you were involved in another proceeding? Yes.

In that proceeding, you were sworn. Yes. In that proceeding, you were asked this question and you gave that answer and that it's different than what you just gave here to show that there -- you just treat it like it's a deposition. Just call the PTAB proceeding a proceeding without getting into what it was, but otherwise, the PTAB should not come in.

The second MIL, arguments, testimony, evidence regarding reasons defendant became independent of Toshiba. Does the plaintiff intend to make any arguments about that?

MS. FASULO: Your Honor, we don't intend to talk about the things that Kioxia's concerned about like the price that it was sold for or the Westinghouse bankruptcy. There is some history between Kioxia and Toshiba that we think we'll need to explain to the jury sort of the fact that Kioxia was a spinout company from Toshiba. But the specific concerns that Kioxia raises in bringing this motion in limine, we don't intend to make those arguments.

But if Kioxia opens the door and is talking about the reasons that there was a spinout, we think we should be able to respond to those arguments. But otherwise, we don't think there's much there for this MIL.

THE COURT: Well, again, I would just urge the plaintiff to limit anything that has to do with Toshiba to

11:31:36 being necessary for the jury to understand. There are three issues, infringement, validity and damages, and if you asked a question that involves Toshiba, you should be able to explain to me why it's relevant to one of those issues.

Evidence regarding the individual -- the fact that investors in the defendant were Apple or Dell, does the plaintiff intend to do that?

MS. FASULO: We do, your Honor, because Apple and Dell are also customers and Kioxia made representations to at least Dell about how the accused products work. Those representations are found in design review documents. We actually saw some of them earlier. I think you made a comment that the jury will absolutely love them. But regardless, the dual position of Dell, for example, as both an investor and a customer is relevant to assessing the accuracy and reliability of the statements that Kioxia made to Dell.

So it would be a statement that Dell is an investor but nothing about sort of how much Dell has invested in Kioxia. No allegation that Kioxia is somehow guilty by association with Dell. None of the concerns that Kioxia raised here.

THE COURT: Okay. That sounds okay to me.

Next up, I have arguments, et cetera, regarding

11:33:07 the size or total revenues of defendant. Again, other
11:33:12 than if it's in damages, you know, the negotiating sides
11:33:20 or anything like that, that should not come in.

11:33:23 MS. FASULO: Your Honor, that is exactly the
11:33:25 context that we would raise it. Just to point out the
11:33:29 relative size of Semtech, which is the third party in the
11:33:33 comparable license to Toshiba, but we could do this in
11:33:37 relative terms. Nothing to draw attention to the overall
11:33:40 size of Toshiba.

11:33:43 THE COURT: And then, finally, concerns about the
11:33:48 accuracy of a witness' preparation for deposition. As a
11:33:51 general rule, I don't like people talking about what
11:33:54 occurred during discovery during the trial. And so, if,
11:33:59 for some reason, someone thinks they need to talk to a
11:34:04 witness about their preparation for deposition, you need
11:34:06 to approach the bench and explain to me why it would be
11:34:09 relevant.

11:34:10 MS. FASULO: Understood. And, your Honor, just
11:34:12 to reset a moment -- and this is Meg Fasulo on behalf of
11:34:17 Viasat. This is 30(b)(6) testimony that doesn't actually
11:34:22 go to preparation. It goes to questions like was there
11:34:26 source code available for this product that the experts
11:34:29 could look at. So I don't think that there will be a
11:34:32 cause for concern there at trial.

11:34:37 MR. SILLIMAN: And just to respond to that

11:34:38 briefly, your Honor, respectfully, that's not an accurate
11:34:42 representation of the designations that have been made.
11:34:45 Certainly if plaintiff is willing to limit itself to those
11:34:49 designations that it just described, that's not
11:34:52 objectionable. But the -- this motion in limine was
11:34:56 primarily directed to other designations that were made
11:34:59 about, one, whether a witness spoke with certain
11:35:02 individuals in preparation for a deposition, and then,
11:35:07 some questions that were outside the scope of a 30(b)(6)
11:35:10 witness' topic and was questioned about whether they
11:35:15 prepared for that out-of-scope material, which is what
11:35:18 this MIL was intended to respond to.

11:35:27 THE COURT: So I think we've worked that out.
11:35:30 And so, give me just one second. Be right back.

11:36:36 Okay. Is there anything else we need to take up?

11:36:39 MR. MCBRIDE: Your Honor, Scott McBride from
11:36:41 Viasat.

11:36:41 I think we have been e-mailing with Mr. Yang
11:36:44 about our trial date in that we're currently second for
11:36:47 the date of the 15th, and we're asking for potential dates
11:36:51 where we could get priority setting us first. And then,
11:36:54 second, just what we should expect in terms of the
11:36:57 duration of the trial, the number of hours.

11:36:59 THE COURT: How many patent -- is it just one
11:37:02 patent?

11:37:03 MR. MCBRIDE: One patent, yes.

11:37:03 THE COURT: How many claims?

11:37:05 MR. MCBRIDE: Four claims currently, your Honor.

11:37:06 THE COURT: You know, I haven't had anyone take
11:37:10 more than 10 hours per side in any of the trials I've had.
11:37:14 That doesn't include voir dire or opening argument or
11:37:16 closing argument, and, you know, so let's shoot for 10
11:37:19 hours. I've had -- I've had people with two and three
11:37:24 patents recently who haven't used 10 hours per side. And
11:37:27 so, let's do that.

11:37:30 I have one quick -- the current motion in limine
11:37:35 that is -- it is in my standing order, but you both may
11:37:39 not necessarily be aware of it that I'm not permitting is
11:37:42 I've had a rash of trials where -- and I'll pick on the
11:37:49 plaintiff because it's all been the plaintiffs so far.
11:37:51 Not you.

11:37:52 So what's happened is plaintiff finishes their
11:37:54 case and then, defendant starts putting on their case and
11:37:57 they call their noninfringement expert and the plaintiffs
11:38:00 state, did you write your own report? Of course, the
11:38:03 expert says yes, and then, they point out there are
11:38:07 sections of their report that are identical, you know,
11:38:09 might be invalidity or something where two or three people
11:38:12 all have the same five pages or some number of pages.
11:38:17 Because clearly the lawyers, you know, did the bones of

11:38:20 it. And then, they, you know, asked did you copy, did you
11:38:25 plagiarize and all that stuff. That doesn't -- I'm down
11:38:30 to where as soon as someone says, did you write a report,
11:38:33 I intervene.
11:38:34 Now, clearly, if you ask a question and the
11:38:39 witness had said something different in his report, you
11:38:42 can use the report to cross-examine -- I'm not talking
11:38:45 about that. But we all know how reports are written and
11:38:50 the involvement of the lawyers and how they got to be
11:38:52 written is not something I think the jury needs to fuss
11:38:56 about. And so, that's really the intent of what I don't
11:39:00 want to have taken up in front of the jury.
11:39:04 What they said in the report, they're stuck with
11:39:07 and you get to use it for cross but not the methodology in
11:39:11 which it was drafted.
11:39:13 MR. MCBRIDE: Understood, your Honor.
11:39:14 THE COURT: Is there anything else that we needed
11:39:16 to take up?
11:39:17 MR. MCBRIDE: Just a trial date issue. That's
11:39:19 it.
11:39:19 THE COURT: I know we're working on it and I'm --
11:39:22 but I could only screw things up if I try to get involved.
11:39:26 MR. MCBRIDE: Sure.
11:39:28 THE COURT: As I think each side has armed
11:39:31 itself, you know, or has -- you know, everyone has law

clerks who know that the real sausage of trial setting is made outside with me having no involvement and really no awareness. I don't really know what I'm doing next Monday and so -- but I know they gave me a heads up that they're working on it and as soon as we know more -- and obviously, if we move it, we'll do our best to get you a spot. I know we've had one or two things settle, for example, in August and so, I think we've got a few things clear up where we could set and give you all a priority date.

MR. MCBRIDE: Understood.

MR. FULGHUM: Can we -- we're not going to trial on the 15th. Is that where we stand right now?

THE COURT: My sense is you're not.

MR. FULGHUM: Okay. And we're going to sort of inform our constituents and release our hotel rooms and the like. And we also have some work to do on depositions and the like coming out of this.

THE COURT: And actually, that was why I didn't -- yeah. Actually, I don't know why I was saying this. No. Y'all have extra work coming out of this, anyway. With respect to the Daubert, the way I did it, you know, y'all wouldn't make the 15th, anyway, and so --

MR. FULGHUM: Okay.

THE COURT: But we will get to work on getting

you another trial date.

MR. FULGHUM: Okay. Thank you, your Honor, for that clarification and appreciate it.

MR. MCBRIDE: Thank you, your Honor.

THE COURT: Okay. Y'all have a good day.

MR. MCBRIDE: You, too.

MR. FULGHUM: Thank you, Judge. Bye-bye.

MS. SMITH: Thank you, your Honor.

(Proceedings concluded.)

* * * * * *

UNITED STATES DISTRICT COURT )
WESTERN DISTRICT OF TEXAS )

I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 29th day of March, 2024.

Lily Iva Reznik

~~~~~~~~~~~~~~~~~~~~~~~~~~
LILY I. REZNIK, CRR, RMR
Official Court Reporter
United States District Court
Austin Division
501 West 5th Street,
Suite 4153
Austin, Texas 78701
(512)391-8792
SOT Certification No. 4481
Expires: 1-31-25
~~~~~~~~~~~~~~~~~~~~~~~~~~