UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

VIASAT, INC. ) Docket No. WA 21-CA-1231 ADA
)
vs. ) Waco, Texas
)
KIOXIA CORPORATION, )
KIOXIA AMERICA, INC. ) July 15, 2024

TRANSCRIPT OF VIDEOCONFERENCE MINI-MARKMAN HEARING
BEFORE THE HONORABLE ALAN D. ALBRIGHT

APPEARANCES:

For the Plaintiff: Ms. Meg E. Fasulo
Mr. J. Scott McBride
Mr. Navi D. Shah
Bartlit Beck, LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654

Ms. Melissa R. Smith
Gillam and Smith, LLP
303 South Washington Avenue
Marshall, Texas 75670

For the Defendant: Mr. Michael Hawes
Baker Botts, LLP
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002

Mr. Mark D. Siegmund
Cherry, Johnson, Siegmund, James, PLLC
400 Austin Avenue, 9th Floor
Waco, Texas 76701

Court Reporter: Ms. Lily Iva Reznik, CRR, RMR
501 West 5th Street, Suite 4153
Austin, Texas 78701
(512)391-8792

Proceedings reported by computerized stenography, transcript produced by computer-aided transcription.

THE COURT: Good morning, everyone.

Jen, would you call the case, please.

THE CLERK: A civil action in Case 21-CV-1231, Viasat, Incorporated vs. Kioxia Corporation, Et Al. Case called for a Markman.

THE COURT: Announcements from counsel, please.

MS. SMITH: Good morning, your Honor.

This is Melissa Smith. Joining me this morning, I have Mr. Scott McBride, lead counsel who will be addressing the Court today. Also, Ms. Meg Fasulo and Mr. Ravi Shah. And, your Honor, plaintiff's ready to proceed.

THE COURT: Welcome.

Mr. Siegmund.

MR. SIEGMUND: Good morning, your Honor.

Mark Siegmund with Cherry, Johnson, Siegmund, James on behalf of defendant. With me this morning is Michael Hawes with Baker Botts. We also have two client representatives with us this morning, Julius Christensen and Rick Lin. And Mr. Hawes will be arguing on behalf of defendant. And he was having some trouble with his video, your Honor, so he'll be addressing the Court via phone if that's okay.

THE COURT: That's fine by me. Give me one second.

We're here to take up the claim term "rate of

errors" and, Mr. Siegmund, I'll hear from your side.

MR. HAWES: Thank you, your Honor.

Michael Hawes for defendant. And again, I apologize, the Zoom Workplace seems to want to just connect me forever so I'm coming by phone and I'll do my best.

THE COURT: No apology needed.

MR. HAWES: Okay. Now, this involves a situation where the specification makes a clear distinction between the rate of errors and the amount of errors and it does so in four different locations. It does it twice in column 7 at lines 59 and 62 and it does it two more times in column 8 at lines 22, 23, and then, again, line 26.

So, you know, it's important as a starting point to realize that the key dispute between the parties is whether rate of errors should be construed broadly enough but capture different language that's used in the specification, and that different language is the amount of errors and, specifically, an amount of errors per sector where, your Honor, a sector is an amount of a subdivision of the memory in question.

Now, the arguments that we see from the other side start with dictionaries. And, you know, frankly, your Honor, the specification is more important than the dictionaries, but I think it is worth looking at the

dictionaries to some extent just because there are a couple of -- or three, I think, definitions that they put forward.

The first is just a general language dictionary. It's the Merriam-Webster and really doesn't go to, you know, the rate of errors in the context of memory. But then, you get to the Oxford Dictionary of Computing and the IEEE Dictionary and what I'd point out for the Court is that each of those definitions includes the concept that the errors are assessed over a time-dependent variable.

So, for example, the Oxford Dictionary says it's a proportion of errors occurring in data transfers to or from the storage medium. Those data transfers obviously are occurring over time. So again, what you have is a comparison of errors over some sort of time period and that's what's relevant for us. We, you know, acknowledge that there are different ways of measuring a rate, but what's really important, your Honor, is that the rate be measured over some sort of time-dependent variable, and that it not be expanded to be measured in terms of just an amount, right, no matter how long, no matter what the time. The idea that their construction encompasses is that the amount of errors is somehow a rate and that's what we think is improper and that's the key dispute here.

So when they say that, well, it's a rate because it's errors per sector, you know, what's important is that the sectors are there from day one, they're there a month later, they're there ten years later if you're still using that memory device. They aren't time dependent. On the other hand, looking at these definitions, everything these definitions use to create a rate is time dependent. So whether it's the data transfers, whether it's the bits transferred per error, whether it's the total number of transmitted bits, or the number of characteristics of the message received.

And, your Honor, I just walked through each of their definitions on page 1 from the -- of their brief from their technical dictionaries. So when you contrast, you'll realize that the technical dictionaries line up with the idea that a rate needs to be time dependent in some manner.

So we would ask that the Court in construing and appropriately with the specification, include that time dependence. Now, it doesn't have to be, you know, per minute. It doesn't have to be per hour. It's not like there is a specific time dependence that's required, but there is a requirement of some sort of time dependence even if that time dependence is, for example, the time for a certain amount of data to be transferred, which is what

11:07:38 some of these technical dictionaries are talking about.
11:07:41 The second point I do want to address, your
11:07:43 Honor, goes to their assertion -- and this is at the
11:07:48 bottom of page 3 of their brief -- that somehow our
11:07:51 construction is inconsistent with our IPR petition. This
11:07:56 is a very brief, two-second section, but I do want to
11:08:00 rebut this, your Honor, because it's important to realize
11:08:02 that when you look at the actual reference we were talking
11:08:07 about, the language is describing figure 19 and talks
11:08:11 about increasing the errors. And if you look at figure
11:08:16 19, that figure is showing a change in slope and the
11:08:22 slope, the axis of that figure is time -- the horizontal
11:08:28 axis is time, the vertical axis is errors.
11:08:31 So what that figure is really showing is the
11:08:33 change in the error rate, the number of errors per time.
11:08:37 That's what that slope is is a very low, very level slope
11:08:42 at the first part and then, it transitions to a much
11:08:45 higher slope in the second part of the figure of the --
11:08:49 that's the Yamaga reference, your Honor, that's being
11:08:52 described at that portion of the petition. So we were
11:08:56 perfectly consistent, your Honor, in terms of looking at
11:08:59 error rate being a calculation of errors as compared to
11:09:05 some sort of time-dependent variable.
11:09:09 Finally, your Honor, I do want to point out this
11:09:11 is not a -- an attempt to limit an independent claim.

This is a situation where a dependent claim -- there are three different dependent claims -- incorporated language concerning one particular feature. And so, it does, your Honor, and we certainly admit it does, limit the scope of the claim relative to the independent claim, but of course, that's the nature of a dependent claim.

So when they chose to limit these particular dependent claims, which doesn't include all of the asserted claims, your Honor, with regard to the rate of errors language, they were limiting it so that it did not cover the distinct language used in the specification for the amount of errors and the amount of errors per sector.

So that's why, as we explain, it's important under the intrinsic evidence to limit these dependent claims in accordance with the actual limitations that were added to make them narrower than the independent claims.

Finally, your Honor, I do want to, you know, kind of look at one extra point that I think is important, which is their inventor, Dr. Fuerst, did testify during deposition about this issue. And usually, you know, an inventor deposition, inventor testimony, kind of low on the totem pole, we certainly understand that. But this inventor is a little special because a few months after his deposition, he was designated to give expert testimony by Viasat. So they designated him to give expert

testimony and that includes expert testimony concerning the license rights available under the 700 patent. So he kind of has to know about what's the scope of the claims to give that kind of testimony.

During his deposition and, again, your Honor, this -- before I present this, I do want to make clear for the record, this deposition included some confidential material concerning their license agreements, but the question and answer I'm going to refer to were not part of that confidential material. This does not concern the license agreements. It only concerns his testimony regarding the asserted patent.

So the question is on page 136 of the deposition of Russell Fuerst that was conducted on July 19th, 2023 and it begins at line 9. The question states: I notice that the error-monitoring module is configured to monitor a rate of errors. What does that mean? The answer, which starts on line 12, is, again, not being an expert specifically in this case, but effectively, what it sounds like it's saying is that it's checking to see how many errors are coming through over a period of time. And that's the end of his answer and it ends at line 16.

Now, of course, at the time of this deposition, he wasn't an expert in this case, but now, he has been designated to give expert testimony. So while, you know,

this is beyond just an inventor saying that rate of errors is errors over a period of time, this is an expert who is looking at the scope of these claims to make opinions, to offer those opinions to the jury. So we do think it's very relevant.

So, your Honor, with that, you know, we think this is -- it's a single issue. We think that distinctions in the specification should drive the outcome. And unless the Court has questions, you know, I think I can finish there.

THE COURT: Thank you, sir.

A response.

MR. MCBRIDE: Scott McBride on behalf of Viasat.

And first, your Honor, I just want to clear up a misstatement by Kioxia that the construction that Viasat is proposing is not that it includes an amount of errors necessarily per sector and limited to that. The plain and ordinary meaning of error rate as we laid it out is that the error rate is the amount of errors per unit time, unit of data, or unit of some other metric. And while a sector is a unit of data, we are not limiting our construction to just be per sector, which is pretty important to the way in which Kioxia has contorted the language of the specification.

One part of the specification that wasn't

mentioned which shows how this construction is supported by the intrinsic evidence is at column 7, line 49, which talks about the error-monitoring module, which it says may monitor an amount of errors associated with flash memory. This monitoring may measure errors over a variety of time periods and metrics and may be translated into an error rate; and then, uses the kind of language that's seen throughout, the monitoring may be performed on a per sector or per set of sectors basis.

And similarly, even the places that defendant has noted in column 7 at line 63, or column 8 at line 27, the idea is given here that errors can be monitored per unit of data, including per sector, or per set of sectors, or other regional basis. And so, what's clear is that the patent is specifically contemplating metrics other than time can be used in coming up with this error rate. And the other metric of monitoring that is specifically noted is a unit of data and this is entirely consistent with how this term is understood in the art.

And I encourage that -- to take a look at the exhibits because defendants' representations of them is not correct in that the exhibits, including the Oxford Dictionary of Computing in Exhibit 1, IEEE at Exhibit 2, and the IBM Dictionary of Computing, Exhibit 3, all describe the possibility of measuring a rate of errors as

the number of errors over a unit of data.

And also includes the idea that it can be measured per unit of time. That's certainly a possibility. But the plain language of the specification and of the understanding of the word "error rate" includes the possibility of measuring by time and measuring by unit of data. And I would further point out that Exhibit 1, the Oxford Dictionary of Computing, even notes in a specific example of how you can measure error rate using errors per unit of data. Talks about it being expressed as a negative power of 10. In other words, if you have one error bit of data per 100,000 data bits, that's one divided by 100,000, or one times 10 to the negative five, which means you can literally express an error rate using a single number in the form of a negative power of 10. And what defendant didn't point out is the patent itself uses that exact nomenclature. At column 4, line 29, it says flash memory does have an inherent probability of error. Depending on the flash technology, this error rate may typically be somewhere between one E negative five and one E negative eight. That's one times 10 to the negative five to one times 10 to the negative eight.

The patent is using error rate in exactly the context of the construction that Viasat is proposing that you can have an error rate being number of errors per unit

of data. Kioxia's own witnesses and documents also understand error rate this way. Mr. Fujiwara at page 30, line 15, talked about an error rate of 20 or 30 bits per ECC frame. That's a unit of data. And at line 32 -- I'm sorry, page 32, line 22, he also went on to talk about an approximate error rate within 100 bits per ECC sector.

So all in all, the internal and the extrinsic evidence all are consistent in broadly understanding error rate to include number of errors per unit time, per unit of data, or some other metric. And Kioxia's construction is in contrast distorting this plain language to create some kind of an inconsistency that isn't there. When it talks about monitoring on a per-sector basis, that language isn't entirely consistent with the construction proposed by Viasat. And it makes perfect sense, your Honor, as the patent points out, errors in familiar memory can occur in clusters based on manufacturing errors. So of course you want to monitor your errors or your error rates for these different regions to find those errors, which means why you would monitor errors and error rates across different sectors, per sector, per group of sectors, or other regional basis.

So, your Honor, in conclusion, Viasat's plain language construction is clearly supported by the intrinsic and the extrinsic evidence and how this term is

11:18:05 understood in this art whereas Kioxia's construction is
11:18:08 looking to narrow that plain language and general
11:18:10 understanding of the term based on an incorrect effort to
11:18:13 contort the language of the specification the way that
11:18:17 does not support what they have to say. So unless your
11:18:19 Honor has any questions, that's all I have to say.
11:18:22 THE COURT: In your infringement contentions, are
11:18:26 there any theories that you could advance where you could
11:18:34 -- that rely only on an amount of errors?
11:18:37 MR. MCBRIDE: No, your Honor. We're relying on
11:18:38 the error rate, meaning the amount of errors per unit of
11:18:41 data and per -- in terms of amount of data that comes out
11:18:44 in total.
11:18:47 THE COURT: Okay. A response.
11:18:50 MR. HAWES: Yes, your Honor.
11:18:52 What I'd note is each of the examples, both in
11:18:56 the dictionaries and in the testimony of the Kioxia
11:19:00 engineers, involves an amount of data that is transmitted
11:19:04 and that is time dependent. So we're not talking here in
11:19:07 each of these situations about an amount of data that just
11:19:12 fits there from start to end and has no time dependence.
11:19:15 So, for example, he talked about the ECC frame,
11:19:18 that's an amount of data that is transmitted. He talked
11:19:21 about this hundred bits per ECC sector, but even their own
11:19:26 brief -- and this is on page 2 where they quote this

deposition testimony is talking about after a year of use. So what it's saying is that over a year, you would have a hundred bits per ECC sector.

So again, we're talking with time dependence and their own brief admits that. So again, we're not saying it has to be a particular period of time. We're saying that it has to be time dependent and you can measure that in different ways. But what we would like the Court to do is, to be clear, it needs to be time dependent in some way, not necessarily with seconds and minutes and hours, but it has to be time dependent. So that's what we're requesting.

Finally, with regard to the infringement contentions, your Honor, their theory is completely time independent. So what Kioxia does is it looks for a particularly severe error. It's multiple levels of error corrections so that if an error cannot be corrected at the first level and cannot be corrected at the third level -- second level, sorry, your Honor, if it is -- then reaches that third level because it hasn't been corrected, that one error, regardless of whether it's the first, second that the drive's been used or ten years after the drive's been used, that's the trigger. So it is clearly an amount, it is not a rate because there's no time dependence whatsoever.

They tried to make it a rate by saying, well, it's one error in a particular sector, but that's an amount of errors per sector. And the specification describes that differently than a rate of errors per sector. And we're asking that the Court for these dependent claims where they included the rate of errors language distinguish between a rate of errors per sector and an amount of errors per sector. That's what I have, your Honor.

THE COURT: Why isn't the time dependent on per-sector rate argument that you're making, why isn't that essentially a negative limitation or some kind of limitation that you're taking out of the spec?

MR. HAWES: So, your Honor, I think it is fair to say that the specification distinguishes between rate of errors and amount of errors. And so, to that extent, yes, the spec is using distinct language for those two ideas. And that the Federal Circuit has said that when -- especially in dependent claims, you include, you know, language choice one, which is distinguished in the specification from language choice two, but you are distinguishing one from the other.

But I think we can capture that broadly and positively by saying time dependent rather than having to use exclusionary language or a negative -- negative type

of limitation.

THE COURT: Any response?

MR. MCBRIDE: Your Honor, I don't feel like I want to go down the rabbit hole of infringement, but I would say that we don't agree with the way they've characterized our theories. I will say that an error rate is fundamentally a ratio: A numerator and a denominator. And what defendants are trying to do is to squeeze multiple things into that denominator in a way that is not supported by the specification or by the extrinsic evidence.

You can describe an error rate based on a time dependency. You can describe an error rate based on the number of errors that come out. And yes, it's certainly possible, and perhaps even probable, that there will be connections between the two, but you do not have to link them in order to have an accurate description of an error rate.

Specifically, again, noting that error rates in flash memory are commonly given as a single number like one times 10 to the negative five, which is specifically an error rate based on a number of errors per total number of data bits read. That is a unit of data in the denominator. That's all we're asking.

And I don't think that there's any need to

11:23:28 artificially add more to this based on defendants' desire
11:23:32 to shape the facts to their specific noninfringement
11:23:36 defense.

11:23:42 MR. HAWES: Your Honor, may I make just one
11:23:44 response to that?

11:23:44 THE COURT: If you'd hold on one second, I want
11:23:47 to ask plaintiff a question. So when the claim's talking
11:23:53 about a ratio, that's two numbers being divided, correct?

11:23:57 MR. MCBRIDE: Yes.

11:23:59 THE COURT: So how does that impact the plain and
11:24:04 ordinary meaning with respect to the rate of errors and
11:24:07 whether or not it includes an amount of errors? Does that
11:24:11 question make sense?

11:24:12 MR. MCBRIDE: Well, I mean, I think so, your
11:24:13 Honor. I mean, an amount of errors, I mean, you can
11:24:16 measure an amount of errors as an absolute number, and
11:24:19 then, you can measure errors as a ratio of that amount of
11:24:23 errors per some denominator and many -- just like, you
11:24:28 know, miles per hour, for example. You could talk about
11:24:30 the absolute number of miles traveled or you could express
11:24:33 it as a ratio of miles per hour spent traveling.

11:24:35 Here, you could talk about a total amount of
11:24:37 errors you just count up, or you can express it as a rate,
11:24:41 meaning a ratio of errors over some unit to give it some
11:24:45 kind of compare-ability or comparability to other measured

amounts of errors and rates of errors.

THE COURT: Okay. A response.

MR. HAWES: Yes. Just, your Honor, I will note that when counsel for Viasat talks about errors per amount of data transmitted, that is not our dispute. Data transmitted occurs over time: it's time dependent. So we don't have a problem with that. What we have a problem with is amounts of errors for the data sector because that has no time dependence at all. It's essentially an amount of errors for something that has no time dependence and thus, is not a rate. So I just want to be clear that amount of errors for data transmitted is not a problem. It's not the dispute. So I'll leave it at that. Otherwise, I think, you know, amounts versus rate is what we're dealing with here.

THE COURT: Anything else from the plaintiff?

MR. MCBRIDE: Nothing, your Honor.

THE COURT: Okay. I'll be back in a second.

Okay. Thank you for that, if we could go back on the record.

My clerk and I are going to work on this. I think the arguments were both very good but we also -- we need to discuss what to do with the motion for partial summary judgment, depending on what our construction is. So we're going to go -- I don't usually do this. I

11:31:33 usually rule at this time, but you should have an order out within a day or so and we'll let you know what we're going to decide. I thought both arguments were very good.

Is there anything else either one -- anyone would like to say on summary judgment or anything before we go?

MR. MCBRIDE: No, your Honor. Although I think that if you do have a construction that you think requires reconsideration of your ruling on summary judgment, we would just ask an opportunity to argue the summary judgment in light of that construction, if possible. I mean, obviously, if you went with our construction, I think that would moot their summary judgment similar to how you resolved it at the pretrial conference. So subject to that.

THE COURT: I think that's fair. If we decide something that we need to have that would be fair before we grant the motion for summary judgment that we need to have your input, we'll certainly take it.

MR. MCBRIDE: Thank you, your Honor.

THE COURT: You bet. Anything else?

MR. HAWES: Nothing else for defendants, your Honor.

THE COURT: Thank you all. I hope to have you on video next time but, you know, when you do a couple of hundred of these Zoom hearings a year, something always

happens.

So, Lily, thank you again for being here and, Lily, I'll see you at 2:00. Take care.

MR. MCBRIDE: Thank you, your Honor.

MR. HAWES: Bye-bye, your Honor.

MS. SMITH: Thank you.

(Proceedings concluded.)

* * * * * *

UNITED STATES DISTRICT COURT )
WESTERN DISTRICT OF TEXAS )

I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 16th day of July, 2024.




~~~~~~~~~~~~~~~~~~~~~~~~~
LILY I. REZNIK, CRR, RMR
Official Court Reporter
United States District Court
Austin Division
501 West 5th Street,
Suite 4153
Austin, Texas 78701
(512)391-8792
SOT Certification No. 4481
Expires: 1-31-25
~~~~~~~~~~~~~~~~~~~~~~~~~