IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

VIASAT, INC. * June 24, 2026
*
* CIVIL ACTION NO.
*
KIOXIA CORPORATION ET AL* 6:21-CV-1231

BEFORE THE HONORABLE ALAN D ALBRIGHT
PRETRIAL CONFERENCE (via Zoom)

APPEARANCES:

For the Plaintiff: J. Scott McBride, Esq.
Nosson D. Knobloch, Esq.
Matthew R. Ford, Esq.
Jordan Golds, Esq.
Bartlit Beck LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654

Meg E. Fasulo, Esq.
Bartlit Beck LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202

James Travis Underwood, Esq.
Gillam & Smith
102 N. College, Suite 800
Tyler, TX 75702

For the Defendants: Roger J. Fulghum, Esq.
Elizabeth L. Flannery, Esq.
Michael Hawes, Esq.
Michael A. Silliman, Esq.
Baker Botts LLP
One Shell Plaza, 910 Louisiana
Houston, TX 77002

Nolan Edward Sullivan McQueen, Esq.
Jeffery S. Becker, Esq.
Baker Botts LLP
2001 Ross Avenue, Suite 900
Dallas, TX 75201

Mark Siegmund, Esq.
Cherry Johnson Siegmund James, PLLC
7901 Fish Pond Road, Ste 2nd Floor
Waco, TX 76710

Court Reporter: Kristie M. Davis, CRR, RMR
PO Box 20994
Waco, Texas 76702
(254) 666-0904

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

03:30 (Hearing begins.)

03:30 DEPUTY CLERK: A civil action in Case 6:21-CV-1231, Viasat versus Kioxia. Case called for a pretrial conference.

03:30 THE COURT: Could I have announcements from counsel starting with the plaintiff, please?

03:30 MR. UNDERWOOD: Good afternoon, Your Honor. This is Travis Underwood for the plaintiff Viasat. Also on the line we have Scott McBride, Nosson Knobloch, Meg Fasulo, Matt Ford, Jordan Golds, and our in-house client representative Colin Wood. And we're ready to proceed.

03:30 THE COURT: And I thought you were just so excited to be in my court all week, you decided to spend an extra hour and a half with me here today.

03:31 MR. UNDERWOOD: It's both reasons, Your Honor.

03:31 (Laughter.)

03:31 THE COURT: Sure it is.

03:31 And for defendant?

03:31 MR. FULGHUM: Good afternoon, Your Honor. For defendant Roger Fulghum. And with me is Michael Hawes, Elizabeth Flannery, Michael Silliman, Jennifer Carter, Mark Siegmund, and our client representative today is Julius Christensen.

THE COURT: Okay. I'm going to go a little bit cattywompus. I've got the amended joint pretrial order and -- I'll get to the motions right after, but I've got the disputes that you all have in your joint pretrial order in blue and red, and I'm going to just go through these and tell you how I'm going to rule.

With regard to the copy of the patent used during the trial, I don't know -- the only thing I've ever seen used as a copy of the patent during the trial is a copy of, you know, kind of the fancy one that issued. So I don't know -- can defendant explain to me why this is a fight?

MR. FULGHUM: Yeah. Sure. I'd be happy to.

So the copy of the patent that's at issue is the patent as available from the Patent Office, and it's in a copy of the patent and it has attached to it the trial certificates from the Patent Office describing the outcome of the PTAB.

THE COURT: Are you -- okay. Fine. Are you going to use anything that's in that?

MR. FULGHUM: Yes. I'm going to tell the jury that Claim 15 has been canceled.

THE COURT: So -- okay. So I'm going

03:32 to --

03:32 MR. FULGHUM: Here's what I'm not going to do. Let me be clear about something. I'm not going to put on an invalidity case. Okay? So let me be clear about that. I'm not going to put on an invalidity case.

03:32 But I am going to tell the jury that Claim 15 has been canceled. I will not tell the jury that Claim 15 is invalid. I will not tell --

03:33 THE COURT: What difference does it make -- why does it matter whether 15 has been canceled?

03:33 MR. FULGHUM: It matters because everything in 15 is in the public domain. And because everything in 15 in the public domain matters for damages. It matters for damages. Because 15 is --

03:33 THE COURT: Your damage expert has testified that because 15 has been canceled, then he's going to -- he's going to opine about this?

03:33 MR. FULGHUM: Yes.

03:33 THE COURT: And it's in his report?

03:33 MR. FULGHUM: Yes.

03:33 THE COURT: Okay. And I -- it seems like a silly fight to me in the sense that you -- I don't -- you can -- Mr. Fulghum, you can say 15 was canceled

regardless.

MR. FULGHUM: Yeah.

THE COURT: And so I don't know -- I don't really know what the fight is over.

MR. FULGHUM: I know. And, Your Honor, here's the -- let me just --

THE COURT: No, no. Let me hear from the plaintiff because they're the ones who oppose. I get what you want. Why does the plaintiff care?

MR. KNOBLOCH: Thank you, Your Honor. Nosson Knobloch for Viasat.

The issue here is that I do not believe it is appropriate for Mr. Fulghum to be referring to Claim 15 as canceled. That is not relevant to the damages apportionment issues in this case at all. The issue is not whether --

THE COURT: Well, it -- hold on a second. He just told me it's in his report. The damage report. Is that not true?

MR. KNOBLOCH: Your Honor, whether it's -- I think the issue is --

THE COURT: Well, no, no, no. No. Answer my question. I know what's relevant. I've done this for a while.

Is it in the damages expert report?

MR. KNOBLOCH: I don't recall right now but I will take Mr. Fulghum's representation that it's in the expert report.

THE COURT: And if it's in his expert report and you guys didn't file a Daubert and keep it -- to keep it out, and if you didn't file summary judgment to keep it out or something, then I'm going to allow him to say that. The time to fight over this stuff has come and gone. And so if --

MR. KNOBLOCH: Well, Your Honor, we did file a motion in limine for --

THE COURT: On this issue?

MR. KNOBLOCH: -- the original trial on this very issue. And this Court ordered the parties that Kioxia was not going to be allowed to say that Claim 15 had been invalidated. And as Your Honor already noted --

THE COURT: Well, then, Mr. Fulghum, if I've ruled that, why --- what are you talking about?

MR. FULGHUM: I'm not going to say it's invalid, Judge. I'm just going to say it's been canceled.

THE COURT: Nope. Nope. Nope. 15's out. I can only deal with these things so many times. 15 is out.

03:35 And so moving on to -- and so what we'll do is we'll use the patent that was issued originally from the Patent Office as the exhibit.

03:35 Next up, I have --

03:35 MR. FULGHUM: Your Honor, may I say one more thing?

03:35 THE COURT: No. Mr. Fulghum, you know, every judge has certain things that they like and dislike.

03:35 MR. FULGHUM: Understood.

03:35 THE COURT: And when I've ruled, that's a thing I don't like. So.

03:35 MR. FULGHUM: Appreciate it.

03:35 THE COURT: So Paragraph 58. In 58, here's the way I see the world. With regard to calling witnesses. If -- and let me just make sure I get the parties straight.

03:36 So if Viasat, the plaintiff, wants to call a witness from the defendant, Kioxia, in their case, that's -- obviously that's fine.

03:36 Now, it's up to Kioxia -- and if I'm saying that right -- it's up to the defendant to decide whether defendant wants to -- when the witness -- if the witness is called in the plaintiff's case, the defendant is free to ask questions or not.

03:36 And then once the plaintiff has rested,
03:36 if the defendant wants to put the same witness back on
03:36 in their case-in-chief, they get to do that. And
03:36 there's no restriction on that. So that's how we're
03:36 going to handle witnesses.

03:36 Next up, I have --

03:36 MR. MCBRIDE: Your Honor, if I might ask
03:36 one quick question on that. This is Scott McBride for
03:36 Viasat.

03:36 Is it -- does Your Honor, in terms of the
03:37 procedures of the Court, simply expect the parties to
03:37 make those witnesses available in that circumstance --

03:37 THE COURT: Yes.

03:37 MR. MCBRIDE: -- versus requiring trial
03:37 subpoenas?

03:37 THE COURT: Yes. I mean, well, here's
03:37 the deal. Depending on who you might make available.
03:37 If the defendant's expert -- I'm sorry. Let me start
over.

03:37 If the defendant's witness John Smith
03:37 lives in Seattle, you don't get him here. I mean,
03:37 you've taken his deposition. You can play his
03:37 deposition.

03:37 If -- now, if the defendant is going to
03:37 call him in their case-in-chief, then they -- and you

want to put him on in your case-in-chief, yes. They have to bring him down and let you do that first. They don't get to say, he's out of subpoena range. You have to use a depo. And then -- but we get to call him live.

So if all -- and it works both ways. If they think they might use him, they have to -- they need to let you know and they have to make him available to you in your case-in-chief. If you call someone in a case-in-chief, it's entirely up to defendant to decide if they're going to have the witness testify in the first half of the trial or the second half or both. Because they don't have a burden.

But thank you for the question. That was a good question.

MR. MCBRIDE: Thank you, Your Honor.

THE COURT: Number -- Paragraph 77. If the question in 77 is can the defendant reserve its opening argument until their case-in-chief, the answer to that is yes. Is there something more to it than that?

MR. MCBRIDE: Your Honor, this is Scott McBride again for Viasat.

Yes. I mean, that is our complaint, that they change -- they want to do -- to change the

03:38 standard procedure.

03:38 THE COURT: That's -- they get to do
03:38 that. That's within the rules. And so they can do
03:38 that.

03:38 I know it isn't done a lot, but it's --
03:38 it is within the rules.

03:38 Discovery responses. On discovery
03:39 responses, I believe that one day before is sufficient.

03:39 On opening statements. Yeah. I've ruled
03:39 on that.

03:39 Closing arguments.

03:39 MR. MCBRIDE: Your Honor, I'm sorry. I
03:39 don't mean to be difficult here.

03:39 But there is one remaining issue here
03:39 with respect to the opening statements fact, and that
03:39 has to do with the timing of disclosures. We currently
03:39 have an agreement to disclose opening statement
03:39 exhibits and demonstratives two calendar days before.
03:39 And we --

03:39 THE COURT: I think one day before is
03:39 fine.

03:39 MR. MCBRIDE: We've agreed to two days.

03:39 THE COURT: Okay. Well, then --

03:39 MR. MCBRIDE: Kioxia has indicated it
03:39 does not feel it needs to abide by that. We think they

should still abide by that timing rule.

THE COURT: They have to -- they will have -- well, listen. They'll have to be careful here. If they decide not to put on their opening argument until -- I'm glad you raised that too.

If they choose, when we start trial on Monday, which is I assume when we're starting, and they say, I'm not going to put on my opening argument until my case-in-chief. Well, if their opening argument starts on Tuesday and they haven't given you their slides, they're not going to get to use any slides.

So it's a two-day window on a moving target. So if the point you're making is they have to do it the same time you do, then I'm not going to require that. But they have to do it -- they do have to do it the same number of days before their opening argument that you do them.

MR. MCBRIDE: That's exactly the question, Your Honor. Thank you.

MR. FULGHUM: Judge, may I speak to that issue by way of clarification?

We are going to reserve our opening argument. My best estimate is that that will occur perhaps on Tuesday afternoon, based upon other trials that I've seen and participated in. I do not know

exactly what's going to be in my slides until I get to my opening statement.

THE COURT: You're making them -- look. I don't -- I'll make it you have one hour beforehand. If -- you know, he has the same argument. He doesn't know what's going to be in his opening argument.

And so, you know, if you all came up with an agreement -- and I don't care about the agreement. I'm happy to change the agreement. But whatever amount of time the plaintiff has to provide their slides to you before he starts talking Monday morning at 9:00, you have to provide the same amount of time in giving the other side your slides.

MR. FULGHUM: Okay. So I'm going to assume, Judge, that we will provide opening on Tuesday. So I don't know what's going to happen.

I'll assume it's on Tuesday and we'll work backwards.

THE COURT: Work backwards. Okay.

So with regard to closing arguments, the way I see it, I don't have any specific number in terms of the division, half or whatever. What I require the plaintiff to do in their -- the opening of the closing argument, the first phase of that, is to give a full closing argument.

03:42 If that's their -- if I give you 45 minutes -- okay. If I give you 45 minutes, I'm not going to say it's 15 minutes or 30 minutes or 45 minutes. But I expect the plaintiff to do a full opening section, and I can't imagine you can do that in less than 25 or 30 minutes.

03:42 MR. FULGHUM: Okay. Judge, let me ask you. In our case, we're not going to have any -- we're not going to have the burden of any issues. So in that regard, does the plaintiff still get to go first and last?

03:43 THE COURT: In closing?

03:43 I'm sorry. Hold on. Okay. Can y'all hear me now?

03:43 MR. FULGHUM: Yes.

03:43 THE COURT: Okay. I don't even understand what y'all are discussing.

03:43 MR. FULGHUM: Can I say --

03:43 THE COURT: In closing, the plaintiff is going to open for, let's say, 30 minutes, if I give you 45 minutes. And then the defendant's going to get 45 minutes. And then the plaintiff is going to get to close with whatever time he has left. Is there...

03:43 MR. FULGHUM: Understood.

03:43 I just didn't know, Judge, if that was

the rule if I didn't have a counterclaim. And it is?

THE COURT: It is.

MR. FULGHUM: That's fine.

MR. MCBRIDE: And, Your Honor, can I get -- just to clarify, we're looking at Paragraph 83, specific to closing arguments at the end of the case. We are only -- the request here is, is that for purposes of rebuttal, that as the plaintiff, Viasat will have the opportunity to reserve some rebuttal time for closing argument at the very end.

THE COURT: I think I just said --

MR. MCBRIDE: If I understand you correctly, that's what you're saying, that is the --

THE COURT: That is literally what I just said.

MR. MCBRIDE: Okay. Thank you. I'm sorry, Your Honor.

THE COURT: Okay. Next up, 89, the parties request the Court will present the tutorial video -- oh.

MR. FULGHUM: Your Honor --

THE COURT: You just -- does Kioxia just want invalidity out of that video?

MR. FULGHUM: Yeah. And I have a version of it with invalidity out. I've sent it over to

03:44 Viasat.

03:44 THE COURT: And why does the plaintiff not want that?

03:44 MR. KNOBLOCH: Your Honor, it's actually for two reasons. Number one, the video that Mr. Fulghum sent still does include references to the validity issue. It just excises some portions of the video that talk about validity. And so I think it would just be more confusing to the jury to present a version that has some discussion of validity but not the full discussion of validity.

03:45 It's also -- it's not a very long discussion. I think it is helpful context for the jury. This is a standard video. I don't see any reason to start editing it and causing --

03:45 THE COURT: I'm with you. We'll go with the standard video. Which by the way, I've never seen. And so.

03:45 (Laughter.)

03:45 THE COURT: I have no idea what's in it.

03:45 MR. KNOBLOCH: I have it almost memorized, Your Honor.

03:45 THE COURT: I hope there's something great about the role of the federal judge in the trial, but I doubt it.

03:45 So -- okay. Now I'm turning to the motions. So the first motion I have is the renewed motion to exclude certain opinions of Dr. Nisha, is it Mody, M-o-d-y?

03:46 MR. FULGHUM: Yes, Your Honor.

03:46 THE COURT: Okay. I just wasn't sure if it was Moody and I was getting it wrong.

03:46 So Dr. Mody and Mr. Doller. And let's see. Okay. Let me hear -- let me hear from the defendant, please.

03:46 MR. FULGHUM: All right. Can you all see my slides?

03:46 THE COURT: I can.

03:46 MR. FULGHUM: Am I in presenter mode or am I just in regular mode?

03:46 THE COURT: I have no idea what that means.

03:46 (Discussion off the record.)

03:46 MR. FULGHUM: You guys bear with me just a second. Let me start all over again.

03:47 Okay. What do you see now? Do you see a short timeline?

03:47 THE COURT: I do.

03:47 MR. FULGHUM: Okay. So, Your Honor, this is how we got to this place.

In March 2024, we had a pretrial conference. Your Honor excluded the Doller report, but Your Honor did give Viasat another chance to submit another report.

In August of 2024, Viasat served their second Doller report. And we deposed Doller and we moved to exclude his report. And that's the motion that we're talking about today.

What's at issue today are Claims 15 and 16. We've already had a discussion about Claims 15 and 16. Claim 15 has been canceled. Claim 16 is the only asserted claim in the case.

Claim 16, generally speaking, adds this requirement which we'll call variable coding. It's the ability to adaptively -- configure to adaptively modify the coding rate. And it relates to how an encoder works.

Claim 15 goes to a system that requires an encoder/memory decoder. There's a specific arrangement of how the corrector modules are arranged. They have to be in parallel. Each one has to receive a portion of a parallel data stream, detect whether there's an error, and then forward those portions of the error over to a corrector. And the corrector and the detector have to be physically separate from each

other.

So there's a lot of activity in Claim 15 that's now part of the public domain. But Claim 16 adds this requirement of adaptive coding, which is something the encoder -- not the whole thing, just the encoder is configured to do.

Okay. So again, this is the inter partes review certificate. This is what Your Honor will not let us --

THE COURT: So, Mr. Fulghum, I don't understand -- well, maybe what you're saying. I get that 15 is gone. But -- and you say it's all in the domain. But I see it -- I'll try and make it simple -- try and make it simple so to make sure I understand it.

If we had some kind of mechanism, apparatus that was being used for fracking and they got a patent on some pipe or something there as an independent claim, Claim 15, and then they added something to it as a dependent claim, which is an independent claim, I don't see -- it doesn't mean to me that you get to say, well, all the other stuff -- let me -- better example.

Like on the ABS brakes, the ABS feature on the brake is -- if someone said, I've come up with this great idea for disc brakes. That's my deal. And

the dependent claim that that they add is the ABS practice where it -- the calipers move really fast.

And if you came in and said, well, Judge, we get a discount because brakes were known. You know, that's in the general public. They don't get to -- they don't get money for that. Well, that's not the whole patent. I mean, you can only look at the whole patent that includes the encoding features that are in Claim 16.

MR. FULGHUM: You do. You have to look at the whole thing. I've got to look at all of 16. And you can't just look at the very end of 16 for the sake of your apportionment.

Let me talk to you about whether -- where the rubber hits the road here, Judge.

THE COURT: Okay.

MR. FULGHUM: There are three damages theories. What we're talking about only affects these two at the bottom, cost-based and incremental. Mr. Doller is involved in both of them.

Here's the way it works. Dr. Hassoun does the infringement analysis that he tells the result to Mr. Doller. Mr. Doller does an apportionment analysis.

THE COURT: What does -- how does

03:51 Dr. Hassoun, I can't say it, Hassoun, how does he -- what does he technically say is the right way of doing the apportionment that Doller relies on?

03:51 MR. FULGHUM: He does not do any apportionment. He leaves it all to Doller.

03:51 THE COURT: Okay. That helps. Okay. I'm sorry to interrupt.

03:51 MR. FULGHUM: So going back to Your Honor's ruling, this is what Your Honor said back in March of 2024. And he says -- with regard to the first report, he said there's not been an adequate disclosure of how the iterative ECC actually reflects only limitations of the asserted claims versus the unasserted claims, so I'm granting the motion.

03:52 That was Your Honor's ruling.

03:52 And what that means is we've got to look at 16 which is the asserted claim, and we've got to make sure that we're not ascribing value to the unasserted claims, which is 15. 15 is unasserted.

03:52 That's exactly what Viasat set out to do when they -- that's what they -- that was their mission. They said, look. Mr. Doller apportions the value of 16 to 15. This is the response they filed on the 25th. The bad news is we deposed Mr. Doller the day before and he did not understand what he was

supposed to do.

Did you read Kioxia's motion to exclude?

I did not.

Did you read the Court order granting the motion?

I did not.

Mr. Doller respectfully did not know what his target was, and since he didn't know what his target was, he surely didn't hit it.

If you look at Mr. Doller's report again that Viasat said and we all agree, we've got to apportion 16 over 15, 16 is mentioned four times. 15 is mentioned zero times. It doesn't come up a single time in Mr. Doller's report. And you will not hear any argument from either me or Viasat that there was an apportionment of the actual language or the features of 15.

Now, let's talk about what he did do. He said that the best noninfringing alternative was either this feature, this product called RS erasure or a product called LDPC. This is what he said in his supplemental report. So just let's pause on that and keep that in mind.

Now, I asked him at his deposition, as you move from report to report, did your best

noninfringing alternative change?

And he said, no. It didn't change.

So as I went from my first report to my second report, the noninfringing alternative was exactly the same.

Did not change. Did not change.

You can see that there.

And then Viasat told the Court in its response for a motion, they said by design, by design, Mr. Doller used the same baselines, that is the same baselines for his noninfringing alternative. So he's still comparing 16 to these two features that he calls the best noninfringing alternatives.

But here's where it gets problematic. When I asked him, does RS erasure practice Claim 15?

He says, no. It does not.

Does LDPC practice Claim 15?

I believe it does not based on what Dr. Hassoun told me.

So he's using noninfringing alternatives that are far away from 16.

So what he does -- here's what the Court told him to do. Compare 16 to 15 so we can figure out the value of variable coding against all those other things that you should be giving value to.

But what he did instead is he compared 16 to things that are much further away. There's a lot of things in this world that don't have variable coding. There's a lot of schemes that don't have variable coding. But that doesn't mean they're the right measure for apportionment. We've got to take into account the features of 15 that are part of 16 that are in the public domain that cannot be valued, and he doesn't do that.

RS erasure does not equal 15. And you will not find any argument -- you will not find any analysis for him that he gave any value whatsoever to those things in 15, that have been canceled, that are in public domain.

Now, earlier this week, counsel for Viasat filed this case Willis. And they said, hey. No worries here. Willis is on all fours procedurally. You've got a dependent and an independent.

Let me just point out that Willis involved a very unusual situation where the IPR and the district court involved two different claim construction standards. That's not what we have here.

What we do have is this language -- and by the way, in Willis, Judge Moore said, look. In this unique circumstance, the dependent claim can

incorporate value from the independent claim. And I'm going to allow that because of the unique circumstance.

But look what else Judge Moore says. Judge Moore says: Here, Ms. Riley -- that's the plaintiff's damages expert -- testified that she apportioned the value of the dependent claim added to the invention as a whole, which is all the law requires.

Mr. Doller has not done that. He has not done the value of 16 to the invention as a whole. The invention as a whole is 16 plus everything in 15. So if he would have done that, he would have had to analyze 16 relative to 15, which is exactly what Judge Moore says is required to do.

Another example is the Prolitec case, which we also cited. This is a Delaware case but it involved Judge Bryson, who often sits by designation as Your Honor knows. This is exactly the same with regard to the procedure.

We had an independent claim that had been canceled and a dependent claim that was asserted. And the judge writes: Because Independent Claim 9 and Independent Claim 9 of this patent had been held invalid, the inventions recited in those claims are in the public domain. That's the same language I've been

using throughout this hearing.

Then the judge writes: That means that the damages stemming from infringement of the dependent claims are confined to the value added by those claims.

And note what he also says: Excluding the value associated with the invalidated claims.

So yes, Your Honor. I agree with your example having to do with the brake, but -- or the disc brake or the improvement to the disc brake. But if it resides in a dependent claim and if the independent claim is invalid, then we have to figure out the value of that independent claim. Just like Willis says and just like Prolitec says.

Mr. Doller did not follow Your Honor's instruction and Mr. Doller used noninfringing alternatives that were far away from 16 and did not say anything about 15.

There's a lot of things that don't have variable coding, you know, like a -- you know, all sorts of features don't have variable coding. But that doesn't make them good points of comparison.

We've got to account for all this -- these things in 15 that are part of 16 but they're all in the public domain. A detector, multiple detectors in parallel, each one having a stream, forwarding to

the corrector and having it -- having a detector and a corrector that are physically separate.

None of that has been done. None of that has been done. Even though Your Honor gave them another opportunity.

THE COURT: Well, I hate to -- whoops. Can you all hear me now? Okay.

You need to be careful quoting Chief Moore. Last year, two years ago, when I had the great honor of sitting on the Federal Circuit, she wrote an opinion that I agreed with. It was 3-0. And about two weeks ago, the Supreme Court nine to zero reversed us. So, you know, she doesn't get everything right. But -- and I'm kidding. But at any rate.

Let me hear from the plaintiff. And help me out. I understand what Mr. Fulghum just said. What I care about more than just the points he was making, and it's maybe the direction you're going to head, is specifically what did you do, now that we're down to Claim 16, to show how you did the apportionment of just Claim 16 with respect both to what it added in the context of the patent itself, but also the apportionment with respect to what it added to the accused features in the accused products.

MR. FORD: Thank you, Your Honor. This

is Matt Ford on behalf of Viasat.

Mr. Fulghum, would you mind ending the screen share so I can show some slides. Thank you.

So Your Honor is right that that is where I was going to start. You're able to see my slides?

(Thumbs up by the Court.)

MR. FORD: So I want to go back to the original report that Mr. Doller submitted. This is a screenshot from that report. I added this arrow at the bottom.

This -- the picture itself is kind of messy but there are only two things you have to know. The first is that the strength of the ECC increases from left to right. And the second is that these lines, these tear drops are different schemes that correct errors. And so these schemes get stronger from left to right.

Now, what he did in his original report was he said, I'm going to compare the value of the '700 patent against a noninfringing alternative. And what Kioxia identified as a noninfringing alternative is another drive called Daikoku2.

As part of that drive, what Mr. -- part of his analysis, what Mr. Doller did was identify the ECC strength associated with Daikoku2. That was a

product that came out in 2009 and it had a very low level of error corrections. All the way over here, this green line on the left.

And in between 2009 and 2013, when the hypothetical negotiation would occur, and even beyond when other infringement would occur, stronger ECC schemes were developed that could be implemented with Daikoku2.

This is in Paragraph 102 of his opening report where he explains that, at the time, these other schemes were available to Kioxia to implement into Daikoku2. And that implementation meant that the baseline analysis, understand that the value of the claim had to look at what was available in terms of the strength of ECC schemes that existed.

Now, when the Court asked him to isolate the value of the specific claims, he said, okay. Well, how am I going to do that with respect to variable ECC? As Mr. Fulghum said, Claim 16 talks about modifying the encoding rate responsive to a rate of errors or age.

THE COURT: Would you remind me, because I can't remember. When we had that Daubert at the time, I'm guessing but I want to make sure I'm right, 15 was still in the case. And so if I'd said -- or was 15 gone by then and did I know it was just 16 and was I

saying you need to compare 16?

MR. FORD: So 15 was already out of the case.

THE COURT: Okay. Thank you.

MR. FORD: But importantly, when Mr. Doller identified the value in his original report, this blue box that I have shown here, that included both variable ECC which relates to Claim 16, as well as another feature called multilevel, which we'll get to in a minute, that concerned other claims.

And so with Your Honor's order in hand, he asked, how would we demonstrate the value of variable ECC? And what that means in shorthand is you don't have to just set a value, a strength of ECC, you can set a strength and then increase it over time as you need to do that. Right?

So he said, look. I am going to go and take that same analysis that I did before and I'm going to break up the value associated with variable ECC, which is the feature we accuse of infringing Claim 16, and I'm going to compare that to the value associated with multilevel ECC, which at the time, we'd accused of infringing other claims.

Now, he started with the same baseline. Same baseline as Paragraph 102 in his report. And that

is Daikoku2. And he said, I saw documents in Kioxia's records saying that they had access to stronger ECC schemes. So you could take those ECC schemes, add them to Daikoku2, and that is your baseline as your noninfringing alternative.

Now, why did he pick Daikoku2? He picked Daikoku2 because that is the noninfringing alternative that Kioxia identified in its interrogatories. And it said that this would be an available and acceptable noninfringing alternative.

So all he was doing in this discussion of different ECC schemes like RS erasure, LDPC, was saying in Daikoku2, it had a very low correction capability that would have improved over time leading up to the hypothetical negotiation and a little beyond, and I'm going to give the benefit of that because I know those were available to Kioxia.

But even the premise of Kioxia's argument that he has to show the value of Claim 15 is belied by the fact that Kioxia says that Daikoku2 practices Claim 15. They say it anticipates Claim 15. So this is an embodiment that not only in their own telling is a noninfringing alternative, but it also practices Claim 15.

He used this as a baseline again as

modified and estimated that same amount of value from the patent afterwards. This is that same blue box we saw at the beginning of the argument.

And he asked, how do I separate the value of these two features? Well, one way to do that was to use Daikoku2. He did that, as their expert said, as a noninfringing alternative. And the second was how could you isolate the value of Claim 16?

And their expert has a theory as to how you would do that. You would disable the feature that allows you to increase the strength of the error correction in the product. Specifically the data encoding rate could be preset to a predetermined value rather than stepping through the available ECC levels.

We saw those steps in that early slide from Kioxia's documents. He's basically saying you pick a step up in the middle and you would keep it the same and you would never be able to increase it above those other steps.

So what did Mr. Doller do? He said if you were to set this with a strong ECC, that's a part of these other claims that we have -- we asserted in the past against Kioxia, you would have a fixed ECC that hit this multilevel ECC, and then anything above that is value that's attributable to the variable ECC

feature.

And if you note what he does here, this is a messy graphic, but I wanted to make sure that the Court had the benefit of Mr. Doller's actual disclosure. Is he compares the value of the variable ECC step to this Daikoku2 with the added ECC strength baseline, and he compares multilevel to the same baseline, and he takes the difference.

So he is comparing Claim 16 to Claim 15, he's just separating the value of other features that are not related to Claim 16. He said that he did this and disclosed this as --

THE COURT: I'm sorry.

Mr. Fulghum, is there anything else you want to add?

MR. FULGHUM: Yeah. So if you heard that presentation, Judge, I hope you noticed that the citations in that document are to our expert reports and what our expert report said in response to their expert.

Their expert Mr. Doller never talked about Claim 15. And Mr. Ford's presentation, he did not even mention Claim 15 until the very end. There is nothing in Mr. Doller's report comparing anything that he subtracted to Claim 15. Just -- it's just not

there.

This is a structural problem. In our view, this should not go in front of the jury. There's not been an apportionment to all those features we see in Claim 15 or Claim 15 itself. It's just not there, Judge.

THE COURT: I disagree. I'm going to deny Kioxia's renewed motion.

Next up, I have the motion to strike untimely opinions regarding alleged noninfringing alternatives.

And, Mr. Fulghum, I'm going to -- I'm sorry. It's been a long day. If I could hear from the plaintiff on this one, please.

MR. MCBRIDE: Your Honor, Scott McBride for Viasat.

And here, what we're talking about is Dr. Melvin, Kioxia's noninfringement expert. And in doing his supplemental report at the same time as these other reports we just discussed, he issued a rebuttal report.

And in that supplemental rebuttal, he identified brand-new noninfringing alternatives that had not previously been disclosed by Kioxia, including one specific to the Claim 16 that is left in the case.

And he used it to criticize Dr. -- Mr. Doller for not having used this better noninfringing alternative.

The problem here, Your Honor, is that this is untimely and there's no good cause for Kioxia not to disclose this earlier.

THE COURT: So let me see if I understand the thrust of what's going on. Your issue is not narrowly that the defendant has come up with a new noninfringing alternative and prejudice and it was late and all that. What you're unhappy about is because of the unique posture of the case -- and by the way, I'm asking if this is right. Tell me if I'm not correct.

Because the unique posture of the case, we now have a damages expert on your side, the plaintiff's side, doing -- using the methodology he did involving Claim 16. Post that report, the defendant has come up with a different noninfringing alternative and then said -- and then criticized your expert for not using the new noninfringing alternative.

MR. MCBRIDE: Yes, Your Honor.

THE COURT: Okay. Mr. Fulghum?

MR. FULGHUM: Yeah. Let me share my screen here very briefly. I've just got one slide on this.

This is Your Honor's comment to us at the

pretrial conference in March of 2024. And this is where Your Honor gives Viasat a chance to put in a new report for Mr. Doller. And Your Honor says after you've done that, then the defendant will have an opportunity to supplement their reports and do whatever rebuttal they need. And that's what we did.

THE COURT: Well, how is adding a new noninfringing alternative and then saying that this damages expert didn't consider it when you hadn't posited to him, how is that rebuttal?

MR. FULGHUM: Okay. It's rebuttal in this way. And let me explain.

What Dr. Melvin says, he says that Dr. -- Mr. Doller chose the wrong noninfringing alternative. And he posited different and better noninfringing alternatives.

THE COURT: But it's your obligation -- it's the defendant's obligation to suggest what a noninfringing alternative is. And so my problem is with if you all had failed to provide -- say X is a noninfringing alternative and then you criticize the other side for not taking it into consideration, I don't understand how that's fair.

MR. FULGHUM: Well, here's why it's fair. Mr. Doller on his second try said, hey. The best

04:11 noninfringing alternative is RS erasure.
04:12 THE COURT: It's the best one that you all had provided.
04:12 MR. FULGHUM: That's not true. Judge, it's not. I hate to interrupt. That is not true. That is one that they selected on their own. They selected that on their own for Mr. Doller's analysis. I didn't pick it. I did not pick it.
04:12 THE COURT: So your argument to change, so I better understand, is they picked a noninfringing alternative to use, and what your guy says in rebuttal to that is, we think there was a different noninfringing alternative and that's what you should -- you guys -- you the plaintiff picked the wrong noninfringing alternative and that's why it's rebuttal?
04:12 MR. FULGHUM: Yes. Absolutely.
04:12 THE COURT: Okay. I got it. Let me hear back from plaintiff. I understand it better.
04:12 MR. MCBRIDE: First, Your Honor, the rebuttal was with respect to the attack on the apportionment analysis. It was not an invitation to interject untimely noninfringing alternatives. It wasn't, as I read it, an opportunity to shift the burden from what it normally is and the burden is on Kioxia.

So it's impossible to -- I mean, the point is is that you can't criticize an expert for using the wrong noninfringing alternative when the burden is on you Kioxia to identify the noninfringing alternative.

THE COURT: But Mr. Fulghum is -- Mr. Fulghum is saying something different. I get -- I agree with you. I think the burden typically is on the defendant.

But unless Mr. Fulghum is -- unless I'm misunderstanding what he's saying, Mr. Fulghum is saying the plaintiff picked a noninfringing alternative to use in his apportionment method. It's not one we suggested. It's one he picked. And, therefore, we get to rebut his decision to pick that noninfringing alternative by saying, no. Here's a different one.

That's what I hear Mr. Fulghum saying.

MR. MCBRIDE: Yeah. So that's incorrect, Your Honor. We just listened to him talk about how Mr. Doller didn't change his baseline because it was Daikoku2. It's the same noninfringing alternative that he identified initially. And he then added in the additional features that he'd already previously identified in his earlier report, he just apportioned them out differently for purposes of what he did in his

supplemental report.

He did not come up with a new noninfringing alternative. He used the ones Kioxia had identified, the features that he -- that were also noninfringing that were disclosed in the documents that Kioxia produced. And instead that this rebuttal from -- this rebuttal from Dr. Melvin is a rebuttal of a hypothetical possible embodiment that he agrees doesn't actually exist that he's -- but he says would be, quote, self evident.

And so he's criticizing the failure to use this hypothetical noninfringing alternative as opposed to the noninfringing alternatives that Kioxia had previously disclosed. So I just don't think we're in that with this world that is being constructed where they're rebutting some new noninfringing alternative.

THE COURT: When -- in terms of date, when did Mr. Fulghum and team provide you your report where they said Doller is wrong with respect to the noninfringing alternative? How long ago was that?

MR. MCBRIDE: This all happened in 2024, Your Honor, before --

THE COURT: Okay. Then I'm -- then I don't find it untimely. So I'm going to deny the plaintiff's motion to strike that opinion.

Now, what else I have in here that I don't know if it's live or not is -- is there still a desire to take Mr. Doller's deposition?

MR. FULGHUM: There is, Your Honor. I was -- I took his deposition on five different occasions. Mr. Doller was instructed not to answer the question. None of them had to do with privilege. That's a violation of Rule 30.

And I would just request the opportunity to complete his deposition. And that is inappropriate deposition behavior, and I do request that leave.

Let me also point out, we allowed -- we allowed Mr. Melvin -- Dr. Melvin to answer any question.

THE COURT: Let me hear from plaintiff's counsel.

MR. FORD: Yes, Your Honor. This is Matt Ford again.

I am the attorney that instructed him not to answer. The basis for instructing him not to answer was the Court's order allowing for an additional deposition into his supplemental report.

And during the deposition, a number of times I asked Mr. Fulghum to move on from areas that were pretty far afield from the opinions that he had

offered in his report.

That included e-mails that his wife, Mr. Doller's wife would send him. Practices of how Mr. Doller -- Mr. Doller's wife would e-mail him. The knowledge of Micron employees about different patents that had nothing to do with the case. Whether Micron used the patent that's here. Whether there was a license negotiation over a nonexistent patent.

These were not to the core of Mr. Doller's opinions by any stretch. Let alone his supplemental opinion. And the basis for my objections, as I explained on the record, was that this went beyond the Court's order.

THE COURT: So here's what I'm going to do. This trial is two weeks away from Monday? Is that right?

MR. FULGHUM: Correct.

THE COURT: Mr. Fulghum, if you will take -- go through with Mr. Doller's deposition that you took and anything -- and send me any questions that you asked him that you think he was inappropriately asked not to answer. And if you will send those to Anna, I'll -- by the end of the week, I'll look through there and let you all know, hopefully by tomorrow -- what's today? Is today Wednesday? I'll let you know

by Friday whether or not I'll allow any additional questions.

THE COURT: But send me what it is that you asked and he was not allowed to answer.

MR. FULGHUM: I'll be happy to, Judge.

THE COURT: Okay. Is there anything else? I'll start with plaintiff's counsel. I think that's all we have, but if it's not, please let me know.

MR. MCBRIDE: Yes, Your Honor. We do have an issue with respect to one of Kioxia's fact witnesses. They have a Japanese fact witness named Mr. Hida who's going to be testifying in Japanese through a translator.

THE COURT: Okay.

MR. MCBRIDE: And we have a dispute whether -- about whether we should have competing partisan translators.

THE COURT: Yes. The answer is yes.

MR. MCBRIDE: We should have competing partisan translators?

THE COURT: Yes.

MR. MCBRIDE: As opposed to a neutral translator?

THE COURT: I don't care. I don't know

what the difference is, partisan. The -- they -- if they have a translator, I want -- let me say what we're going to do. I don't know what you're using in terms of partisan and all that stuff.

The witness is going to get on the witness stand. They will have a translator translating for him. You plaintiff will also have a translator. And if there's an issue about the appropriateness of the translation from Japanese to English or vice versa, then your check translator needs to interrupt and let us know, and I will resolve it.

MR. MCBRIDE: Understood, Your Honor.

And one clarification on that. Is it then they use their translator for their direct and we use our translator --

THE COURT: No. It's going to be one translator.

MR. MCBRIDE: One translator with one check translator?

THE COURT: One check, yes.

MR. MCBRIDE: So also with respect to Mr. Hida, we have a dispute we could use some guidance on with respect to the scope of his testimony. Specifically that Mr. Hida is a witness who was disclosed as being specific to one particular

controller in this case.

THE COURT: Is he a fact witness?

MR. MCBRIDE: Yes. He is a pure fact witness, Your Honor.

THE COURT: Then he's going to get -- y'all got to depose him. You've had eight years to do it. He's going to talk about -- if when he gets to the -- if he's on the witness stand and he talks about something that's not relevant to infringement or damages, then you can object under 401. Otherwise, he gets to testify what he wants to testify about.

MR. MCBRIDE: I understand, Your Honor.

Actually the problem is a little different, Your Honor, is is that now that the controller that he was disclosed as knowing about is no longer in the case, we've asked -- we are -- our concern is is that he -- even though he has disclaimed knowledge in his deposition about the controllers that are still in the case, you know, we --

THE COURT: What a joy you would have if he came and tried to testify and you crossed him with his deposition. I would think you'd be salivating at the option -- at the opportunity to get to cross-examine him.

So anything else that we need to take up?

04:20 MR. FULGHUM: Oh, Judge, when will -- how does it work with the list of jurors?

04:21 THE COURT: Say again.

04:21 MR. FULGHUM: How does it work with the list of jurors?

04:21 THE COURT: How do I know?

04:21 (Laughter.)

04:21 MR. FULGHUM: Should we reach out to Judge MacLemore on that?

04:21 THE COURT: No, no, no. You guys have brilliant local counsel and you're asking me how to do a list of jurors? Talk to your local counsel because I don't know. But this is the friendliest courthouse in America, and if we can get you information on the list of jurors, and MacLemore is my favorite magistrate judge, we can -- they will -- we'll do whatever we can to get you whatever you want. But just -- and you're welcome to -- I'm certain between now and him picking the jury, he's going to have a call like this with you and you can ask him whatever you want.

04:21 MR. FULGHUM: Understood, Your Honor.

04:21 MR. MCBRIDE: So, Your Honor, just one quick question is is there are some proposed disputes in the preliminary jury instructions. How do you wish to handle those and will you just --

THE COURT: Let's take them up -- it's three weeks away. Let's take it up right now.

MR. MCBRIDE: Right now?

THE COURT: No. I'm kidding.

(Laughter.)

MR. MCBRIDE: Sorry, Your Honor. I turned my sarcasm meter too low there for a moment.

THE COURT: We will start trial on Monday, somewhere around -- it's just a one-patent case, right? One claim patent case.

MR. MCBRIDE: One claim, one patent.

THE COURT: So you all will have at most ten hours per side. So I predict somewhere around Wednesday at lunch, we will sit down. Y'all will need to have your draft jury charges to us by close of business Friday the week before.

And if you haven't been in front of me and done this, if the plaintiff wants something in the jury charge that Mr. Fulghum doesn't want, you put it in red. If Mr. Fulghum wants something in the jury charge that the plaintiff doesn't want, he puts it in blue.

So I take my copy and all of us will sit in chambers off the record and go through it. And I only stop if there's something in red or blue and take

04:23 up what it is. It's off the record. And then you have to assign someone on your team to make sure that before I read the jury charge, you remind me that you need to make your objections to it at the end of trial, if you have any.

04:23 Now, you guys are too good of lawyers to do this. Mr. Underwood's sitting right here. He may fall asleep on us. But I can't imagine why we would even need to have a jury charge conference at this point because you all will be my I think 60th patent trial, which means there are 59 prior jury charges that I've used. And so I can't imagine what you have to fight over in this case.

04:23 MR. MCBRIDE: That's true, Your Honor.

04:23 THE COURT: But you could surprise me. And if you surprise me in the way of saying there are like nine things we want to talk about, it will probably be a very short charge conference and you won't get any of them.

04:24 So I typically -- charge conferences typically last from between 10 and 15 minutes at most. Because there's very little I'm going to change.

04:24 MR. MCBRIDE: Understood, Your Honor.

04:24 THE COURT: In fact, talk to Mr. Fulghum. I think he's, two or three trials ago, was -- just take

the charge we used in Mr. -- the case he won a couple of weeks ago in Austin and change the names and send it to me.

MR. FULGHUM: Judge, that's what I've been telling them.

MR. MCBRIDE: What we've been trying to do, Your Honor. We're trying to hold him to it.

THE COURT: Well, try harder.

MR. MCBRIDE: We will.

THE COURT: Because I'm kind of at the point where I'm probably not going to be very amused at having a long charge conference.

MR. MCBRIDE: Understood, Your Honor.

And if I could just --

THE COURT: Now, on the verdict form, same thing. I mean, just, you know, you got a question on infringement, a question on damages. I mean, it's going to be a short verdict form.

MR. MCBRIDE: We agree, Your Honor.

The -- if I could confirm one thing in terms of timing. We understood ten hours per side. Separate from that, openings 30 minutes per side and closings 45 minutes per side. Or do you have some preference?

THE COURT: So you currently have

45 minutes for closing. If over the course of the week you all are in trial I have to get -- and it appears I might have to -- if I have to come in early before trial and resolve important issues like the size of the font in a demonstrative or someone is going to say something's in red and they don't want it, then the closing arguments will be 30 minutes.

So if I have an enjoyable week during trial, you get 45 minutes. It's worth it to me to have 30 extra minutes of closing arguments and suffer through that than suffer all week. So be on your best behavior.

But look. I'm not talking -- I'm not being silly. If Fulghum tells you, I'm going to put on Batman and you need to have a fight over whether Batman can come on or not, I'm not telling you you don't have that argument. But if it's an argument, like most arguments are in patent cases, over, you know, things like the font's too big, then it's -- I'll rule on them pretty quickly. But we'll have a shorter closing argument.

Now, Mr. Fulghum can tell you, and Mr. Underwood too, what I will do my best to do is come to finish the case, finish the trial and get the jury charge read in a way that you start the morning with

closing arguments the next day. I do not like -- you will not start closing arguments, for example -- if you agree, I'll do anything you want. But typically if we -- if you are going to start closing arguments at 4:00 in the afternoon, I will push it to the next day and have you do it the next day.

So I'm not going to -- I -- you won't believe this during the course of trial, I'm sure Mr. Underwood will tell you I'm lying after this because he's in trial with me, but most of what I try and do throughout the course of the trial is whatever I perceive is what's best for you guys if I were in your shoes. And so when I'm doing things, I'm really trying to make it as user friendly as possible. So.

MR. MCBRIDE: Understood, Your Honor. Thank you.

Nothing further from us, Your Honor.

THE COURT: Mr. Fulghum?

MR. FULGHUM: Nothing further, Judge.

I want to get at some point some guidance from Your Honor about what I can tell the jurors about Claim 15.

THE COURT: Why is Claim 15 relevant?

MR. FULGHUM: Because it's part of 16. It's not asserted.

THE COURT: Oh, I'm sorry. Yeah. But why -- what does it have to do with -- what -- I get that it's part of 16. But what does it have to do with infringement?

MR. FULGHUM: It goes to damages, Judge.

THE COURT: Okay.

MR. FULGHUM: Because everything in 15 is available and in the public domain, and the jurors can take that into account as part of their analysis.

THE COURT: Your expert says that?

MR. FULGHUM: Yes. We have experts that say that.

THE COURT: Your expert -- look. Anything that you -- you are free, at this point, to say anything that you have in a report that you've exchanged with the other side and I haven't excluded.

MR. KNOBLOCH: Your Honor, that goes exactly to the issue we talked about earlier. Your Honor has excluded any mention of the fact that Claim 15 is invalid or canceled or anything like that.

So I think they can say that it's unasserted. That's fine. But they can't say that it's invalid or canceled. And that's a --

THE COURT: Yeah. I agree with everything you just said. But Mr. Fulghum, I think, is

not -- is not going to do that. He's going to say it's not asserted here, but 16 is a dependent claim and everything but X is in 15 and 15's not being asserted. And it's available.

MR. KNOBLOCH: Great.

THE COURT: And it's available. You know, it's the brakes.

MR. FULGHUM: It's available to the public.

THE COURT: It's available to the public.

MR. FULGHUM: Yes.

MR. KNOBLOCH: That's fine.

THE COURT: I agree.

MR. KNOBLOCH: I just don't want him to talk about --

THE COURT: You have exactly the response, which is that's why God made dependent claims. And, you know, it's -- you have -- you're asserting 16 because you don't look at the patents, you know, you don't look and see whether a cherry pie has where you add frosting and say, oh, it's a cherry pie, da da da. And they say, no. It's a cherry -- it's not a cherry pie. It's a cherry pie that has additional. And that's what God intended when he made dependent claims. I mean --

04:30 MR. KNOBLOCH: Amen.
04:30 THE COURT: So. I mean, I would be happy
04:30 to take either side of this argument.
04:30 MR. FULGHUM: I understand, Judge. And I
04:30 understand your limine ruling, and I will approach if
04:30 I -- and I don't want to test your patience on this.
04:30 THE COURT: No. All I'm saying is this.
04:30 I am very simple, as you know. It deals with
04:30 infringement or it deals with patent damages here,
04:30 because you don't have validity. If you can persuade
04:30 me that what you want to do is in either the damages
04:30 report that you have or to cross their damages report
04:30 or same with infringement reports, you get to talk
04:30 about it.
04:30 MR. FULGHUM: Yeah.
04:30 THE COURT: Because it's been disclosed.
04:30 MR. FULGHUM: That sounds good, Judge.
THE COURT: Okay.
04:30 MR. FULGHUM: One complicating factor,
04:30 not to add too much. One of their witnesses is both a
04:30 fact and an expert. I expect to ask him questions like
04:30 this as well. So we'll cross that.
04:30 THE COURT: Questions like that?
04:30 MR. FULGHUM: About the scope of 16
04:31 versus 15.

THE COURT: Has he given -- is he going to give an opinion on that?

MR. FULGHUM: He is.

MR. MCBRIDE: No, Your Honor. He's not.

THE COURT: So you get to do that, Mr. Dunnam (sic), if they put him in -- just listen to what -- I take it this is a witness the plaintiff's going to call?

MR. FULGHUM: Yes. Their inventor. He also served a Rule 26(a)(2)(C) report that implicates the scope of the claims. And look. If he doesn't testify to it --

THE COURT: Look. Look.

MR. FULGHUM: -- there's no cross.

THE COURT: For eight years, you all have tried to get me to tell you in advance what you can and can't do.

MR. FULGHUM: I know. Yeah.

THE COURT: Put on your big boy pants, come to trial, ask your questions. And if the other side's unhappy, they can object. And if I'm unhappy, I'll sustain the objection. And we'll move on.

MR. FULGHUM: Understood.

THE COURT: I can't tell you in advance what you can and can't do. That's -- you know, that's

04:31 not my job.

04:31 MR. FULGHUM: Understood, Your Honor.

04:32 THE COURT: I mean, I can, and to the extent I should, I think I have.

04:32 Anything else?

04:32 MR. FULGHUM: Nothing for Kioxia, Your Honor.

04:32 MR. MCBRIDE: No, Your Honor.

04:32 THE COURT: Have a good afternoon.

04:32 (Hearing adjourned.)

UNITED STATES DISTRICT COURT )
WESTERN DISTRICT OF TEXAS )

I, Kristie M. Davis, Official Court Reporter for the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

Certified to by me this 25th day of June 2026.

*/s/ Kristie M. Davis*
KRISTIE M. DAVIS
Official Court Reporter
PO Box 20994
Waco, Texas 76702
(254) 666-0904
kmdaviscsr@yahoo.com

04:32