**JOINT EXHIBIT**

Viasat v. Kioxia

**JX50**

## IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012

This IP Core Development and License Agreement (this "Agreement") is made effective as of October 22, 2012 (the "Effective Date") by and between ViaSat, Inc., a Delaware corporation with a place of business at 6155 El Camino Real, Carlsbad, California 92009 ("ViaSat"), and Semtech Corporation, a Delaware corporation with a place of business at 200 Flynn Road, Camarillo, California 93012 ("Semtech"). ViaSat and Semtech are each hereafter referred to individually as a "Party" and together as the "Parties."

WHEREAS, ViaSat has expertise in communications systems and Intellectual Property (IP) Core design and verification;

WHEREAS, Semtech has expertise and capabilities with respect to the development, manufacture and marketing of leading, unique, and proprietary semiconductor products, and desires to combine its analog circuit designs and chip integration capabilities with ViaSat's coherent digital signal processing algorithms;

WHEREAS, the Parties wish to pursue development activities to develop 100 Gbps and next generation coherent receiver products for sale to Third Parties; and

WHEREAS, ViaSat is willing to grant to Semtech, and Semtech desires to receive, a license to the Licensed Materials for Semtech to make and sell Semtech Devices, all on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

1. **DEFINITIONS**

Capitalized terms used in this Agreement shall have the meanings specified below or elsewhere herein.

1.1    "Acceptance Date" means the date of acceptance of the Final Netlist delivery for the Licensed Materials by Semtech pursuant to Section 4.5.3 of the Development Plan, Exhibit A.

1.2    "Affiliate" means any corporation, firm, limited liability company, partnership or other entity that controls or is controlled by or is under common control with a Party to this Agreement. For purposes of this definition, "control" means ownership, directly or indirectly through one or more Affiliates, of fifty percent (50%) or more of the shares of stock entitled to vote for the election of directors, in the case of a corporation, or fifty percent (50%) or more of the equity interests in the case of any other type of legal entity, status as a general partner in any partnership, or any other arrangement whereby a party controls or has the right to control the Board of Directors or equivalent governing body of a corporation or other entity. An Affiliate shall be deemed to be an Affiliate only for the duration of such control.

1.3    "ASIC" or "Application Specific Integrated Circuit" means a chip that is custom designed for a specific application rather than a general-purpose chip such as a microprocessor.

1.4    "ASSP" or "Application Specific Standard Part" means an ASIC chip that is designed as a generic device for a particular market. Whereas an ASIC is typically used only by its creator, ASSPs are used by many different companies in the design of their products.

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016700

1.5    "Commercial Markets" means fiber optics network applications, systems and infrastructure that are managed or conducted by (i) private companies, (ii) publicly-owned companies, (iii) utility companies, or (iv) comparable providers, to include providers that may be government owned or controlled, but which operate in the marketplace as or in the nature of a commercial "for profit" entity.

1.6    "Control" means the right of a Party to grant a license to the other Party under this Agreement of the scope granted under this Agreement without such grant (i) resulting in any breach or other violation of any obligation of such Party or any of its Affiliates to any Third Party, or (ii) resulting in any payment obligations to a Third Party.

1.7    "Development Fee" has the meaning set forth in Section 5.1.

1.8    "Development Plan" means the activities attached to this Agreement as Exhibit A, as amended from time to time in accordance with Section 2.1.

1.9    "Development Work" means the activities to be performed by a Party as specified in the Development Plan.

1.10   "DSP IP Cores" means digital signal processing IP cores that perform modem functionality for transmit and receive sides of optical metro and higher reach capable communications systems.

1.11   "Field" means any or all of the following in or for Commercial Markets (i.e., non-government): (i) ultra-long-haul optical network applications; (ii) long-haul optical network applications; or (iii) metro fiber optical network applications. For avoidance of doubt, the Field does not include sales to government customers (United States or foreign government customers except as jointly agreed to in writing by ViaSat and Semtech), or satellite communications, wireless, microwave or free space optical applications.

1.12   "Fiscal Quarter" means each of the following consecutive three-month periods: (i) the three-month period beginning on the day after the last Sunday in January, (ii) the three-month period beginning on the day after the last Sunday in April, (iii) the three-month period beginning on the day after the last Sunday in July, and (iv) the three-month period beginning on the day after the last Sunday in October.

1.13   "Intellectual Property Rights" means any and all inventions (whether or not patentable and whether or not reduced to practice); patents; works of authorship and other copyrightable works; copyrights; mask works; trade secrets (including, without limitation, data, ideas, formulae, compositions, manufacturing and production processes and techniques, know-how, research and development information, drawings, specifications, designs, plans, proposals, technical data); information technologies (including, without limitation, software programs (both source and object code), data and related documentation); and other intellectual property rights.

1.14   "Licensed Materials" means the 100 Gbps Digital Signal Processing (DSP) IP Core described in Exhibit B, Specifications, along with design data thereto provided as deliverables and specified in Section 5 of Exhibit A, Development Plan, and any modifications thereto provided by ViaSat to Semtech under this Agreement. For the avoidance of doubt, source code is not included in the Licensed Materials and will not be delivered to Semtech under this Agreement.

1.15   "Licensed Materials Delivery Date" means the actual date of the Gold Netlist delivery set forth in Section 5 of Exhibit A, Development Plan.

TMG

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016701

1.16    "Net Sales" means the gross amount billed or invoiced by or on behalf of Semtech or its Affiliates (in each case, the "Invoicing Entity") on sales of Semtech Devices, less the following to the extent applicable with respect to such sales and not previously deducted from the gross invoice price: (a) customary trade, quantity or cash discounts to the extent actually allowed and taken; (b) amounts actually repaid or credited by reason of rejection or return of any previously sold, leased or otherwise transferred Semtech Devices; (c) customer freight or insurance charges or other transportation costs related to the delivery of Semtech Devices that are paid by or on behalf of the Invoicing Entity; and (d) to the extent separately stated on purchase orders, invoices or other documents of sale, any sales, value added or similar taxes, custom duties or other similar governmental charges levied directly on the production, sale, transportation, delivery or use of a Semtech Device that are paid by or on behalf of the Invoicing Entity, but not including any tax levied with respect to income; provided that:

1.16.1  in any transfers of Semtech Devices between an Invoicing Entity and an Affiliate of such Invoicing Entity not for the purpose of resale by such Affiliate, Net Sales will be equal to the fair market value of the Semtech Devices so transferred, assuming an arm's length transaction made in the ordinary course of business, and

1.16.2  in the event that an Invoicing Entity receives non-cash consideration for any Semtech Devices or in the case of transactions not at arm's length with a non-Affiliate of an Invoicing Entity, Net Sales will be calculated based on the fair market value of such consideration or transaction, assuming an arm's length transaction made in the ordinary course of business.

Sales of Semtech Devices by an Invoicing Entity to its Affiliate for resale by such Affiliate will not be deemed Net Sales. Instead, Net Sales will be determined based on the gross amount billed or invoiced by such Affiliate upon resale of such Semtech Devices to a Third Party purchaser.

1.17    "sale," "sell," or "sold" means the transfer, conveyance, license or distribution for consideration (which consideration includes cash, payment in kind, or other forms of value) of a good or a service to a Third party, or the distribution to a Third Party (e.g., a supplier or distributor) for sale by such Third Party of the applicable good or service to the marketplace.

1.18    "Semtech Devices" means integrated circuits (ASIC and/or FPGA) that (i) are designed, manufactured, and marketed by or on behalf of Semtech, and branded as a Semtech product, for its Advanced Communications business unit (or any successor business unit focusing on or servicing the Field) product lines and (ii) incorporate all or any part of the Licensed Materials or were designed using any of the Licensed Materials (regardless of whether or not the Licensed Materials are enabled or disabled in such product).

1.19    "Specifications" means the specifications for the Licensed Materials attached hereto as Exhibit B.

1.20    "Third Party" means any person or entity other than Semtech, ViaSat and their respective Affiliates.

1.21    "ViaSat Intellectual Property Rights" means the Intellectual Property Rights (other than trademarks) Controlled by ViaSat or its Affiliates that cover the Licensed Materials or their manufacture or use.

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016702

## 2.    DEVELOPMENT

2.1    **Development Plan.** The Development Plan attached hereto as Exhibit A includes a description of each phase of Development Work and the timeline and deliverables for each phase. In the event of any conflict between the terms of the Development Plan and this Agreement, the terms of this Agreement shall take precedence. In the event a Party proposes a change in scope or scheduling to the Development Plan, such Party shall make its request in writing to the other Party and as soon as reasonably practicable, but no later than fifteen (15) days after receipt of such request, the Parties shall discuss the feasibility of implementing such proposal. Each Party shall in good faith consider the other Party's request for changes to the Development Plan, provided however, that such changes are feasible and do not materially alter the terms and conditions of this Agreement. The Parties shall evaluate such proposal, including (a) the effect on the original schedule, (b) the effect on the engineering development charges, (c) the effect on the Semtech Device pricing, and (d) all other relevant factors. Unless changes are mutually agreed to in writing signed by both Parties, the Parties shall continue their respective activities under the Development Plan without making any modifications to the Development Plan.

2.2    **Point of Contact.** Each Party shall designate an employee who will be its primary point of contact ("POC") for the Parties with respect to the Development Plan. Each Party may change its POC by submitting written or electronic notice from its then-current POC directly to the other Party's POC.

2.3    **Development Work.**

2.3.1    Each Party shall use commercially reasonable efforts to accomplish the work allocated to it under the Development Plan in accordance with the timeline therefor.

2.3.2    Each Party shall commit sufficient numbers of suitably qualified and experienced personnel, together with such facilities, equipment, expertise and other resources necessary to timely perform its Development Work. Each Party shall conduct its Development Work in a professional manner and with such standards of performance as are customary in the industry, and in compliance with all regulatory requirements and applicable laws.

2.3.3    Neither Party shall subcontract any of its Development Work without the other Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) to the specific subcontractor and the scope of work to be subcontracted. No such subcontracting shall relieve a Party of any obligation under this Agreement.

2.4    **Acceptance.** Acceptance of the Licensed Materials shall occur after completion of acceptance tests in accordance with the Development Plan. Prior to the Acceptance Date, Semtech shall not, and agrees not to, derive any revenue bearing or other beneficial commercial use from the Licensed Materials or other deliverables provided by ViaSat hereunder. Notwithstanding anything else, any revenue bearing or other beneficial commercial use of the Licensed Materials by Semtech shall be deemed as Semtech's acceptance of the Licensed Materials.

2.5    **Development Costs.** Except for the Development Fee or as otherwise expressly agreed by the Parties in this Agreement (including the Development Plan), each Party will be responsible for all of the costs and expenses that it incurs in the course of conducting its activities under the Development Plan.

2.6    **Ownership.**

*IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
*Page 4*
*ViaSat Confidential*

Highly Confidential - Attorneys' Eyes Only                              VIASAT_FEC_00016703

2.6.1   Semtech acknowledges that all Intellectual Property Rights in and to the Licensed Materials are, shall be and will remain the sole property of ViaSat, including all modifications, improvements, and derivative works made by or for either or both Parties relating to the Licensed Materials under this Agreement or otherwise, including but not limited to all modifications, improvements, and derivative works of the Licensed Materials requested or suggested by Semtech (collectively, "Improvements"). Semtech hereby makes any assignments necessary to accomplish the foregoing ownership provision and agrees to cooperate in good faith to assist ViaSat in every proper way to evidence and perfect such assignment, including by executing documents reasonably requested by ViaSat. The term "Licensed Materials" shall include all Improvements.

2.6.2   ViaSat acknowledges that all Intellectual Property Rights in and to the Semtech Devices (other than the Licensed Materials) are, shall be and will remain the sole property of Semtech, including all modifications, improvements, and derivative works made by or for either or both Parties relating to the Semtech Devices (other than the Licensed Materials) under this Agreement or otherwise, including but not limited to all such modifications, improvements, and derivative works requested or suggested by ViaSat. ViaSat hereby makes any assignments necessary to accomplish the foregoing ownership provision and agrees to cooperate in good faith to assist Semtech in every proper way to evidence and perfect such assignment, including by executing documents reasonably requested by Semtech.

2.7   **Restrictions.**   Semtech agrees that it will use the Licensed Materials only as authorized herein and for the term hereof (and as permitted thereafter under Section 9.5) and agrees that it will not decompile, reverse engineer, disassemble, or otherwise reduce the Licensed Materials to a human-perceivable form. Semtech may not modify or prepare derivative works of the Licensed Materials in whole or in part, except as expressly set forth in this Agreement in connection with the exercise of its license rights for Semtech Devices. Semtech may not provide design data or information including, but not limited to, schematics, hardware description language source code, or netlist files, to a Third Party without prior written approval from ViaSat (which approval shall not to be unreasonably withheld or delayed in the case of sublicensing under Section 3.2). With respect to any copies of Licensed Materials, Semtech will at all times and in each instance, reproduce all copyright notices and proprietary legends on each copy in the same manner as such notices and legends appeared on the original. Except as expressly permitted in this Agreement, no other copies may be made without the ViaSat's prior written consent.

3.   **LICENSE GRANT**

3.1   **License to Semtech.**   Subject to the terms and conditions of this Agreement (including all payment obligations), ViaSat hereby grants to Semtech, under the ViaSat Intellectual Property Rights, a non-exclusive (except as set forth in Section 4.1), worldwide, nontransferable, non-assignable (except in accordance with Section 11.7), royalty-bearing license, with no right to sublicense (except as set forth in Section 3.2), to:

3.1.1   use and modify the Licensed Materials solely for the purpose of creating designs that are programmed into a Semtech Device and integrating the Licensed Materials into Semtech Devices solely for the Field;

3.1.2   make, have made, import, market, sell and have sold such Semtech Devices solely within the Field; and

3.1.3   copy the Licensed Materials as reasonably necessary for the purposes of exercising its rights under Sections 3.1.1 and 3.1.2.

*TMG*
*EZ*

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016704

3.2     **Sublicensing.** Subject to ViaSat's approval thereof on a case-by-case basis (not to be unreasonably withheld or delayed), Semtech may engage Third Party contractors to exercise Semtech's rights set forth above, but only for the manufacture of Semtech Devices under Section 3.1.2 for the sole benefit of Semtech and not independent use by such Third Parties. Semtech shall require that each sublicensee be subject to an enforceable agreement consistent with the terms of this Agreement and at least as protective of ViaSat's confidentiality and intellectual property ownership interests as this Agreement. Semtech shall be responsible for the actions of its Third Party contractors within the scope of their engagement with Semtech, and any breach of the terms of this Agreement by such a Third Party contractor shall be deemed to be a breach of this Agreement by Semtech.

3.3     **No Implied Rights.** All rights not expressly granted herein are reserved by ViaSat, and no other licenses are granted herein, by implication, estoppel or otherwise.

3.4     **Diligence.** Following acceptance of the Licensed Materials by Semtech, Semtech will use diligent efforts to develop, market and sell Semtech Devices throughout the world.

3.5     **Forecast.** Beginning no later than December 1 after the Licensed Materials Delivery Date, and on December 1 every year thereafter, Semtech will provide ViaSat with a production forecast detailing Semtech's then-current good faith belief concerning the amount of Semtech Devices to be produced by Semtech and its Affiliates over the following three (3) calendar years. Such (3) three year forecast shall include a forecast for each calendar quarter comprising the three (3) year period.

4.      **EXCLUSIVITY.**

4.1     **ViaSat Restrictions.**

4.1.1   For a period of seven (7) years following the Effective Date (unless terminated earlier in accordance with Section 4.1.2), ViaSat shall not, directly or indirectly through its Affiliates or otherwise, (a) sell DSP IP Cores, or develop and sell any modifications or derivatives thereto, to any entity for the Field, or (b) license any of its Intellectual Property Rights for DSP IP Cores to any entity to use DSP IP Cores, or make, import or sell DSP IP Cores for use, in the Field other than Semtech; provided, however, that these restrictions shall not apply to the Forward Error Correction (FEC) element or component as a stand-alone item.

4.1.2   ViaSat may terminate the restrictions set forth in Section 4.1.1 effective immediately upon notice in the event that any of the following occur:

(i)     Semtech does not arrange for and secure an appropriate bona fide indication of interest for a Semtech Device with at least one customer within six (6) months of the Licensed Materials Delivery Date;

(ii)    Semtech does not release to fabrication a Semtech Device within one hundred and twenty (120) days after the Licensed Materials Delivery Date (the "Fabrication Deadline");

(iii)   Semtech does not deliver customer engineering samples of a Semtech Device to at least one (1) potential customer within ten (10) months after the Licensed Materials Delivery Date (the "Samples Deadline") unless there is an unanticipated manufacturing delay by Semtech's fabrication or packaging supplier, provided that (i) any such delay is not due to Semtech's action or

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016705

inaction, and (ii) Semtech provides Viasat with written notice within seven (7) business days of Semtech's knowledge of such delay; or

(iv)    Semtech fails to pay Royalties under and pursuant to the provisions and requirements of this Section 4.1.2 (iii). Beginning with the first full Fiscal Quarter that begins at the earlier of (i) at least six (6) months after the release of the Semtech Device to production, or (ii) eighteen (18) months after the Licensed Materials Delivery Date, Semtech is required to pay to ViaSat the minimum Royalties set forth in the table below based on actual Net Sales during each such Fiscal Quarter, subject to the following provisions. No later than five (5) business days after the release of the Semtech Device to production, Semtech shall provide ViaSat with written notice thereof. In the event of any shortfall in Royalties for and in a given Fiscal Quarter per the table below, (i.e. actual Royalties paid for the given Fiscal Quarter are less than the applicable minimum amount noted for a given Fiscal Quarter), Semtech will be allowed an additional one (1) Fiscal Quarter, after the end of the applicable Fiscal Quarter, in which to generate additional sales of Semtech Devices, with the resulting cumulative amount of Royalties paid (or combination of Royalties paid plus separate straight make up payment by Semtech in lieu of amounts calculated as Royalties on Net Sales) over the two (2) Fiscal Quarter period being equal to or exceeding the sum of the minimum Royalties required for the two Fiscal Quarters involved.

| Fiscal Quarter No. | Fis. Qtr 1 | Fis. Qtr 2 | Fis. Qtr 3 | Fis. Qtr 4 | All future Fiscal Quarters |
|---|---|---|---|---|---|
| Min. Royalty | 250,000 | 250,000 | 350,000 | 400,000 | 500,000 |

In connection with clause (i) of this Section 4.1.2, Semtech shall provide to ViaSat appropriate substantiation (subject to necessary confidentiality considerations) that provides for proof of Semtech having met the requirements of such clause. In connection with clause (ii) of this Section 4.1.2, Semtech shall provide to ViaSat, on or before the Fabrication Deadline, documentation showing Semtech has provided the foundry with signoff for release to tapeout. In connection with clause (iii) of this Section 4.1.2, Semtech shall provide to ViaSat, on or before the Samples Deadline, copies of invoices or other shipping documentation validating shipment of the engineering samples.

4.2    **Semtech Restrictions.**

4.2.1    For a period of seven (7) years following the Effective Date, Semtech shall not, directly or indirectly through its Affiliates, any third parties, or otherwise, engage in any development of DSP IP Cores.

4.2.2    For a period of seven (7) years following the Effective Date, Semtech and its Affiliates shall purchase all of their requirements of DSP IP Cores from ViaSat. Notwithstanding the preceding sentence, Semtech shall be permitted to use any customer directed or specified and furnished DSP without being considered non-compliant with the preceding sentence, for and in such products and applications as may be directed by such customer , provided: (i) the Licensed Materials cannot meet the application requirements of such customer; (ii) any such customer-furnished DSP IP Core must be provided to Semtech without charge of any kind to Semtech, directly or indirectly, by such customer or any of its affiliates or any third party agents or suppliers; (iii) the ASIC created by

*IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
*Page 7*
*ViaSat Confidential*

Semtech using such customer-furnished DSP IP Core (the "Custom ASIC") may only be sold by Semtech to the customer who provided the DSP IP Core for use in that customer's own products; and (iv) neither Semtech or such customer shall be permitted, directly or indirectly, to redistribute the Custom ASIC as a standalone product.

## 5.    PAYMENTS

5.1    **Development Fees.**    Semtech shall pay to ViaSat a development fee (the "Development Fee") of two million dollars (US $2,000,000), which, solely for the administrative ease of the Parties hereto, shall be paid to ViaSat in accordance with the following payment schedule:

| Development Payment Event | Development Payment Amount |
| --- | --- |
| Within 30 days of the Effective Date | US $1,000,000 |
| Within 30 days of the Silver Netlist Delivery | US $700,000 |
| Within 30 days of the Gold Netlist Delivery | US $300,000 |

The Development Fees are non-refundable and non-creditable.

5.2    **Royalties.**    Semtech shall pay to ViaSat royalties on Net Sales (the "Royalties") as follows:

5.2.1    For Royalties payable to ViaSat up to a maximum cumulative amount paid of thirty-five million dollars (US $35,000,000) (the "Royalty Threshold"), the Royalties due for a Fiscal Quarter (commencing with the first Fiscal Quarter in which Net Sales are generated) shall be equal to the greater of (i) ten percent (10%) of Net Sales during such Fiscal Quarter, or (ii) one-hundred dollars (US $100.00) for each unit of Semtech Devices sold by Semtech or its Affiliates during such Fiscal Quarter;

5.2.2    Once the Royalty Threshold has been reached and paid by Semtech, all Royalties due for a Fiscal Quarter for all sales of Semtech Devices commencing with royalties arising from sales in the Fiscal Quarter next following achievement of the Royalty Threshold shall be equal to ten percent (10%) of Net Sales during such Fiscal Quarter.

5.3    **Royalty Reports.**

5.3.1    Within thirty (30) days after the conclusion of each Fiscal Quarter commencing with the first Fiscal Quarter in which Net Sales are generated, Semtech shall deliver to ViaSat a report with respect to accounting for all Royalties (in each instance, with a Semtech Device-by-Semtech Device and country-by-country breakdown). Such report shall indicate (i) the quantity of Semtech Devices sold during the reporting quarter, and the gross sales price of such Semtech Devices, (ii) the Royalties attributable to such Semtech Devices, (iii) a breakdown of all deductions applied in accordance with Net Sales calculation by category and amount, and (iv) such other reasonable information requested by ViaSat from time to time. If no such sales have been made during a reporting period, Semtech shall so report. Each such report shall be certified on behalf of Semtech as true, correct and complete in all material respects.

5.3.2    Contemporaneously with submitting each such quarterly report, Semtech shall submit its payment for all Royalties in cash by means of electronic wire transfer using the following instructions (as may be changed upon notice from ViaSat):

*IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
*Page 8*
*ViaSat Confidential*

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016707

<u>Electronic Wire Transfer Instructions</u>

| | |
|---|---|
| Bank: | UNION BANK N.A. |
| Address: | Monterey Park, California USA |
| Routing Transit #: | 122000496 |
| Acct Name: | ViaSat, Inc. General Checking Account |
| Acct #: | 4000142625 |
| Swift ID: | BOFC US 33 MPK    (For international wire transfers) |

5.4     **Payment Terms.** Except as otherwise specified herein, amounts shall be due within thirty (30) days of the invoice therefor. Any amounts not paid when due shall be subject to a late payment fee of one and one-half percent (1.5%) per month, and ViaSat shall be entitled to its reasonable costs of collection, including attorneys' fees.

5.5     **Taxes.** All international, national, regional or local taxes, duties or similar liabilities, however designated, except for income taxes imposed by the U.S. Government or its political subdivisions, which may be levied upon ViaSat in connection with this Agreement shall be for the account of Semtech and paid directly by Semtech or, if required to be paid by ViaSat, shall be immediately reimbursed by Semtech to ViaSat upon evidence of payment.

5.6     **Payment Currency.** All payments due under this Agreement will be paid in U.S. Dollars. Conversion of foreign currency to U.S. Dollars will be made at the conversion rate existing in the United States (as reported in the Wall Street Journal) on the last working day of the applicable Fiscal Quarter. Such payments will be without deduction of exchange, collection or other charges.

5.7     **Records.** Semtech shall maintain, and shall cause its Affiliates to maintain, complete and accurate records of Semtech Devices that are sold under this Agreement, any amounts payable to ViaSat in relation to such Semtech Devices, which records shall contain sufficient information to permit ViaSat to confirm the accuracy of any reports or notifications delivered to ViaSat under Section 5.3. Semtech and its Affiliates, as applicable, shall retain such records relating to a given Fiscal Quarter for at least five (5) years after the conclusion of that Fiscal Quarter, during which time ViaSat will have the right, at its expense, to cause an independent, certified public accountant (or, in the event of a non-financial audit, other appropriate auditor) reasonably acceptable to Semtech to inspect such records during normal business hours for the purposes of verifying the accuracy of any reports and payments delivered under this Agreement and Semtech's compliance with the terms hereof. The Parties shall reconcile any underpayment or overpayment within thirty (30) days after the accountant delivers the results of the audit. If any audit performed under this Section 5.7 reveals an underpayment in excess of five percent (5%) in any calendar year, Semtech shall reimburse ViaSat for all amounts incurred in connection with such audit. ViaSat may exercise its rights under this Section 5.7 only once every calendar year per audited entity (unless an audit reveals an underpayment or breach) and only with at least five (5) business days' prior notice to Semtech.

6.     **CONFIDENTIAL INFORMATION.** Each Party shall maintain in strict confidence, and will use and disclose only as authorized by the disclosing Party, in accordance with the provisions of Non-Disclosure Agreement No. 20120711SEM executed between them on July 17, 2012 (the "NDA"), all information that it receives from the other Party in connection with this Agreement, including, but not limited to, all information concerning trade secrets, engineering, material, supplies, hardware, equipment, software or other technical information of the other Party's products or financial, accounting or marketing information, business plans, analyses, forecasts, predictions or projections, and customer information relating to the other Party's business, and

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016708

personnel information relating to the other Party's employees (hereinafter referred to as "Confidential Information"). The end date of the above referenced NDA shall be considered automatically extended as needed in order to run coterminous with the end date of this Agreement. Notwithstanding anything else, the Licensed Materials shall be the Confidential Information of ViaSat.

### 7.    REPRESENTATIONS AND WARRANTIES

7.1    **ViaSat Representations.** ViaSat represents, warrants and covenants to Semtech that:

(i)    the execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by all appropriate ViaSat corporate actions;

(ii)    this Agreement is a legal and valid obligation binding upon ViaSat and enforceable in accordance with its terms, and the execution, delivery and performance of this Agreement by the Parties does not conflict with any agreement, instrument or understanding to which ViaSat is a party or by which it is bound.

7.2    **Semtech Representations.** Semtech represents, warrants and covenants to ViaSat that:

(i)    the execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by all appropriate Semtech corporate action; and

(ii)    this Agreement is a legal and valid obligation binding upon Semtech and enforceable in accordance with its terms, and the execution, delivery and performance of this Agreement by the Parties does not conflict with any agreement, instrument or understanding to which Semtech is a party of or by which it is bound.

7.3    **Warranty.** ViaSat warrants that for the period ending on the earlier of (i) when Semtech releases a Semtech Device to production, or (ii) 18 months after the Acceptance Date, the Licensed Materials will substantially conform to the Specifications. In the event that, prior to the expiration of the above stated warranty period, the Licensed Materials do not substantially conform to the Specifications and Semtech requires ViaSat to correct such non-conformities, the above warranty period will extend until a Semtech Device is released to production. ViaSat's sole liability and Semtech's exclusive remedy with respect of breach of the foregoing limited warranty will be limited to error correction or replacement of the Licensed Materials. EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT, THE LICENSED MATERIALS AND ANY SERVICES HEREUNDER ARE PROVIDED "AS IS" WITHOUT ANY OTHER WARRANTY OF ANY KIND, EITHER EXPRESSED, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION, ANY WARRANTY WITH RESPECT TO NONINFRINGEMENT, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016709

Joint Exhibit JX50, page 10 of 33

## 8.    INDEMNIFICATION

### 8.1    General Indemnification.

8.1.1    Semtech Indemnity.    Semtech shall indemnify, defend and hold harmless ViaSat, its Affiliates and its and their respective directors, officers, employees, stockholders and agents (the "ViaSat Indemnitees") from and against any liability, damage, loss or expense (including reasonable attorneys' fees and expenses of litigation) incurred by or imposed upon such ViaSat Indemnitees, or any of them, in connection with any Third Party claims, suits, actions, demands or judgments, including personal injury and product liability matters, arising out of the negligence or willful misconduct on the part of Semtech or its Affiliates.

8.1.2    ViaSat Indemnity.    ViaSat shall indemnify, defend and hold harmless Semtech, its Affiliates, and its and their respective directors, officers, employees, and agents, (the "Semtech Indemnitees") from and against any liability, damage, loss or expense (including reasonable attorneys' fees and expenses of litigation) incurred by or imposed upon such Semtech Indemnitees, or any of them, in connection with any Third Party claims, suits, actions, demands or judgments, including personal injury and product liability matters, to the extent arising out of the negligence or willful misconduct on the part of ViaSat or its Affiliates.

### 8.2    IP Indemnification.

8.2.1    ViaSat shall indemnify, defend and hold harmless the Semtech Indemnitees from and against any liability, damage, loss or expense (including reasonable attorneys' fees and expenses of litigation) incurred by or imposed upon such Semtech Indemnitees, or any of them, in connection with any Third Party claims, suits, actions, demands or judgments, to the extent arising out of the design of the DSP IP Core delivered by ViaSat to Semtech as part of the Licensed Materials (the "Indemnified Product") infringing the Intellectual Property Rights of such Third Party.

8.2.2    If, at any time, the Indemnified Product becomes subject to a permanent injunction, then ViaSat shall, at its sole election and expense either (A) procure the right for Semtech to continue using the Indemnified Product without infringement; or (B) replace the Indemnified Product or modify it to make it non-infringing and substantially in conformance with the Specifications. If ViaSat cannot reasonably accomplish either of the remedies described in clause (A) or (B), then ViaSat may terminate this Agreement and refund to Semtech the Royalty amounts paid by Semtech to ViaSat under this Agreement during the two (2) year period immediately preceding such termination. The provisions of these Sections 8.2.1 and 8.2.2 state the entire liability of ViaSat with respect to any infringement claim.

8.2.3    Under no circumstances shall ViaSat have any liability for infringement to the extent such infringement arises from (i) the use of the Indemnified Product in combination and/or configuration with other items not furnished by ViaSat (unless such combination or configuration is required for the items furnished by ViaSat to function), (ii) incorporation of a specific design or modification at the request of Semtech, (iii) Intellectual Property Rights owned by Semtech or its Affiliates, or (iv) the failure by Semtech to implement changes, replacements or new releases recommended by ViaSat, where the infringement would have been avoided by such changes, replacements or new releases and such changes would not have materially diminished the compliance with the Specifications.

8.2.4    Semtech shall indemnify, defend and hold harmless the ViaSat Indemnitees from and against any liability, damage, loss or expense (including reasonable attorneys' fees and expenses of litigation) incurred by or imposed upon such ViaSat Indemnitees, or any of them, in

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016710

connection with any Third Party claims, suits, actions, demands or judgments, arising out of an allegation based on any of the clauses in Section 8.2.3.

8.3    **Indemnification Procedures.**    In the event that any Indemnitee is seeking indemnification under this Section 8 from a Party (the "Indemnifying Party"), the other Party shall notify the Indemnifying Party of such claim with respect to such Indemnitee as soon as reasonably practicable after the Indemnitee receives notice of the claim, and the Party (on behalf of itself and such Indemnitee) shall permit the Indemnifying Party to assume direction and control of the defense and settlement of the claim. The indemnification obligations shall not apply to any harm suffered as a direct result of any delay in notice to the Indemnifying Party hereunder or to amounts paid in settlement of any claim, demand, action or other proceeding if such settlement is effected without the consent of the Indemnifying Party. The Indemnitee and its employees and agents shall reasonably cooperate with the Indemnifying Party and its legal representatives in the investigation of any claim, demand, action or other proceeding covered by Sections 8.1 or 8.2, as applicable.

9.    **TERM AND TERMINATION**

9.1    **Term.**    The term of this Agreement will commence on the Effective Date and shall continue until terminated in accordance with this Section 9.

9.2    **Termination for Breach.**    Either Party may terminate this Agreement upon any material breach by the other Party of any material obligation under this Agreement, effective forty-five (45) days after giving written notice to the breaching Party of such termination, which notice shall describe such breach in reasonable detail. The foregoing notwithstanding, if such default or breach is cured or remedied or shown to be non-existent within the aforesaid forty-five (45) day period, the notice shall be automatically withdrawn and of no effect.

9.3    **Termination for Insolvency.**    Either Party may terminate this Agreement effective immediately upon notice in the event that the other Party: (i) applies for or consents to the appointment of or the taking of possession by a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property; (ii) makes a general assignment for the benefit of creditors; (iii) an order for relief is entered under the Federal Bankruptcy Code against such other Party and is not dismissed or vacated within sixty days; or (iv) any application is filed against such other Party for the appointment of a receiver, custodian or trustee or for the reorganization, dissolution or liquidation of itself or all or a substantial part of its property, and such application is not denied, dismissed or vacated within sixty days.

9.4    **Effects of Termination.**    Upon any termination of this Agreement, all licenses granted herein (including Semtech's rights to further modify, copy and use the Licensed Materials) shall immediately terminate. Semtech will destroy or return all of the Licensed Materials, including all copies and all relevant documentation and within ten days of termination provide written certification of such destruction to ViaSat. Semtech agrees that its failure to destroy or return the Licensed Materials to ViaSat shall cause ViaSat irreparable harm, and that ViaSat shall be entitled to injunctive relief allowing ViaSat to recover the Licensed Materials from Semtech, in addition to any other remedies available. Upon termination of this Agreement, the Parties shall be entitled to all rights available to them at law or in equity, subject to the Limitations of Liability set forth herein. Any provision of this Agreement which contemplates performance or observance subsequent to termination or expiration (in whole or in part) shall survive any such termination or expiration and continue in full force and effect.

9.5    **Sell Off Rights.**    Notwithstanding Section 9.4, in the event of any termination of this Agreement (other than termination by ViaSat under Section 9.2 due to Semtech's breach of its



Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016711

obligation to pay all or any portion of the Development Fee or all or any portion of the Royalties otherwise due under this Agreement), Semtech shall have the right to continue to (i) market, sell and have sold all units of Semtech Devices in inventory on the effective date of such termination, and (ii) make, have made, sell and have sold Semtech Devices solely as needed to fulfill any customer orders accepted by Semtech prior to the effective date of such termination, subject in each case to Semtech's compliance with all applicable terms of this Agreement, including without limitation, Semtech's royalty payment and reporting obligations in Section 5.

10.    **LIMITATIONS OF LIABILITY.** EXCEPT IN THE EVENT OF A BREACH OF SECTIONS 2.7 (RESTRICTIONS), 4 (EXCLUSIVITY), OR 6 (CONFIDENTIAL INFORMATION), A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 8 (INDEMNIFICATION), OR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (i) NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE), EVEN IF INFORMED OF SUCH DAMAGES, AND (ii) NEITHER PARTY'S LIABILITY TO THE OTHER IN CONNECTION WITH THIS AGREEMENT SHALL EXCEED THE SUM OF: (A) ALL AMOUNTS PAYABLE BY SEMTECH TO VIASAT UNDER SECTION 5; AND (B) ALL AMOUNTS PAID BY SEMTECH TO VIASAT UNDER SECTION 5 DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRIOR TO THE DATE ON WHICH THE CIRCUMSTANCE GIVING RISE TO SUCH LIABILITY FIRST ARISES.

11.    **MISCELLANEOUS**

11.1    **Choice of Law/Venue.** This Agreement will be governed by, and construed in accordance with, the substantive laws of the state of California, without giving effect to any choice or conflict of law provision. Any action, suit or other proceeding arising under or relating to this Agreement (a "Suit") shall be brought in a court of competent jurisdiction in the county of Irvine, California, and the Parties hereby consent to the sole jurisdiction of the state and federal courts sitting in the county of Irvine, California. Each Party agrees not to raise any objection at any time to the laying or maintaining of the venue of any Suit in any of the specified courts, irrevocably waives any claim that Suit has been brought in any inconvenient forum and further irrevocably waives the right to object, with respect to any Suit, that such court does not have any jurisdiction over such Party.

11.2    **Notification.** All notices given hereunder shall be in writing, and shall be deemed to be duly given if delivered via email and confirmed with a signed copy delivered personally, by regular mail or by express delivery service:

**If to ViaSat:**

20511 Seneca Meadows Parkway, Suite 200
Germantown, Maryland  20876
Attn: Ted Gammell, Director, Contracts
Email: ted.gammell@viasat.com
Phone: 240-686-4490

With a copy to (which shall not constitute notice hereunder):

4830 East 49th St.
Cuyahoga Heights, Ohio  44125
Attn: Russell Fuerst, VP
Email: Russell.fuerst@viasat.com

*IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
*Page 13*
*ViaSat Confidential*

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016712

Phone: 216-706-7619

**If to Semtech:**

Semtech Corporation
200 Flynn Road
Camarillo, CA 93012
Attn: Legal Department
Email:
Phone: 805-480-2153

Either Party may by like notice specify or change an address to which notices and communications shall thereafter be sent. Notices sent by regular mail shall be effective on the fifth business day following the day such mailing is made, by express delivery service shall be effective upon receipt; notices via e-mail shall be effective if the recipient personally (i.e., not by automated machine response) confirms receipt from the sender; and notices given personally shall be effective when delivered.

11.3     Import/Export. ViaSat shall have no obligation to make any delivery in violation of U.S. export laws or the import laws of any country. Semtech acknowledges that the hardware, software, technical data, and in some cases services supplied by ViaSat directly or indirectly under this Agreement are subject to U.S. export laws and regulations and trade laws of other national governments that may apply to the import, use, distribution, or export of these items. These regulations include, but are not limited to, the Export Administration Regulations and Foreign Assets Control Regulations. Semtech acknowledges it will comply with these laws. The items to be delivered under this Agreement are subject to the U.S. Export Administration Regulations. Semtech is responsible for obtaining the Export Classification Control Number from ViaSat prior to exporting, reexporting or transferring these items including to non-US nationals wherever located. The current known export classification control number for Development Production Technology and DSP IP Cores includes but is not limited to 5E001.c.1. and c.2.c. A US Department of Commerce export license is needed to export Development Production Technology to certain countries including but not limited to China. This information is subject to change without further notice unless Semtech requests or verifies the current information with ViaSat prior to export.

Semtech shall not, without prior U.S. government authorization, export, re-export, or transfer any items delivered hereunder, either directly or indirectly, to any country subject to a U.S. trade embargo or sanction or to any resident or national of these countries (current list consists of Cuba, Iran, North Korea, Sudan and Syria, or any subsequent amendments), or to any person or entity on any U.S. government restricted party lists. In addition, any items delivered hereunder may not be exported, re-exported, or transferred to any end-user engaged in prohibited activities, or for any end-use, directly or indirectly related to the design, development, production, or use of weapons of mass destruction including nuclear, chemical, or biological weapons, and/or the missile technology to deliver them. Semtech shall communicate in writing the export limitation provisions of this clause to applicable parties involved including its subsidiaries affiliates, subcontractors, partners and customers. Upon written notice from ViaSat, Semtech shall provide such information as is reasonably necessary to verify compliance by Semtech with the provisions of this clause.

11.4     Entire Agreement; Amendment. This is the entire Agreement between the Parties with respect to the subject matter hereof and supersedes all prior representations, understandings and agreements between the Parties with respect to the subject matter hereof, provided for clarity that the

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016713

NDA shall continue in full force and effect with respect to information exchanged prior to the Effective Date of this Agreement unless terminated in writing by the Parties. All exhibits, schedules and attachments attached hereto are hereby incorporated into this Agreement. No modification shall be effective unless in writing with specific reference to this Agreement and signed by the Parties.

11.5    **Waiver.** The terms and conditions of this Agreement may be waived only by a written instrument executed by the Party waiving compliance. The failure of either Party at any time or times to require performance of any provision hereof shall in no manner affect its rights at a later time to enforce the same. No waiver by either Party of any condition or term shall be deemed as a continuing waiver of such condition or term or of another condition or term.

11.6    **Headings.** Section and subsection headings are inserted for convenience of reference only and do not form part of this Agreement.

11.7    **Assignment.** Neither this Agreement nor any right or obligation hereunder may be assigned, delegated or otherwise transferred, in whole or part, by either Party without the prior express written consent of the other Party; provided, however, that either Party may, without the prior written consent of the other Party, assign this Agreement, in its entirety, in connection with the transfer or sale of all or substantially all of such Party's assets or business related to this Agreement, whether through merger, reorganization or otherwise (provided that such assignment is not to a competitor of the non-assigning party). Any permitted assignee shall assume all obligations of its assignor under this Agreement. Any purported assignment in violation of this Section 11.7 shall be void. The terms and conditions of this Agreement shall be binding upon and inure to the benefit of the permitted successors and assigns of the Parties.

11.8    **Force Majeure.** Neither Party shall be liable for failure of or delay in performing obligations set forth in this Agreement, and neither shall be deemed in breach of its obligations, if such failure or delay is due to natural disasters or any causes beyond the reasonable control of such Party. In event of such force majeure, the Party affected thereby shall use reasonable efforts to cure or overcome the same and resume performance of its obligations hereunder and shall promptly notify the other Party in writing.

11.9    **Construction.** The Parties hereto acknowledge and agree that: (i) each Party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting Party shall not be employed in the interpretation of this Agreement; and (iii) the terms and provisions of this Agreement shall be construed fairly as to all Parties hereto and not in favor of or against any Party, regardless of which Party was generally responsible for the preparation of this Agreement. In this Agreement: (a) the words and phrases "including" and "such as" and similar words and phrases shall be deemed to be followed by the phrase "without limitation" or like expression; (b) the singular shall include the plural and *vice versa*; (c) masculine, feminine and neuter pronouns and expressions shall be interchangeable, and (d) all references to dollars or $ are to United States dollars, whether or not so expressly stated.

11.10    **Severability.** If any provision(s) of this Agreement are or become invalid, are ruled illegal by any court of competent jurisdiction or are deemed unenforceable under then current applicable law from time to time in effect during the term hereof, it is the intention of the Parties that such provision(s) be deemed to be severed from this Agreement and the remainder of this Agreement shall not be affected thereby. The Parties hereto agree to renegotiate any such severed provision in good faith in order to provide a reasonably acceptable, valid alternative to the severed provision, it being the intent of the Parties that the basic purposes of this Agreement are to be effectuated.

Highly Confidential - Attorneys' Eyes Only                    VIASAT_FEC_00016714

11.11   Status.  Nothing in this Agreement is intended or shall be deemed to constitute a partner, agency, employer-employee, or joint venture relationship between the Parties.

11.12   Counterparts.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.13   Bankruptcy.  If ViaSat files a petition under applicable bankruptcy laws, or an involuntary petition is filed against ViaSat, the Parties intend that Semtech will be protected in the continued enjoyment of its rights as licensed herein to the maximum extent possible, including, without limitation, if it so elects, the protection conferred upon licensees under section 365(n) of title 11 of the United States Code (the "Bankruptcy Code"), any successor provision or any similar provision of applicable law.  The Intellectual Property Rights licensed hereunder shall be deemed to be "intellectual property" as defined under section 101(35A) of the Bankruptcy Code or any successor provision. All Licensed Materials shall be considered to be "embodiments" of such intellectual property for purposes of section 365(n) of the Bankruptcy Code or any successor provision.

[Remainder of page intentionally left blank]

<em>IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012</em><br><em>Page 16</em><br><em>ViaSat Confidential</em>

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016715

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

VIASAT, INC.                                    SEMTECH CORPORATION

By: _____                  By: _____

Name: Ted M. Gammell                            Name: Emeka Chukwu

Title: Director, Contracts                      Title: Sr VP, Finance + CFO

23 Oct 12

*IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
*Page 17*
*ViaSat Confidential*

Highly Confidential - Attorneys' Eyes Only                                    VIASAT_FEC_00016716

## Exhibit A
## DEVELOPMENT PLAN

### 1    SUMMARY OF THE DEVELOPMENT

This Exhibit A describes the development work effort to be accomplished by ViaSat and Semtech (inclusive of the work to be accomplished by Semtech's 3rd Party Back-end Physical Design & Fabrication Partner) under ViaSat-Semtech Development and License Agreement No. 10192012 (hereinafter referred to as the "Agreement").

Under the Agreement, ViaSat will design and develop certain specified intellectual property (IP) cores for integration into a Mixed Signal ASSP for a Coherent Transceiver or Coherent Modem function per the specification in Exhibit B, "Specifications". The ASSP is to be targeted to 32nm SOI process technology.

Under the Agreement, Semtech will integrate the ViaSat supplied IP cores together with Semtech's analog (ADC and DAC) and other 3rd party IP cores to develop a mixed signal ASSP targeting the 100G long haul and metro optical transport markets. Semtech will work with its selected 3rd party physical design & fabrication partner (hereinafter referred to as the "3rd Party Back-end Partner"), to integrate the IP; and test and manufacture the ASSP for sale into this market.

### 2    IP Cores

ViaSat will develop and deliver a fully integrated IP core (hereinafter referred as the "Coherent Transceiver IP") which shall consist of the following 2 digital IP cores:

1.  DSP IP core for a 100Gbps DQPSK modulation for DWDM Long Haul and Metro Applications, meeting the applicable DSP IP Core specifications set forth in Exhibit B to the Agreement.

2.  Soft Decision FEC IP core with ~20% Overhead for 100Gbps data rate, meeting the applicable Soft Decision FEC IP Core specifications set forth in Exhibit B to the Agreement.

### 3    ViaSat Tasks

For the Coherent Transceiver IP design effort, ViaSat will perform the tasks described in this Section 3 in accordance with the schedule set forth in Section 5 hereof. In addition to the tasks described below, weekly review meetings will be held between ViaSat and Semtech to ensure coordination between ViaSat's and Semtech's development teams (these reviews will be held by teleconference and/or Web-Conferencing).

#### 3.1    System Study and Architecture analysis

3.1.1    ViaSat will provide simulation and design for the transceiver design through performance in optical communications channel models including fiber impairments, and transmitter and receiver impairments.

3.1.2    ViaSat shall use channel models provided by Semtech or Semtech's customers to perform simulations and validate the performance of the coherent transceiver IP as described in

*Exhibit A to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*

Page 1 of 8

Contents Proprietary and Confidential. Unauthorized disclosure outside ViaSat, Inc. and Semtech is prohibited.
© 2012 ViaSat, Inc. All rights reserved.

## Exhibit A
## DEVELOPMENT PLAN

section 3.1.1. If Semtech or Semtech's customers do not have a previously developed or readily available channel model, ViaSat can provide their channel model as the baseline for the system simulation and design.

3.1.3    ViaSat will deliver high level architecture documentation and interface specifications to Semtech. This documentation will include the top level architecture, simulation results indicating that the design meets the specifications, and the interface specification to assist with integration of the DSP IP Core.

### 3.2    *RTL Verification/Regression Testing*

ViaSat shall develop and deliver to Semtech a verification platform, which shall consist of the verification plan, verification architecture, and test cases.

3.2.1    The Verification Plan is defined as a high level document that contains how the top level coherent transceiver IP will be verified in a simulation environment for functionality and performance. This test plan will be developed by ViaSat with Review and Acceptance provided by Semtech according to the review schedule set forth for interim deliverables in Section 5. The test plan will include the test architecture and all Test Cases.

3.2.2    The Verification Architecture is defined as the methodology by which the RTL will be verified as compared against the simulation to validate performance of the code against the simulation baseline.

3.2.3    The Test Cases are defined as a suite of both random and directed test vectors that will provide stimulus to the test architecture to be run on the top level coherent transceiver design (in System Verilog, C, Verilog or some combination of the aforementioned languages) for the purpose of verifying the functionality and performance of the coherent transceiver.

3.2.4    The Test Case document is defined as the document that lists the various Test Cases. ViaSat shall deliver to Semtech the Verification Plan and Test Case document and the results of the various regression tests run for validation.

3.2.5    Acceptance of the Final Delivery shall be deemed granted by Semtech upon ViaSat successfully passing the Test Cases per the Verification Plan.

### 3.3    *Synthesis*

3.3.1    ViaSat shall create the synthesizable RTL Code for the coherent transceiver IP based on the design resulting from the system study and architecture analysis phase of the development plan and the Specification set forth in Exhibit B of the Agreement ("Exhibit B").

*Exhibit A to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*

Page 2 of 8

Contents Proprietary and Confidential. Unauthorized disclosure outside ViaSat, Inc. and Semtech is prohibited.

© 2012 ViaSat, Inc. All rights reserved.

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016718

## Exhibit A
## DEVELOPMENT PLAN

**3.3.2**    The Architecture implemented will be based upon the Exhibit B Specifications.

**3.3.3**    ViaSat will synthesize the RTL and generate gate level encrypted netlists suitable for delivery to Semtech and the 3rd Party Back-end Partner .

**3.3.4**    ViaSat shall only be required to deliver encrypted RTL under the Agreement; however, if the 3rd party backend partner requires unencrypted RTL for the purpose of increasing the efficiency in synthesis in order to achieve better performance in power, area and timing closure in the chip level integration process, ViaSat will provide the unencrypted RTL directly to the 3rd party backend partner, subject to the 3rd Party Backend Partner first executing a suitable limited software license agreement directly with ViaSat that restricts the 3rd party backend partner's use of such encrypted RTL solely to the purposes described above in this 3.3.4, and prohibits the 3rd party backend partner from making any subsequent disclosure, directly or indirectly, of any such unencrypted RTL to any other party, including Semtech.

**3.3.5**    ViaSat shall deliver the following 3 netlist drops directly to Semtech and/or the 3rd party backend partner at various stages in the development, according to the schedule in Table 1.

    **3.3.5.1**    Initial Netlist/Bronze Netlist (1st drop) – The Initial Netlist/Bronze Netlist will be used by Semtech and the 3rd Party Backend Partner for floor planning and layout purposes. The Initial Netlist/Bronze Netlist will provide a very good indication of the size and the HLB (Hierarchical Layout Blocks) sizes. The memories will be largely defined and will not change unless there is a significant size benefit or certain functionality requires the RTL designer to change the memory dimensions. The I/O will be fixed at this time according to the architecture documents.

    **3.3.5.2**    Critical Netlist/Silver Netlist (2nd drop) – The Critical Netlist/Silver Netlist will be >80% functionally verified and all of the features implemented.

    **3.3.5.3**    The Final Netlist/Golden Netlist (3rd drop) will have passed 100% of the regression and functional tests.

**3.4**    *Support to Semtech and the 3rd Party Backend Partner in floor planning and layout*

**3.4.1**    ViaSat shall provide support to Semtech and the 3rd Party Backend Partner to complete backend tasks including floor planning, layout, timing closure at the chip level and GDSII released for manufacturing. ViaSat shall also provide support during the ASSP engineering sample testing once devices are available and built into the Semtech hardware test platform.

*Exhibit A to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*

Page 3 of 8

Contents Proprietary and Confidential. Unauthorized disclosure outside ViaSat, Inc. and Semtech is prohibited.

© 2012 ViaSat, Inc. All rights reserved.

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016719

## Exhibit A
## DEVELOPMENT PLAN

**4    Semtech Tasks**

Section 4 describes the development tasks that will either (a) be performed directly by Semtech, or (b) be performed on Semtech's behalf by its 3rd Party Backend Partner, as part of Coherent Transceiver development in accordance with the schedule set forth in Section 5 hereof. In both cases, Semtech shall remain the party solely responsible under the Agreement for the timely completion of the tasks described in this Section 4.

**4.1    ASIC Libraries and Tools**

**4.1.1**    Semtech shall facilitateViaSat's access to IBM's 32SOI libraries within five (5) days of execution of the Agreement. Delay in providing such library access to ViaSat shall delay the progress and delivery of the IP core under the Agreement, and in such case ViaSat shall be entitled to schedule relief associated with any such delay.

**4.1.2**    Semtech shall facilitateViaSat's access to IBM's 32SOI tool suite, required training, and any specialized tools used during the synthesis, timing closure and sign-off process. Delay in providing such access to ViaSat shall delay the progress and delivery of the IP core under the Agreement, and in such case ViaSat shall be entitled to schedule relief associated with any such delay.

**4.2    Integration**

**4.2.1**    Semtech shall be responsible for the chip level integration that includes the Coherent Transceiver IP, ADC, DAC, any necessary formatting/framing, and any other 3rd party IP cores.

**4.2.2**    Semtech shall be responsible for testing the chip level integrated solution as specified in section 4.2.1

**4.2.3**    Semtech shall provide ViaSat with a chip level integration test plan and the final test results prior to sending the tapeout/release for manufacturing to the 3rd Party Backend Partner.

**4.2.4**    Semtech and its 3rd Party Backend Partner shall be responsible for the following:

**4.2.4.1**    Package Design, which shall include specifying and designing the ASIC package for optimal performance with regard to parasitic, noise immunity, cross talk, ground bounce, stability, reflections, mismatch, signal damping, ringing dispersion, thermal performance, mechanical characteristics, and reliability. All analysis data for the characteristics listed above will be provided to ViaSat and Semtech for approval.

**4.2.4.2**    Chip Power Analysis, which shall include Top Level Analysis and Design for On Chip Power Distribution, Package-Die interface, and Package Network as well as the Low Level Analysis and Design related to wire interconnect capacitance and dynamic power consumption. An analysis of on-chip decoupling capacitors/regulators should also be conducted in order to reduce the impedance of

*Exhibit A to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*

Page 4 of 8

Contents Proprietary and Confidential. Unauthorized disclosure outside ViaSat, Inc. and Semtech is prohibited.
© 2012 ViaSat, Inc. All rights reserved.

Highly Confidential - Attorneys' Eyes Only                                        VIASAT_FEC_00016720

## Exhibit A
## DEVELOPMENT PLAN

the Power Distribution System. These analyses will be conducted at each Netlist Phase in order to assist in the optimization of the power design for the ASIC.

4.2.4.3    Timing Closure, which shall be performed at each process step, including logic synthesis, floor planning, placement-based synthesis, clock tree synthesis, and final place and route. A statistical timing analysis should be performed to analyze variations in voltage and temperature. The backend partner shall provide feedback at each netlist phase in order to optimize RTL Design. A Standard Delay Format File shall be provided to ViaSat for back-annotation into the final system design.

4.2.4.4    Simultaneous Switching Analysis for IOs and Package, which shall include an analysis of optimal IO locations relative to frequency, simultaneous switch, voltage sensitivity and noise sensitivity.

4.2.4.5    Performing Clock Design and Validation of Clock Jitter Design, which shall include designs based on PLLs provided from an existing IP Library. Analysis of cycle-to-cycle and peak-to-peak jitter shall be conducted and provided to ViaSat to facilitate the optimal design and performance.

4.2.4.6    Performing DFT (Design for Test), JTAG (Joint Test Action Group) & Boundary Scan (IEEE 1149.1), BIST, LBIST, MBIST. Associated gate counts, cell counts, die sizing, and JTAG ID shall be provided to ViaSat. Automatic Test Pattern Generation shall be performed and all results reported to ViaSat.

4.2.4.7    Providing required IP Cores for Serdes, PLLs, embedded SRAM and/or DRAM, and High Speed I/O.

4.2.4.8    Performing validation of Top Level Integrated Chip Design, including an analysis of Signal Noise Immunity including cross-talk, power distribution, voltage islands, signal integrity on-chip and through package pins, package pinouts suitable for various evaluation boards, analog and digital noise division, and Design for Manufacturability.

Contents Proprietary and Confidential. Unauthorized disclosure outside ViaSat, Inc. and Semtech is prohibited.

© 2012 ViaSat, Inc. All rights reserved.

Highly Confidential - Attorneys' Eyes Only                    VIASAT_FEC_00016721

## Exhibit A
## DEVELOPMENT PLAN

### 4.3    ASSP testing

4.3.1    Semtech shall provide ViaSat with draft a test plan to validate the ASSP Engineering samples. ViaSat will review and provide suggestions to ensure the ViaSat supplied IP is exercised during the course of the device level testing.

4.3.2    Semtech shall develop a hardware ASSP Test platform to test the ASSP prototypes/ Engineering Samples.

4.3.3    Semtech shall execute testing of the ASSP on the ASSP Test platform according to the approved test plan.

4.3.4    Semtech to provide ViaSat a copy of the final test plan and results of the ASSP tests to allow for understanding of final performance and gain understanding of design for future products.

### 4.4    Respin

4.4.1    If the ASSP respin is required due to any technical or process issues, Semtech shall manage the respin process.

4.4.2    ViaSat will only be responsible for correction of any non-compliances found in ViaSat supplied IP during the respin process. Semtech must provide ViaSat will specific details during the manufacturing and testing process that indicate the non-compliances. ViaSat will fix the non-compliances and provide any additional testing or validation required as part of the initial delivery for the non-compliant portion(s) of the design.

### 4.5    Review, Acceptance & Limitations

4.5.1    During the duration of the IP Core development work carried out under this Exhibit B, if either party requests a technical review with the other party, the parties shall each make its technical personnel available in a timely manner to participate in any such review, and shall provide its feedback to the other party in a timely manner to ensure the development work hereunder is not unduly delayed.

4.5.2    For all ViaSat interim deliverables hereunder, Semtech shall review such each such deliverable and provide its acceptance or rejection thereof to ViaSat within two (2) weeks of such delivery. Any rejection shall be accompanied by a detailed reference to where such rejected deliverable fails to meet the applicable requirements/specifications set forth in this Exhibit A SOW and/or Exhibit B Specification. Absent any rejection notice within the above stated time period, such interim deliverable shall be deemed accepted by Semtech.

4.5.3    ViaSat shall deliver to Semtech the results of simulation based verification tests which confirm and validate that ViaSat's IP core design meets the applicable

*Exhibit A to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*

Page 6 of 8

Contents Proprietary and Confidential. Unauthorized disclosure outside ViaSat, Inc. and Semtech is prohibited.

© 2012 ViaSat, Inc. All rights reserved.

TMG
EL

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016722

## Exhibit A
## DEVELOPMENT PLAN

requirements/specifications set forth in this Exhibit A SOW and/or Exhibit B Specification requirements. Semtech shall provide its acceptance or rejection of the Final Netlist delivery (as specified in 3.3.5.3) within four (4) weeks of such delivery. Absent any rejection notice within the above stated time period, such final deliverable shall be deemed accepted by Semtech.

4.5.4    Any changes required to the RTL, except for changes related to any noncompliances traced back to ViaSat IP blocks, after Final Review and Acceptance, are outside the scope of this Exhibit A SOW. Similarly, any subsequent deliverables beyond LongHaul+Metro deliverables set forth in this Exhibit A SOW, including, but not limited to, updated specifications, updated requirements, updated test benches, updated test cases, re-synthesis, and updated documentation are outside the scope of this Exhibit A.

## 5    Deliverables

| Tasks | Reference | Deliverable | Format | Delivered By | Delivered To | Delivery Date |
|---|---|---|---|---|---|---|
| System Study and Architecture Analysis | Exhibit A Section 3.1 | High level architecture specification document of top level coherent transceiver design | PDF/ MS Word | ViaSat | Semtech | Dec 2013 |
| RTL Verification and Regression testing | Exhibit A Section 3.2 | Verification Plan including Test Architecture & Test Case documents with Test Results | PDF/ MS Word | ViaSat | Semtech | Delivered as part of Netlist Deliverable (see Synthesis below) |
| Synthesis | Exhibit A Section 3.3 | Synopsys compatible encryptedVerilog netlist as defined in Section 3.4 | Verilog netlist | ViaSat | Semtech | Bronze Netlist – Dec 2012 Silver Netlist – Feb 2013 Gold Netlist – Apr 2013 |

*Exhibit A to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*

Page 7 of 8

Contents Proprietary and Confidential. Unauthorized disclosure outside ViaSat, Inc. and Semtech is prohibited.

© 2012 ViaSat, Inc. All rights reserved.

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016723

## Exhibit A
## DEVELOPMENT PLAN

| Layout, Floor Plan and Timing Closure | Exhibit A Section 3.4 | Details listed in Section 3.4<br><br>Floor plan, Layout information, Timing closure and other required information requested by ViaSat | Tool specific | Backend Partner and or Semtech | ViaSat | Support as part of Netlist Deliverable (see Synthesis below) (see above) |
|---|---|---|---|---|---|---|
| ASIC Tools and Libraries | Exhibit A Section 4.1 | IBM Related tools, and training to be scheduled | Tools and training as required | Semtech and or IBM | ViaSat | Tools within 5 days of contractsigning; Training to be scheduled as early as practical |
| Integration Test | Exhibit A Section 4.2 | Detailed test plan, test cases, and test results of chip level integration. | PDF/ MS Word | Semtech | ViaSat | *At ASIC Release-to-Checking (RTC) with IBM* |
| ASSP Hardware Testing | Exhibit A Section 4.3 | Detailed test plan, test cases, and test results of ASSP performance on Semtech hardware platform. | PDF/ MS Word | Semtech | ViaSat | *3 months after receipt of first packaged ASSP parts by Semtech* |

**Table 1: Key Tasks, Deliverables, Milestones, and Dates**

*Exhibit A to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
Page 8 of 8

Contents Proprietary and Confidential. Unauthorized disclosure outside ViaSat, Inc. and Semtech is prohibited.
© 2012 ViaSat, Inc. All rights reserved.

Highly Confidential - Attorneys' Eyes Only

VIASAT_FEC_00016724

Highly Confidential - Attorneys' Eyes Only

Joint Exhibit JX50, page 26 of 33

VIASAT_FEC_0001 6725

Exhibit B
SPECIFICATIONS

**This Exhibit B describes the specifications for the development work effort to be accomplished by ViaSat and Semtech (inclusive of the work to be accomplished by Semtech's 3rd Party Back-end Physical Design & Fabrication Partner) under ViaSat-Semtech Development and License Agreement No. 10192012 (hereinafter referred to as the "Agreement").**

## 1. ASSP Overview

The ASSP is a coherent digital modem chip for 100G optical channels.

The design supports dual-polarization QPSK modulation scheme at the 100G rate (Targeted at Metro and Long Haul Market). Both coherent and differential encoding modes are supported. The design supports Soft-Decision FEC (SDFEC) mode with 20% overhead (Proprietary) and also supports an external 7% FEC mode.

The chip has fully integrated Transmit and Receive functionalities. The inclusion of the DAC core allows for a modulator design with pulse shaping and digital channel pre-compensation. The two immediate benefits of this type of design are a lower power demodulator design and improvements in demodulator performance resulting from properly matched filtering and band limiting.

The design target is the IBM 32nm SOI process with Semtech supplied ADC, DAC, and SERDES cores.



## 2. DSP Specifications

### 2.1. General Specification

General

| Parameter | Specifications | Notes |
|---|---|---|
| Client Data Protocols | 100G - OTU4 | |
| Network Mode | Mode 1: Metro (using external to ASSP 7% FEC)<br>Mode 2: Long Haul (with internal 20% SDFEC) | |
| Modulation Format | Dual Polarization QPSK (DP-QPSK) | Differential & Coherent modes are both supported. |
| Process technology | 32nm SOI | |
| Power consumption estimates | Estimated ~12 W typical in Mode 1 *<br>Estimated ~15 W typical in Mode 2 * | DSP only based on IBM 32SOI power reduction targets from 28nm TSMC. Maximum chip level power targets are 20W (Mode 1) and 25W (Mode 2). |

### 2.2. SDFEC Specification

FEC

| Item Parameter | Specifications | Notes |
|---|---|---|
| 20% SDFEC NECG | 11.3dB NECG at 1e-15 BER | SDFEC supports configurable # of iterations allows for trade-off of performance vs. power. |
| SDFEC Burst Error Correction | > 1000 bits | |
| SDFEC Decoder bypass mode | Yes, programmable | Parity bits are inserted on the transmit side to maintain baud rate. At receive side parity bits are ignored and discarded. |
| SDFEC Performance Statistics | Number of bits corrected<br>Number of frames in error | Counters updated and cleared every second Running count user controlled clear. |

Highly Confidential - Attorneys' Eyes Only

Joint Exhibit JX50, page 27 of 33

VIASAT_FEC_00016726



Joint Exhibit JX50, page 28 of 33

VIASAT_FEC_00016727

Exhibit B
SPECIFICATIONS

## 2.3.    *DSP Specification*

The following tables contain each parameter tested in isolation.

**DSP General**

| Parameter | Specifications | Notes |
|---|---|---|
| Line Side Data Rate | Mode 1: ~ 112.6 Gbps<br>Mode 2: ~127.2 Gbps | |
| Symbol Rate | Mode 1: ~28.2 Gbaud<br>Mode 2: ~31.8 Gbaud | |
| Physical Layer Pre-amble | Unique pre-amble word for XI, XQ, YI, YQ with ~0.7 % Overhead | |
| Modulation | Dual Pol-QPSK (DP-QPSK) | |
| Differential/coherent mode | Both fully coherent QPSK (differential encoding bypassed) and Differential QPSK (DQPSK) are supported | |

**DSP Transmit**

| Parameter | Specifications | Notes |
|---|---|---|
| Channel Pre-compensation | Support sinx/x and other system/channel pre-compensation. With mode selection could support up to ±2000 ps/nm CD compensation. | |
| Gain pre-compensation | +/- 1 dB | Programmable |
| TXSKEW Control – XI, XQ, YI, YQ | ±1.0UI with 1/32 UI resolution | Programmable |
| TX Latency | Mode 1 (Metro): < 1us<br>Mode 2 (Long Haul): <2 us | |

*Exhibit B to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
Page 3 of 8

**DSP Receive**

| Parameter | Specifications 100G | Notes |
|---|---|---|
| OSNR Implementation loss margin for 1e-15 BER (compared to theoretical SDFEC). | 1.0 dB for QPSK 1.2 dB for D-QPSK | Measured back-to-back in a 0.1 nm resolution bandwidth, with an optimal peak-to-peak ADC input voltage |
| LO Frequency Error Acquisition | ± 3.0GHz ASSP only ± 7.0GHz S/W assisted algorithm | |
| Combined Linewidth (Differential) | ≤1MHz for DQPSK at 100 GBaud | Assumes 50%/50% split between the TX and RX LOs. |
| Combined Linewidth (Coherent) | ≤ 500KHz for QPSK at 100 GBaud | Assumes 50%/50% split between the TX and RX LOs. |
| CD Tolerance | Mode 1: Metro Mode: ± 16,000ps/nm Mode 2: Long Haul Mode: ± 55,000ps/nm | Measured back-to-back in a 0.1 nm resolution bandwidth, with an optimal peak-to-peak ADC input voltage |
| First order PMD | Max 105ps Ave 35ps | |
| Second Order PMD | Max 4200ps² | |
| Polarization Tracking | 50 kHz | |
| PDL | Max 2.5 dB OSNR difference and 2.5 dB Power difference between H and V pol | |
| RXSKEW- XY-Tolerance | ±1.0UI | Dynamic tracking |
| RXSKEW- IQ-Tolerance | ±0.2UI | Dynamic tracking |
| RXSKEW- XY-SET | ±2.0UI with 1/32 UI resolution | Programmable |
| RXSKEW- IQ-SET | ±1.0UI with 1/32 UI resolution | Programmable |
| Synchronization LOS <15ms | <1ms | Full FEC synchronization time with bulk CD compensation fixed and LO frequency error < ±1% of the baud rate. |
| Synchronization with CD convergence | Mode 1 (Metro): < 15 ms Mode 2 (Long Haul): <100 ms | For dynamic CD search (LO tuning time is excluded). |
| RX Latency in SDFEC mode | Mode 1 (Metro): < 1us Mode 2 (Long Haul): <8 us | |

*Exhibit B to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
Page 4 of 8

Highly Confidential - Attorneys' Eyes Only

Joint Exhibit JX50, page 30 of 33

VIASAT_FEC_00016729

Exhibit B
SPECIFICATIONS

## 2.4.    Client Side Specification

| Client Side Interfaces | | |
| --- | --- | --- |
| **Parameter** | **Specifications** | **Notes** |
| OTU4 Interface | TX/RX OTU4 frames over using OTL4.10 standard interface or 10+1 lane SFI-S over CEI-11G-MR | TBD (need to decide the client side interface requirements based on customer feedback) |

## 2.5.    Line Side Specification

| Line Side Framing  &Interfaces | | |
| --- | --- | --- |
| **Parameter** | **Specifications** | **Notes** |
| line side framing | Support 20% SDFEC and 7% HDFEC with proprietary framing protocol with 0.7 % framing symbols inserted periodically. | |
| RX LO Tuning with Estimated Frequency Error Value | ASSP will generate an estimated RX frequency error value  and make it available externally to tune the RX LO. | |
| AGC loop | Error signal is provided to support ±8dB / 50μsec gain variation. | Uses analog RX gain control signal to drive typical TIA.  Digital AGC control signals are provided for end users to design proprietary AGC loop. |

# 3. ADC, DAC and SERDES

The following design requirements are imposed upon the Semtech Supplied ADC, DAC, and high speed SERDES, in order for the DSP IP described in Section 2, above, can meet the desired performance levels.

The ADC and DAC requirements assume ADC/DAC clock at ~2GHz with an accuracy of ±20ppm and mutually agreeable jitter specification.

DSP performance assumes at least 30dB isolation between analog signals (DAC and ADC).



Highly Confidential - Attorneys' Eyes Only

Joint Exhibit JX50, page 31 of 33

VIASAT_FEC_00016730

## Exhibit B
## SPECIFICATIONS

| ADC, DAC & SERDES | | | | | |
|---|---|---|---|---|---|
| Parameter | Specifications | | | | Notes |
| | Min | Typ | Max | | |
| **High-Speed Analog Inputs to ADC** | | | | | |
| Input Amplitude | 500 | | 700 | mVpp-diff | |
| Input Damage Level; Single-Ended | -0.1 | | Vcc+0.2 | V | |
| Input Impedance; Differential | | 100 | | Ohms-diff | |
| Input Return Loss; Differential | | | | | |
| 10MHz to 16GHz | 14 | | | dB | Includes package |
| >16 to 24GHz | 12 | | | dB | Includes package |
| >24 to 32GHz | 10 | | | dB | Includes package |
| Input Impedance; Common Mode | | 50 | | Ohms | |
| Input Return Loss; Common Mode | | | | | |
| 10MHz to 16GHz | 10 | | | dB | Includes package |
| >16 to 24GHz | 8 | | | dB | Includes package |
| >24 to 32GHz | 6 | | | dB | Includes package |
| | | | | | |
| | | | | | |
| | | | | | |
| Input Coupling | AC-Coupled (External DC blocker required) | | | | |
| **ADC Performance** | | | | | |
| Sampling Rate: | 42 | | 48 | Gsps | 1.5x the baud rate |
| Resolution Bandwidth | 18 | | | GHz | Frequency at which ENOB degrades by 3dB (0.5 bits) |
| Low-Frequency ENOB | 6 | | | Bits | DC to 5GHz |
| Non-Linearlity | | | | | |
| INL | | | | | Target +/- 1 LSB |
| DNL | | | | | Target +/- 2 LSB |

*Exhibit B to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
Page 6 of 8

Highly Confidential - Attorneys' Eyes Only

Joint Exhibit JX50, page 32 of 33

VIASAT_FEC_0016731

## Exhibit B
## SPECIFICATIONS

| | | | | | |
|---|---|---|---|---|---|
| Total Harmonic Distortion | | | 0.5 | % | |
| SFDR | | | | | |
| 10MHz to fs/4 | 40 | | | dB | |
| <fs/4 to fs/3 | 37 | | | dB | |
| <fs/3 to fs/2 | 34 | | | dB | |
| Aperture Jitter; 10 MHz to fs/2 | | | 60 | fsec rms | |
| I-Q Skew Error (V or H polarizations) | | | 250 | fsec | After calibration |
| I-Q Skew Error Adjustment Range | -5 | | 5 | psec | Adjustable sampling skew in ADC cores; requires control from DSP block. TBD (needs discussion) |
| **DAC Performance** | | | | | |
| Conversion Rate: | 55.4 | | 64.0 | Gsps | |
| Analog Bandwidth | 18 | | | GHz | Frequency at which response is reduced by 3dB |
| ENOB | | | | | Ideal ENOB target is 6.5 bits up to fs/3 |
| 10MHz to fs/4 | 5.5 | | | Bits | |
| <fs/4 to fs/3 | 5.0 | | | Bits | |
| <fs/3 to fs/2 | 4.5 | | | Bits | |
| Non-Linearlity | | | | | |
| INL | | | | | Target +/- 1 LSB |
| DNL | | | | | Target +/- 2 LSB |
| Total Harmonic Distortion | | | 0.5 | % | |
| SFDR | | | | | |
| 10MHz to fs/4 | 40 | | | dB | |
| <fs/4 to fs/3 | 37 | | | dB | |
| <fs/3 to fs/2 | 34 | | | dB | |
| Aperture Jitter; 10 MHz to fs/2 | | | 60 | fsec rms | |
| | | | | | |
| **High-Speed Analog Outputs** | | | | | |
| Output Type | | Differential Analog | | | |
| Output Amplitude; Full-Scale | 1000 | | 1200 | mVpp-diff | |
| Output Impedance; Differential | | 100 | | Ohms-diff | |
| Output Return Loss; Differential | | | | | |

*Exhibit B to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
Page 7 of 8

Highly Confidential - Attorneys' Eyes Only

Joint Exhibit JX50, page 33 of 33

VIASAT_FEC_0001 6732

## Exhibit B
## SPECIFICATIONS

| | | | | | |
|---|---|---|---|---|---|
| 10MHz to 16GHz | 14 | | | dB | Includes package |
| >16 to 24GHz | 12 | | | dB | Includes package |
| >24 to 32GHz | 10 | | | dB | Includes package |
| Output Impedance; Common Mode | | 50 | | Ohms | |
| Output Return Loss; Common Mode | | | | | |
| 10MHz to 16GHz | 10 | | | dB | Includes package |
| >16 to 24GHz | 8 | | | dB | Includes package |
| >24 to 32GHz | 6 | | | dB | Includes package |
| Output Coupling | AC-Coupled (External DC blocker required) | | | | |
| | | | | | |
| | | | | | |
| **High-Speed SERDES I/O** | | | | | |
| Description | Compliant to OIF-CEI-11G-SR for 10x10G I/O; and OIF-28G-VSR for 4x25G I/O | | | | TBD (need to decide the client side interface requirements based on customer feedback) |
| Coupling | AC-Coupled (External DC blocker required) | | | | |
| Symbol Rate | 2/5 x (Symbol Rate) x 1/(FEC overhead factor) | | | | |
| -10x10G I/O | 11.08 | | 11.32 | Gaud | |
| -4x28G I/O | 27.7 | | 28.3 | Gaud | |
| Deskew Method | | | | | TBD (need to decide the client side interface requirements based on customer feedback) |
| Method A | SFI-S; 10+1 lane; per OIF_SFI-S_01.0_IA | | | | For 10x10G I/O |
| Method B | OTL4.10 per ITU-T G.709; YR-2010 | | | | For 10x10G I/O |
| Method C | OTL4.4 ITU-T G.709, YR-2010 | | | | For 4x28G I/O |
| Deskew Range | 84 | | | UI | 1UI = 1/11.32Gbaud |
| Dynamical Wander Tolerance (Including Relate and Common Mode Wander) | 90 | | | UI | 1UI = 1/11.32Gbaud |
| MSB Identification and Output | | | | | Data aided by OTU FAS in logic lane |

*Exhibit B to IP CORE DEVELOPMENT AND LICENSE AGREEMENT NO. 10222012*
Page 8 of 8