**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **VIASAT, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**KIOXIA CORPORATION and KIOXIA AMERICA, INC.,**<br><br>**Defendants.** | **Case No.: 6:21-cv-01231-ADA**<br><br>**JURY TRIAL DEMANDED** |

**KIOXIA CORPORATION AND KIOXIA AMERICA, INC.'S RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

Page


I. INTRODUCTION ... 1

II. LEGAL STANDARD ... 1

III. KIOXIA IS ENTITLED TO JUDGMENT OF NONINFRINGEMENT ... 1

A. The Accused Products Do Not Contain a "Decoder" That Includes an "Error Detection Sub-Module" That "Forward[s]" the Critical Portion of a Data Stream to a "Physically Separate" "Error Correction Module" ... 2

1. No Reasonable Jury Could Find That the NANDC and L3D Are the Claimed "Error Detection Sub-Module" and "Error Correction Module," or That Together They Form the Claimed "Decoder" ... 3

2. Viasat's Legally Improper Use of "Comprising" Does Not Save Its Infringement Theory ... 5

3. No Reasonable Jury Could Find That the NANDC Forwards the Same Received Data Stream to the L3D ... 7

4. No Reasonable Jury Could Find That the Forwarding Limitation Is Met Under the Doctrine of Equivalents ... 9

B. The Accused Products Do Not Adaptively Modify the Coding Rate "Responsive to an Age of the Flash Memory or a Rate of Errors Associated with the Decoded Data" ... 10

1. Reliance on Inoperative Firmware Cannot Prove Infringement ... 11

2. No Reasonable Jury Could Find That the Accused Products Modify the Coding Rate in Response to the Claimed Conditions ... 12

IV. KIOXIA IS ENTITLED TO JUDGMENT OF NO DAMAGES ... 15

A. All Three of Dr. Mody's Theories for Royalty Rates Fail to Adequately Apportion as a Matter of Law ... 15

1. Viasat Failed to Apportion Its Costs and Incremental-Value Theories' Royalty Rates ... 16

2. Viasat Also Failed to Apportion the Licensing Theory's Royalty Rate ... 17

B. Dr. Mody's Licensing Theory Lacked Evidence of Technical Comparability ... 18

C. Viasat's Unsupported Royalty Base Independently Warrants JMOL ... 19

V. CONCLUSION ... 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
651 F.3d 1318 (Fed. Cir. 2011)....................13

*Arsement v. Spinnaker Expl. Co.*,
400 F.3d 238 (5th Cir. 2005) ....................7

*Bd. of Regents of the Univ. of Tex. Sys. v. Bos. Sci. Corp.*,
184 F.4th 618 (Fed. Cir. 2026) ....................5

*Centricut, LLC v. Esab Grp., Inc.*,
390 F.3d 1361 (Fed. Cir. 2004)....................19

*Centripetal Nets., LLC v. Palo Alto Nets., Inc.*,
No. 23-1654, 2024 WL 4639207 (Fed. Cir. Oct. 31, 2024)....................13

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................16

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007)....................6

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999)....................1

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)....................1, 16, 18

*Express Mobile, Inc. v. Meta Platforms, Inc.*,
No. 23-1646, 2025 WL 1693494 (Fed. Cir. June 17, 2025)....................12

*Finesse Wireless LLC v. AT&T Mobility LLC*,
156 F.4th 1221 (Fed. Cir. 2025) ....................1, 11

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010)....................17

*In re Varma*,
816 F.3d 1352 (Fed. Cir. 2016)....................5

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
496 F.3d 1334 (Fed. Cir. 2007)....................7

*Johnston v. Ferrellgas, Inc.*,
96 F.4th 852 (5th Cir. 2024) ....................1

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012)....................19

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)....................18

*Magnolia Med. Techs., Inc. v. Kurin, Inc.*,
169 F.4th 1094 (Fed. Cir. 2026) ....................4

*Microsoft Corp. v. Int'l Trade Comm'n*,
731 F.3d 1354 (Fed. Cir. 2013)....................11

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
10 F.4th 1358 (Fed. Cir. 2021) ....................16

*MobileMedia Ideas LLC v. Apple Inc.*,
780 F.3d 1159 (Fed. Cir. 2015)....................18

*NexStep, Inc. v. Comcast Cable Commc'ns, LLC*,
119 F.4th 1355 (Fed. Cir. 2024) ....................9, 10

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
904 F.3d 965 (Fed. Cir. 2018)....................16, 20

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004)....................6

*Prolitec Inc. v. ScentAir Techs., LLC*,
No. 20-cv-984, 2024 WL 341342 (D. Del. Jan. 30, 2024) ....................17

*Provisur Techs., Inc. v. Weber, Inc.*,
119 F.4th 948 (Fed. Cir. 2024) ....................19

*Quartz Auto Techs. LLC v. Lyft, Inc.*,
No. 1:20-cv-00719-ADA, Dkt. 380 (W.D. Tex. Aug. 24, 2026)....................11

*Rex Med., L.P. v. Intuitive Surgical, Inc.*,
156 F.4th 1289 (Fed. Cir. 2025) ....................1, 16, 18

*Scott v. Harris*,
550 U.S. 372 (2007)....................11

*Telecom Nets. Sols., LLC v. AT&T Corp.*,
No. 2:21-cv-00415-JRG, 2023 WL 2169026 (E.D. Tex. Feb. 22, 2023) ....................12

*VLSI Tech. LLC v. Intel Corp.*,
87 F.4th 1332 (Fed. Cir. 2023) ....................18

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997)....................10

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000)....................14, 16

*Wis. Alumni Rsch. Found. v. Apple Inc.*,
905 F.3d 1341 (Fed. Cir. 2018)....................2

## I. INTRODUCTION

Pursuant to Rule 50(b), Kioxia Corporation and Kioxia America, Inc. (collectively, Kioxia) respectfully move for judgment as a matter of law (JMOL). Neither the jury's determination that Kioxia infringed Claim 16 of U.S. Patent No. 8,615,700 nor its award of $229,025,021 in damages "as a running royalty" (Dkt. 295) is consistent with the law or supported by substantial evidence.

## II. LEGAL STANDARD

JMOL should be granted when there is no legally sufficient evidentiary basis to support the jury's verdict. *Johnston v. Ferrellgas, Inc.*, 96 F.4th 852, 857 (5th Cir. 2024). JMOL of no infringement "is appropriate if no reasonable fact finder could determine that the accused devices meet every limitation of the properly construed claims." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999); *see also Finesse Wireless LLC v. AT&T Mobility LLC*, 156 F.4th 1221, 1224-30 (Fed. Cir. 2025). JMOL of no damages is appropriate where, for example, there is insufficient evidence for a reasonable jury to tie (*i.e.*, apportion) the royalty awarded "to the infringing acts." *Rex Med., L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1298-99 (Fed. Cir. 2025); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

## III. KIOXIA IS ENTITLED TO JUDGMENT OF NONINFRINGEMENT

Viasat had to prove the accused products satisfy ***every*** limitation of Claim 15, on which Claim 16 depends, as well as Claim 16's additional limitation. Claim 15 requires a "decoder" with "error detection sub-modules" that "forward the portion of the respective received stream containing an error" to a physically separate "error correction module" (Section III.A). Claim 16 further requires that the accused products "adaptively modify the coding rate responsive to an age of the flash memory or a rate of errors associated with the decoded data" (Section III.B).

Although Kioxia sought constructions of the key terms (Dkt. 83; Dkt. 221), the Court instructed the jury to apply plain and ordinary meaning. Trial Tr. (Tr.) 897:9-898:1 (Ex. A). JMOL

is appropriate if "no reasonable juror" could find infringement "[a]pplying the plain and ordinary meaning" of a term. *Wis. Alumni Rsch. Found. v. Apple Inc.*, 905 F.3d 1341, 1347 (Fed. Cir. 2018).

### A. The Accused Products Do Not Contain a "Decoder" That Includes an "Error Detection Sub-Module" That "Forward[s]" the Critical Portion of a Data Stream to a "Physically Separate" "Error Correction Module"

Claim 15 requires a "decoder" that includes "a plurality of error detection sub-modules" and "an error correction module" that are "physically separate" from each other. Further, each "error detection sub-module" must be configured to: (1) detect whether "a portion" of a received data stream contains an error, and (2) forward "the portion" of the received data stream containing the error to the separate "error correction module." PX1 (Dkt. 297-1) ('700 Patent) at 12:24-44.

Trial evidence established that the accused products do not perform those limitations. All accused products contain NANDCs with decoders using error-detection and error-correction circuitry. Tr. (Hassoun) 177:11-19, 187:1-17, 267:5-269:5, 281:20-282:22. But Viasat did not, and could not, map that circuitry onto Claim 15's "error detection sub-modules" and "error correction module." ***First***, the NANDC decoders' detection and correction circuitries are not "physically separate" from each other, as required. The detection and correction circuitry shares physical space in the NANDC. Tr. (Hassoun) 267:5-269:5, 281:20-282:22. ***Second***, no "portion" of the "received [data] stream" is sent ***from*** the detection circuitry ***to*** the correction circuitry, as required. Instead, the data stream sent to the detection circuitry ***never leaves it***; correction is performed on a ***different*** stream. Tr. (Hassoun) 242:18-243:25, 270:16-271:13, 282:5-284:24. That was, and is, undisputed.

Unable to rely on the NANDC's circuitry to satisfy the claim, Viasat engaged in three-card monte. It identified the ***entire NANDC***, including an L1 decoder containing ***both*** error-detection and error-correction circuitry, as an "error detection sub-module." Tr. (Hassoun) 220:13-224:21.[1]

---

[1] Viasat's expert Dr. Hassoun also described the error-detection portion of the L1 decoder in the NANDC as an "error detection sub-module." Tr. (Hassoun) 187:8-17; 220:20-221:24.

Viasat then pointed to the L3D,[2] a module outside the NANDC that includes a ***different*** decoder that, like the NANDC decoders, contains ***both*** error-detection and error-correction circuitry, as the alleged physically separate "error correction module." Tr. (Hassoun) 188:11-18, 209:6-25, 244:1-19. That fails as a matter of law.

### 1. No Reasonable Jury Could Find That the NANDC and L3D Are the Claimed "Error Detection Sub-Module" and "Error Correction Module," or That Together They Form the Claimed "Decoder"

No reasonable jury could find that the NANDC and L3D, each containing its own decoder(s) that detect ***and*** correct errors, meet the plain and ordinary meaning of "error detection sub-module" and "error correction module," respectively, or together form the claimed "decoder."

First, a reasonable jury applying plain meaning would understand that an "error ***detection*** sub-module" excludes error-***correction*** circuitry, because the claim recites error detection and error correction as two separate functions assigned to "physically separate" structures: "error detection sub-modules" and an "error correction module," respectively. PX1 (Dkt. 297-1) at 12:27-44. The plain meaning of "module" supports that understanding: a "module" is merely part of something larger that performs a "distinct function." *Module*, Dictionary.com, https://www.dictionary.com/browse/module (Ex. C). The preceding adjectives identify that distinguishing function: the "error detection sub-module" ***detects*** (but does not correct) errors, while the physically separate "error correction module" ***corrects*** (but does not detect) errors. Because both the NANDC and L3D ***decoders*** perform ***both*** functions, no reasonable jury applying plain meaning could have accepted Viasat's argument (Tr. (Hassoun) 220:13-224:1, 244:1-19) that the NANDC is an "error detection sub-module" and the L3D is an "error correction module."

[2] The L3D is used for Level 3 error correction. If earlier correction attempts fail, this different decoder uses its own detection and correction circuitry and "a more complex algorithm" to correct errors. Tr. (Hassoun) 191:15-192:11, 210:15-20, 237:5-17.

*Magnolia Medical Technologies, Inc. v. Kurin, Inc.*, 169 F.4th 1094, 1099-1100 (Fed. Cir. 2026), confirms that the only reasonable interpretation is that error ***detection*** modules cannot contain ***correction*** circuitry, and vice versa. There, the court affirmed JMOL of no infringement because the accused product lacked separate structures corresponding to the separately recited "vent" and "seal" limitations. *Id.* "[W]hen claim limitations are separately listed within a claim, that implies that the claim's *plain and ordinary meaning* requires separate corresponding structures." *Id.* at 1102 (citation omitted). But the jury's infringement verdict there ignored that "require[ment]." *Id.* at 1104. Here, too, Claim 15 assigns detection to one structure and correction to another "physically separate" structure. A reasonable jury could not find that the NANDC satisfies the "error detection sub-module" limitation, or that the L3D satisfies the "error correction module" limitation, when each indisputably ***also*** performs the very function the claim assigns to a physically separate and distinct module. Tr. (Hassoun) 244:1-25, 267:5-269:16, 282:4-10.

Second, Viasat's theory fails because it does not identify both claimed modules ***in the same decoder***. Claim 15 requires a "decoder" including ***both*** an error detection sub-module and an error correction module, with a "portion" of a data stream "forwarded" between them. The only reasonable reading requires ***a*** decoder including modules configured to perform those functions. But Viasat, without support in the accused products' structure or function, cobbled together parts of different decoders: the NANDC's L1 decoder for one part and the L3D decoder for another.[3]

That mix-and-match approach makes a hash of the claims that no reasonable jury, applying plain language and common sense, could accept. The claim does not contemplate forwarding data from one decoder (that detects and corrects errors) to another (that also detects and corrects errors).

[3] Tr. (Hassoun) 186:7-187:21, 244:1-25 ("[t]he physically separate correction module" L3D does "correction and detection"), 267:5-269:12 (NANDC decoder includes "detection and correction").

Rather, it requires forwarding a data stream from a detection sub-module to a correction module ***within one decoder***. A "module" in that context must mean part of something larger, performing a particular function. No one would call a cherry-picked set of modules drawn from different decoders a single "decoder." As the Federal Circuit has explained: "For a dog owner to have '*a* dog that rolls over and fetches sticks,' it does not suffice that he have two dogs, each able to perform just one of the tasks." *In re Varma*, 816 F.3d 1352, 1362-63 (Fed. Cir. 2016).

Consider, for example, two apartments, each with its own kitchen and living room. Those rooms (modules) are physically separate and serve different functions (*e.g.*, cooking and watching TV). But no one would call the first apartment's kitchen and the second apartment's living room "an apartment." Likewise, here, the NANDC's L1 decoder and the L3D decoder are different decoders, and no one could reasonably find infringement based on their ***respective*** components being the claimed "modules" that make up ***the single*** claimed "decoder."

### 2. Viasat's Legally Improper Use of "Comprising" Does Not Save Its Infringement Theory

Viasat's infringement expert Dr. Hassoun never explained why the "error detection sub-module" could be the NANDC (or its decoder) under the term's plain meaning, despite it performing both error detection and error correction. Nor did he reconcile that theory with the claims' distinct "error correction module." "[A]rtificially separat[ing]" out correction or detection components from the NANDC or the L3D "is not reasonable." *Bd. of Regents of the Univ. of Tex. Sys. v. Bos. Sci. Corp.*, 184 F.4th 618, 631 (Fed. Cir. 2026).

Instead, Viasat invoked the open-ended term "comprising"[4] to cherry-pick parts from separate decoders and assemble the claimed "decoder." But the Court instructed the jury that "[a]

[4] The preamble to Claim 15 says that the claim covers a system "comprising" the encoder, flash memory, and decoder for which the claim adds various limitations.

claim that includes the word 'comprising' is not limited to systems having only elements recited in the claim. It covers systems that ***add additional elements***." Tr. 898:22-899:18 (emphasis added).

No reasonable jury, applying that definition, could have agreed with Viasat's argument. Although "comprising" permits a claimed system to include unrecited elements (as the jury instructions explained), it "does not remove the limitations that are present," *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1409 (Fed. Cir. 2004), or permit ***alterations*** to the elements, including adding to one element a function the claim assigns to a different, physically separate structure. "[C]omprising" is "not a weasel word with which to abrogate claim limitations" and cannot "render every word and phrase" within a recited limitation open-ended. *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007) (citation modified). Viasat did not merely identify additional components beyond the claimed requirements, as contemplated by the instructions and the law. Viasat ***redefined*** the claim's requirements—arguing that the NANDC, whose decoder performs both error detection ***and*** correction, could be the claimed "error detection sub-module" while the L3D, whose decoder likewise performs both functions, could be the claimed "error correction module." Tr. (Hassoun) 240:19-244:25; *see also* Tr. (Viasat Opening) 22:19-23:14.

That theory cannot support the verdict. Once the claimed encoder, flash memory, and decoder are identified, "comprising" permits the ***system*** to contain additional components. But it does not undo the requirement that the "error detection sub-module" be within the same "decoder" as a physically separate "error correction module," nor does it allow Viasat to assemble an artificial decoder by taking the "error detection sub-module" from one decoder and the "error correction module" from another. Viasat's view—that the alleged error detection sub-module (NANDC) and error correction module (L3D) can contain ***either*** detection or correction functionality depending on Viasat's whim—erases that structural division and renders the limitation meaningless.

If Viasat hoped the jury would apply a broader or different meaning of "comprising," and it thought such an instruction legally supportable, it should have requested that instruction. But under the instruction given and the law, no reasonable jury could find that the NANDC is an "error detection sub-module" or that the L3D is an "error correction module" based on Viasat's legally erroneous interpretation of "comprising." *See Arsement v. Spinnaker Expl. Co.*, 400 F.3d 238, 248 (5th Cir. 2005) ("well established" that JMOL is governed by legal principles, not the "law as stated in the jury instructions"); *cf. Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334, 1342 (Fed. Cir. 2007) ("[W]hen an expert witness'[s] statement of the law is incorrect, that view of the law cannot be relied upon to support the verdict."). Accordingly, no reasonable jury could find that the accused products contain the "decoder," "error detection sub-module," and "error correction module." JMOL of no infringement should be granted.

### 3. No Reasonable Jury Could Find That the NANDC Forwards the Same Received Data Stream to the L3D

JMOL of no infringement is ***independently*** required because the accused "error detection sub-module" (NANDC) does not "forward the portion of the respective received [data] stream containing an error" to the accused "error correction module" (L3D). Claim 15 recites:

(a) flash memory that "generate[s] a plurality of data streams";
(b) processing at error detection sub-modules "a different ***one of*** the plurality of data streams";
(c) wherein the error detection sub-module is configured to (i) "detect whether ***a portion*** of ***the respective*** received stream contains an error" and (ii) "forward ***the portion*** of ***the respective*** received stream containing an error" to an error correction module; and
(d) correcting ***the forwarded portions*** of ***the respective*** received streams.

PX1 (Dkt. 297-1) at 12:24-44 (emphases added). The claim thus requires the error detection sub-module to forward to the error correction module ***the same portion*** of the ***same*** received data stream containing the detected error.

No reasonable jury could have found that the NANDC "forward[s] ***the portion*** of ***the***

***respective*** received stream containing an error" to the L3D (Viasat's alleged error correction module). It is undisputed that Kioxia's accused products use multiple levels of error correction—*e.g.*, L1, L2, and L3—but those levels operate through sequential rereads and retries, not by passing a single data stream from one level to the next. *See* Tr. (Hassoun) 193:3-194:25, 243:12-25, 254:22-255:25, 271:10-17. It is undisputed that if L1 correction fails, the unsuccessfully corrected data is discarded and L2 initiates a new read from NAND (*i.e.*, the flash memory); if L2 also fails, L3 does the same. Each level receives the output of a distinct retrieval operation, not the output from the error detection sub-module. Tr. (Melvin) 682:14-685:20, 686:21-692:5, 696:14-700:13.

Kioxia's read-and-retry process does not satisfy the claim's "forward[ing]" requirement. Kioxia's noninfringement expert Dr. Melvin testified without rebuttal that the NANDC's L1 decoder's detector sends only "***information*** about the error"—its location—to the L1 corrector, while the data on which correction occurs bypasses the detector. Tr. (Melvin) 682:14-685:7 (emphasis added). If the error is not corrected at L1 and L2, the next level (L3—the only level accused by Viasat) retrieves and processes newly read data from NAND rather than receiving the same error-containing portion from the preceding level (*i.e.*, from the accused error-detection circuitry in the NANDC). Tr. (Melvin) 682:14-685:20, 686:21-692:5, 696:14-700:13. A new read from flash cannot reasonably be understood as the error detection sub-module "forward[ing]" "the portion" previously detected as containing an error. Nor is the reread data part of the ***same*** stream recited by the claim, because each reread occurs under different voltage conditions and produces different data—as Dr. Melvin testified, unrebutted. Tr. (Melvin) 687:6-14. Even Dr. Hassoun conceded that repeated reads do not necessarily produce the same data: "an error on one read coming from flash memory" might, in a later read, be "correct[ed]." Tr. (Hassoun) 194:19-25, 270:12-271:13.

Dr. Hassoun testified that the forwarding requirement is satisfied by the NANDC purportedly sending data to L3D. He focused on a general path of data allegedly moving from NANDC, to DRAM, to L3D. *See* Tr. (Hassoun) 224:22-229:5, 282:11-284:24 (discussing PDX4 (Ex. B) at 94), 286:9-23. But he never testified that the data traveling that path to L3D is the ***same*** portion of the data stream on which detection occurred. Tr. (Hassoun) 286:9-23 (testifying only as to the general "flow of data"). That ***some other*** data moved through a certain path from the NANDC to the L3D, in response to detection is not "forward[ing]" ***the portion of the data stream*** containing the error. Nor could Dr. Hassoun have provided that testimony, given the intervening reread of data from NAND between the L1 and L3 steps. At most, his testimony is evidence that data reaches L3D somehow, which is not sufficient to meet the claims' requirement.

No reasonable jury could find that rereading data from NAND is the ***error detection sub-module*** "forward[ing]" "***the portion***" of the received data stream merely because the reread data stream may contain some of the same content. *See* Tr. (Hassoun) 242:18-243:25, 270:12-271:17. Claim 15's plain meaning reinforces that many times over, requiring the error detection sub-module to "forward" "the" particular "portion" of the "respective" stream that it "received" and "detect[ed]" as having an error—not some other circuitry sending data independently retrieved from flash through a new read. Accordingly, no reasonable jury could find that the NANDC literally "forward[s] the portion of the respective received stream containing an error" to the L3D.

### 4. No Reasonable Jury Could Find That the Forwarding Limitation Is Met Under the Doctrine of Equivalents

Viasat's only doctrine-of-equivalents (DOE) argument related to the forwarding limitation. Tr. (Hassoun) 229:20-232:15. Proving DOE requires "particularized testimony and linking argument" satisfying the function-way-result test. *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, 119 F.4th 1355, 1364 (Fed. Cir. 2024). DOE "evidence and argument . . . cannot merely be

subsumed in plaintiff's case of literal infringement." *Id.* at 1377-78 (citation modified). But Dr. Hassoun's conclusory testimony simply assumed literal infringement in asserting DOE: that the accused process "moves" or "forwards" the relevant data, focusing on the purported "way [that] the data is forwarded." Tr. (Hassoun) 231:7-16. He did not explain ***why*** the actual accused process—the detection sub-module discarding data after detection—performs substantially the same function, in substantially the same way, with substantially the same result as the claimed detection sub-module. *See* Tr. (Hassoun) 229:20-232:15. There was no basis for a DOE finding.

Moreover, Viasat's DOE theory would vitiate claim limitations, contrary to precedent. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). Viasat's theory nullifies the claims' distinction between the functions of detection sub-modules and correction modules, deprives "decoder" of meaning, and eliminates the requirement that ***the portion*** on which detection occurs is also ***the portion*** on which correction occurs. Claim 15 also recites "forward" and "retrieve" separately. If retrieving reread data from NAND were equivalent to "forward[ing]" the detected error-containing portion of the data stream, the claim's distinction between those limitations would become superfluous. No reasonable jury could find equivalents on this record.

### B. The Accused Products Do Not Adaptively Modify the Coding Rate "Responsive to an Age of the Flash Memory or a Rate of Errors Associated with the Decoded Data"

Claim 16 adds to Claim 15 the requirement that "the encoder is further configured to adaptively modify the coding rate responsive to an age of the flash memory or a rate of errors associated with the decoded data." No reasonable jury could find this limitation met, for at least two independent reasons: (1) Viasat relied on source code that undisputedly ***does not control*** the operation of the accused products, let alone in response to age or a rate of errors, and (2) even with that evidence, no reasonable jury could have found that the accused products satisfy Claim 16's limitation.

### 1. Reliance on Inoperative Firmware Cannot Prove Infringement

Dr. Hassoun testified that Kioxia's firmware "is ***the software that controls*** what the hardware is doing"—specifically, the accused controllers. Tr. (Hassoun) 248:14-15. He identified specific firmware source-code lines to opine that the accused controllers adaptively modify the coding rate in response to a rate of errors. Tr. (Hassoun) 248:14-249:23, 250:20-251:9 (discussing PX525 (Dkt. 298-2)). And he said that those lines on his slides "were showing and telling the jury what the hardware was doing." Tr. (Hassoun) 250:24-251:2, 272:2-23, 273:8-15.

Yet Dr. Hassoun then admitted that he relied on that code "without knowing" whether it was actually compiled—*i.e.*, actually running on the accused products. Tr. (Hassoun) 276:17-279:23. And Dr. Melvin testified, ***without cross or dispute***, that Dr. Hassoun's lines of firmware source code are "removed" during compilation, so they are "literally not in the firmware." Tr. (Melvin) 726:23-729:21. That renders Dr. Hassoun's opinion as to what the hardware is doing insufficient as a matter of law. No reasonable jury could find that the code could "control" the hardware in a particular way without evidence that the relevant code is included in the accused products. Uncompiled source code cannot meet Claim 16's requirement to "adaptively modify the coding rate" responsive to any condition. *See Quartz Auto Techs. LLC v. Lyft, Inc.*, No. 1:20-cv-00719-ADA, Dkt. 380, at 5 (W.D. Tex. Aug. 24, 2026) ("Non-operative source code is not sufficient to establish infringement."); *Microsoft Corp. v. Int'l Trade Comm'n*, 731 F.3d 1354, 1362 (Fed. Cir. 2013) (insufficient evidence of infringement where it was not clear whether the accused devices "***always*** contain" the source code the expert testified about (emphasis added)). Unsupported and blatantly false testimony cannot support a verdict. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Finesse Wireless*, 156 F.4th at 1227.

Without that testimony, the evidence of infringement was insufficient. Dr. Melvin testified again, without contradiction, that the only other firmware source code Viasat presented did not

identify changes in coding rate responsive to age or a rate of errors. Tr. (Melvin) 736:8-18. The experts thus agreed that firmware "control[s]" the accused controllers' operation, but Viasat never identified any infringing firmware. ***Uncompiled*** source code is not sufficient evidence of the claimed coding-rate modification—and undisputed evidence confirms none of the ***operative*** firmware on the accused devices performs that limitation. JMOL follows.

### 2. No Reasonable Jury Could Find That the Accused Products Modify the Coding Rate in Response to the Claimed Conditions

No reasonable jury could find that the accused products are "configured to adaptively modify the coding rate responsive to an age of the flash memory or a rate of errors associated with the decoded data," for additional reasons. Viasat identified changes to the error correction code (ECC)[5] as evidence that the accused devices "adaptively modify[] the coding rate." But the claims require that change to occur "***responsive to***" certain conditions—which Viasat never proved.

**Plain Meaning Requires Responsiveness to Age and Responsiveness to Rate of Errors**. Claim 16 requires the encoder to be "configured to" adaptively modify the coding rate "responsive to an age of the flash memory ***or*** a rate of errors associated with the decoded data," meaning it must be capable of doing so in response to ***either*** condition, as appropriate. *See, e.g.*, *Telecom Nets. Sols., LLC v. AT&T Corp.*, No. 2:21-cv-00415-JRG, 2023 WL 2169026, at *10-13 (E.D. Tex. Feb. 22, 2023) (holding that an apparatus "configured to" perform a responsive action if condition A "or if" condition B occurred must be capable of performing that action in response to either condition); *Express Mobile, Inc. v. Meta Platforms, Inc.*, No. 23-1646, 2025 WL 1693494, at *4-5 (Fed. Cir. June 17, 2025) (holding that a "style" capable of association with "one or more objects" "must be capable of being applied to both"). That reading accords with ordinary language.

[5] ECC (error correction code) refers to the portion of the retrieved data that is appended to the user data as part of the data stream and is used by the decoder to detect and correct any errors in the user data. *See* Tr. (Hassoun) 181:10-16, 188:19-189:9, 191:15-192:11, 193:16-23.

No reasonable person would understand a self-driving car "configured to brake responsive to pedestrians or other cars" to be satisfied by a car that stops for other cars yet runs over pedestrians.

Dr. Hassoun did not dispute that meaning. He never opined that ***only one*** condition sufficed, instead purporting to opine that ***both*** conditions were met. *See* Tr. (Hassoun) 192:16-195:25, 245:1-260:13, 262:22-263:8. Even if only one condition were required, there is insufficient evidence to support that the coding rate is adaptively modified in response to either one.

**There Is Insufficient Evidence of Responsiveness to Age**. Dr. Hassoun's testimony cannot support a finding that the encoder modifies the coding rate "responsive to" age of the flash memory. The only reasonable plain and ordinary meaning of "responsive to" requires ***causation***—that modifications be caused by (not merely correlated with) the trigger condition (*e.g.*, flash-memory age). *See Centripetal Nets., LLC v. Palo Alto Nets., Inc.*, No. 23-1654, 2024 WL 4639207, at *4-5 (Fed. Cir. Oct. 31, 2024) ("responsive to" requires action "in reaction to" with causal relationship); *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1339-40 (Fed. Cir. 2011).

Dr. Hassoun offered no testimony that the accused products change ECC in reaction to the age of the flash memory. Instead, he testified only that, as flash memory ages, error rates increase and that ECC may therefore change. Tr. (Hassoun) 194:9-195:19, 252:14-20, 257:3-260:13, 262:22-263:3 (citing JX9 (Dkt. 297-61) at 88). Indeed, he stated that ECC is changed as reliability in the NAND falls, which is "proportional to the age of the device." Tr. (Hassoun) 257:17-258:9. But, Dr. Hassoun's observation that NAND (flash) "is aging" when ECC levels "change[]" proves no causal connection. Tr. (Hassoun) 262:22-263:3. NAND is always aging. And Kioxia Vice President Randy Cohen testified without rebuttal that the coding rate does not change in response to the age of the flash memory because "there's nothing in the drive that keeps track of its age." Tr. (Cohen) 597:3-8. Dr. Hassoun's testimony on the advantages of longer-lasting flash is

irrelevant to whether modifications are ***responsive to*** age. Tr. (Hassoun) 195:3-19, 257:3-258:9. At most, his testimony supports a finding that aging and ECC changes are ***correlated***—but that does not satisfy the claim. Under the proper plain and ordinary meaning, that alone defeats infringement. (And regardless, it would at least require a new trial.)

**No Evidence That Any Rate of Errors Is Associated with the Decoded Data**. Dr. Hassoun's testimony also cannot support a finding that the encoder adaptively modifies the coding rate "responsive to" "a rate of errors associated with the decoded data." Dr. Hassoun's "rate of errors" theory at trial should have been excluded—either because, as explained in the new trial motion filed simultaneously herewith, the theory was undisclosed or because it inappropriately second-guessed the claim construction of "rate of errors." If the Court agrees, no other evidence supported the verdict, and JMOL follows. *See Weisgram v. Marley Co.*, 528 U.S. 440, 456 (2000).

Even if Dr. Hassoun's new rate-of-errors testimony was admissible, it ***confirms*** the "***associated with the decoded data***" limitation is not met. The only way to understand Claim 16's "decoded data" is as the output of the "decoder" in Claim 15. ("Decod**ed**" is past tense, so the decoder must be finished.) The last step of "decod[ing]" in Claim 15 is the correction step in the error correction module, which Viasat argued occurs in L3D, as explained above. Thus, to meet Claim 16's "rate of errors" limitation under Viasat's own theory, the "decoded data" that comes ***out of the L3D*** must be "associated" with the "rate of errors" that triggers the "encoder" to "modify the coding rate." But Dr. Hassoun did not identify the ***L3D*** output as the trigger for the encoder's change in coding rate. He testified that ECC (the purported "coding rate") is modified (*i.e.*, "Variable ECC step goes up") ***only*** when the error-correction process reaches the ***L2*** "FSB Read" step ***in the NANDC***. Tr. (Hassoun) 253:7-256:15; *see also* Tr. (Cohen) 595:9-596:24. That process (L2 in NANDC) is undisputedly ***before*** any data reaches the L3D, and thus cannot be "associated"

with the L3D's ***output***, as is reflected in Dr. Hassoun's annotations on JX28 (Dkt. 297-67) below:



| Level | Step | Description | M6 | M5 |
|---|---|---|---|---|
| L1 | HB+ Read | Read with shift parameter succeeded previously | < 100us | < 100us |
| L2 | Retry Read | Retry Read by changing Vth up to 8 times | 0.6ms | 1.3ms |
| L2 | Vth Tracking | Search best threshold | 0.6ms | 8.7ms |
| L2 | HB+ Read | Read with best threshold | 0.07ms | 0.1ms |
| L2 | FSB Read | Soft decision decoding | 2.5ms | 12ms |
| L3 | RAID-6 Level | Up to two point error can be recovered | 2.7ms | 43ms |
| L4 | Iteration ECC | L1/L2 and L3 iteration | - | - |



PDX4 (Ex. B) at 146-47 (red box added). Dr. Hassoun opined that the aim of modifying the ECC is to try to ***avoid*** going through the L3D, which "takes more power." Tr. (Hassoun) 254:22-255:11.

Dr. Hassoun never even identified what he claimed the "decoded data" was. Instead, he testified the coding rate is modified when the errors in data read from a "physical block group"—***on the flash drive***—reach a certain threshold. *See* Tr. (Hassoun) 251:7-9, 254:22-255:18. But those are not errors associated with the system's decoded data under Viasat's theory that the L3D's correction completes the decoding process. ***At most***, the ECC change might be responsive to a rate of errors associated with the ***NANDC***'s L2 correction circuitry—but that circuitry was not, and could not be, the accused error correction module, as explained above.

## IV. KIOXIA IS ENTITLED TO JUDGMENT OF NO DAMAGES

Kioxia is also entitled to JMOL of $0 in damages. Viasat's damages expert, Dr. Mody, arrived at a 3.5% royalty rate by blending three models: (1) an "avoided cost" theory, (2) an "incremental value" theory, and (3) a licensing theory. She then multiplied her blended 3.5% rate by a royalty base consisting of Kioxia's ***entire*** solid-state drive (SSD) revenue ($6.6 billion) over the alleged damages period. None of that can sustain the $229,025,021 damages award.

### A. All Three of Dr. Mody's Theories for Royalty Rates Fail to Adequately Apportion as a Matter of Law

If the accused technology is not "the whole of the accused product, apportionment is

required." *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373 (Fed. Cir. 2021). The patentee must thus prove the "incremental value added to the accused products" by the patented technology, as distinct from unpatented features. *Ericsson*, 773 F.3d at 1226; *see Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). JMOL is appropriate where a patentee fails to introduce "record evidence that would allow reasonable apportionment." *Rex Med.*, 156 F.4th at 1300. Here, that was true of each of Dr. Mody's theories, requiring not only their exclusion but also—and independently—JMOL. *See Weisgram*, 528 U.S. at 456; *Rex Med.*, 156 F.4th at 1300; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) (court "remains free to direct a judgment" even if *Daubert* is denied).

### 1. Viasat Failed to Apportion Its Costs and Incremental-Value Theories' Royalty Rates

Viasat was required to identify the incremental value of Claim 16 over the prior art: that the encoder be "further configured to adaptively modify the coding rate responsive to an age of the flash memory or a rate of errors associated with the decoded data." PX1 (Dkt. 297-1) at Claim 16; Pretrial Conf. Tr. (Dkt. 220) 46:16-53:5 (Mar. 28, 2024). The rest of Claim 16's requirements (*e.g.*, error detection and correction) come from the ***canceled*** Claim 15, which was undisputedly in the public domain. Tr. (Hassoun) 284:25-285:10; Tr. (Doller) 418:14-419:9. Yet Dr. Mody's cost and incremental-value royalty rates, which rested on Ed Doller's (Viasat's expert) technical-benefits opinions, Tr. (Doller) 420:22-421:8; Tr. (Mody) 475:18-477:24,[6] failed to identify the benefit Claim 16 added. As Kioxia has explained, Mr. Doller's report should have been excluded for failure to meet that apportionment requirement. *E.g.*, Dkt. 226. But his ultimate ***testimony*** was legally insufficient because it did not permit proper apportionment. *See Daubert*, 509 U.S. at 596.

[6] Dr. Mody explained that the "avoided cost" theory sought to estimate Kioxia's cost to design around Claim 16, and the "incremental value" theory sought to measure the economic benefit that Claim 16 allegedly provided to Kioxia. *See* Tr. (Mody) 429:19-430:10.

While Mr. Doller offered conclusory testimony professing to have performed a proper apportionment analysis, *see* Tr. (Doller) 313:7-314:6, 362:3-24, he ***admitted*** on cross-examination that ***he never*** "evaluate[d] claim 15," Tr. (Doller) 418:12-419:9. Because he failed to apportion Claim 16's marginal value over canceled Claim 15, Viasat failed to meet its burden to apportion. *See Prolitec Inc. v. ScentAir Techs., LLC*, No. 20-cv-984, 2024 WL 341342, at *1-2 (D. Del. Jan. 30, 2024) (Bryson, J.) (apportionment requires "exclud[ing]" value of invalid claim limitations).

Mr. Doller's calculations also depended on the wholly unsupported assumption that the accused products would make maximum use of ECC such that every block in every drive would reach the highest ECC level (including L3D's process). Tr. (Doller) 411:24-417:3, 420:22-421:8. Even Mr. Doller ***admitted*** that his model "grossly overestimated" avoided costs, and actual testing of certain Elnath controllers showed that only about 4% of blocks reached even the ***first*** ECC level, far below the maximum level his model assumed. *Id.* Although Mr. Doller attempted to confine that concession to the Elnath controllers reflected in the data, Tr. (Doller) 421:13-422:8, he used the same maximum-ECC assumption to analyze all accused products, Tr. (Doller) 371:1-372:14. No reasonable jury could rely on the resulting calculations.

**2. Viasat Also Failed to Apportion the Licensing Theory's Royalty Rate**

Dr. Mody's third royalty-rate theory (licensing) relies solely on the Semtech agreement to derive a 5.4% royalty rate for Claim 16. Tr. (Mody) 452:20-457:11.[7] She relied on Dr. Fuerst for putative apportionment of that agreement. Tr. (Mody) 479:4-9. But apportionment under a licensing theory, as under an avoided-cost theory, requires identifying what reasonable negotiators in a hypothetical negotiation would agree to pay for a license ***to the invention*** based on a technically comparable license. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 853 (Fed.

[7] Dr. Mody also discussed, but did not base calculations on, a second license (Cisco/Acacia). Tr. (Mody) 448:17-452:5, 456:4-457:11. Her 5.4% matched the Semtech-based royalty alone. *Id.*

Cir. 2010). Dr. Fuerst, however, never apportioned the prior license's royalty to the invention at issue here—Claim 16. He testified instead that his purported apportionment analysis was "done at a high level based on my experience in the industry." Tr. (Fuerst) 56:16-63:9. And he had "never done an analysis of the '700 patent against any of the IP core development agreements." Tr. 86:20-87:13. That was insufficient for the jury to conclude that the licensing theory represented the value of the invention "and no more." *Ericsson*, 773 F.3d at 1226.

Nor did Viasat offer other evidence that would have allowed the jury to discern how much of the Semtech agreement's royalty rate was attributable to technology comparable to Claim 16. The failure to apportion left the jury to determine a reasonable royalty by "mere speculation or guess," and is fatal to Dr. Mody's licensing theory of damages. *See Rex Med.*, 156 F.4th at 1300.

### B. Dr. Mody's Licensing Theory Lacked Evidence of Technical Comparability

To support a damages award, prior licenses must be "sufficiently comparable to the royalty proposed by a party for the technology at issue." *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1346-47 (Fed. Cir. 2023). That requirement "often precludes use of other licenses that involve (only or even partly) technology other than the patented technology at issue in the case at hand." *Id.* Here, it was Viasat's "burden to prove" comparability. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332 (Fed. Cir. 2009).

Viasat failed to meet that burden. The Semtech agreement did not specify ***any*** patents, let alone the patented technology. Tr. (Fuerst) 58:5-59:14. Nor was there record evidence from which a reasonable jury could find the fiber-optic Semtech agreement technically comparable to the '700 Patent. The ***only*** admitted evidence of technical comparability was Dr. Mody's cursory testimony that it was her "understand[ing]" from Dr. Fuerst that the technologies are comparable. Tr. (Mody) 452:20-455:4. "Conclusory statements by an expert . . . are insufficient." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015). Even more so where, as here, Dr. Fuerst

***conceded*** that the fiber-optic Semtech agreement "wouldn't apply" to the '700 Patent, which "is tied to forward error correction for flash memory." Tr. (Fuerst) 58:17-23.

Moreover, Dr. Mody's comparability testimony rested entirely on Dr. Fuerst's opinion, which the Court excluded as previously undisclosed. *See* Tr. 77:20-80:8, 82:15-88:25 (objection and ruling); *see also* Tr. (Kioxia's Rule 50(a)) 503:2-12. Dr. Mody was not qualified as a technical expert, did not independently verify Dr. Fuerst's analysis, and indisputably lacked the expertise to determine whether the technology covered by the Semtech license was technically comparable to Claim 16. Tr. (Mody) 430:11-431:17, 433:5-9, 475:10-17 ("[Q.] You're not intending to give any technical opinions in this case? A. I'm not."). The Court instructed that expert testimony is from a person with "special skill or knowledge" and that, in weighing such testimony, the jury may consider the expert's qualifications. Tr. 891:14-892:7. No reasonable jury applying those instructions could rely on Dr. Mody's cursory testimony on comparability.

Viasat needed more. The "technology involved"—flash memory and fiber optics—is "complex," requiring expert comparison. *Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1369 (Fed. Cir. 2004). Kioxia's technical expert testified that the technologies were not comparable. Tr. (Melvin) 710:19-713:4. Viasat thus ***needed*** to disclose, and offer, expert testimony to overcome Kioxia's showing "negat[ing]" Viasat's theory. *See Centricut*, 390 F.3d at 1369. It did neither.

### C. Viasat's Unsupported Royalty Base Independently Warrants JMOL

It "is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). Under a "narrow exception" called the "entire market value rule," parties may use the entire product as a base if "the patentee proves the patented feature is the basis"—the ***only*** basis—"for customer demand." *Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948, 957-58 (Fed. Cir. 2024). Showing the patented feature is "valuable, important, or even essential" is

insufficient. *Power Integrations*, 904 F.3d at 979. The patentee "must establish that [valuable unpatented] features do not cause consumers to purchase the product." *Id.*

Viasat improperly invoked the entire market value rule to apply its 3.5% royalty rate to Kioxia's entire SSD revenue ($6.6 billion). It is undisputed that the accused SSDs include both a controller and NAND, but only the controller performs the accused functionality (variable ECC having certain triggers). Tr. (Hassoun) 182:6-11; Tr. (Doller) 324:4-7; Tr. (Mody) 437:2-11.

Dr. Mody based her damages calculations on the entire market value rule without sufficient evidentiary support. *See* Tr. (Mody) 437:2-11, 462:10-463:14. Viasat focused only on whether variable ECC is purportedly "important" or "critical," Tr. (Doller) 313:7-314:6, but that is legally insufficient, *Power Integrations*, 904 F.3d at 979. Viasat offered no evidence that any variable ECC, much less the specific types covered by Claim 16, is the sole or even a significant driver of SSD demand. And Kioxia showed that it is ***not***, because NAND has independent value, including storing data on the SSD. Tr. (Mody) 491:12-492:13; Tr. (Cohen) 582:5-23. Mr. Cohen, Kioxia's Vice President, testified without rebuttal that customers do not care how error correction is implemented and have never asked about variable coding. Tr. (Cohen) 582:16-583:13.

The Semtech agreement Dr. Mody relied on confirms the impropriety of using Kioxia's entire product revenue. That license tied its running royalty only to sales of a controller chip (or ASIC) for a fiber-optic device, ***not*** to sales of a complete device that includes a controller bundled with other components. Tr. (Fuerst) 57:16-24; Tr. (Mody) 488:3-491:7. Yet Dr. Mody improperly applied her royalty rate to Kioxia's entire SSD revenue.

## V. CONCLUSION

Kioxia respectfully requests that the Court grant Kioxia judgment as a matter of law of no infringement of the '700 Patent and of no damages.

Dated: August 28, 2026

Respectfully submitted,

_/s/ Roger Fulghum_
Roger Fulghum
Texas State Bar No. 00790724
Michael Hawes
Texas State Bar No. 24010761
Elizabeth D. Flannery
Texas State Bar No. 24045815
Michael Silliman
Texas State Bar No. 24093152
Baker Botts L.L.P.
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
Email: roger.fulghum@bakerbotts.com
Email: michael.hawes@bakerbotts.com
Email: liz.flannery@bakerbotts.com
Email: michael.silliman@bakerbotts.com

Nolan McQueen
Texas State Bar No. 24125322
Baker Botts L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
Telephone: (214) 953-6525
Email: nolan.mcqueen@bakerbotts.com

Mark D. Siegmund
Cherry Johnson Siegmund James PLLC
7901 Fish Pond Road, Second Floor
Waco, TX 76710
Telephone: (254) 732-2242
Email: msiegmund@cjsjlaw.com

*Attorneys for Defendants*
*Kioxia Corporation and Kioxia America, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2026 all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ ECF system.

*/s/ Roger Fulghum*
Roger Fulghum