**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **VIASAT, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**KIOXIA CORPORATION and KIOXIA AMERICA, INC.,**<br><br>**Defendants.** | **Case No.: 6:21-cv-01231-ADA**<br><br>**JURY TRIAL DEMANDED** |

**KIOXIA CORPORATION AND KIOXIA AMERICA, INC.'S RULE 59 MOTION FOR A NEW TRIAL**

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 1

II. LEGAL STANDARD ........ 1

III. A NEW TRIAL IS REQUIRED ON LIABILITY ........ 2

A. Dr. Hassoun's Source-Code Misrepresentation Marred the Trial with Prejudicial Error ........ 2

B. Dr. Hassoun's Undisclosed Fixed-Correction-Capability Theory Was Erroneously Admitted ........ 4

1. Dr. Hassoun's Trial Theory Was Inadmissible Because It Was Not Disclosed in His Expert Report ........ 5

2. The Trial Theory Also Defied the Court's Construction of "Rate of Errors" ........ 8

C. The Prejudicial Errors Reinforced One Another ........ 9

D. The Verdict Is Also Against the Weight of the Evidence and Contrary to Law for Additional Reasons ........ 9

IV. A NEW TRIAL ON DAMAGES AND LIABILITY IS REQUIRED BECAUSE NUMEROUS ERRORS TAINTED THE JURY'S AWARD ........ 10

A. Viasat's Semtech-Based "Comparable" "License" Theory of Damages Was Unsupported ........ 10

B. The Court Erred in Failing to Exclude Viasat's Damages Theories for Failure to Apportion ........ 13

1. Dr. Mody's Cost-Avoided and Incremental Value Theories Were Not Apportioned to Claim 16 ........ 14

2. Dr. Mody's Semtech-Agreement Theory Was Not Properly Apportioned to Claim 16 ........ 16

3. The Failure to Apportion Was Compounded by the Exclusion of Evidence That Claim 15 Was Canceled ........ 17

4. A New Trial Is Also Required Based on Unreliable Expert Testimony That Should Never Have Been Admitted ........ 18

C. The Court Erred in Permitting an Entire-Market-Value Royalty Base Without Proof That the Patented Feature Drove Customer Demand ........ 18

D. Errors in the Inputs to the Blended Damages Award Infect the Entire Verdict and Independently Warrant a New Trial ........ 19

E. A New Trial on Liability Should Follow ........ 20

V. THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES A NEW TRIAL ........ 20

VI. CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alpha & Omega Semiconductor Ltd. v. Force MOS Tech. Co.*,
No. 22-cv-05448-PCP, 2026 WL 2161197 (N.D. Cal. July 27, 2026)............................12

*Barry v. DePuy Synthes Cos.*,
164 F.4th 896 (Fed. Cir. 2026) ..............................................................................8

*CQ, Inc. v. TXU Mining Co.*,
565 F.3d 268 (5th Cir. 2009) ..........................................................................7, 11

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................................................................8, 9, 10, 13, 14, 18

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)...........................................................................13

*ESW Holdings, Inc. v. Roku, Inc.*,
No. 6-19-CV-00044-ADA, 2021 WL 3742201 (W.D. Tex. Aug. 24, 2021) ......................1

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018)...........................................................................13

*Fraige v. Am.-Nat'l Watermattress Corp.*,
996 F.2d 295 (Fed. Cir. 1993)...............................................................................4

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
721 F.3d 1330 (Fed. Cir. 2013)...........................................................................17

*Gasoline Prods. Co. v. Champlin Refin. Co.*,
283 U.S. 494 (1931)..........................................................................................20

*Guillory v. Domtar Indus. Inc.*,
95 F.3d 1320 (5th Cir. 1996) ..............................................................................14

*In re Taxotere (Docetaxel) Prods. Liab. Litig.*,
26 F.4th 256 (5th Cir. 2022) ...............................................................................12

*Keeler v. Richards Mfg. Co.*,
817 F.2d 1197 (5th Cir. 1987) ...............................................................................2

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012).................................................................13, 16, 18, 19

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)...........................................................................10

*Martin v. Tex. Emp'rs Ins. Ass'n*,
193 F.2d 645 (5th Cir. 1952) ....................2, 9, 20

*MobileMedia Ideas LLC v. Apple Inc.*,
780 F.3d 1159 (Fed. Cir. 2015)....................13

*Omega Pats., LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ....................19

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
904 F.3d 965 (Fed. Cir. 2018)....................13, 18, 19

*Prolitec Inc. v. ScentAir Techs., LLC*,
No. 20-cv-984, 2024 WL 341342 (D. Del. Jan. 30, 2024) (Bryson, J.)....................14

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
818 F.3d 1320 (Fed. Cir. 2016)....................4

*Rewis v. United States*, 369 F.2d 595 (5th Cir. 1966)....................3

*Rousseau v. Teledyne Movible Offshore, Inc.*,
812 F.2d 971 (5th Cir. 1987) ....................2, 10

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
402 F.3d 1198 (Fed. Cir. 2005)....................4

*Smith v. Transworld Drilling Co.*,
773 F.2d 610 (5th Cir. 1985) ....................1

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ....................4, 9

*SPEX Techs., Inc. v. W. Digit. Corp.*,
No. SACV 16-01799-JVS(AGRx), 2023 WL 6922860 (C.D. Cal. Oct. 3, 2023)....................12

*Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC*,
127 F.4th 1340 (Fed. Cir. 2025), *cert. denied*, 146 S. Ct. 187 (2025)....................4

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)....................16, 19

*United States v. Alvarado-Valdez*,
521 F.3d 337 (5th Cir. 2008) ....................4, 8, 9

*United States v. Williams*,
836 F.3d 1 (D.C. Cir. 2016) ....................18

*Viskase Corp. v. Am. Nat'l Can Co.*,
261 F.3d 1316 (Fed. Cir. 2001)....................4

*Wi-LAN Inc. v. Sharp Elecs. Corp.*,
992 F.3d 1366 (Fed. Cir. 2021)....................11

**STATUTES**

35 U.S.C. § 112(f) ..... 10

35 U.S.C. § 284 ..... 13, 18

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26, 37(c)(1) ..... 4

Fed. R. Civ. P. 59(a)(1)(A) ..... 1

Fed. R. Evid. 702 ..... 4, 17

Fed. R. Evid. 703 ..... 11

Fed. R. Evid. 802 ..... 13

## I. INTRODUCTION

Kioxia Corporation and Kioxia America (respectively, Kioxia) respectfully seek a new trial. The $229,025,021 judgment against Kioxia, for allegedly infringing Claim 16 of U.S. Patent No. 8,615,700, rests on inadmissible evidence and a damages model that fails to apportion. Independently and cumulatively, those and other errors require a new trial.

On liability, Viasat's expert Dr. Hassoun's testimony alone requires a new trial. Dr. Hassoun prejudicially ***misrepresented*** the function of the accused source code, and conceded he did not know whether that code was ever compiled. Dr. Hassoun's undisclosed "rate of errors" infringement theory was erroneously admitted. And the damages award cannot stand either. Viasat's damages theory (which the jury adopted to the penny) relied on a putative license—the "Semtech agreement," an agreement to develop content and deliverables for fiber-optic devices that was not a patent license at all. That agreement was probative of damages ***only*** if the technology it covered was comparable to the claimed invention. Yet there was ***no admissible evidence*** of that comparability. The damages theory that the jury adopted also failed to apportion damages down to Claim 16's inventive contribution and rested on an impermissible (unsupported) assumption that Claim 16's inventive contribution drove demand for ***more than $6.6 billion in sales***. Individually, these errors call for a new trial. Taken together, they demand one.

## II. LEGAL STANDARD

The Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A), including when the verdict is against the weight of the evidence, damages are excessive, or the trial was unfair or marred by prejudicial error. *ESW Holdings, Inc. v. Roku, Inc.*, No. 6-19-CV-00044-ADA, 2021 WL 3742201, at *1 (W.D. Tex. Aug. 24, 2021). The Court "weighs all the evidence, but need not view it in the light most favorable to the nonmoving party." *Smith v. Transworld*

*Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). Even if one error alone would not warrant a new trial, the cumulative effect of multiple errors may. *Martin v. Tex. Emp'rs Ins. Ass'n*, 193 F.2d 645, 646 (5th Cir. 1952).

A verdict may be against the great weight of the evidence even if substantial evidence supports it, *Rousseau v. Teledyne Movible Offshore, Inc.*, 812 F.2d 971, 972 (5th Cir. 1987), and the new-trial standard is therefore less stringent than the JMOL standard, *Keeler v. Richards Mfg. Co.*, 817 F.2d 1197, 1200 (5th Cir. 1987).

## III. A NEW TRIAL IS REQUIRED ON LIABILITY

The sole claim of the '700 Patent asserted here—Claim 16—depends from (now-canceled) Claim 15. Consequently, to prove infringement of Claim 16, Viasat had to prove the accused products—drives with Kioxia's Canopus, Deneb, and Elnath controllers—practiced ***both*** Claim 15 and all additional elements in Claim 16. Claim 15 requires an "encoder" and "decoder," with particular requirements. Claim 16 requires that the "encoder" must be "further configured to adaptively modify the coding rate responsive to an age of the flash memory or a rate of errors associated with the decoded data." Viasat's infringement theory rested critically on false and inadmissible testimony from its expert, Dr. Hassoun. A new trial is required.

### A. Dr. Hassoun's Source-Code Misrepresentation Marred the Trial with Prejudicial Error

Dr. Hassoun testified, under oath, that an excerpt of roughly fifteen highlighted lines of Kioxia's source code (PX525) "is ***the software that controls*** what the hardware is doing," specifically invoking the function IncrReadErrCount in the source code. Trial Tr. ("Tr.") (Hassoun) 248:14-19 (emphasis added) (Ex. A); PX525 (Dkt. 298-2).[1] That code, Dr. Hassoun

[1] A program's "source code" is written in a high-level language that humans can understand and manipulate. The source code is then "compiled" into computer-readable instructions (compiled code) that devices can execute, but humans cannot understand. Thus, hardware products run compiled programs, rather than the source code itself. Because compiled code is not human-readable, determining a product's functions and capabilities typically involves reviewing the human-readable source code used to compile the firmware. References to source

testified, shows that Kioxia's products practice Claim 16's requirement that the encoder be "configured to adaptively modify the coding rate." Tr. (Hassoun) 248:14-249:23. On cross-examination, however, Dr. Hassoun admitted that he ***did not know*** whether the lines of source code on which he relied were compiled into the firmware that was on, and capable of running on, accused controllers. Tr. (Hassoun) 276:17-279:23.

Thus, contrary to his testimony, he ***did not and could not*** know whether the software he had highlighted as infringing actually "control[led] what the hardware is doing." Tr. (Hassoun) 248:14-15. Kioxia's expert, Dr. Melvin, then testified, without contradiction, that the critical lines of source code on which Dr. Hassoun relied for this limitation ***are not compiled***—and thus are not part of and cannot be executed on the firmware. That code, he explained, is sandwiched between compiler directives "#if 0" and "endif." Tr. (Melvin) 726:23-729:21. That means the code is not operative, is never compiled, stored, or executed, and thus cannot control anything.[2]

Dr. Melvin's testimony on that point was not disputed. As explained elsewhere, that requires JMOL. At the very least, it requires a new trial. ***First***, it shows how unreliable, and thus inadmissible, Dr. Hassoun's testimony was. For an expert "opinion to have any value it must be based on assumptions which the trier of the facts can find to have been proved." *Rewis v. United States*, 369 F.2d 595, 602-03 (5th Cir. 1966) (reversing and remanding for a new trial based on expert opinion resting on "unproved facts"). But Dr. Hassoun's opinion rested on an assumption that was disproved—he relied on code that ***undisputedly*** never ran. ***Second***, Dr. Hassoun's testimony that those lines of code controlled the hardware was undisputedly ***false***. It was never compiled and thus could not control anything. Such false testimony is grounds for

code being "incorporated," "integrated," "present," "included," etc., in firmware mean that the source code in question is part of the source code that was compiled to create the firmware.

[2] As Dr. Melvin explained, an "if 0" compiler directive tells the compiler to skip the enclosed code, and the skipped code is "eliminated" from compilation rather than included in the controller. Tr. (Melvin) 728:20-729:16.

a new trial. *See Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1325-29 (Fed. Cir. 2016) (ordering new trial where expert's false technical testimony infected the proceedings).[3]

The unfair prejudice is manifest. Dr. Hassoun's misrepresentation was the only software code evidence on a central limitation. Viasat did not correct Dr. Hassoun's assertions on redirect or in closing. *See* Tr. (Kioxia's Closing) 949:20-952:22; Tr. (Viasat's Closing) 976:8-17. To the contrary, Viasat argued in closing rebuttal that Dr. Melvin's objectively correct testimony on the issue was somehow not credible, even though Viasat had not even bothered to cross-examine him on it. "The only person who testified about these two lines of code was Dr. Melvin, and I submit to you that his testimony on those two lines of code is not credible." Tr. (Viasat's Closing) 976:8-17. That underscores the prejudice. *See United States v. Alvarado-Valdez*, 521 F.3d 337, 343 (5th Cir. 2008). And Viasat's closing cannot change the fact that the sole software code evidence presented to the jury, to show a critical limitation was met, was misrepresented as operative. Viasat never sought to correct that. Pretending other source-code evidence exists (where it does not) cannot alter the prejudice. *Cf. Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (new trial required where the record does not negate the possibility that the verdict rests on an improper theory). A new trial is required.

### B. Dr. Hassoun's Undisclosed Fixed-Correction-Capability Theory Was Erroneously Admitted

Under settled law, a new trial is warranted where the jury hears unreliable or previously undisclosed expert testimony. *See Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC*, 127 F.4th 1340, 1351 (Fed. Cir. 2025), *cert. denied*, 146 S. Ct. 187 (2025); *see also* Fed. R. Evid. 702; Fed. R. Civ. P. 26, 37(c)(1). Both grounds apply here.

---

[3] *See also Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1324 (Fed. Cir. 2001) (verdict irretrievably tainted by expert misrepresentation even though the sponsoring party was unaware); *Fraige v. Am.-Nat'l Watermattress Corp.*, 996 F.2d 295, 299 (Fed. Cir. 1993); *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1206 (Fed. Cir. 2005).

### 1. Dr. Hassoun's Trial Theory Was Inadmissible Because It Was Not Disclosed in His Expert Report

Rule 26(a)(2)(B) requires disclosure of "the facts or data considered" by an expert and "a complete statement of all opinions" the expert will express. Under Rule 37(c)(1), a party that fails to disclose "is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." The admission of Dr. Hassoun's trial testimony violated those requirements.

**Dr. Hassoun Offers a Fixed-Correction-Capability Theory at Trial Over Objection.** At trial, Dr. Hassoun used Elnath as the example for a correction-capability theory of the claimed "rate of errors." He supplied—for the first time—his opinion that the Elnath controller's L1 decoder (the first error-correction stage) had a fixed correction capability of 50 erroneous bits per kilobyte, which supplied the claimed "rate of errors" threshold. He further opined that reaching a subsequent recovery stage, such as L3 (a more powerful correction stage), necessarily meant the decoded data had an actual error rate ***greater*** than 50 bits per kilobyte. Tr. (Hassoun) 253:14-257:2. He also testified that one bit beyond the L1 decoder's 50-bit capability would establish that threshold and that, for a 1-kilobyte chunk with more ***than 50*** errors, Elnath would forward the data to L3 and modify the coding rate. *Id.* Kioxia objected that this testimony was outside Dr. Hassoun's report. Tr. 254:13-14. After Viasat pointed to Paragraph 287 and the preceding paragraphs, the Court overruled the objection. Tr. 254:15-20.

Viasat then extended this correction-capability framework beyond Elnath. Immediately after the Elnath example, Viasat asked Dr. Hassoun for the corresponding "correctable bits per frame in Canopus and Deneb." He testified that Canopus began at approximately 2 correctable bits and could increase to 40; Deneb began at approximately 1 and could increase to 64; and Elnath began at approximately 50 and could increase to 274. Tr. (Hassoun) 256:7-25. He explained he was "showing details—the numbers for the other products." *Id.* Viasat thus presented Elnath as the worked example of a correction-capability theory, then applied it across

the accused controllers with the particular correction capability varying by controller.

That common trial presentation did not match Dr. Hassoun's written disclosures, which differed materially by controller. Neither the paragraphs cited by Viasat's counsel nor any other part of Dr. Hassoun's report discloses the "rate of errors" theory he offered at trial. The report identified only two triggers for cluster crushing—Kioxia's name for the variable-ECC operation Dr. Hassoun identified as the claimed coding-rate modification, Tr. (Hassoun) 192:20-193:2, 246:16-247:8. *See* Ex. C (Hassoun Infringement Report) ¶¶ 120-133. The first was reaching "FSB Read," a later read step after earlier correction attempts fail. *Id.* ¶¶ 122-123, 285-287. The second was data that "Shift Read" could not read; Shift Read is a sequence of adjusted reads used to try to recover data. *Id.* ¶¶ 130, 240. Neither is a 50-bit-per-kilobyte ceiling (the maximum number of errors triggering the next correction stage). The report also stated that flash-memory age increases error likelihood and that bit error rate affects the cluster-crushing setting, *id.* ¶¶ 123-124, 131, 281, but that observation is not a 50-bit ceiling either. The report never discloses any technical basis for converting a recovery event (the point at which the controller escalates from one error-detection-and-correction stage to the next) into the claimed "rate of errors" trigger.

The main paragraph on which Viasat's counsel relied at trial, Paragraph 287, asserts that FSB Read "only occurs when the rate of errors crosses a given threshold" and "is one trigger for cluster crush operations." *Id.* ¶ 287. It does not identify the decoder's 50-bit-per-kilobyte correction capability as that threshold. It does not equate reaching FSB or triggering cluster crush with an error rate above 50 bits per kilobyte in the decoded data. Nor does it state that crossing a fixed 50 bits per kilobyte threshold causes the subsequent coding-rate modification. *See also id.* ¶¶ 285-286.

The report, however, never discloses the Elnath-specific opinion Dr. Hassoun gave the jury: that the Elnath L1 decoder had a fixed correction capability of 50 erroneous bits per kilobyte supplying the claimed "rate of errors" threshold, such that reaching the subsequent

recovery stage necessarily established an error rate greater than 50 bits per kilobyte triggering coding-rate modification. Tr. (Hassoun) 254:5-12. Dr. Hassoun's Elnath claim chart for Claim 16 merely cross-references Claims 10, 11, and 15. Ex. F (Hassoun's Elnath Claim Chart) at 344. The remaining Elnath discussion refers generally to monitoring a rate for cluster crushing, never identifying the 50-bit-per-kilobyte correction ceiling as the claimed threshold. *Id.* at 40-44, 55-56, 267-304, 338-44. Admitting that undisclosed testimony was error.

Viasat cannot fix the error by invoking the Canopus chart's statement that the L3 ECC powers up when the error rate exceeds the NANDC's correction capability. Ex. D (Hassoun's Canopus Claim Chart) at 214-18, 245-48. That concerns a different controller and architecture and does not disclose the Elnath theory that Dr. Hassoun presented at trial. Ex. F (Hassoun's Elnath Claim Chart) at 40-44, 55-56, 267-304, 338-44; Ex. D (Hassoun's Canopus Claim Chart) at 214-18, 245-48; *see also* Ex. G (Hassoun Dep. Tr.) at 93:14-97:17.

The Deneb chart too discloses a different theory than at trial. Like the Elnath chart, it cross-references Claims 10, 11, and 15, identifies the "rate of errors" as failing symbols or L1Fail information, and elsewhere relies on raw bit error rate. Ex. E (Hassoun's Deneb Claim Chart) at 148, 183-89, 251. Neither is a decoder correction capability. Dr. Hassoun confirmed the omission at deposition. When asked for an actual Deneb rate, he identified none in the Deneb chart and turned instead to the Canopus chart. Ex. G (Hassoun Dep. Tr.) at 152:3-154:7. The jury nonetheless heard a correction-capability theory never disclosed for Deneb.

**Viasat Cannot Show the Error Evidence Was "Substantially Justified" or "Harmless."** The nondisclosure cannot be dismissed as harmless. *See CQ, Inc. v. TXU Mining Co.*, 565 F.3d 268, 279-80 (5th Cir. 2009). The new theory supplied the ***only*** evidence that one of the accused products, Elnath, satisfied the "responsive to . . . rate of errors" limitation. Tr. (Hassoun) 253:7-257:2. Absent the undisclosed correction capability theory, Viasat had no evidence of an error-rate trigger for a coding-rate modification in Elnath. The prejudice

extended beyond Elnath because Viasat used Elnath to teach the jury the correction-capability inference and then immediately supplied the corresponding correction-capability figures for Canopus and Deneb. Tr. 256:7-25. That presentation invited the jury to carry the newly disclosed inference across all three accused controllers.

Indeed, Viasat invoked that evidence in closing and rebuttal. Tr. (Viasat's Closing) 927:4-929:22, 978:5-23. Prejudice is almost certain where, as here, a party "relies on [that] very evidence" in closing. *Alvarado-Valdez*, 521 F.3d at 343. And Viasat's failure to disclose its theory for proving that critical limitation deprived Kioxia of any opportunity to challenge or rebut through discovery or *Daubert* proceedings. Viasat offered no explanation for failing to disclose that theory in Dr. Hassoun's report, instead incorrectly maintaining that Paragraph 287 disclosed it. Once the theory emerged at trial, a meaningful cure would have required reopening expert discovery, not merely additional cross-examination.

**2. The Trial Theory Also Defied the Court's Construction of "Rate of Errors"**

Dr. Hassoun's late-disclosed testimony was also inadmissible because it contradicts the Court's construction of the term "rate of errors." *See Barry v. DePuy Synthes Cos.*, 164 F.4th 896, 903 (Fed. Cir. 2026). This Court construed that term as having its plain and ordinary meaning, "wherein the plain and ordinary meaning does ***not*** include ***an amount of*** errors" (Dkt. 221 at 7 (emphases added)) and instructed the jury accordingly (Tr. 897:15-18). Kioxia had opposed that construction and proposed an alternative (Dkt. 211). But Dr. Hassoun's testimony defies the construction and instructions the Court actually gave.

Dr. Hassoun's correctability theory is grounded in an "amount of errors," not a rate. It treats the L1 decoder's fixed 50-bit-per-kilobyte correction capability as the benchmark: once a recovery event occurs, he infers that at least one error exceeded that capability and therefore that the claimed "rate of errors" was greater than 50 bits per kilobyte. Tr. (Hassoun) 253:19-256:15, 258:17-25. But a count of bits exceeding a fixed threshold is an amount, not a measured

rate. The inference is thus wrong under the Court's construction, which expressly excludes ***an amount of*** errors; it treats ***any amount*** of errors above a threshold as the claimed rate. Dkt. 221 at 7. The record confirms that no rate is measured. Mr. Hida testified that QSBC does not measure a rate of errors, Tr. (Hida) 553:11-554:8, and Dr. Melvin testified that the accused controllers compute no ratio or rate at all—a single recovery event, without any rate calculation, triggers the move to the next correction level and the coding-rate modification, Tr. (Melvin) 699:6-700:13, 701:13-702:16. Dr. Hassoun's theory cannot satisfy the Court's construction on either ground.

Viasat's arguments show the prejudice. In closing, it told the jury the opposite—that a rate of errors includes the number of errors compared to the device's data capacity and that the number of errors per block is a rate of errors. Tr. 927:4-19, 978:16-23. That underscores the prejudice. *Alvarado-Valdez*, 521 F.3d at 343; *cf. Spectrum Sports*, 506 U.S. at 459.

### C. The Prejudicial Errors Reinforced One Another

Those errors were prejudicial individually. But their cumulative effect was dramatic. *See Martin*, 193 F.2d at 646. At trial, closing, and rebuttal, Viasat repeatedly emphasized its bit-errors-per-kilobyte theory. Tr. (Viasat's Closing) 927:4-929:22, 978:16-23. Kioxia thus continually confronted a never-before-disclosed theory of how the "responsive to . . . rate of errors" limitation was met—which Kioxia never had a chance to *Daubert*—based on Dr. Hassoun's new-for-trial interpretation of source code that was never compiled, as reinforced by Viasat's arguments on rebuttal. That left the jury with a mistaken impression that this Court's instructions could not cure.

A more consequential set of interconnected issues is hard to imagine.

### D. The Verdict Is Also Against the Weight of the Evidence and Contrary to Law for Additional Reasons

Kioxia is concurrently filing its Renewed Motion for Judgment as a Matter of Law Under Rule 50(b). Even if the Court denies JMOL, the verdict is against the great weight of

the evidence and warrants a new trial under Rule 59. *Rousseau*, 812 F.2d at 972. For example, the great weight of the evidence at least does not support findings that the accused products satisfy Claim 15's limitation requiring an error detection sub-module that forwards the critical portion of the data stream to the claimed error correction module, or Claim 16's limitation requiring responsiveness to age and to a rate of errors associated with the decoded data. Kioxia also preserves its positions that Claim 16 is indefinite under 35 U.S.C. § 112(f); that the Court's constructions, including for "rate of errors," are incorrect and insufficiently explained; and that the Court improperly denied Kioxia's renewed *Daubert* motions. *See* Dkt. 49 (Kioxia Opening Claim Constr. Br.); Dkt. 55 (Kioxia Reply Claim Constr. Br.); Dkt. 83 (Claim Constr. Order) (claim construction and § 112 ¶ 6 indefiniteness); Dkt. 211 (Kioxia Suppl. Claim Constr. Br.); Dkt. 221 (Suppl. Claim Constr. Order); Dkt. 226 (Kioxia Renewed *Daubert*); Dkt. 273 (Omnibus Order Denying); Dkt. 304 (Memorandum in Support of Omnibus Order).

## IV. A NEW TRIAL ON DAMAGES AND LIABILITY IS REQUIRED BECAUSE NUMEROUS ERRORS TAINTED THE JURY'S AWARD

Viasat asserted damages under three theories: a license theory (corresponding to a 5.4% royalty rate), a cost-avoided theory (2.7%), and an incremental-value theory (with no rate). Without providing quantitative analysis, Dr. Mody combined those results into a single blended 3.5% running royalty and applied that rate to a royalty base of more than $6.6 billion to calculate damages of $229,025,021. Tr. (Mody) 437:2-11, 463:5-14. The jury adopted her figure to the dollar. Dkt. 295 at 3. Each of Viasat's three damages theories is independently defective. And because Dr. Mody's testimony blended all of them into a single rate—which the jury accepted—an error in any one of them infects the verdict and requires a new trial.

### A. Viasat's Semtech-Based "Comparable" "License" Theory of Damages Was Unsupported

When relying on prior licenses to calculate damages, patentees must show the licenses are "sufficiently comparable to support the . . . damages award." *Lucent Techs., Inc. v.*

*Gateway, Inc.*, 580 F.3d 1301, 1325, 1327-32 (Fed. Cir. 2009). Rule 26 requires that an expert's opinion on technical comparability be disclosed during discovery. *See CQ*, 565 F.3d at 279-80. Viasat's Semtech theory violated those principles.

1. For comparable licenses, Dr. Mody relied on an agreement between Viasat and Semtech. Tr. (Mody) 452:20-457:11. But Dr. Fuerst admitted that agreement involved fiber-optics technologies—not flash memory and not the '700 Patent: "[Q.] [D]oes the Semtech license include a license to the '700 patent that's at issue in this case? A. No, because it wouldn't apply. This is -- as I mentioned, this is a fiber optic space, and the patent is tied to forward error correction for flash memory." Tr. (Fuerst) 58:17-23. It was not even a license, but an agreement to develop content and deliverables incorporated into fiber-optic devices that happened to include a generic IP license clause unspecific to any patent or portfolio. Dkt. 297-69 (JX50). Viasat attempted to introduce testimony from Dr. Fuerst that the Semtech agreement was technically comparable to Claim 16's flash-memory error-correction feature. Tr. 77:15-24, 82:17-88:25. But the Court properly excluded that testimony because Dr. Fuerst failed to disclose that opinion in his Rule 26 disclosure. *Id.*; *see also* Ex. H (Fuerst Rule 26 Disclosure).

With no testimony from Dr. Fuerst showing comparability, Viasat snuck in Dr. Fuerst's excluded opinion through Dr. Mody—a damages expert with no technical expertise. Tr. (Mody) 452:20-455:4, 475:13-17, 478:9-12. She told the jury that she understood Dr. Fuerst found the Semtech agreement comparable. *Id.* The Court overruled Kioxia's objection. *Id.*

Permitting Viasat to supply the missing technical-comparability opinion at trial through Dr. Mody was prejudicial error. Rule 703 does not permit an expert to transmit inadmissible evidence to the jury as the basis for an opinion when the expert adds nothing independent to that evidence. *Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1374-75 (Fed. Cir. 2021). Yet Viasat did precisely that when it smuggled in Dr. Fuerst's excluded testimony through Dr. Mody—who was not qualified to opine on technical comparability and who had done nothing

to independently evaluate Dr. Fuerst's purported opinion. Tr. (Mody) 475:13-17, 478:9-12.

The Fifth Circuit's decision in *In re Taxotere (Docetaxel) Products Liability Litigation*, 26 F.4th 256 (5th Cir. 2022), makes the error clear. There, the defendant offered a corporate representative as a "lay witness" who testified about his post hoc re-analysis of clinical trial data. *Id.* at 266-67. The defendant then called an expert witness who relied on that re-analysis to opine on causation. *Id.* at 269. Because the lay witness's testimony was inadmissible, the Fifth Circuit held that the expert could not rely on it. *Id.* at 264, 269. The Court explained that routing inadmissible testimony through an expert is improper when the evidence comes from a witness testifying at the same trial, the evidence is critical to the expert's testimony, and the expert does not independently verify it. *Id.* at 269 n.10. Precisely that happened here. Viasat's technical expert, Dr. Fuerst, failed to disclose his opinion that the Semtech agreement was comparable in his Rule 26 disclosure; the Court excluded his testimony as a result. Tr. 82:17-88:25. The testimony was critical to technical comparability. Viasat then used Dr. Mody to transmit that excluded opinion to the jury—just as the *Taxotere* defendant used its expert to repeat inadmissible lay analysis.

2. Admission of Dr. Mody's testimony also violated Rule 26. Dr. Mody could not rely on an opinion that Dr. Fuerst never disclosed. *See, e.g.*, *Alpha & Omega Semiconductor Ltd. v. Force MOS Tech. Co.*, No. 22-cv-05448-PCP, 2026 WL 2161197, at *14 (N.D. Cal. July 27, 2026) ("To the extent a damages expert relies on technical analysis by another expert, those opinions must be separately disclosed by the technical expert." (citation modified)); *see also SPEX Techs., Inc. v. W. Digit. Corp.*, No. SACV 16-01799-JVS(AGRx), 2023 WL 6922860, at *4-6 (C.D. Cal. Oct. 3, 2023) (excluding damages opinion lacking technical foundation). That makes sense: because neither expert report disclosed the technical-comparability opinion, Kioxia had no opportunity to test it in discovery. And because the Court granted Kioxia's request to exclude Dr. Fuerst's testimony on that basis, Kioxia did not even

have an opportunity to cross-examine Dr. Fuerst on his never-before-disclosed analysis. That is precisely what Rule 26 and the hearsay rule exist to prevent. *See* Fed. R. Evid. 802.

3. Moreover, Dr. Mody's comparability testimony was legally inadequate. Her answer was conclusory—failing to discuss Claim 16 or explain why the "technology" between fiber optics and flash is similar, much less what that similar "technology" is. Tr. (Mody) 454:20-455:4. Such conclusory expert testimony is insufficient as a matter of law. *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015). That alone requires at least a new trial on damages (or JMOL).

**B. The Court Erred in Failing to Exclude Viasat's Damages Theories for Failure to Apportion**

Patent law requires "apportionment" to ensure that patentees recover based solely on the incremental value the patented invention itself adds, and not the value of the product's many unpatented features. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018); *see also* 35 U.S.C. § 284. For that reason, proposed royalty rates and the royalty base must be apportioned—they must separate those contributions. *See Power Integrations*, 904 F.3d at 977; *see also LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309-13 (Fed. Cir. 2018); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226-29 (Fed. Cir. 2014). All of Viasat's damages models violate that requirement.

Although apportionment is often a *Daubert* issue, it can also raise sufficiency-of-the-evidence and new-trial issues, as this Court acknowledged. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) (court "remains free to direct a judgment" even if *Daubert* is denied); Dkt. 304 at 4-7 (applying *Daubert* to hold that "shaky but admissible evidence" may be attacked at trial). Kioxia vigorously, and successfully, attacked Viasat's so-called apportionment theories at trial—to the point where the way the testimony played out at trial cannot sustain the verdict, even if the pretrial reports were not strictly inadmissible. This

Court is also entitled, however, to reconsider *Daubert* rulings. *See Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1332 (5th Cir. 1996).

### 1. Dr. Mody's Cost-Avoided and Incremental Value Theories Were Not Apportioned to Claim 16

Dr. Mody's avoided-cost and incremental-value theories rested entirely on Mr. Doller's apportionment of the contribution to Claim 16. Tr. (Mody) 475:22-477:24. Mr. Doller purported to limit the benefit of the patented invention—whether measured as incremental added value or avoided cost—to Claim 16 alone. Tr. (Doller) 313:7-314:6, 362:3-24. But his analysis did not do so. Because Claim 16 depends from now-canceled Claim 15, whose elements are in the public domain (Tr. (Doller) 418:12-419:9), Mr. Doller had to value only what Claim 16 itself adds: that the coding rate is modified responsive to an age of the flash memory or a rate of errors. Damages thus had to reflect the incremental value of that trigger and could not capture the value of Claim 15's elements or of all variable ECC generally. *See Prolitec Inc. v. ScentAir Techs., LLC*, No. 20-cv-984, 2024 WL 341342, at *1-2 (D. Del. Jan. 30, 2024) (Bryson, J.) (apportionment requires "exclud[ing]" value of invalid claim limitations). Yet Mr. Doller conceded at trial that he never excluded Claim 15's contribution, even though he understood Claim 15 to be available to everybody and a noninfringing alternative: "Q. You did not evaluate 15? A. I did not evaluate claim 15. Q. And you would agree with me that Claim 15 is available to everybody? A. After sitting through yesterday, that's my understanding. Yes. Q. Claim 15 is a noninfringing alternative? A. That's my understanding." Tr. (Doller) 419:2-9.

That testimony cannot be reconciled with the condition on which the Court permitted the opinion to reach the jury: that "Mr. Doller's analysis isolates" the added limitation of Claim 16 "by subtracting out improved performance associated with Multi-Level ECC features," which Mr. Doller equated with the scope of Claim 15. Dkt. 304 at 6. At trial, Mr. Doller disclaimed the subtraction that the Court understood him to have performed.

The Court's ruling, moreover, rested on Mr. Doller's supplemental report, in which he purported to subtract Multi-Level ECC. Dkt. 304 at 6-7. At trial, Mr. Doller described a different operation altogether, testifying that subtracting Daikoku2 and "other ECC features" isolated the value to the accused products' use of variable ECC (*i.e.*, the purported incremental value of Claim 16). Tr. (Doller) 366:22-367:2. But the Court never found any such comparison to be reliable. The Court held that Mr. Doller's failure to discuss Daikoku2 in the supplemental report did not impact the outcome. Dkt. 304 at 4 n.1. The jury therefore heard, and adopted, an apportionment theory that the Court never approved, and Mr. Doller never mentioned "Multi-Level ECC" at trial.

Worse still, Mr. Doller treated Claim 16 as covering all "variable ECC." He testified that his understanding of Claim 16 was nothing more than "variable ECC." Tr. (Doller) 362:3-13. But Claim 16 is narrower: it requires modifying the coding rate "responsive to" either "an age of the flash memory" or "a rate of errors associated with the decoded data." PX1 (Dkt. 297-1) at Claim 16; Tr. (Hassoun) 192:20-193:2. When asked whether he considered those express limitations, Mr. Doller effectively disclaimed any effort to read the '700 Patent: "Q. [B]ut can we agree that you didn't get hung up on every word? A. For me, as I read patents, that's why I don't read them." Tr. (Doller) 391:23-392:1. And when confronted with Claim 16's age-or-error-rate trigger itself, he confirmed "it didn't matter to me in my analysis what the trigger was." Tr. (Doller) 396:2-12.

Mr. Doller also conceded that he had not learned of the claimed trigger until the day before his testimony and ***had not taken it into account*** in his analysis. Tr. (Doller) 392:7-393:4. Viasat doubled down on the effort to treat Claim 16 as covering all variable ECC in closing. Tr. (Viasat's Closing) 934:13-17. But Claim 16 adds only adaptively modifying the coding rate based on an age-or-error-rate trigger to Claim 15, not all variable ECC. By assigning Claim 16 the value of all variable ECC instead of the incremental value of that trigger, Mr. Doller's

analysis failed to apportion as a matter of law.

Mr. Doller also exaggerated damages by relying on simulated data that assumed, without basis, 100% usage of variable ECC. He assumed that 100% of the blocks in the accused products advanced to the highest of seven levels, even though only about 4% advanced to the lowest of the seven levels, and he conceded that he "grossly overestimated the problem." Tr. (Doller) 416:2-417:3; *see also* Dkts. 210, 226, 233, 273. Viasat attempted to downplay the problem as limited to eight preproduction Elnath drives (Tr. (Viasat's Closing) 933:10-934:1), but Mr. Doller modeled more than 24 million shipped drives (Tr. (Doller) 354:10-22, 403:14-406:25). And Mr. Doller's model for all 24 million drives was based on simulated data totally divorced from actual usage of shipped drives. *See* Tr. (Doller) 354:10-22, 403:14-406:25, 416:2-417:3. His unsupported maximal-use assumption inflated damages across the entire royalty base. The Court's pretrial finding that Mr. Doller's data was sufficiently tied to the facts of the case (Dkt. 304 at 5-6) cannot stand in light of the facts adduced at trial.

### 2. Dr. Mody's Semtech-Agreement Theory Was Not Properly Apportioned to Claim 16

Dr. Mody's Semtech-agreement theory also failed to apportion properly. The Semtech agreement on which Dr. Mody relied (JX50 (Dkt. 297-69)) was not a patent license, as explained above (*supra* p. 11). Dr. Fuerst nonetheless purported to apportion it by separating the delivered content unrelated to advanced error correction—Viasat brand, DSP technology, and older technology—from what he called the value of advanced error correction. Tr. (Fuerst) 56:24-63:9. But he supplied no methodology for the values assigned to those categories. Such testimony, "plucked out of thin air based on vague qualitative notions of the relative importance" cannot support a damages award. *LaserDynamics*, 694 F.3d at 69 (reversing for a new trial on damages); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). Even on its own terms, Dr. Fuerst at most purported to value error correction generally, not the narrower type of variable ECC required by Claim 16. And Dr. Fuerst never

testified that he apportioned the licensed features to the incremental value of Claim 16, excluding and as compared to noninfringing alternatives like canceled Claim 15.[4]

Because the record lacks meaningful evidence that either Dr. Fuerst's or Mr. Doller's model (or both) was reliably apportioned to Claim 16, their presentations infected Dr. Mody's opinion. *See* Tr. (Mody) 476:23-479:9. The Court's reasoning makes that consequence unavoidable. The Court declined to exclude Dr. Mody's opinions because it found Mr. Doller's apportionment analysis reliable. Dkt. 304 at 7. Dr. Mody agreed that, if Mr. Doller's analysis was incorrect, hers would be incorrect as well. Tr. (Mody) 476:23-479:9. The resulting damages verdict, based on a blend of one or more unapportioned theories, cannot be sustained.

#### 3. The Failure to Apportion Was Compounded by the Exclusion of Evidence That Claim 15 Was Canceled

The erroneous exclusion of evidence that Claim 15 was canceled (*see* Dkt. 243-2 at 18-19) compounded the prejudice. The Court barred Kioxia from telling the jury that Claim 15 was "invalid or canceled," allowing Kioxia to say only that it was "unasserted" and "available to the public." Pretrial Conf. Tr. 4:1-8:3, 50:19-52:13 (June 24, 2026) (Ex. B); Dkt. 175 at 3-4; Dkt. 210 at 3. Over objection, the jury was shown the originally issued version of the '700 Patent (PX1 (Dkt. 297-1)), including Claim 15, without noting the claim's cancellation. Tr. 31:12-32:17; *see also* Dkt. 272 (Joint Pre-Trial Order) ¶ 85; Tr. 73:5-7.

That was error. It left the jury with the mistaken impression that Claim 15 still had some vitality, and that Viasat could claim its supposed benefits as damages. *See generally Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1340 (Fed. Cir. 2013). Kioxia's inability to explain Claim 15's cancellation to the jury prejudicially hampered its defense against Viasat's

[4] Kioxia challenged Dr. Fuerst's speculative testimony and Dr. Mody's reliance on it before trial and at the Rule 50(a) stage. Dkts. 210, 226, 233; Tr. 503:20-25. The Court denied the motions. Dkt. 210 at 2; Tr. 505:20; Dkt. 273 at 1. The Court's subsequent reasoning resolved only the Rule 702 admissibility question and expressly consigned Kioxia's apportionment challenges to weight. Dkt. 304 at 7. It did not address the sufficiency of the trial evidence; the Court had simply overruled the motions without explanation.

insufficiently apportioned damages theories. And nothing in the Court's ultimate jury instructions cured that prejudice. *See United States v. Williams*, 836 F.3d 1, 16 (D.C. Cir. 2016) (instructions not curative unless tailored to correct the "potential confusion").

#### 4. A New Trial Is Also Required Based on Unreliable Expert Testimony That Should Never Have Been Admitted

Before trial, the Court denied Kioxia's pretrial *Daubert* challenges to three Viasat experts. Dkts. 210, 226, 233, 273. Each challenge identified reliability failures that were introduced at trial, including that Dr. Fuerst lacked any reproducible methodology for apportioning the Semtech agreement to Claim 16; Mr. Doller's model assumed that 100% of the blocks advanced to the highest of seven error-correction levels when actual data showed only about 4% advanced to the lowest of those seven levels (Tr. (Doller) 416:2-417:3); and Dr. Mody's blended royalty rate combined three theories without an explained weighting methodology, leaping from a spread of 2.7%-5.4% to 3.5% with no justification (Tr. (Mody) 462:10-463:8). Each of those challenges should have been upheld and require a new trial.

### C. The Court Erred in Permitting an Entire-Market-Value Royalty Base Without Proof That the Patented Feature Drove Customer Demand

Because patentees are only entitled to damages "adequate to compensate for the infringement," 35 U.S.C. § 284, the general rule is that "royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *LaserDynamics*, 694 F.3d at 67. The entire market value rule is "a narrow exception" available only where the patented feature drives demand for the product. *Id.* The patentee must show that the patented feature drove demand. *Power Integrations*, 904 F.3d at 977-79.

The unrebutted trial evidence established the opposite. Kioxia's Vice President of Customer Technical Support and Product Support Engineering, Mr. Cohen, testified that customers want error recovery because it speaks to the product's reliability, but generally do not care how the error recovery is implemented so long as it meets the required level of

performance. Tr. (Cohen) 582:16-23. He confirmed that no customer had ever asked him about variable coding and that customers place no importance on it, because they do not care about the under-the-hood details of how the expected reliability is achieved. Tr. (Cohen) 583:3-13.[5] Viasat thus applied its rate to a royalty base exceeding $6.6 billion in accused sales without proving that Claim 16's error-correction feature drove customer demand.

None of Viasat's witnesses testified otherwise. Yet Viasat repeatedly emphasized the inflated base $6.6 billion revenue in opening (Tr. 18:22-19:1, 27:7-12); expert testimony (Tr. (Doller) 354:18-22; Tr. (Mody) 437:2-11); and closing (Tr. 936:12-16, 981:3-9). Dr. Mody simply applied her blended 3.5 percent rate to the SSD revenue of $6,661,529,165 to reach $229,025,021, which the jury awarded. Tr. (Mody) 437:2-11, 463:5-8. Even Mr. Doller, whose opinions did not concern the revenue from Kioxia's accused products, gratuitously parroted that number. Tr. (Doller) 354:18-22. Viasat's continual bombardment of the jury with that total revenue figure, over repeated objection (*see* Dkt. 137 at 19-22; Tr. 502:4-20), distorted the damages horizon and rendered the damages trial unfair. *See Uniloc*, 632 F.3d at 1320.

### D. Errors in the Inputs to the Blended Damages Award Infect the Entire Verdict and Independently Warrant a New Trial

Where a damages expert presents a blended bottom-line figure rather than separate alternatives, any defective input renders the methodology unreliable. *See Uniloc*, 632 F.3d at 1318; *see also Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380-81 (Fed. Cir. 2021); *LaserDynamics*, 694 F.3d at 81-82. Dr. Mody expressly blended multiple different methodologies here. Tr. (Mody) 462:10-463:8. Error in any of those methodologies is fatal to her blended result.

---

[5] At most, Viasat elicited testimony that Kioxia shares content on variable error-correction coding with customers, but Mr. Cohen expressly distinguished that from customer demand, disagreeing that customers consider this content important. Tr. (Cohen) 644:5-10. Evidence that Kioxia mentioned a feature to customers does not satisfy Viasat's burden to prove that the ***claimed feature*** drove demand. *See Power Integrations*, 904 F.3d at 977-79.

### E. A New Trial on Liability Should Follow

A damages-only retrial is proper only if damages are "distinct and separable" from liability. *Gasoline Prods. Co. v. Champlin Refin. Co.*, 283 U.S. 494, 500 (1931). Where the two are "so interwoven" "that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty," both must be retried. *Id.* That standard is met here.

Viasat's avoided-cost and incremental-value theories rested on Mr. Doller's position that Claim 16 is coextensive with variable error-correction coding, even though Claim 16 requires a coding-rate modification responsive to "an age of the flash memory" or "a rate of errors associated with the decoded data." *See supra* Section IV.B.1. Viasat reinforced that false equivalency in closing. Tr. (Viasat's Closing) 934:14-17. It threatens to infect the jury's determination of damages and liability; it reads specific limitations, necessary to establish infringement, out of the case. Regardless, submitting damages alone to a new jury would require the new jury to understand the basis for the prior jury's determination. That is the "confusion and uncertainty" that *Gasoline Products* forbids. 283 U.S. at 500.

## V. THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES A NEW TRIAL

Each error independently warrants a new trial. Together, they allowed the jury to credit false testimony about source code that was never compiled, to hear an expert theory never disclosed in discovery and contrary to the Court's construction of "rate of errors," and to award $229,025,021 in damages without proper apportionment and on a royalty base no witness tied to the patented feature—all without learning that the claim from which Claim 16 depends had been canceled. Cumulatively, they rendered the trial unfair, necessitating retrial. *Martin*, 193 F.2d at 646.

## VI. CONCLUSION

For the foregoing reasons, Kioxia respectfully requests that the Court grant a new trial on all issues under Rule 59(a), or, in the alternative, a new trial on damages.

Dated: August 28, 2026

Respectfully submitted,

_/s/ Roger Fulghum_
Roger Fulghum
Texas State Bar No. 00790724
Michael Hawes
Texas State Bar No. 24010761
Elizabeth D. Flannery
Texas State Bar No. 24045815
Michael Silliman
Texas State Bar No. 24093152
Baker Botts L.L.P.
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
Email: roger.fulghum@bakerbotts.com
Email: michael.hawes@bakerbotts.com
Email: liz.flannery@bakerbotts.com
Email:
michael.silliman@bakerbotts.com

Nolan McQueen
Texas State Bar No. 24125322
Baker Botts L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
Telephone: (214) 953-6525
Email: nolan.mcqueen@bakerbotts.com

Mark D. Siegmund
Cherry Johnson Siegmund James PLLC
7901 Fish Pond Road, Second Floor
Waco, TX 76710
Telephone: (254) 732-2242
Email: msiegmund@cjsjlaw.com

*Attorneys for Defendants*
*Kioxia Corporation and Kioxia*
*America, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served August 28, 2026, with a copy of this document via the Court's CM/ ECF system.

*/s/ Roger Fulghum*
Roger Fulghum