PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **VIASAT, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**KIOXIA CORPORATION and KIOXIA AMERICA, INC.,**<br><br>**Defendants.** | **Case No.: 6:21-cv-01231-ADA**<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANTS' MOTION FOR CONDITIONAL SANCTIONS AND RELIEF FROM JUDGMENT PURSUANT TO THIS COURT'S INHERENT AUTHORITY AND RULE 60(b)(3)**

[redacted]

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

A. The Asserted Claim and Accused Products ..... 2

B. Dr. Hassoun's Testifies Falsely—But Viasat Offers No Correction ..... 4

C. Dr. Melvin Testifies Without Challenge That Dr. Hassoun's Testimony Was False ..... 6

D. Viasat's Counsel Does Not Correct Dr. Hassoun's Testimony—and Attacks Dr. Melvin's Testimony—on Rebuttal ..... 7

III. LEGAL STANDARDS ..... 7

IV. ARGUMENT ..... 9

A. Dr. Hassoun's Statements Were Materially False ..... 9

B. Viasat's Counsel's Failure to Correct the Falsity Constituted Misconduct Warranting Relief under Rule 60 ..... 11

C. In the Alternative, This Court Should Enter a Remedy Under Its Inherent Authority ..... 14

D. Kioxia Respectfully Requests Entry of Judgment or a New Trial That Excludes Dr. Hassoun ..... 15

V. CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrahamsen v. Trans-State Express, Inc.*,
92 F.3d 425 (6th Cir. 1996) ....................12

*Carroll v. Jaques Admiralty L. Firm, P.C.*,
110 F.3d 290 (5th Cir. 1997) ....................8

*Cohn v. Comm'n for Law. Discipline*,
979 S.W.2d 694 (Tex. App. 1998)....................15

*Fraige v. Am.-Nat'l Watermattress Corp.*,
996 F.2d 295 (Fed. Cir. 1993)....................12

*Frew v. Janek*,
780 F.3d 320 (5th Cir. 2015) ....................7

*Hernandez v. Results Staffing, Inc.*,
907 F.3d 354 (5th Cir. 2018) ....................7, 9, 11, 12

*In re Disciplinary Complaint Against Rosales*,
No. 16-MC-1326-DAE, 2017 WL 8180454 (W.D. Tex. July 11, 2017),
*aff'd sub nom. In re Rosales*, 716 F. App'x 364 (5th Cir. 2018) (per curiam) ....................8

*In re Vioxx Prods*,
489 F. Supp. 2d 587 (E.D. La. 2007)....................12

*Lopez v. State Farm Lloyds*,
780 F. Supp. 3d 663 (W.D. Tex. 2025)....................10, 11

*Mac Sales Inc. v. E.I. duPont de Nemours & Co.*,
No. 96-30420, 1997 WL 450059 (5th Cir. July 7, 1997)....................13

*Menier v. United States*,
405 F.2d 245 (5th Cir. 1968) ....................9

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
818 F.3d 1320 (Fed. Cir. 2016)....................7

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) ....................7

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
402 F.3d 1198 (Fed. Cir. 2005)....................12, 13, 15

*Seven Elves, Inc. v. Eskenazi*,
635 F.2d 396 (5th Cir. Unit A Jan. 1981) ....................9

*Sossamon v. Lone Star State of Tex.*,
560 F.3d 316 (5th Cir. 2009) ....................10

*Toon v. Wackenhut Corr. Corp.*,
250 F.3d 950 (5th Cir. 2001) ....................8, 14

*United States v. Alvarado-Valdez*,
521 F.3d 337 (5th Cir. 2008) ....................11

*United States v. Reyes*,
577 F.3d 1069 (9th Cir. 2009) ....................13

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56....................10

Fed. R. Civ. P. 60(b)(3)....................2, 7, 8, 9, 12, 15

W.D. Tex. Loc. R. AT-7(a)....................8

## I. INTRODUCTION

The circumstances that prompt this motion are unusual to say the least. On the first day of trial, Viasat's technical expert, Dr. Marwan Hassoun, gave critical testimony on whether Kioxia infringed the only claim asserted in this suit. Dr. Hassoun testified that certain critical software was included in Kioxia's products. There is no longer any dispute that Dr. Hassoun's testimony was false. On cross-examination, Dr. Hassoun admitted that he had no basis for testifying that the software at issue was compiled into Kioxia's products, and Viasat's counsel did not attempt to rehabilitate Dr. Hassoun. Two days later, Kioxia's technical expert (Dr. Melvin) explained exactly why Dr. Hassoun's testimony was objectively, verifiably, and undisputedly wrong. Viasat's counsel did not cross-examine Dr. Melvin on this point. Viasat's counsel took no corrective action with respect to the false testimony it had elicited.

Nor did Viasat's counsel correct the record through closing argument. Kioxia's counsel challenged Viasat's counsel to say ***something***—anything—about the fact that ***Viasat's own expert*** had offered false testimony. Viasat's counsel did not attempt to correct the false testimony. Nor did Viasat's counsel acknowledge that Dr. Hassoun's testimony on a critical issue was objectively wrong. Instead, Viasat's counsel told the jury that ***Dr. Melvin's*** objectively correct, unchallenged, and unimpeached testimony correcting the error was "not credible." Within hours, the jury found Kioxia liable for infringing Claim 16 with a damages verdict of nearly ***$230 million***.

If that sequence of events sounds extraordinary, that is because it is. Applicable state and federal ethics codes are clear: When attorneys become aware of material, false evidence, they must act in good faith to correct or withdraw the false evidence. *See* Tex. Disciplinary Rules Pro. Conduct R. 3.03(b) & cmt. 8; Model Rules of Pro. Conduct r. 3.3(a)(3) (A.B.A. 2020). That did not happen here. Instead, Viasat's counsel attacked the testimony that would have corrected the error—testimony that was undisputedly correct—as not credible. The resulting judgment almost

certainly rested on either the false testimony of Viasat's expert, or on Viasat's counsel's encouragement to the jurors to discredit and disregard Kioxia's effort to correct the false testimony.

This Court's intervention is warranted. Kioxia has explained elsewhere why Dr. Hassoun's testimony requires both a JMOL under Rule 50(b) and a new trial under Rule 59. But the exceptional circumstances here call for further relief. Federal Rule of Civil Procedure 60(b)(3) and the Court's inherent powers afford it broad, discretionary authority to craft appropriate sanctions for misconduct. Kioxia respectfully requests that the Court exercise those powers to award it relief that would not be available based on Rules 50 and 59 alone—namely, either (1) to enter judgment in Kioxia's favor (irrespective of whether the Rule 50 standard is formally satisfied based on Dr. Hassoun's false testimony) or (2) to grant a new trial with the ***additional*** sanction that Dr. Hassoun be excluded from the new trial.

## II. FACTUAL BACKGROUND

### A. The Asserted Claim and Accused Products

The trial in this case concerned one asserted claim from U.S. Patent No. 8,615,700: Claim 16. Among other requirements, Claim 16 requires a system with an encoder "configured to adaptively modify the coding rate responsive to an age of the flash memory or a rate of errors associated with the decoded data"—that is, the encoder must automatically adjust its error-correction coding—rather than applying a fixed level of error correction—and it must do so in response to the flash memory drive's age and the decoded data's error rate. Trial Tr. ("Tr.") (Hassoun) 182:12-183:3 (Ex. A).

To prevail on infringement, Viasat had to prove that Kioxia's accused products practiced every claim limitation, including Claim 16's adaptive modification requirement. The accused products are solid-state drives (SSDs) with a controller chip inside them that manages how data is read from and written to the flash memory on the SSD. Each relevant controller chip has an

"encoder," but one of the key infringement issues at trial was whether the encoder is configured to adaptively modify the coding rate as required by Claim 16.

Computer hardware, like a controller chip, is controlled by software instructions known as "firmware." Tr. (Hassoun) 248:12-15. To create firmware, software engineers start with what is called "source code." Source code is written by computer programmers in a ***human-readable*** programming language. Source code can be written in a number of different languages, including (as relevant here) "C."

Source code does not, itself, run on computer hardware. Machines cannot read human programming languages; they read 0s and 1s (machine-readable code). Converting source code into firmware requires a process called "compiling"; through that process, source code is converted, *i.e.*, compiled, into a ***machine-readable*** format of 0s and 1s. Only code that is compiled is in the firmware that controls the product. *See* Tr. (Melvin) 728:3-729:16. Source code that is ***not*** compiled is never part of the device's operating instructions of 0s and 1s. Tr. (Melvin) 729:10-16. Uncompiled source code exists only in the source code and has no effect on how the product works. *See id.*

Sometimes source code is not compiled into operative machine-executable code ***on purpose***. For example, "[d]uring program development, it's often helpful to 'comment out' portions of code to ***prevent them*** from being compiled." Paul Deitel & Harvey Deitel, *C How to Program: With an Introduction to C++* 551, 555 (8th ed. 2016) [hereinafter Deitel (Ex. B)] (emphasis added).[1] Indeed, any "comments" in the source code "do *not* cause the computer to perform any action when the program is run—they're *ignored* by the C compiler and do *not* cause

[1] Deitel, *supra*, is available at https://faculty.ksu.edu.sa/sites/default/files/c_how_to_program_with_an_introduction_to_c_global_edition_8th_edition.pdf. Cited pages of this resource are attached hereto as Exhibit B.

any machine-language object code to be generated." Deitel (Ex. B) at 72-73 (italics in original). In addition, the C programming language includes a set of "preprocessor directives" that identify lines of source code that are not compiled. In this regard, the software instructions "#if 0" and "endif" are preprocessor directives. Lines of source code between "#if 0" and "endif" are ignored and are not compiled. *Id*. at 551, 555. The use of "#if 0" and "endif" as bookends to identify source code that is not to be compiled is not a debatable or obscure practice. Preprocessor directives like "#if 0" and "endif" are taught in basic C programming textbooks designed to "[w]elcome" students "to the C programming language." *Id.* at 23, 555.

### B. Dr. Hassoun's Testifies Falsely—But Viasat Offers No Correction

At trial, Viasat presented Dr. Hassoun to show that Kioxia's accused products infringe Claim 16. On direct examination, Dr. Hassoun testified that Kioxia's source code, an excerpt of which was admitted as trial exhibit PX 525 (Ex. C), "is ***the software that controls*** what the hardware is doing." Tr. (Hassoun) 248:14-15 (emphasis added). He testified that Kioxia's SSDs performed Claim 16's requirement through a specific function in those lines of source code called "IncrReadErrCount." Tr. (Hassoun) 248:16-249:23, 250:24-251:9. And Dr. Hassoun then highlighted the "IncrReadErrCount" function language, including language within that function, shown as indented under the top-line "IncrReadErrCount" language, in his software demonstratives:







This was the first time Dr. Hassoun relied on or highlighted any particular source code or the IncrReadErrCount function in particular. Dr. Hassoun's expert report, for example, did not focus on the precise source code that Dr. Hassoun presented to the jury in PX 525.

But, as shown on page 2 of PX 525 (Ex. C), the entire body of the critical IncrReadErrCount function that Dr. Hassoun relied on for his infringement analysis before the jury was bracketed on either side by "#if 0" and "#endif":

```
{
#if 0
```

```
    }
#endif
}
```

Dkt. 298-2 at 2. As explained above, that means the source code was not compiled. It thus did not exist in Kioxia's products in any respect and ***could not have*** "control[led]" the hardware, contrary to Dr. Hassoun's testimony. Tr. (Hassoun) 248:14-15.

On cross-examination, Dr. Hassoun acknowledged that "#if 0" and "endif" are "compiler directives." Tr. (Hassoun) 278:24-25; 279:11-13. But despite having a Ph.D. in Electrical Engineering and having studied the source code for 120 hours, *id.* at 165:10-16, 277:17-25, Dr. Hassoun claimed he did not know that these directives meant the code he relied on was never compiled. *Id.* at 279:14-18. Dr. Hassoun testified that he ***did not know*** whether the lines of source code on which he relied had been compiled into the firmware that controlled Kioxia's accused products—notwithstanding his earlier testimony that firmware did just that. *Id.* at 276:17-279:23, 279:19-23 ("[Y]ou included this code in your slide without knowing whether this compiler directive would instruct the compiler not to use this code in controlling the hardware . . . That's correct."). And Dr. Hassoun confirmed that he did not consider the directives in his analysis. *Id.* at 279:19-23. On re-direct, Viasat asked Dr. Hassoun no questions about the compiler directives or his software analysis.

### C. Dr. Melvin Testifies Without Challenge That Dr. Hassoun's Testimony Was False

During Kioxia's case, technical expert Dr. Melvin testified that the source code Dr. Hassoun relied on ***was not compiled***—meaning it was not part of Kioxia's firmware and could not be executed by Kioxia's controllers—because the code was bracketed by the "#if 0" and "endif" compiler directives. Tr. (Melvin) 726:23-732:14. That testimony was unrebutted. On cross-

examination, Viasat asked Dr. Melvin no questions about it.

### D. Viasat's Counsel Does Not Correct Dr. Hassoun's Testimony—and Attacks Dr. Melvin's Testimony—on Rebuttal

In the first half of its closing argument, Viasat said nothing about the false evidence. Kioxia challenged Viasat to address the issue in rebuttal. Tr. (Kioxia's Closing) 954:19-955:2. Instead of taking the opportunity to correct the record, Viasat effectively doubled down. It argued that Dr. Hassoun's testimony involved only "two lines of source code" and that Dr. Melvin was "not credible." Tr. (Viasat's Closing) 976:12-17. Less than three hours later, the jury returned a verdict of infringement and Viasat's nearly $230 million damages request to the dollar.

## III. LEGAL STANDARDS

Under Rule 60(b)(3), the Court may relieve a party from a final judgment for "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those which are factually incorrect." *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978). Accordingly, Rule 60(b) "is to be construed liberally to do substantial justice." *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015) (citation omitted).

"To prevail on a Rule 60(b)(3) motion, a party must establish, by clear and convincing evidence, (1) that the adverse party engaged in fraud or other misconduct, and (2) that this misconduct prevented the moving party from fully and fairly presenting [its] case." *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 364 (5th Cir. 2018) (citation omitted). Although the authority to grant Rule 60 relief is within the discretion of the district court judge, the Fifth and Federal Circuits have held it can be an abuse of discretion to deny relief from a judgment under Rule 60(b)(3) where an opposing party presented false testimony or evidence at trial. *See, e.g.*, *Rozier*, 573 F.2d at 1339-42 (reversing for new trial under Rule 60(b)(3)); *Rembrandt Vision Techs., L.P.*

*v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1329 (Fed. Cir. 2016) (same).

This Court has inherent authority to sanction the parties before it for "bad faith" conduct. *Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950, 952-53 (5th Cir. 2001) (affirming sanctions). "When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions." *Carroll v. Jaques Admiralty L. Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997). That includes the ability to sanction parties based on violations of applicable state and federal rules of professional misconduct. *See In re Disciplinary Complaint Against Rosales*, No. 16-MC-1326-DAE, 2017 WL 8180454, at *8 (W.D. Tex. July 11, 2017), *aff'd sub nom. In re Rosales*, 716 F. App'x 364 (5th Cir. 2018) (per curiam); *see also* W.D. Tex. Loc. R. AT-7(a) (requiring compliance with the Texas Disciplinary Rules of Professional Conduct).

Texas's Disciplinary Rules of Professional Conduct prohibit offering false evidence and require attorneys to take remedial steps where necessary. *See* Tex. Disciplinary Rules Pro. Conduct R. 3.03(a)(1) ("A lawyer shall not knowingly make a false statement of material fact or law to a tribunal[.]"). Critically, if a lawyer learns during a trial that the lawyer has offered material false evidence, the lawyer must correct the record:

> If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall make a good faith effort to persuade the client to authorize the lawyer to correct or withdraw the false evidence. If such efforts are unsuccessful, the lawyer shall take reasonable remedial measures, including disclosure of the true facts.

*Id.* R. 3.03(b). "When a lawyer learns that the lawyer's services have been improperly utilized in a civil case to place false testimony or other material into evidence, the rule generally recognized is that the lawyer must disclose the existence of the deception to the court or to the other party, if necessary [to] rectify the deception." *Id.* R. 3.03 cmt. 8. The ABA Model Rules of Professional Conduct impose similar requirements, requiring a lawyer who learns of material, false evidence to

"take reasonable remedial measures, including, if necessary, disclosure to the tribunal." Model Rules of Pro. Conduct r. 3.3(a)(3) (A.B.A. 2020).

## IV. ARGUMENT

This Court should enter relief, under Rule 60(b) or its inherent powers, to remedy Dr. Hassoun's material misstatements and Viasat's intentional failure to correct those falsehoods. Relief is warranted because Viasat has (1) "engaged in fraud or other misconduct" and (2) "this misconduct prevented [Kioxia] from fully and fairly presenting its case." *Hernandez*, 907 F.3d at 364. And this Court has ample authority to impose a remedy for acts of bad faith that violate professional standards. "Rule 60(b) is 'a grand reservoir of equitable power to do justice in a particular case.'" *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. Unit A Jan. 1981) (quoting *Menier v. United States*, 405 F.2d 245, 248 (5th Cir. 1968)).

### A. Dr. Hassoun's Statements Were Materially False

There is no question that Dr. Hassoun was ***objectively wrong*** when he opined that the source code sandwiched between #if 0 and #endif "control[led]" any of the accused products. Tr. (Hassoun) 248:14-15. As a matter of C-programming-101, source code between #if 0 and #endif is never compiled, is not included on the controller, and plays no role whatsoever in the functioning of the products. *See supra* pp. 3-4 (citing, *e.g.*, Deitel, *supra*, at 551, 555); Tr. (Melvin) 726:23-732:14. Dr. Hassoun effectively admitted on the stand that he had no basis for testifying that this turned off source code ***did*** control the hardware, because he testified on cross that he ***did not know whether it was compiled into the firmware***. *See supra* pp. 5-6 (citing Tr. (Hassoun) 276:17-279:23).

There certainly is reason to think that Dr. Hassoun ***knew***, or at least learned during cross-examination, that the source code he relied on was not compiled and thus could not support infringement. Dr. Hassoun has a Ph.D. in Electrical Engineering and studied Kioxia's source code

for 120 hours. Tr. (Hassoun) 165:10-16, 277:17-25. On cross-examination, Dr. Hassoun acknowledged that "#if 0" and "endif" are "compiler directives." Tr. (Hassoun) 278:24-25. Yet he claimed to be unaware about what a "compiler directive" does—namely, ***direct source code to compile or not***. That unawareness from Dr. Hassoun concerned a software operation, *i.e.*, turning off the compilation of source code with #if 0 and #endif, that is so common as to appear in introductory C programming textbooks. *See supra* pp. 3-4. That is like a master mechanic quickly identifying the components parts of a car (such as spark plugs, windshield wiper blade, gas cap) but suddenly not being able to testify that the spark plugs carry electricity or the wiper blade wipes the window. It is implausible that Dr. Hassoun did not know what he was saying was false.

Dr. Hassoun's false statements were material. *Cf. Lopez v. State Farm Lloyds*, 780 F. Supp. 3d 663, 670 (W.D. Tex. 2025) (fact is material under Fed. R. Civ. P. 56 if it "might affect the outcome of the lawsuit (quoting *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009))). Whether Kioxia's products performed the adaptive coding limitation of claim 16 was the key issue at trial. The jury could not find infringement without finding that Kioxia's products were configured as required by Claim 16. *See* Dkt. 291 (Jury Instructions) at 17 ("In order to prove literal infringement, Viasat must prove . . . that Kioxia sold . . . a product that meets all of the requirements of claim 16 . . . .") Dr. Hassoun was the only witness who purported to identify anything in the source code that would allow them to do so. And Dr. Hassoun testified to source code evidence in the form of the IncrReadErrCount function that was turned off, not compiled, and therefore not included in any Kioxia product. In addition to introducing the false evidence through PX 525, which was admitted, Dr. Hassoun highlighted the false evidence on a demonstrative. Such evidence can be especially powerful and persuasive for juries. Viasat must have thought so: It chose to make the source code the centerpiece of Dr. Hassoun's Claim 16

testimony, even though his expert report spoke about source code on a much higher level and did not expressly invoke the turned off portions that were highlighted live at trial. Ex. D (Hassoun Infringement Report) ¶¶ 120-133.

Closings underscored the materiality. Kioxia challenged Viasat to defend Dr. Hassoun's obvious falsehood—focusing the jury's attention on the testimony. Tr. (Kioxia's Closing) 950:7-955:2. But Viasat's closing did not correct the error or concede Dr. Hassoun's incorrectness. Instead, Viasat's counsel faulted the credibility of ***Dr. Melvin's*** testimony that attempted to correct Dr. Hassoun's false testimony. Tr. (Viasat's Closing) 976:8-977:1. He belittled Dr. Melvin as referring to only "two lines of source code on one slide" (#if 0 and #endif), *id.*, when in fact the point of his testimony was that everything ***between*** those two lines was not compiled and not part of the system that could infringe. Tr. (Melvin) 726:23-732:14. (There are forty-four lines of software code in the IncrReadErrCount function. *See* PX 525 (Ex. C) at 2). And Viasat's counsel told the jury that Dr. Melvin's truthful correction of Dr. Hassoun's undeniable falsehood was "not credible." Such attacks on Kioxia's key technical witness, based on testimony that sought to correct an objective falsehood, on rebuttal when Kioxia could not respond, certainly "might" have affected the jury's verdict, especially given how both parties focused on it in closing. *Lopez*, 780 F. Supp. 3d at 670; *see United States v. Alvarado-Valdez*, 521 F.3d 337, 342-43 (5th Cir. 2008) (reliance on erroneously admitted evidence in closing supports prejudice finding).

### B. Viasat's Counsel's Failure to Correct the Falsity Constituted Misconduct Warranting Relief under Rule 60

The misconduct here amply meets the "fraud or other misconduct" standard for Rule 60 relief. *Hernandez*, 907 F.3d at 364. Viasat's actions, if not fraud, violated the rules of professional conduct. As explained above, those rules required Viasat's counsel to, in good faith, work with Kioxia to correct or withdraw the false evidence or, in the alternative, for Viasat's counsel to

disclose the truth. *See supra* pp. 7-8. Neither happened, despite multiple opportunities. To the contrary, Viasat's counsel dug the hole deeper. When confronted with testimony that corrected Dr. Hassoun's falsehood, counsel called that correction "not credible" (even apart from the misleading effort to paint the testimony as concerning two lines of code). The presentation of false testimony, knowing failure to correct it when the falsehood is uncovered, and effort to rehabilitate the falsehood by challenging a truthful effort to correct it, easily qualifies as "misconduct" within the meaning of Rule 60(b)(3). *Abrahamsen v. Trans-State Express, Inc.*, 92 F.3d 425, 429 (6th Cir. 1996) (counsel's "doing nothing to correct [the witness's false] testimony" was, "at the very least, misconduct within the scope of Rule 60(b)(3)").

Viasat's misconduct also prevented Kioxia "from fully and fairly presenting [its] case." *Hernandez*, 907 F.3d at 364; *see also In re Vioxx Prods.*, 489 F. Supp. 2d 587, 594-95 (E.D. La. 2007) (expert's false testimony about his credentials prevented opposing party from "fully and fairly presenting her case to the jury"). It is never fair for an attorney or party or witnesses to knowingly use false evidence at trial; the rules of ethics and perjury laws make that clear. As the Federal Circuit has explained, it can be "impossible accurately to appraise the extent to which the jury relied on testimony tainted by the false and forged [evidence]." *Fraige v. Am.-Nat'l Watermattress Corp.*, 996 F.2d 295, 299 (Fed. Cir. 1993) (internal citation and quotation omitted). As another example, in *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198 (Fed. Cir. 2005), the Federal Circuit affirmed the grant of a new trial under Rule 60(b)(3) based on an attorney's concealment of material facts, rejecting the argument that a new trial was warranted only "to the extent that its misrepresentations had demonstrated effects on the judgment." *Id.* at 1206. "A litigant who engages in misconduct should not be permitted the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his

opponent." *Id*. (internal quotation omitted).

The misconduct here is manifestly prejudicial. The dispute was not merely material, but central to the case. Lay juries would not ordinarily understand the significance of preprocessor directives in preventing lines of source code from being compiled. And Kioxia did not have the last word on this issue at trial—Viasat did. Kioxia properly expected that Viasat's counsel would correct the falsehood on rebuttal or at least not double-down on it and dismiss the correction as "not credible." Viasat, for example, could have complied with its ethical obligations by admitting the falsehood while perhaps chalking it up to mistake, confusion, or some other lapse. Instead, Viasat got up on rebuttal and ***continued*** trying to persuade the jury to accept the false testimony by attacking the credibility of Kioxia's expert Dr. Melvin. And, by that point, Kioxia was unable to defend itself, because Viasat had the last word.

That Kioxia discovered Viasat's misconduct ***during trial*** does not change the analysis. The Fifth Circuit has refused to penalize Rule 60 movants simply because they discover the misconduct and attempt to remedy it during trial. In *Mac Sales Inc. v. E.I. duPont de Nemours & Co.*, the plaintiff's expert witness intentionally misled the jury as to the number of interviews conducted. No. 96-30420, 1997 WL 450059, at *1-3 (5th Cir. July 7, 1997). The defendant recognized the fraudulent basis for the testimony "only hours before [the plaintiff's expert witness] testified" and "chose to vigorously cross-examine" the expert. *Id*. at *4. The Fifth Circuit affirmed the district court's grant of the defendant's Rule 60(b)(6) motion, despite the defendant's "choice to try and expose the perjury and hope the jury disbelieved the witness." *Id*.; *cf. United States v. Reyes*, 577

F.3d 1069, 1077 (9th Cir. 2009) (defense counsel's performance did not excuse prosecutor's misconduct).[2]

Having put forward false evidence and having not fulfilled its obligation to correct it, Viasat cannot complain that its misconduct is excused by Kioxia's diligence in discovering that misconduct. Once a litigant learns that it placed false evidence before the jury (including false evidence on the most important factual issue in the trial), the effect of that false evidence cannot be parsed or minimized.

### C. In the Alternative, This Court Should Enter a Remedy Under Its Inherent Authority

As explained above, this Court also retains inherent authority to sanction violations of the federal and state rules of professional conduct. To exercise inherent authority, the Court must "make a specific finding of bad faith." *Toon*, 250 F.3d at 952-53. And the Court must consider the least restrictive available measure to afford relief for the misconduct. *Id.* Kioxia does not lightly make the charge of bad faith. But the sequence of events at trial show knowledge that false testimony was given, no effort to correct it, and affirmative efforts to overcome its correction. Viasat's counsel did not redirect its own witness after the witness admitted he had no basis for knowing whether the source code he invoked actually made it into Kioxia products. Presumably he knew nothing could be done. Viasat's counsel did not cross-examine Dr. Melvin on the critical point when Dr. Melvin explained why Dr. Hassoun's testimony was false—that, as a matter of programming 101, the lines of source code he invoked were not compiled. He knew there was no

[2] Because Dr. Hassoun's expert report did not specify what source code allegedly "configured [the products] to adaptively modify the coding rate," Kioxia did not discover that Dr. Hassoun was relying on ***turned off*** source code until trial when Kioxia received Viasat's demonstratives for Dr. Hassoun. Had Dr. Hassoun identified his opinion on the ***turned off*** source code in his expert report as required by Rule 26, Kioxia would have recognized the issue and exposed it during expert discovery, preventing Viasat, presumably, from presenting it to the jury.

way to impeach it. In closing, Viasat's counsel ***again*** refused to defend Dr. Hassoun's false testimony. But instead he chose to attack Dr. Melvin's true testimony.

At any point, Viasat's counsel could have Googled "end if and if 0" and learned that C-programming-101 disproves its expert's testimony. After Dr. Melvin's explanation, Viasat's counsel was on notice and had an ***obligation*** to inquire further and correct the false testimony. *See supra* pp. 7-8; *Cohn v. Comm'n for Law. Discipline*, 979 S.W.2d 694, 698-99 (Tex. App. 1998) (counsel "knowingly" misrepresented material fact when he was at least on notice of the need to inquire further and failed to do so). Instead, Viasat's counsel tried to ignore the problem, until Kioxia called them out in closing. In the moment, Viasat's counsel made the wrong decision. Rather than come clean on the false testimony, he doubled down. That may be understandable. But it is not good faith. At the very least, it warrants the focused relief of a new trial and foreclosing Dr. Hassoun from further testifying in this case, as explained further below.

### D. Kioxia Respectfully Requests Entry of Judgment or a New Trial That Excludes Dr. Hassoun

Rule 60 provides that a Court may, on "just terms, . . . relieve a party . . . from a final judgment." Fed. R. Civ. P. 60(b). The rule does not specify the precise form of the relief from the judgment. For example, the Federal Circuit has recognized that case-terminating sanctions are available under Rule 60(b)(3). *See Schreiber Foods*, 402 F.3d at 1206 (discussing the availability of dismissal as a sanction for the plaintiff's misconduct). Kioxia brings this motion under Rule 60 so that the Court has the option to apply "just terms" sufficient to appropriately redress the misconduct, including by potentially entering judgment in Kioxia's favor, as a sanction for the above misconduct.

At the very least, if a new trial is granted, this Court should forbid Dr. Hassoun from testifying as a "just term" under Rule 60 and under this Court's inherent authority over its

courtroom. That sanction is warranted because one of two things must be true as to Dr. Hassoun. Either he lied regarding his knowledge of the effect of "#if 0" and "endif", under oath, in this Court. Or he honestly ***does not know*** C-programing-101. If the former, he should be excluded for committing a fraud on the Court under oath. If the latter, he should be excluded because he clearly is not the "expert" his Ph.D. in Electrical Engineering would suggest. Either way, this Court should not allow him to take the stand again in this case.

## V. CONCLUSION

This Court should relieve Kioxia from the judgment and enter sanctions against Viasat in the form of either entering judgment for Kioxia or granting a new trial and forbidding Dr. Hassoun from testifying.

Dated: August 28, 2026

Respectfully submitted,

*/s/ Roger Fulghum*
Roger Fulghum
Texas State Bar No. 00790724
Michael Hawes
Texas State Bar No. 24010761
Elizabeth D. Flannery
Texas State Bar No. 24045815
Michael Silliman
Texas State Bar No. 24093152
Baker Botts L.L.P.
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
Email: roger.fulghum@bakerbotts.com
Email: michael.hawes@bakerbotts.com
Email: liz.flannery@bakerbotts.com
Email: michael.silliman@bakerbotts.com

Nolan McQueen
Texas State Bar No. 24125322
Baker Botts L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
Telephone: (214) 953-6525
Email: nolan.mcqueen@bakerbotts.com

Mark D. Siegmund
Cherry Johnson Siegmund James PLLC
7901 Fish Pond Road, Second Floor
Waco, TX 76710
Telephone: (254) 732-2242
Email: msiegmund@cjsjlaw.com

Attorneys for Defendants Kioxia
Corporation and Kioxia America, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served August 28, 2026, with a copy of this document via electronic mail.

*/s/ Roger Fulghum*
Roger Fulghum