**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **VIASAT, INC.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**KIOXIA CORPORATION and KIOXIA AMERICA, INC.,**<br><br>**Defendants.** | **Case No.: 6:21-cv-01231-ADA**<br><br>**JURY TRIAL DEMANDED**<br><br>[redacted] |

**PLAINTIFF'S OPPOSITION TO KIOXIA'S RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS


I. Legal Standard ........ 1

II. The Jury's Infringement Verdict Is Supported by Substantial Evidence ........ 1

A. Kioxia's Arguments That the Jury Could Not Have Found Claim 15's Limitations Infringed Are Waived, Meritless, or Both ........ 2

1. Kioxia's Argument That a "Module" Must Perform a Single Function Is Waived and Wrong ........ 2

2. Kioxia's "No Single Decoder" Theory Is Waived and Wrong ........ 6

3. Kioxia's Argument That the NANDC Does Not Forward "The Same Received Data Stream" Is Waived and Incorrect ........ 7

4. Kioxia's DOE Argument Proceeds from a Mistaken Premise ........ 10

B. Kioxia's Arguments That the Jury Could Not Have Found the Additional Limitation of Dependent Claim 16 Satisfied Also Fail ........ 11

1. Kioxia's Source Code Challenge Ignores Record Evidence ........ 11

2. "Or" Means Or—Kioxia's Claim Construction Is Waived and Wrong ........ 13

3. Kioxia's Controllers Modify the Coding Rate Responsive to Age ........ 14

4. Kioxia's Error Rates Are Associated with the Decoded Data ........ 15

III. Viasat Only Sought and Received Damages for Kioxia's Infringement of Claim 16 ........ 16

A. Mr. Doller Isolated the Value of Variable ECC ........ 16

B. Dr. Mody Apportioned Her License-Based Royalty Rate to Claim 16 ........ 17

C. Dr. Mody Relied on Substantial Evidence of Technological Comparability Between the Semtech License and the '700 Patent ........ 18

D. The Royalty Base Reflects What Kioxia Actually Sells, Which Are SSDs and Not Controllers ........ 19

IV. Conclusion ........ 20

# TABLE OF AUTHORITIES

**Cases**

*Brown v. 3M*,
265 F.3d 1349 (Fed. Cir. 2001) ... 13

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018) ... 19, 20

*Express Mobile, Inc. v. Meta Platforms, Inc.*,
No. 2023-1646, 2025 WL 1693494 (Fed. Cir. June 17, 2025) ... 14

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ... 3

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ... 2

*KAIST IP US LLC v. Samsung Elecs. Co.*,
439 F. Supp. 3d 860 (E.D. Tex. 2020) ... 3

*Magnolia Medical Technologies, Inc. v. Kurin, Inc.*,
169 F.4th 1094 (Fed. Cir. 2026) ... 5

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ... 3

*Puga v. RCX Sols., Inc.*,
922 F.3d 285 (5th Cir. 2019) ... 3, 6

*SkinMedica, Inc. v. Histogen Inc.*,
727 F.3d 1187 (Fed. Cir. 2013) ... 13

*SVV Tech. Innovations Inc. v. Acer Inc.*,
No. 6:22-CV-00640-ADA, 2026 WL 1747093 (W.D. Tex. June 9, 2026) ... 1, 11

*Telecom Network Sols., LLC v. AT&T Corp.*,
No. 2:21-CV-00415-JRG, 2023 WL 2169026 (E.D. Tex. Feb. 22, 2023) ... 14

*UCB, Inc. v. Watson Laboratories, Inc.*,
927 F.3d 1272 (Fed. Cir. 2019) ... 9

**Rules**

Fed. R. Civ. P. 50(a)(1) ... passim

Fed. R. Civ. P. 50(b) ... 3, 18

Kioxia argues that the jury's verdict was riddled with nearly a dozen different errors. Many of Kioxia's challenges are waived; all are wrong.

## I. Legal Standard

Judgment as a matter of law is warranted "only if a reasonable jury would not have a legally sufficient evidentiary basis to find for the non-moving party on that issue." *SVV Tech. Innovations Inc. v. Acer Inc.*, No. 6:22-CV-00640-ADA, 2026 WL 1747093, at *1 (W.D. Tex. June 9, 2026) (citing Fed. R. Civ. P. 50(a)(1)). "JMOL must be denied if a jury's verdict is supported by legally sufficient evidence that amounts to more than a mere scintilla." *Id.* In deciding Kioxia's motion, the Court "must draw all reasonable inferences in favor of [Viasat], and it may not make credibility determinations or weigh the evidence." *Id.* (citation omitted).

## II. The Jury's Infringement Verdict Is Supported by Substantial Evidence

In rendering its verdict, the jury necessarily found that Kioxia's products satisfy the limitations of Claim 15, including that they contain (1) a decoder with error detection sub-modules; (2) a physically separate error-correction module, and that (3) the error detection sub-modules detect errors and forward the portion of the data stream with errors to the error correction module. *See* PX1 at Claim 15. Substantial evidence supports those findings. Dr. Hassoun walked the jury through each limitation and explained how Kioxia's products infringe. *See generally* Ex. 1, Tr. at 163:13-287:2. He presented two different ways that Kioxia's products include the claimed error detection sub-modules. First, that Kioxia's NANDCs **constitute** the claimed detection sub-modules. *See* Tr. at 210:5 ("the NANDC **is** the error detection submodule"), 219:3-18, 220:2-8 (describing the role of the NANDC). Second, that Kioxia's NANDCs **contain** the claimed detection sub-modules. *Id.* at 187:15-17 ("Each one of these NANDCs has an error detection submodule inside of it."); *id.* at 212:19-20, 218:4-22, 222:18-19, 223:23-25. The jury was free to

credit either theory.[1] The evidence also showed that Kioxia's L3D is an error correction module, *id.* at 191:15-192:11, 210:1-212:22, 224:22-229:18, 231:22-239:14; and that Kioxia's NANDCs detect errors and forward data with errors to the L3D, *id.* at 224:22-229:18.

The jury also found that Kioxia's products satisfy Claim 16—i.e., that they contain an "encoder [that] is further configured to adaptively modify the coding rate responsive to an age of the flash memory or a rate of errors associated with the decoded data." PX1 at Claim 16. Substantial evidence supports the jury's findings. Dr. Hassoun testified at length about how Kioxia's Variable ECC is responsive to both age and rate of errors. Tr. at 245:1-263:8. This is consistent with Kioxia's documents, which freely admit that the coding rate is modified "[a]s the Raw BER [bit error rate] increases with age." PX44 at 71; *see also* JX28 at 12; JX20 at 9; PX15 at 18; JX9 at 61, 88. In fact, even Kioxia's own expert admitted that Kioxia's products use "Variable ECC" to modify the coding rate. Tr. at 692:24-693:4.

### A. Kioxia's Arguments That the Jury Could Not Have Found Claim 15's Limitations Infringed Are Waived, Meritless, or Both

#### 1. Kioxia's Argument That a "Module" Must Perform a Single Function Is Waived and Wrong

Kioxia asserts that the NANDCs cannot be "detection sub-modules" and the L3D cannot be an "error correction module" because the NANDC and L3D are each capable of both detection and correction. Br. at 3-4 (Dkt. 313). Kioxia relies on dictionary.com's definition of "module," which Kioxia says is "part of something larger that performs a 'distinct function.'" *Id.* at 3. Kioxia argues that this means that an error-detection sub-module must only detect errors and the error-correction module must only correct errors. *Id.* at 3. This argument fails.

First, Kioxia's "distinct function" claim construction argument is waived. Kioxia did not

---

[1] General verdict must be affirmed if the evidence supports "*any* of the plaintiff's alternative factual theories." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010).

seek this construction any time before trial. *See* Dkt. 49 (Kioxia *Markman* Brief). Kioxia "cannot raise th[is] claim construction issue for the first time in post-trial motions: it is too late at the JMOL stage to argue for or adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1306 (Fed. Cir. 2018) (quotation omitted). Kioxia's error correction module argument is further waived because Kioxia did not even mention the "error correction module" in its Rule 50(a) motion. Tr. at 498:21-501:21. *See Puga v. RCX Sols., Inc.*, 922 F.3d 285, 290 (5th Cir. 2019) ("courts prohibit parties from using a Rule 50(b) motion to assert a ground that was not included in the original motion"). Further, in deciding a Rule 50(b) motion, the Court does not "entertain new evidence not presented to the jury," and the dictionary.com definition (Kioxia's Exhibit C) was never presented to the jury. *See KAIST IP US LLC v. Samsung Elecs. Co.*, 439 F. Supp. 3d 860, 893 (E.D. Tex. 2020).

Second, Kioxia's waived construction of "module" is wrong. The definition on which Kioxia (improperly) relies states that a module is "part of a program that performs a distinct function." Dkt. 313, Ex. C. Kioxia equates "distinct" with "exclusive," without any support. And it cannot mean "exclusive" in the context of the claims here. Claim 15 *requires* that the error detection sub-modules do more than exclusively detect errors: They must also "forward" to the error correction module. PX1 at Claim 15. The specification also contemplates that "buffering" will be part of the decoding process. *See, e.g.*, *id.* at 6:11-14, 6:46-50. Thus, the fact that Kioxia's systems perform functions other than detection and correction is not relevant. Claim 15 is also a "comprising" claim which, Kioxia concedes, "covers systems that add additional elements." Br. at 6. Kioxia's "distinct function" construction therefore cannot be correct—at the very least, this dispute cannot be resolved on JMOL. *See Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)

(*en banc*) (looking to plain meaning, claim context, and specification for claim construction).[2]

Third, substantial evidence supports a finding that Kioxia's products include modules whose "distinct function" is error detection and error correction. With respect to the L3D, Dr. Hassoun explained that its sole or ultimate purpose **is** to correct errors. *See* Tr. at 244:1-12 ("ultimately what is its job? It's to rescue the corrupted data"), 231:22-232:2 ("the sole purpose of L3D or a main purpose of the L3D is to correct corrupted data that come from NANDC"). Kioxia itself describes the "L3D" as "a module for rescuing read data." JX25 at 1; *see also* JX18 at 2 (listing the "main roles of L3D," which include "Data correction" but not detection); PX2013 at 15-16, 114-125 (depicting distinct detection and correction circuitry in the L3D); Tr. at 750:1-4. Under any reasonable definition, the L3D is an error correction module.

The evidence similarly showed that error detection is the core, essential function of the NANDC. The first thing it does (after descrambling) is to detect errors. *See* Tr. at 157:15-22 (Kioxia's 30(b)(6) representative explaining that error detection is "the first thing that happens" in the NANDC's "L1/MED decoder"), 205:15-206:2 (Dr. Hassoun explaining that the "first thing" Kioxia's detection sub-modules do is check for errors). Error detection is also the last thing the NANDC does before forwarding the data. As Dr. Hassoun explained, the error detection submodules are shown in the boxes labeled "BCH" on page 45 of JX10. *Id.* at 218:4-14. The arrows coming out of those boxes show the fundamental choice made by the NANDC. "[I]f the data doesn't have errors" it is sent "back to the user." *Id.* at 191:9-14, 206:3-7. That is shown by the lines going straight to the left. On the other hand, if the NANDC "**finally** detects an error . . . it's

[2] Kioxia's new definition is also not the only possible definition of "module." For example, Cambridge Dictionary defines module as "one of a set of separate parts that, when combined, form a complete whole." Ex. 2 at 1. The competing definitions underscore that this is a claim construction issue that cannot be litigated for the first time post-trial.

going to send it to the correction module." *Id.* at 191:15-22; *see also id.* at 221:7-24. That is shown by the arrows going down to the L3 corrector. *Id.* at 206:3-22, 223:2-19; *see also id.* at 160:14-161:15 (Kioxia's 30(b)(6) representative discussing how the NANDC will send error-free data "to the host" and "forward data to . . . the L3" when "an uncorrectable error was detected"). Thus, the fundamental purpose of the NANDC—the thing it does first and last—is to detect whether the data has errors. It is a quintessential error detection sub-module.

Kioxia's "module" argument also ignores Dr. Hassoun's alternative theory—that the claimed detector is a part of the NANDC. Under that theory, there can be no meaningful dispute that Kioxia's products include circuitry that performs the "distinct function" of error detection (i.e., a detection sub-module). Indeed, Kioxia's Dr. Melvin agreed that "the NANDCs in each of the accused controllers, they have this L1 circuitry that detects errors." Tr. at 749:6-13; *see also id.* at 157:15-22 (Kioxia engineer describing circuitry deciding "whether or not there's an error"). Kioxia counters that "the detection and correction circuitry shares physical space in the NANDC." Br. at 2. But even Kioxia's distinct function construction does not require physically distinct circuitry for each function within the claimed modules.[3]

*Magnolia Medical Technologies, Inc. v. Kurin, Inc.*, 169 F.4th 1094 (Fed. Cir. 2026), which Kioxia cites (Br. at 4), is distinguishable. In *Magnolia*, the plaintiff relied on the same structure to satisfy two separate claim elements. Here, Viasat identified two different structures to satisfy two separate claim elements. As Kioxia concedes, Viasat identified the NANDCs (and the error detection functionality in the NANDCs) as the "error detection sub-modules" and the physically

[3] Kioxia also misstates the evidence that the detection and correction functionalities in the NANDC "share[] physical space." Br. at 2. Dr. Hassoun did not explicitly address the issue, although the evidence he showed the jury separately depicted the detection and correction features of the NANDC. *See* JX4 at 13; JX13 at 18; JX22 at 17; Tr. at 218:15-22, 223:2-224:16. Kioxia's expert did not address the issue; he admitted that he did not analyze it. Tr. at 764:21-25.

separate L3Ds as the claimed "error correction module." Br. at 3-4.[4]

**2. Kioxia's "No Single Decoder" Theory Is Waived and Wrong**

Kioxia next argues that the NANDC and L3D constitute *two separate decoders* and not modules/sub-modules of the *single claimed decoder*. Br. at 4-5. But Kioxia did not even mention the word "decoder" in its Rule 50(a) motions, let alone make this argument. *See* Tr. at 498:21-501:21. Nor did Kioxia's expert ever opine at trial or in his report that Kioxia's products do not infringe because they contain two decoders. *See id.* at 666:6-23 (Dr. Melvin summarizing his non-infringement arguments). The argument is waived. *Puga*, 922 F.3d at 290.

In any event, substantial evidence supports the jury's conclusion that Kioxia's NANDC and L3D are part of the single claimed decoder. Dr. Hassoun presented the diagram from JX10 at 45, depicting the NANDCs and the L3D in a Kioxia controller. Tr. at 186:7-188:18. He explained that "*the* decoder is everything that we see over here." *Id.* at 188:6-7; *id.* at 203:1-4 ("*the* decoder . . . is everything here"); *see also id.* at 187:8-11, 212:10-22 (explaining that the NANDC and L3D are each a "part" or "portion" of the decoder). And both sides' experts testified that Kioxia's NANDCs and L3Ds work together to decode data—testimony from which the jury could have concluded they were part of a single decoder. Kioxia's expert, Dr. Melvin, acknowledged that, if the NANDC detects an error it cannot correct, then it will send the data to the L3D for correction. *See id.* at 749:14-750:4, 750:19-22 (agreeing that, "at the end of the steps, if the L1 still detects errors, it sends the data on to the L3D for correction"); *see also id.* at 751:8-11. Dr. Hassoun similarly opined that the NANDCs and L3Ds work together to decode data from the NAND. *See, e.g.*, *id.* at 191:15-192:5 (explaining how the NANDC and L3D work together in Kioxia's

---

[4] Kioxia's post-trial motions do not challenge the jury's finding that the NANDC and L3D are physically separate. The "physically separate" issue is thus no longer in dispute.

products), 228:15-229:13 (NANDC forwards data with errors to the L3D for correction).

Kioxia's criticisms of this evidence fail. Kioxia's argument (Br. at 4-5) that "[n]o one would call a cherry-picked set of modules drawn from different decoders a single 'decoder'" and its analogies to dog owners and rooms in separate apartments ignores the evidence, described above, that the NANDC and L3D are part of a single decoder. Using Kioxia's analogy, they are within the *same* apartment—the same controller. Similarly, Kioxia's argument (*id.* at 5) that Viasat is using the term "comprising" to "cherry-pick parts from separate decoders and assemble the claimed 'decoder,'" misconstrues Viasat's argument. Viasat relies on testimony and evidence that establish that the error-detection and error-correction modules constitute a single decoder.

### 3. Kioxia's Argument That the NANDC Does Not Forward "The Same Received Data Stream" Is Waived and Incorrect

Kioxia next argues that there was insufficient evidence that Kioxia's products "forward *the portion* of the respective received stream containing an error to an error correction module." *See* Br. at 7-9; PX1 at Claim 15. The crux of Kioxia's argument is that the NANDC does not send the "same portion" of data on which it detects an error to the L3D for correction but instead sends a copy of that data to the L3D. *Id.* This argument is waived. Kioxia did not raise it in its Rule 50(a) motion, which said nothing about the "portion" limitation (and mentioned "forward" only regarding DOE). Tr. at 498:22-501:20. The argument also fails on the facts and the law.

First, there is substantial evidence that the NANDC does forward the same portion of data on which it detects an error to the L3D for correction. The parties agreed at trial that the NANDC (also referred to as the "L1") forwards data with errors to the L3D, the error correction module. Dr. Melvin agreed that "at the end of the steps, if the L1 still detects errors, *it sends the data on to the L3D* for correction." *Id.* at 750:19-22; *see also id.* at 751:8-11 (same), *id.* at 749:15-19 (agreeing that it is "generally correct" that, "if the NANDC is unable to correct all the errors in a given sector

[of data], then ***the sector*** *goes from the NANDC to the L3 for correction*”). Dr. Hassoun also testified that data in which errors were detected is forwarded from the NANDC to the L3D for correction. *Id.* at 227:17-22 (“The NANDC . . . has to do the forwarding”), 286:9-19 (summarizing “the flow of data from the NANDC to the L3D”); *see also id.* at 154:6-12, 162:9-11 (Kioxia engineers agreeing that data is sent from the NANDC to the L3D).

Kioxia’s documents similarly show data in which errors have been detected traveling from the NANDC to the L3D. *See, e.g.*, JX15 at 3-4 (“Data read from NAND is transferred to LUT by NANDC.”); PX2013 at 96 (data with errors goes “from NANDC” to the “L3 SRAM inside the [correction module]”); JX15 at 2 (depicting data flow from NAND, through NANDC, to the L3D); JX13 at 17 (showing data path); JX22 at 17 (same). Dr. Hassoun even identified the specific wires used to transmit data from the NANDC to the L3D. Tr. at 225:6-15 (discussing JX12). He further explained that the “data stream” consists of “block after block of data.” *Id.* at 206:14-22. If the NANDC detects errors in a block of data, the NANDC forwards *that data block* to the L3D. *Id.*; *see also id.* at 223:3-14, 228:4-229:5, 242:18-243:25 (explaining forwarding). In short, the data sent from NANDC to the L3D *is the same portion* of data in which the NANDC found an error.

Second, Kioxia’s arguments that the re-reading process somehow interrupts this forwarding are a red herring. *See* Br. at 7-8. Even its own expert agrees that, after the re-read steps are completed, Kioxia’s NANDCs forward “the portion” of data in which an error was found. *Id.* at 749:6-750:22. As Dr. Melvin himself admitted, it is *always* the NANDC that retrieves the data from the flash and, after detecting whether *that data* has errors, sends it to the L3D. Tr. at 749:15-750:22; *see also id.* at 242:18-243:25 (Dr. Hassoun explaining that, at the end of the re-read process, the NANDC “will detect” whether there are uncorrectable errors and, if so, “it will forward” the data in which an error was detected). The jury was free to find Dr. Melvin’s

uncorroborated testimony that Kioxia's products "initiate[] a new read from NAND" before L3 correction (Br. at 8) not credible in view of his other admissions and Dr. Hassoun's testimony.

Third, Kioxia's argument that Dr. Hassoun "never testified that the data traveling the path to L3D is the same portion of the data stream on which detection occurs" fails on the facts and the law. Br. at 9. As explained above, there was substantial evidence that this data was the same portion of the data stream on which detection occurred. *See supra* pp. 7-8. In any event, forwarding a copy would also satisfy the claim language. As Dr. Hassoun explained, Claim 15 is agnostic about how forwarding the "portion of the respective received stream containing an error" happens. *See* Tr. at 230:16-231:6 (data can be forwarded with "instructions . . . to send the data to the error correction module"). A "portion" of a data stream simply refers to the sector, block, or other unit of data used for error detection and correction. *See* PX1 at 1:42-46 (monitoring and coding data "on a per-sector (or per-set of sectors) basis"). Nothing in the claim precludes "forwarding" the relevant "portion" by sending a copy—indeed, the word "same" that Kioxia keeps repeating in its motion is not in the claim language. And to the extent it does not literally meet the limitation, sending a copy is insubstantially different from sending the original.[5]

The "forward" limitation is also met under Dr. Hassoun's alternative theory that Kioxia's NANDCs contain the claimed detection sub-modules. *Id.* at 187:15-17, 218:4-22. Kioxia argues that this theory fails because the specific circuitry within the NANDC that is responsible for detection does not, itself, forward the data to the L3D. Br. at 8. But Kioxia incorrectly assumes that the claimed "error detection sub-module" is narrowly limited to the circuitry that performs

---

[5] Kioxia argues that forwarding a copy cannot satisfy the claimed forwarding because that would vitiate the "forward" limitation. Br. at 10. But Kioxia fails to explain how, if forwarding a copy of data falls within the scope of Claim 15, that would broaden the meaning of "forward" to the point "that the element would disappear entirely." *UCB, Inc. v. Watson Laboratories, Inc.*, 927 F.3d 1272, 1283 (Fed. Cir. 2019). Regardless, Kioxia's products send the original, not a copy.

error detection. Claim 15 explicitly contemplates a detection sub-module that *both* "detects" *and* "forwards." PX1 at Claim 15. The detection sub-module *must* therefore include circuitry whose functions are not limited to error detection. In Kioxia's products, that can include the detection circuits as well as the buffers through which data with errors is forwarded for correction. *See, e.g.*, JX15 at 12 (errors detected by "MED Decoder" and data with errors forwarded for correction from "data read buffer"); JX4 at 13; JX24 at 10; Tr. at 682:1-684:6 (Dr. Melvin discussing how data moves from the NAND to the "internal cluster buffer" before being sent "on to the corrector"), 749:15-750:22 (Dr. Melvin admitting that data is sent "from the NANDC to the L3D for correction"). There was substantial evidence on which the jury could conclude that Kioxia's "detection sub-modules" include all the circuitry used in the error detection process, including the buffers from which Kioxia's own expert agreed the data is forwarded for correction.

#### 4. Kioxia's DOE Argument Proceeds from a Mistaken Premise

Kioxia next argues that Dr. Hassoun's alternative theory of infringement under the doctrine of equivalents fails because he did not explain why "discarding data after detection" is the equivalent of the claimed forwarding. Br. at 10. Kioxia misunderstands the trial record and misstates Dr. Hassoun's testimony. Dr. Hassoun's DOE testimony was focused on the fact that, in some Kioxia products, the data is forwarded from the NANDC to an external buffer before it goes into the L3D. Tr. at 231:7-16. To the extent this data path is not literally forwarding from the NANDC to the L3D, Dr. Hassoun explained, it performs substantially the same function, in substantially the same way, with substantially the same result. *Id.* at 230:2-232:10. Kioxia's motion does not challenge this theory of infringement under the doctrine of equivalents.

Instead of challenging Dr. Hassoun's actual DOE theory, Kioxia raises an argument that is based on a flawed premise: that the detection sub-module "discard[s] data after detection" and that the L3D "retriev[es] reread data from NAND," such that there is no forwarding at all. Br. at 10.

That is not how Kioxia's products work. As discussed above, the jury had substantial evidence on which to conclude that the *same* portion of data in which errors were detected is itself forwarded from the NANDC to the L3D for correction. *Supra* pp. 7-8.

### B. Kioxia's Arguments That the Jury Could Not Have Found the Additional Limitation of Dependent Claim 16 Satisfied Also Fail

The jury correctly found that Kioxia's products infringe Claim 16's limitation that "the encoder is further configured to adaptively modify the coding rate responsive to an age of the flash memory or a rate of errors associated with the decoded data." PX1 at Claim 16. Indeed, Kioxia's counsel conceded that its products adaptively modify the coding rate. Tr. at 521:10-20, 946:12-13. Kioxia also admits that the coding change "might be responsive to a rate of errors." Br. at 15. That is the end of the story. By Kioxia's own admission, there is evidence supporting the jury's finding of infringement of Claim 16. *See SVV Tech.*, 2026 WL 1747093, at *6. Even putting these admissions aside, Kioxia's arguments as to why its products do not meet the limitation in Claim 16 fail.

#### 1. Kioxia's Source Code Challenge Ignores Record Evidence

Kioxia argues that Viasat failed to prove infringement of Claim 16 because it relied on allegedly "inoperative" source code. Br. at 11-12. This argument fails for three reasons.

First, Kioxia overstates the evidence that the source code was inoperative. During cross examination, Dr. Hassoun merely admitted that he was "not sure how" 3 of the 14 lines of source code he showed the jury were "used in this context." Tr. at 278:19-25; *see also id.* at 279:17-18. He did not admit that *any* of the source code he showed the jury was inoperative; he certainly did not admit that *all* the source code he relied on was inoperative, as Kioxia's motion implies. As discussed further in Viasat's concurrently filed response to Kioxia's sanctions motion, Kioxia has not shown that these 3 lines of code were in fact inoperative.

Second, the three lines of code Dr. Hassoun discussed during his cross examination—lines 1040-1042—are not central to any issue in this case. *See* Dkt. 320 at 5 & Ex. C (showing the "#if 0" and "#end if" statements at lines 1013 and 1045). As discussed in greater detail in Viasat's concurrently filed response to Kioxia's new trial motion, Dr. Hassoun barely mentioned those three lines of code during his direct. *See* Tr. at 248:12-249:23. His testimony focused instead on line 1006, which describes how Kioxia's products monitor the error rate ("IncrementReadErrorCount"), *id.* at 248:12-249:5, and on other lines discussing how Kioxia's products modify the coding rate responsive to both age and error rate, *id.* at 249:6-250:2, 258:10-260:13, 262:22-263:3 (discussing lines 1240-41, 1246, 2497-98, 2518-19, 2527-28, and 2536). Critically, *none* of those lines fall between the "if 0" and "end if" statements Kioxia says make a portion of the code inoperable.[6]

Third, Kioxia incorrectly asserts that its source code was the only evidence Viasat relied on for Claim 16. Dr. Hassoun's Claim 16 testimony focused first and foremost on Kioxia's own documents, which repeatedly admit that its products modify the coding rate responsive to age and error rate. *See* Tr. at 192:12-195:23, 245:1-247:11, 251:15-253:13 (discussing JX28 at 12, JX9 at 88, PX15 at 18, JX20 at 9, and JX9 at 61, 88). None of these documents or testimony—which are more than enough to show infringement of Claim 16—rely on source code.

Dr. Hassoun also presented what Kioxia refers to as his "correction-capability" theory. *See* Dkt. 315 at 5-7. In Kioxia's products, the L1 corrector will have a specific correction ability at each encoding level. *See* JX18 at 18; JX4 at 74-75; JX24 at 31; JX28 at 12; *see also* Tr. at

[6] The code Dr. Hassoun relied on to show responsiveness to age was indisputably operative. *See* Tr. at 732:9-735:23 (Dr. Melvin disagreeing with how that code works, but not with the underlying premise that it is operational in Kioxia's products). Because Claim 16 only requires responsiveness to age *or* error rate, the jury was free to find infringement by relying on Dr. Hassoun's testimony on the age-related code—and to reject Dr. Melvin's contrary testimony.

253:7-256:9 (Dr. Hassoun testimony on this issue); PX2013 at 97, 100 (defining "L1 correction capacity," as the "maximum number of bits that can be corrected" per frame). For example, when using the lowest level of encoding, the NANDC in Kioxia's Elnath controller can correct up to 50 bits per frame (in an HB read). *See* JX28 at 12; Tr. at 253:14-255:11. It is undisputed that, if the controller cannot correct all the errors in a frame—i.e., when the rate of errors exceeds 50 bits per frame—the "Variable ECC step goes up." *Id.* at 256:1-9; *see also* JX28 at 10; Tr. at 752:16-20 (Dr. Melvin agreeing that "so . . . what it is that's happening is that the HB+ fails, and it moves on to FSB Read where this variable ECC level change occurs"), 753:13-754:19, 756:13-757:6. Kioxia has conceded that "responsive to" only requires "but for" causation. *See* Dkt. 260-1 at 7. This causal chain (rate of errors exceeds 50 bits per frame→HB read fails→coding rate changed) establishes a "but for" causal link between the rate of errors and the coding rate. The non-source-code evidence—including Kioxia's own expert testimony—thus supports the jury's finding of infringement of Claim 16.

**2. "Or" Means Or—Kioxia's Claim Construction Is Waived and Wrong**

Kioxia next argues that in Claim 16, "or" means "and," and therefore Viasat was required to show that Kioxia's products modify the coding rate responsive to both age and the rate of errors. Br. at 12-13. Kioxia failed to seek this construction at the appropriate time; it is waived.

Kioxia's proposed construction is also wrong. "The disjunctive 'or' plainly designates that a series describes alternatives." *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1199 (Fed. Cir. 2013); *see also Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) ("or" and "and" are "not technical terms of art," and "[t]here is no basis in the specification or prosecution history for reading 'or' as 'and'"). Here, the specification includes an embodiment in which the coding rate is responsive only to age, PX1 at Fig. 6, 8:62-64, and a different embodiment where the coding rate is responsive only to error rate, Fig. 7, 9:26-28. Kioxia's cases are distinguishable on that basis.

*See Telecom Network Sols., LLC v. AT&T Corp.*, No. 2:21-CV-00415-JRG, 2023 WL 2169026, at *13 (E.D. Tex. Feb. 22, 2023) (requiring that two conditions both be met where using "'and' instead of 'or,' the claim would arguably require an impossible condition"); *Express Mobile, Inc. v. Meta Platforms, Inc.*, No. 2023-1646, 2025 WL 1693494, at *5 (Fed. Cir. June 17, 2025) ("the plain reading of the specification implies that a style must be capable of being applied to multiple objects"). And Kioxia's electric car hypothetical is loaded. Given what everyone expects about cars and braking, a statement that an electric car will brake for "cars or pedestrians" would of course be understood to be referring to braking for both. In other words, context matters, and Kioxia has given no good reason to ignore the specification's teachings, even were this Court to entertain Kioxia's waived claim construction argument at this late stage.

Finally, Kioxia's products *are* responsive to both age and error rate. *See* Tr. at 245:1-263:8. So, even if the Court were to adopt Kioxia's construction, JMOL would still not follow.

### 3. Kioxia's Controllers Modify the Coding Rate Responsive to Age

Kioxia next argues that Dr. Hassoun's testimony established only that ECC and age are *correlated*, and not that ECC changes *because of* age. *See* Br. at 13-14. Not so: Dr. Hassoun testified that the coding rate is modified "responsive to an age of the flash memory." Tr. at 195:3-19, 252:14-20. His testimony established causation, not mere correlation. Dr. Hassoun pointed for support to Kioxia's own documents, which show the coding rate increasing "due to" an increase in age. *See id.* (discussing JX9 at 88); *see also id.* at 258:4-9 (discussing PX2038 at 50 and explaining that "[i]t talks about increasing the ECC length due to an increase in the number of erase operations," which is indisputably a measure of age). Dr. Hassoun also explained one way in which the source code shows Kioxia's controllers modifying the coding rate in response to age. If "over 10 percent of" the sectors "are giving me errors," the system will conclude that "the entire chip . . . it's aging." *Id.* at 260:2-13. In response to that determination, the coding rate "is changed

for the entire chip." *Id.* at 262:22-263:3. This is substantial evidence that demonstrates a causal relationship between age (as indicated by the average rate of errors across the chip) and coding rate (which is modified for the entire chip in recognition of the fact that the entire chip has aged).

Kioxia also argues that its products do not modify the coding rate responsive to age because its products supposedly do not "keep[] track of [their] age." Br. at 13. But there is more than one way to track a product's age. Indeed, the specification acknowledges that "age" "may be a time since manufacture, . . . an amount of use, or *any other metric which corresponds to the aging* of the flash memory." PX1 at 7:43-45 (emphasis added). As Dr. Hassoun explained, Kioxia's products modify the coding rate in response to the "age" of the flash, as measured by its erase cycles, Tr. at 257:17-258:3, and by the average error rate across the chip, *id.* at 262:22-263:3. Substantial evidence shows that the "age" option in Claim 16 is satisfied.

#### 4. Kioxia's Error Rates Are Associated with the Decoded Data

Kioxia finally argues that the "error rate" limitation of Claim 16 is not met because the rate of errors Dr. Hassoun relied on did not relate to "the decoded data." This argument was not included in Kioxia's Rule 50(a) motion and is therefore waived.

The argument is also wrong. Kioxia contends that an error rate "associated with the decoded data" refers to the error rate *of* the decoded data. Br. at 14. This makes no sense. As Kioxia concedes, "the decoded data" refers to data in which the errors have already been corrected (i.e., where there are no errors). Br. at 14. Kioxia does not explain how a system can modify the coding rate "responsive to a rate of errors" in data that has no errors (that is, data having already been corrected). Indeed, Claim 16 does not require modifying the coding rate responsive to "the error rate *of* the decoded data." It requires modifying the coding rate responsive to "a rate of errors *associated with* the decoded data," such as the rate of errors observed before the specific data was decoded. PX1 at Claim 16 (emphasis added). Kioxia's products determine a rate of errors for a

given frame or sector relatively early in the decoding process. *See, e.g.*, Tr. at 253:7-257:2. Under any reasonable construction, that rate of errors is still "associated with" that frame or sector after it completes the decoding process (i.e., after those errors are corrected in the L3D). *Id.* at 245:9-24, 251:3-9. Kioxia's contrary interpretation is waived, nonsensical, and incorrect.

## III. Viasat Only Sought and Received Damages for Kioxia's Infringement of Claim 16

Viasat presented a robust damages case supported by two experts, Viasat's corporate representative, and three approaches that isolated the value of Claim 16. The jury reasonably credited this evidence. Kioxia now raises many of the same arguments that the Court has rejected already, which the Court should reject again.

### A. Mr. Doller Isolated the Value of Variable ECC

Mr. Doller properly apportioned the value of Claim 16 over Claim 15 by isolating the value of Claim 16's variable ECC in Kioxia's SSDs. Flash memory inevitably produces more data errors as data is written and rewritten to the flash contained in the drives. Tr. at 43:1-9, 323:11-325:1. To make sure the drives work for their customers as warrantied, companies like Kioxia account for flash's known increase in errors by either (i) having stronger ECC (to correct more errors); or (ii) including more flash memory in the drive than advertised (to produce fewer errors by spreading out the wear among more flash). *Id.* at 313:9-314:6, 338:10-19, 340:1-343:21, 346:16-24. Kioxia uses variable ECC to avoid this tradeoff—i.e., ECC that increases in strength only as needed.

Dr. Hassoun testified that variable ECC is the feature in Kioxia's drive that "modif[ies] the coding rate"—i.e., that implements Claim 16. *Id.* at 195:3-19. Mr. Doller relied on Dr. Hassoun's opinions that variable ECC infringes Claim 16. *See id.* at 392:21-24, 362:3-18. He then accounted for the value of variable ECC by measuring any increased error-correction performance the feature provided over two noninfringing alternatives that Kioxia identified: a prior-art drive and drives with variable ECC turned off. *Id.* at 289:1-11, 361:10-362:2, 364:9-367:2, 368:14-369:10. The

remaining increased performance in Kioxia's drives was solely attributable to variable ECC and Claim 16. Mr. Doller and Dr. Mody then converted that performance into a dollar value using two different models—the avoided cost of purchasing additional flash and the value of marketing and selling drives with a higher user capacity. *Id.* at 368:15-371:23. Mr. Doller apportioned the value of Claim 16 by isolating the value to Kioxia of the only feature that practices Claim 16.

Kioxia says that Mr. Doller admitted that his model "grossly overestimated" avoided costs based on testing data from eight drives. Br. at 17. That is nonsense. Mr. Doller said that Kioxia's testing data he was asked about showed that the "eight SSDs" Kioxia happened to test did not use the full scope of error correction enabled by variable ECC. Tr. at 416:25-417:3, 422:1-423:8. Kioxia ignores the pages of testimony in which Mr. Doller explained why he did not consider Kioxia's cherry-picked testing of those eight drives (out of over [redacted] sold) to be relevant or to show real-world use. *Id.* at 378:14-380:16, 631:23-25. As he testified, the data only concerned a few drives, had unrealistic testing conditions, did not reflect the type of flash actually used in the drives Kioxia sold, and was inferior to other potential evidence of real-world use. *Id.* at 378:14-380:16, 422:1-423:8. Indeed, Kioxia's own witness conceded that the testing data Kioxia identified does not reflect real-world use. The eight drives tested were not even production units that would have been sold to Kioxia's customers. *Id.* at 378:14-380:16, 422:1-423:8; *see also id.* at 633:14-21. And even for the eight drives tested, Kioxia ignores that the testing data showed that variable ECC was actually used in 100% of the drives tested. *Id.* at 643:19-22. Finally, Mr. Doller explained that Kioxia designed its drives based on the assumption that they would employ the highest correction capability. *Id.* at 368:4-13. The jury was entitled to credit this testimony.

**B. Dr. Mody Apportioned Her License-Based Royalty Rate to Claim 16**

Kioxia is also wrong that Dr. Mody "derive[d] a 5.4% royalty rate for Claim 16" based solely on the Semtech license and without further analysis. Instead, she further apportioned the

5.4% rate associated with the error-correction technology in the Semtech license to account for the value of Claim 16. Dr. Fuerst testified that 5.4% of the Semtech license's royalty rate was attributable to the comparable error-correction technology in the license. Tr. at 61:1-62:9, 76:22-77:10. Dr. Mody considered Dr. Fuerst's estimate of the portion of the Semtech royalty rate that was associated with the similar technology involved in that license, but she never suggested that this was the royalty rate that was associated with Claim 16.[7] *Id.* at 455:22-456:1, 456:2-9. On the contrary, she testified that "part of my charge was to isolate the licensing associated with a claim of a patent. So [the ultimate royalty] should be less than the 5.4 percent amount." *Id.* at 462:9-463:8. Based on Mr. Doller's cost-based and capacity-enabled approaches, the licensing approach informed by Dr. Fuerst, the comparable Cisco/Acacia license, and the other Georgia-Pacific factors, Dr. Mody concluded that the reasonable royalty for Claim 16 would be "3.5 percent or in that range," which the jury ultimately awarded. *Id.* at 462:9-463:8.

### C. Dr. Mody Relied on Substantial Evidence of Technological Comparability Between the Semtech License and the '700 Patent

The record contradicts Kioxia's argument that Viasat failed to establish technical comparability between the Semtech license and the '700 patent. Dr. Fuerst testified at length and without objection that "this invention . . . in [the] '700 patent . . . compare[s] technically with the work that [Viasat] were doing in licensing for Semtech . . . in the fiber optic space." Tr. at 76:22-77:10.[8] The two were "very similar," in part because Semtech's fiberoptic technology and

[7] Kioxia cites its lawyer's argument to the Court during a sidebar as though Dr. Fuerst testified to the jury that he had not compared the '700 patent with "IP core development agreements." *See* Br. at 18 (citing Tr. at 86:20-87:13). The '700 patent did not contribute to the royalty rate in the Semtech license because the license concerned fiberoptics, not flash. And of course, lawyer argument that the jury never heard cannot support a Rule 50(b) motion.

[8] The Court's exclusion of Dr. Fuerst's testimony only concerned whether Dr. Fuerst would compare "Claim 16 of the '700 patent to the Semtech agreement." Tr. at 83:4-9. The Court did not limit (and Kioxia did not object to) Dr. Fuerst's discussion of the technical comparability of the

the ’700 patent’s flash technology had similarly high data rates and data density. *Id.* at 76:22-77:10. Dr. Fuerst explained that the technical solution reflected in the Semtech license allowed for adaptive power modification to account for higher errors in transmission. *Id.* at 76:22-77:10. Though the “distributions of the error is slightly different,” the ’700 patent and the Semtech license contain “very similar technology.” *Id.* at 76:22-77:10. Dr. Mody then relied on Dr. Fuerst’s testimony, her earlier conversations with him, and her own analysis in describing the technological comparability of the Semtech license and the ’700 patent. *Id.* at 450:25-451:7, 453:22-456:16.

Kioxia complains that this is insufficient because fiberoptics and flash are different technologies. That is true but irrelevant. The Semtech license did not license the ’700 patent because Semtech concerned the “fiber optic space, and the [’700] patent is tied to forward error correction for flash memory,” as Dr. Fuerst explained in his direct examination. Tr. at 58:17-23. But both Dr. Fuerst and Dr. Mody explained why the distinction between fiberoptics and flash did not undermine technical comparability. *Id.* at 454:20-455:4, 494:2-14. Their focus was on the relevant underlying technology in the Semtech license, which was comparable error-correction technology to what is claimed. *Id.*; *see also id.* at 909:4-910:14 (instruction given without objection that “the patented technology . . . [is] not identical to the hypothetical negotiation”).

### D. The Royalty Base Reflects What Kioxia Actually Sells, Which Are SSDs and Not Controllers

Viasat properly used the sales of the infringing SSDs as the royalty base. Patentees can apportion the value of an infringed claim through either the royalty rate or the royalty base. *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018)

---

error-correction technology in the Semtech license and the ’700 patent or the percentage value of the error-correction technology within the Semtech license. And as explained above, Dr. Mody further apportioned the Semtech license to account for only the value of Claim 16. And Kioxia never sought to exclude or limit the use of this testimony.

(apportionment can be addressed through the base or the rate). As just discussed, Viasat's experts apportioned the value of the drives' features that infringe Claim 16 by fine-tuning the royalty rate to the scope of the claim. As such, Viasat is not seeking damages based on the unpatented features of the solid-state drives. The entire-market-value rule is irrelevant.[9]

In addition, Kioxia's SSD sales are the proper royalty base. Claim 16 requires more than just a controller; it also requires flash memory. A controller and flash memory are the key features of an SSD. Additionally, "[t]here is nothing inherently wrong with using the market value of the entire product, especially when there is no established market value for the infringing component or feature." *Exmark*, 879 F.3d at 1349. Here, Kioxia's SSDs are the smallest saleable units that practice Claim 16—a product that contains the controller and flash, as Dr. Mody testified. Tr. at 174:6-11, 177:6-19, 492:8-13. What's more, Kioxia provided no evidence that some other base was appropriate or that it sells individual controllers to its customers separate from solid-state drives. *Id.* at 583:18-24, 585:10-586:5. On the contrary, Kioxia's witnesses said Kioxia's business is to "make SSDs," which it sells to its customers as final assembled drives. *Id.* at 531:10-13, 532:15-534:15, 580:17-581:14, 618:3-13; *see also id.* at 492:8-13. And in Kioxia's interrogatory responses presented to the jury, Kioxia identified alternative "SSD drives," not distinct controllers, as "noninfringing alternatives to the claims of the" '700 patent. *Id.* at 289:1-11.

## IV. Conclusion

For the foregoing reasons, and those discussed in Viasat's oppositions to Kioxia's new trial and sanctions motions, the Court should uphold the verdict and deny Kioxia's motions.

---

[9] Notably, Kioxia never sought an entire market value rule instruction, instead agreeing without objection to the instruction saying that apportionment could be shown "by adjustment of the royalty rate so as to discount the value of a product's non-patented features." Tr. at 911:24-912:4.

Dated: October 2, 2026

Respectfully submitted,

/s/ *James Travis Underwood*
Melissa R. Smith, State Bar No. 24001351
James Travis Underwood, State Bar No. 24102587
GILLAM & SMITH, LLP
102 N College, Suite 800
Tyler, TX 75702
Telephone: (903) 934-8450
melissa@gillamsmithlaw.com
travis@gillamsmithlaw.com

J. Scott McBride (*Pro Hac Vice*)
Matthew R. Ford (*Pro Hac Vice*)
Nevin M. Gewertz (*Pro Hac Vice*)
Meg E. Fasulo (*Pro Hac Vice*)
Mac LeBuhn (*Pro Hac Vice*)
Jordan G. Golds (*Pro Hac Vice*)
BARTLIT BECK LLP
54 W. Hubbard Street, Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
scott.mcbride@bartlitbeck.com
matthew.ford@bartlitbeck.com
nevin.gewertz@bartlitbeck.com
meg.fasulo@bartlitbeck.com
mac.lebuhn@bartlitbeck.com
jordan.golds@bartlitbeck.com

Nosson D. Knobloch (*Pro Hac Vice*)
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
nosson.knobloch@bartlitbeck.com

*Counsel for Plaintiff Viasat, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on October 2, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System. A true and correct copy of the above and foregoing document has been sent to all counsel of record via electronic mail.

/s/ *James Travis Underwood*