**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **VIASAT, INC.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**KIOXIA CORPORATION and KIOXIA AMERICA, INC.,**<br><br>**Defendants.** | **Case No.: 6:21-cv-01231-ADA**<br><br>**JURY TRIAL DEMANDED**<br><br>[redacted] |

**PLAINTIFF'S RESPONSE TO KIOXIA'S MOTION FOR A NEW TRIAL**

# TABLE OF CONTENTS


I. Legal Standard ..... 1

II. Kioxia is Not Entitled to a New Trial on Infringement ..... 2

A. Dr. Hassoun Accurately Testified About How Kioxia's Products Operate ..... 2

1. Dr. Hassoun's Testimony Was Not False ..... 2

2. Kioxia Waived Objections to Dr. Hassoun's Testimony ..... 4

B. Viasat Fully Disclosed Dr. Hassoun's Correction-Capability Theory ..... 6

C. Kioxia's Claim Construction Argument is Specious ..... 9

III. Viasat's Damages Theories Were Robust, Disclosed, Apportioned, and Supported ..... 10

A. Viasat Disclosed Its Technical Comparability Between the Semtech License and the '700 Patent and Proved It at Trial ..... 10

B. Viasat Only Sought Damages for Kioxia's Infringement of Claim 16 ..... 13

1. Viasat Apportioned Its Damages Theories to Account for the Only Feature in Kioxia's Products That Practice Claim 16 ..... 13

2. Dr. Mody Apportioned Her License-Based Royalty Rate to Claim 16 ..... 16

C. The Court Correctly Prohibited Kioxia from Calling Claim 15 "Cancelled" ..... 17

D. The Court Did Not Err in Admitting the Testimony of Viasat's Experts ..... 18

E. Viasat Apportioned the Infringing Features ..... 18

F. Viasat Did Not Present a "Blended Damages Award" ..... 20

G. No New Trial Is Necessary, But Damages and Liability Are Severable ..... 20

IV. Conclusion ..... 20

# TABLE OF AUTHORITIES

**Cases**

*ATD Corp. v. Lydall, Inc.*,
159 F.3d 534 (Fed. Cir. 1998) .......... 9

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
No. 2:14-CV-911-JRG, 2016 WL 4440255 (E.D. Tex. Aug. 23, 2016) .......... 10

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018) .......... 18

*Foradori v. Harris*,
523 F.3d 477 (5th Cir. 2008) .......... 1

*Fraige v. American-National Watermattress Corp.*,
996 F.2d 295 (Fed. Cir. 1993) .......... 4

*Frazier v. Honeywell Int'l, Inc.*,
518 F. Supp. 2d 831 (E.D. Tex. 2007) .......... 6

*Harris Corp. v. Ericsson Inc.*,
417 F.3d 1241 (Fed. Cir. 2005) .......... 20

*Indect USA Corp. v. Park Assist, LLC*,
No. 2024-1023, 2026 WL 41173 (Fed. Cir. Jan. 7, 2026) .......... 8

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .......... 16

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
818 F.3d 1320 (Fed. Cir. 2016) .......... 4

*Rewis v. United States*,
369 F.2d 595 (5th Cir. 1966) .......... 4

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
402 F.3d 1198 (Fed. Cir. 2005) .......... 4

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) .......... 4

*SVV Tech. Innovations Inc. v. Acer Inc.*,
No. 6:22-CV-00640-ADA, 2026 WL 1747093 (W.D. Tex. June 9, 2026) .......... 1, 2

*Trudell Med. Int'l v. D R Burton Healthcare LLC*,
127 F.4th 1340 (Fed. Cir. 2025) .......... 8

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ........ 17, 20

*United States v. Alvarado-Valdez*,
521 F.3d 337 (5th Cir. 2008) ........ 4

*United States v. Nguyen*,
507 F.3d 836 (5th Cir. 2007) ........ 10

*Vetter v. McAtee*,
850 F.3d 178 (5th Cir. 2017) ........ 2

*Viskase Corp. v. Am. Nat'l Can Co.*,
261 F.3d 1316 (Fed. Cir. 2001) ........ 4

*Wi-LAN Inc. v. Sharp Elecs. Corp.*,
992 F.3d 1366 (Fed. Cir. 2021) ........ 12

*Willis Elec. Co. v. Polygroup Ltd.*,
166 F.4th 1363 (Fed. Cir. 2026) ........ 17

**Rules**

Fed. R. Civ. P. 26(a)(2)(C) ........ 11

Fed. R. Civ. P. 50(a) ........ 19

Fed. R. Civ. P. 50(b) ........ 2, 17

Fed. R. Civ. P. 60(b)(3) ........ 2

Fed. R. Evid. 103(a)(1)(A) ........ 6, 19

Kioxia had a full and fair opportunity to present its case. Kioxia was represented by experienced counsel who made strategic choices about how to present their case to the jury. With regard to source code, Kioxia chose to wait until Dr. Hassoun's cross-examination to reveal his alleged mistake, and it fully aired the issue with the jury. Kioxia cannot now complain that the trial it orchestrated was unfair. Nor can Kioxia show that it was unfairly surprised by Dr. Hassoun's "correction capability" infringement theory. This theory was fully disclosed in Dr. Hassoun's report and further explained to Kioxia in advance of trial. Kioxia's final liability argument—that Dr. Hassoun's "correction capability" theory violates the Court's construction—re-raises an argument this Court previously dismissed as "specious." It still is.

In addition, Viasat presented damages theories specific to Claim 16 supported by three witnesses. Mr. Doller valued only the incremental benefit to Kioxia from variable ECC—that is, the only feature that infringes Claim 16—subtracting any error-correction performance attributable to other features. Dr. Mody considered Mr. Doller's testimony, as well as Dr. Fuerst's testimony on comparable technology, and then apportioned the ultimate royalty rate to the value of Claim 16. Kioxia's arguments in support of a new trial wish away this testimony, and are willfully blind to the opinions Viasat in fact presented to the jury. Kioxia also belatedly raises claims it affirmatively waived before trial or abandoned during trial.

## I. Legal Standard

Kioxia has the "burden . . . to show a new trial is warranted." *SVV Tech. Innovations Inc. v. Acer Inc.*, No. 6:22-CV-00640-ADA, 2026 WL 1747093, at *9 (W.D. Tex. June 9, 2026). Kioxia must show both error and prejudice; prejudice exists only if "after considering the record as a whole, the court concludes that manifest injustice will result from letting the verdict stand." *Id.* (quoting *Foradori v. Harris*, 523 F.3d 477, 506 (5th Cir. 2008)). Where Kioxia seeks a new trial on evidentiary grounds, Kioxia must show "there was 'an absolute absence of evidence to support

the jury's verdict.'" *Id.* at *10 (quoting *Vetter v. McAtee*, 850 F.3d 178, 184 (5th Cir. 2017)).

## II. Kioxia is Not Entitled to a New Trial on Infringement

### A. Dr. Hassoun Accurately Testified About How Kioxia's Products Operate

Kioxia first argues that it is entitled to a new trial because three lines of the source code that Dr. Hassoun showed the jury were allegedly inoperable. Br. at 2-4 (Dkt. 315). As discussed in Viasat's response to Kioxia's sanctions motion, Kioxia has not shown that this code was inoperable. Moreover, Kioxia did not object to the admission of this code—or to Dr. Hassoun's testimony about it—at any time before or during trial. Instead, Kioxia sought to capitalize on Dr. Hassoun's purported error to execute a surprise cross. Kioxia's decision not to object to this testimony precludes it from seeking a new trial on this basis now. Kioxia's belated objections are also incorrect. Dr. Hassoun did not present false testimony. He accurately testified about how Kioxia's products work, and Kioxia had a full and fair opportunity to cross-examine him on areas of disagreement. Kioxia also cannot show prejudice. Copious evidence—including the admissions of Kioxia's own expert—independently supports the jury's infringement finding.

#### 1. Dr. Hassoun's Testimony Was Not False

Kioxia's cross-examination of Dr. Hassoun was not the Perry Mason moment it imagines. Dr. Hassoun did not admit that the code he relied on was inoperable. He certainly never admitted to being wrong about Kioxia's infringement or to misrepresenting any evidence. In the admission that Kioxia relies upon, Dr. Hassoun merely agreed that he was not sure whether 3 of the 14 lines of firmware code included in his slides were used "in controlling the hardware." Ex. 1, Tr. at 279:19-23. This narrow admission does not justify a new trial.

As discussed extensively in Viasat's responses to Kioxia's Rule 50(b) and 60(b)(3) motions (both of which are incorporated by reference), these three lines of code (lines 1040-1042) were not central to Viasat's case. The bulk of Dr. Hassoun's testimony on Claim 16 related to Kioxia's

documents, not its source code. *See* Tr. at 192:12-195:23, 245:1-263:10. Dr. Hassoun explained that "the reason I was showing you the source code is *just to show you the firmware matches the documentation* that explains how this ECC level modifying coding rate works." *Id.* at 250:24-251:2; *see also id.* at 272:24-273:2 (reviewed the firmware "to confirm what the documentation told me"). Kioxia's code was not the lynchpin of Viasat's infringement case, let alone the only infringement evidence Viasat presented, despite Kioxia's repeated suggestions to the contrary.

Kioxia's motion identifies a single source code function—"IncrReadErrCount"—and argues that this function was central to Viasat's infringement case. Br. at 2-3. It was not. In his direct, Dr. Hassoun stated that "this is the function that says, I found an error." Tr. at 248:12-249:5. But Dr. Hassoun presented substantial other evidence showing that Kioxia's products detect errors and modify the coding rate when the rate of errors exceeds a given threshold. *See id.* at 191:15-195:23, 205:15-206:22, 220:23-224:21, 245:1-248:9, 250:3-258:9. Additionally, the "Increment Read Error Count" function shows up in line 1006, which appears *before* the "if 0" statement that Kioxia contends rendered the code inoperative. *See* PX525. It is not "sandwiched between compiler directives '#if0' and 'endif,'" as Kioxia alleges. Br. at 3. And Kioxia's cross of Dr. Hassoun *did not address* line 1006.[1] Instead, Kioxia's cross-examination focused on lines 1012 (the "if 0") through line 1045 (the "end if"). *See* Tr. at 276:4-279:23. Only three lines of the code Dr. Hassoun showed the jury appeared in that range—lines 1040-1042. *Compare* PX525 with Dkt. 320 at 5 (reproducing Dr. Hassoun's source code slides). Dr. Hassoun said next to nothing about those three lines during his direct.[2] Kioxia's assertion that these three lines of code were somehow

[1] Dr. Hassoun's slides also highlighted the statement "ReadErrCount" in line 1040. *See* Dkt. 320 at 5. But Dr. Hassoun did not discuss that statement in his direct and Kioxia did not raise it in cross.

[2] After discussing the "Increment Read Error Count" statement from line 1006, Dr. Hassoun testified that "you can see the words Pbg all over here," which he explained refers to a "physical block group." *Id.* at 249:3-5. While "pbg" shows up once in line 1042 (which is between the

central to the case—let alone that any mistake about these three lines of code could have materially affected the case—is demonstrably false.

Moreover, Kioxia fails to identify a single case where a court ordered a new trial simply because a vigorous cross-examination caused an expert to express some uncertainty about one piece of evidence. The cases Kioxia cites in which courts ordered new trials are very far afield.[3] And Kioxia's fraud cases are inapplicable. They involve the knowing presentation of false testimony whose falsity was discovered *after* trial.[4] Dr. Hassoun did not knowingly present any false evidence. Moreover, in *none* of these cases was the dispute over the veracity of the testimony aired, as it was here, at trial. Kioxia's critique of Dr. Hassoun's testimony was aired extensively to the jury in cross-examination and in closing argument. Therefore a new trial is not warranted.

### 2. Kioxia Waived Objections to Dr. Hassoun's Testimony

Kioxia argues Dr. Hassoun's testimony was "inadmissible." Br. at 3. But Kioxia's challenge to the admissibility of Dr. Hassoun's testimony is waived, because Kioxia did not once seek to

---

directives Kioxia points to), it shows up seven more times in lines 1240-41 and 1246 (which is after those directives). *See* PX525. Dr. Hassoun then discussed the "ECC minus 1" function, Tr. at 249:16-23, which shows up in line 1246. Thus, Dr. Hassoun's only testimony about those three lines of code—the reference to "pbg"—supported the undisputed fact that encoding levels are set by "block." Dr. Melvin agreed that ECC level is determined by block. *See* Tr. at 692:23-693:11.

[3] *See Rewis v. United States*, 369 F.2d 595 (5th Cir. 1966) (ordering a new bench trial where the court's findings of fact relied on unproven facts); *United States v. Alvarado-Valdez*, 521 F.3d 337 (5th Cir. 2008) (ordering a new trial where the district court improperly admitted hearsay testimony over the defendant's timely objection and the government made that constitutionally improper testimony the lynchpin of its case); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (ordering a new trial where the district court gave a legally erroneous instruction).

[4] *See Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1205 (Fed. Cir. 2005) (defendant discovered after trial that plaintiff "misrepresented its ownership of the [asserted] patent"); *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1324 (Fed. Cir. 2001) ("post-trial discovery" that plaintiff's expert committed perjury); *Fraige v. American-National Watermattress Corp.*, 996 F.2d 295 (Fed. Cir. 1993) (post-trial hearing found defendant had committed fraud); *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1323-27 (Fed. Cir. 2016) (parties both agreed that new facts showed that expert had testified falsely).

exclude this testimony. Instead, it made an apparent strategic decision to address its concern for the first time at trial, in cross-examination. It is stuck with that decision.

Kioxia had many opportunities to object to Dr. Hassoun's use of the source code in question. Dr. Hassoun first identified the code in his expert report, which Viasat served on Kioxia more than two years before the trial. In that report, Dr. Hassoun named "IncrReadErrCount" as one of the "functions related to . . . thresholds" used for variable ECC. Ex. 2 at 222. This is the same function that Kioxia now complains about in its brief. *See* Br. at 3. In response, Kioxia did not alert Viasat to the possibility that some of the code related to this function might not be used in its products.[5] Nor did Kioxia seek to exclude any opinions based on that code.[6]

As trial approached, Viasat informed Kioxia of the specific lines of source code it intended to show the jury. Ex. 3 (disclosing Dr. Hassoun's demonstratives). At this point, it is beyond dispute that Kioxia knew that Dr. Hassoun would show the jury the code it now says is inoperable in its products. Once again, Kioxia did not raise any concerns or objections with Viasat or the Court.

Instead, Kioxia apparently made a strategic decision to try to undermine Dr. Hassoun's credibility. Kioxia then made this issue a centerpiece of its case. It cross-examined Dr. Hassoun extensively on the code in question. *See* Tr. at 272:14-279:23. And Kioxia introduced its own expert, Dr. Melvin, to testify that the code was not compiled. *See* Br. at 3. In its mid-trial opening, Kioxia characterized Dr. Hassoun's source code testimony as "the most important answer in the case." *Id.* at 522:6-7. But Kioxia overstated the record, broadly asserting that all of "the source

---

[5] Kioxia also thwarted Viasat's efforts to learn about this code. Viasat sought 30(b)(6) testimony from Kioxia on the relevant source code. *See* Ex. 4 at 7-9 (Topics 72-83). Kioxia refused to prepare its witnesses on those issues. *See* Ex. 5 at 1-2.

[6] Kioxia's own expert, Dr. Melvin, did not say in his expert report that this source code might be inoperable. To the contrary, Dr. Melvin's report relied on the *same code* as evidence for this feature. *See* Tr. at 723:19-25 (Kioxia's counsel noting that its expert cited "the same file" as Dr. Hassoun).

code that he presented to you is not turned on." *Id.* at 523:10-12. Kioxia repeated this exaggeration in closing, arguing that "*all* the code that was shown does nothing." *Id.* at 953:4-5.

Kioxia cannot now complain that Dr. Hassoun's testimony was "inadmissible" because he relied on source code that was allegedly inoperable. It knew what code Dr. Hassoun would rely on, and it chose to let him testify anyway, without objection. It has therefore waived the argument it now makes. *See* Fed. R. Evid. 103(a)(1)(A) (to argue evidence was admitted in error, must "timely object[] or move[] to strike"); *Frazier v. Honeywell Int'l, Inc.*, 518 F. Supp. 2d 831, 839 (E.D. Tex. 2007) (waived objection that expert testimony lacked "data supporting his analysis").

### B. Viasat Fully Disclosed Dr. Hassoun's Correction-Capability Theory

Kioxia next argues that the Court should order a new trial because one of Dr. Hassoun's infringement theories was supposedly undisclosed in his expert report and because it "defied the court's construction of [the term] 'rate of errors.'" Br. at 4-9. These arguments fail: Kioxia was well aware of that theory before trial, and the theory did not violate the Court's construction. Kioxia only objected once to Dr. Hassoun's "correction-capability" testimony. That objection was correctly overruled; all other objections are waived.

Dr. Hassoun's November 2023 report walked through the same evidence he discussed at trial. His report explained that "Elnath controllers implement variable ECC." Ex. 6 at ¶ 281. He then reproduced JX28 at 12, which shows that an Elnath HB read can correct "50 to 61 bits/1kB." *Id.* at ¶ 284. He then explained the "conditions" in which "cluster crush" (a.k.a. "variable ECC") is applied, including "When Error Recovery Step reaches FSB read." *Id.* at ¶¶ 285-286. He further explained that reaching FSB "only occurs when the rate of errors crosses a given threshold." *Id.* at ¶ 287. His report also explained exactly what triggers an FSB read—a failure at the prior HB read step. *Id.* And, as noted just a few paragraphs earlier in his report, an Elnath controller will fail at HB read when the error rate is above 50 bits per kB. *Id.* at ¶ 284.

This is exactly what Dr. Hassoun explained at trial. He relied on JX28 to discuss the correction capabilities of the various encoding steps in Elnath. Tr. at 253:7-254:9. He explained, exactly as shown in his report, that Elnath controllers can correct up to 50 errors per kilobyte (i.e., 50/1kB) when using HB read. *Id.* at 253:14-254:9. He explained the various correction steps, including the HB step whose failure will trigger the system to move on to FSB read and modify the coding rate. *Id.* at 255:12-256:9. His trial testimony did not introduce a new theory.

While Dr. Hassoun's report was certainly clear enough for Kioxia to understand these points, Viasat spelled them out further before Dr. Hassoun took the stand. Shortly before trial, Kioxia attempted a last-ditch motion for summary judgment of non-infringement on this very issue. *See* Dkt. 260. In response, Viasat walked through these same paragraphs of the report, and highlighted how they show the "direct causal link between FSB and error rate." Dkt. 262 at 8 (citing ¶¶ 123 and 285-287 in Dr. Hassoun's report). Kioxia did not complain at that time that Dr. Hassoun's opinion was somehow new or undisclosed.

Viasat also provided Dr. Hassoun's trial demonstratives to Kioxia two days before Dr. Hassoun testified. Those slides walked through this same evidence once again in connection with the same claim limitation. *See* Ex. 7 at slides 145-147. For example, Dr. Hassoun's demonstratives pointed to the "50 bits per KB" figure in JX28 and labelled it "correction ability."[7] *Id.* at slide 145. The slides further noted that after an HB fail, FSB read is performed, which also causes the system to "advance Variable ECC one step." *Id.* at slides 146-147. Viasat baby-stepped its infringement theory in Dr. Hassoun's slides. Kioxia had no objection then, and it has no basis to complain now.

[7] Dr. Hassoun's report noted that exceeding the "*correction capability* of the NANDC" evidences a "rate of errors" above a threshold. Ex. 2 at 192-93. Kioxia complains this statement was made in connection with a different claim, Br. at 7, but the report made clear that the evidence "should be considered as relevant to each and every one of the claim elements." Ex. 2 at 1.

At trial, Kioxia objected to only one question posed to Dr. Hassoun in connection with the correction-capability theory. That question was: "What happens in the Elnath controller if you have a 1-kilobyte chunk of data with more than 50 bits in error?" Tr. at 254:10-12. The answer to that question is plainly disclosed in Dr. Hassoun's report. *See* Ex. 6 at ¶¶ 120-133, 281-290. The Court correctly overruled this objection; this testimony was not new.

To the extent Kioxia believed other "new" testimony was unfairly elicited at trial on issues "beyond Elnath" (Br. at 5-6, 7-8), it could and should have objected then. It did not. Any objections to those questions are waived. *See Indect USA Corp. v. Park Assist, LLC*, No. 2024-1023, 2026 WL 41173, at *6 (Fed. Cir. Jan. 7, 2026) (post-trial challenges to expert testimony "are waived" because plaintiff failed to object to that testimony at trial). Kioxia did not object to Dr. Hassoun's testimony on the similarities (and minor differences) between how the different controllers modify the coding rate. Tr. at 256:16-257:2. Nor did Kioxia object to the slide Dr. Hassoun used to help summarize those comparisons. Ex. 7 at slide 148. Kioxia's complaints are waived.

Kioxia's complaints are also baseless. The specific coding rate and correction capability numbers shown to the jury were all taken verbatim from Dr. Hassoun's report. *See* Ex. 6 at ¶ 177 (Canopus coding bytes per frame); Ex. 2 at 238 (Canopus correction ability); Ex. 8 at 132 (Deneb correction ability), 179 (Deneb coding bits per frame). Dr. Hassoun's report also plainly disclosed that reaching an FSB read (for Deneb) or Shift read (for Canopus) triggered a change in the coding rate. Ex. 6 at ¶¶ 174, 240-241. And Dr. Hassoun's infringement charts discussed the L1 correction capability at length, for each product, in connection with the relevant claim limitation. Ex. 2 at 226-235; Ex. 8 at 191-200; Ex. 9 at 294-302. This infringement theory was no surprise.[8]

[8] This case is not like *Trudell Med. Int'l v. D R Burton Healthcare LLC*, 127 F.4th 1340, 1347-49 (Fed. Cir. 2025). There, the expert provided *no timely report at all*, the plaintiff timely objected, and the new opinions "constituted nearly all [defendant's] evidence of noninfringement."

Kioxia also fatally ignores that its own expert ultimately admitted that Dr. Hassoun's correction-capability opinion was correct. After being repeatedly confronted with his deposition testimony, Dr. Melvin admitted that (1) the HB Read can correct a given number of errors per block, Tr. at 753:21-754:19; (2) if the HB Read fails, then "by definition" that means that the errors in that block exceed the HB Read correction capability, *id.* at 752:25-754:19; (3) 50+ errors per block is a rate of errors, *id.* at 747:5-22; and (4) when the HB Read fails, Kioxia's systems will modify the coding rate, *id.* at 751:20-25, 752:13-20, 720:7-15. *See also id.* at 687:25-688:5. The jury heard all of this from Kioxia's own expert anyway, so Kioxia cannot identify any prejudice from the admission of Dr. Hassoun's identical testimony. *See ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 550 (Fed. Cir. 1998) (erroneous admission of defendant's patent was harmless error where other evidence supported the jury's non-infringement findings).

### C. Kioxia's Claim Construction Argument is Specious

Kioxia's final infringement argument asserts that Dr. Hassoun's infringement theory violated the Court's claim construction. Br. at 8-9. But Kioxia never previously raised this objection, so it is waived. It is also incorrect. Dr. Hassoun explained that HB read will fail when "**the rate of errors** [is] bigger than **50 bits per kilobyte.**" Tr. at 254:5-9; *see also id.* at 254:22-255:11 (explaining what happens when "a 1-kilobyte chunk of data has more than 50 errors"), 256:10-15 ("if I have an Elnath controller and I have a 1-kilobyte chunk of data with more than 50 errors in it," then "variable ECC is going to be bumped up"). "More than fifty errors per kilobyte" is a quintessential rate of errors. As Kioxia's own expert agreed, "a rate of errors includes an amount of errors per unit of data." *Id.* at 744:24-745:4, 747:12-18.

Kioxia's post-trial argument rests on the incorrect premise that a number of errors per unit of data (such as a sector, frame, or block of data) cannot be a "rate of errors." This Court rejected that argument as "specious" in its claim construction decision. Dkt. 221 at 5. Post-trial motions are

not the right time to relitigate claim construction. *See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-911-JRG, 2016 WL 4440255, at *5 (E.D. Tex. Aug. 23, 2016).[9]

Kioxia also tries to undermine Dr. Hassoun's opinions by pointing to Mr. Hida's testimony that its system does not directly measure error rates. Br. at 9. But Mr. Hida admitted that he never worked on the controllers at issue in this case and the jury was free to disregard his testimony in any event. Tr. at 556:13-19, 560:4-16. Kioxia also incorrectly assumes that being "responsive to" a rate of errors requires that the system directly measure the error rate. As Dr. Hassoun explained, and Dr. Melvin confirmed, Kioxia's systems modify the coding rate when a given block of data reaches an FSB read, which only happens when the rate of errors exceeds a given threshold. Tr. at 256:1-15, 751:20-754:19. Kioxia's products are thus indisputably modifying the coding rate "responsive to" a rate of errors, even if that rate is not directly measured.

Kioxia's motion also asks for a new trial for miscellaneous additional reasons. Br. at 9-10. These issues are not properly raised. *United States v. Nguyen*, 507 F.3d 836, 839 (5th Cir. 2007) ("passing reference" insufficient to raise issue for new trial). For the reasons stated in Viasat's oppositions to the other referenced motions, these challenges are also wrong.

## III. Viasat's Damages Theories Were Robust, Disclosed, Apportioned, and Supported

### A. Viasat Disclosed Its Technical Comparability Between the Semtech License and the '700 Patent and Proved It at Trial

Kioxia's first argument on damages is that the Court erred in allowing Dr. Mody to testify that the Semtech license is comparable because, according to Kioxia, the Court excluded Dr. Fuerst's opinion on that point. Kioxia argues that this was error because (1) Dr. Mody

[9] Kioxia mischaracterizes Viasat's position, stating that Viasat "told the jury" that "a rate of errors includes the number of errors compared to the device's data capacity." Br. at 9. That is not correct; Viasat explained the relevant rate was "per unit of data." Tr. at 927:9-13, 978:18-21.

supposedly did not add anything to Dr. Fuerst's opinion, and Dr. Fuerst's opinion on this issue was completely excluded, and (2) Dr. Mody could not rely on an opinion that was never disclosed, and Viasat allegedly never disclosed Dr. Fuerst's comparability opinion. *See* Br. at 11.

First, Kioxia is wrong that there was "no testimony from Dr. Fuerst showing comparability." Br. at 11. Dr. Fuerst testified at length and without objection about how "this invention . . . in [the] '700 patent . . . compare[s] technically with the work that [Viasat] were doing in licensing for Semtech . . . in the fiber optic space." Tr. at 76:22-77:10.[10] The two were "very similar," in part because both Semtech's fiberoptic technology and the '700 patent's flash technology had similarly high data rates and data density. *Id.* Dr. Fuerst explained that the technical solution reflected in the Semtech license allowed for adaptive modification of the power to account for higher errors in transmission. *Id.* Even though the "distributions of the error is slightly different," he explained that the '700 patent (on which he is a named inventor) and the Semtech license contained "very similar technology." *Id.* Dr. Mody then relied on both Dr. Fuerst's testimony, her earlier conversations with him, and her own analysis in describing the technological comparability of the Semtech license and the '700 patent. *Id.* at 450:25-451:7, 453:22-456:16.[11]

Second, this testimony from Dr. Fuerst (a Viasat employee) is consistent with his Rule 26(a)(2)(C) disclosures, which Kioxia probed during his deposition. Dr. Fuerst's disclosures stated

[10] The Court's exclusion of Dr. Fuerst's testimony only concerned, as Kioxia's counsel said, whether Dr. Fuerst would compare "claim 16 of the '700 patent to the Semtech agreement." Tr. at 83:4-9. The Court did not limit (and Kioxia did not object to) Dr. Fuerst's discussion of the technical comparability of the error-correction technology in the Semtech license and the '700 patent or to his isolation of the percentage value of the error-correction technology within the Semtech license. Kioxia never sought to exclude this testimony or obtain a limiting instruction.

[11] Kioxia says that the Semtech license is "not even a license, but an agreement to develop content." Br. at 11. But the document itself—admitted without objection—is called "IP Core Development and **License** Agreement." JX50. Section 3.1 is entitled "License Grant," which expressly covers "Viasat Intellectual Property Rights." *Id.*; *see also* Tr. at 58:5-16.

that he examined the relevant error-correction patents underlying Viasat's forward error correction designs for certain ASICs (i.e., the Semtech license) and concluded those were technologically comparable to the '700 patent's structure and implementation because they dealt with a solution to "high-speed, low-power, and high efficiency [error correction] decoders." Ex. 10 at 2. Kioxia deposed him about these opinions, including the reasons he found the technologies comparable, his conversations with Dr. Mody on the comparable technologies, and his apportionment of the error-correction technology in the Semtech license. Ex. 11 at 84:9-20, 97:9-98:2, 148:7-20.

Similarly, Dr. Mody discussed her conversations with Dr. Fuerst on technical comparability in her report. Ex. 12 at ¶¶ 104-106 ("Dr. Fuerst . . . explain[s] that the . . . Semtech Agreement [and others] are all technically comparable in that they include a transfer of technology comparable to the '700 patent"). She said that she relied on technical experts to support her work, which Kioxia never challenged as an improper basis for assessing damages.[12] Kioxia then deposed her at length about Dr. Fuerst's technical comparability and how that influenced her damages opinion. *E.g.*, Ex. 13 at 238:10-239:8. And Kioxia's own experts addressed Drs. Fuerst's and Mody's comparability opinions in their reports. Ex. 14 at ¶ 591 (Melvin); Ex. 15 at ¶¶ 336, 345 (Bakewell). Dr. Fuerst's opinions have been known for years and are consistent with his unobjected-to trial testimony.

Kioxia is also wrong that the evidence on comparability is insufficient because fiberoptics and flash are different technologies. Kioxia essentially argues that technology needs to be identical in order to be comparable. That is plainly wrong, as the Court itself instructed the jury. Tr. at 909:4-910:14 (correctly explaining that agreements can be comparable even if "the patented technology

[12] *Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1376 (Fed. Cir. 2021) does not apply. The Court in *Wi-Lan* addressed the situation where the expert relied on unauthenticated third-party source-code printouts without any demonstration that an expert would reasonably rely on those documents. Dr. Mody testified to her reliance on technical experts at trial without objection.

. . . [is] not identical to the hypothetical negotiation."). Notably, Kioxia did not object to this instruction. And both Dr. Fuerst and Dr. Mody explained why the differences between flash and fiberoptics did not undermine technical comparability. Tr. at 76:22-77:10, 454:20-455:4, 494:2-14. They focused on the underlying technology in the Semtech license, which was comparable error-correction technology to what is claimed. Far from being "conclusory," Dr. Mody explained how the technical comparability was tied to the underlying technology as opposed to whether it was implemented in flash or fiberoptics. *Id.* at 454:20-455:4, 493:17-494:14; *see* Br. at 11. Their testimony is more than sufficient to explain comparability between flash and fiberoptics.

### B. Viasat Only Sought Damages for Kioxia's Infringement of Claim 16

Next, Kioxia argues that the Court should not have permitted any of Viasat's three damages theories to be introduced to the jury at trial, because those theories supposedly failed to apportion the value of Claim 16. Br. at 13. Kioxia argues that its allegedly successful attack of those damages theories means that a new trial is warranted. *Id.* Those arguments fail because both experts properly apportioned the value of that claim for each of the three damages theories. Kioxia takes liberties with the record in arguing otherwise.

#### 1. Viasat Apportioned Its Damages Theories to Account for the Only Feature in Kioxia's Products That Practice Claim 16

Mr. Doller apportioned the value of Claim 16 by isolating the value of variable ECC (the feature that infringes Claim 16's limitations) in Kioxia's SSDs. As he explained at trial, a trade-off exists between the strength of ECC in a given drive and the amount of extra flash (or overprovisioning) included in the drive. Tr. at 313:9-314:6, 346:16-24. Flash memory inevitably produces more errors as data is written and rewritten to the flash in the drives. *Id.* at 43:1-9, 323:11-325:1. To make sure the drives work for customers as warrantied, companies like Kioxia account for the known increase in errors by either (i) implementing stronger ECC (to correct more errors);

or (ii) including more flash memory in the drive than advertised (to produce fewer errors by spreading out the wear among a larger pool of flash). *Id.* at 338:10-19, 340:1-343:21, 346:16-24.

Mr. Doller calculated the increased error-correction strength enabled by variable ECC over non-infringing alternatives. He first removed any performance attributable to a prior-art drive that Kioxia itself identified as a non-infringing alternative. Tr. at 289:1-11, 361:10-362:2, 364:9-367:2. And he then removed the performance of a second non-infringing alternative that Kioxia identified—drives that simply had variable ECC (i.e., Claim 16) turned off. *Id.* That second non-infringing alternative captured the value of Claim 15. The remaining performance was therefore solely attributable to variable ECC—that is, Claim 16. Mr. Doller and Dr. Mody then converted the performance attributable to Claim 16 into a dollar value using two different models. Because of the improved performance enabled *solely* by variable ECC (i.e., Claim 16), Kioxia avoided having to add more flash to the drives (Cost Avoided) or having to market their drives at a lower capacity (Capacity Enabled). *Id.* at 368:15-371:23. Each is quantified solely using the improved error-correction performance associated with Claim 16.

Kioxia's motion for a new trial reimagines the testimony at trial, which in reality reflects a hand-in-glove link between what Mr. Doller valued and Claim 16. First, Dr. Hassoun testified that variable ECC is the feature in the SSD that "modif[ies] the coding rate," a limitation only found in Claim 16. Mr. Doller affirmed that, in addition to the trial testimony, Dr. Hassoun "explained to me that, yes, Claim 16 is variable ECC." *Id.* at 362:3-18. Mr. Doller then quantified the value of that feature by looking at the increased error-correction performance Kioxia achieved through its use of variable ECC. *Id.* at 364:9-367:2. Isolating the value to Kioxia of the only feature in its infringing drives that practices Claim 16 *is* apportioning the value of Claim 16. *Id.* at 392:21-24 ("I was asked to evaluate Claim 16, which is -- as a feature, which is variable ECC."). Kioxia's

discussion of the "trigger" in Claim 16 is therefore confused. Kioxia's variable ECC is the feature that Dr. Hassoun said infringed Claim 16, being triggered by both the age and error rate. Mr. Doller then valued variable ECC as used in Kioxia's products, by comparing their performance to non-infringing alternatives that Kioxia itself had identified. Kioxia's suggestion that Mr. Doller valued "variable ECC" in the abstract, without consideration of the trigger, is simply incorrect. *Id.* at 330:5-12, 392:16-24, 396:2-12. He valued Kioxia's variable ECC—trigger and all.

This testimony is identical to what the Court permitted in its *Daubert* ruling.[13] Dkt. 304. As described in his report, referenced in Kioxia's pretrial motion, referred to in the Court's order, and discussed at trial, Mr. Doller subtracted out of the error correction performance available to Kioxia in its non-infringing alternatives which allowed him to isolate the value of variable ECC. Mr. Doller testified regarding the same analysis that he set out in his report to isolate the value of variable ECC and the same chart that Viasat presented to the Court during pretrial arguments. Kioxia complains that Mr. Doller didn't use the words "Multi-Level ECC" to describe the features he subtracted—a term the jury had never heard regarding another feature in Kioxia's SSDs. But Mr. Doller's testimony at trial subtracted the exact performance level that he called "Multi-Level ECC" in his supplemental report. There is no magic words requirement under *Daubert*, especially when the analysis and opinions are exactly the same.

In addition, Kioxia selectively quotes a portion of Mr. Doller's testimony under cross-examination in which, Kioxia says, Mr. Doller admitted that his model "grossly overestimated"

---

[13] This is at least the third time that Kioxia has raised the same confused and unsuccessful arguments about Mr. Doller's opinions. *See* Dkt. 137, 210, 225, 304. After its first motion, Mr. Doller submitted a supplemental report that explained the apportioned value of two features in Kioxia's products—variable ECC (in Claim 16) and the underlying error-correction architecture (called Multi-Level ECC and subject to different claims). Dkt. 304 at 1-2. Kioxia moved again to strike these opinions before trial and lost, again misstating Mr. Doller's analysis. Throughout, Mr. Doller's analysis has been consistent in isolating the value of variable ECC in Kioxia's products.

avoided costs based on testing data from eight drives. That is nonsense. Mr. Doller said that Kioxia's testing data showed that eight SSDs Kioxia happened to test did not use the full scope of error correction enabled by variable ECC. Tr. at 416:25-417:3, 422:1-423:8. But Kioxia ignores the pages of testimony in which Mr. Doller clearly explained why he did not consider Kioxia's cherry-picked testing to be relevant or to show real-world use. *Id.* at 378:14-380:16. As he testified, the data only concerned 24 drives out of more than [redacted] sold, had unrealistic testing conditions, did not reflect the type of flash used in Kioxia's drives, and was inferior to other potential evidence of real-world use. *Id.* at 378:14-380:16, 422:1-423:8. Indeed, Kioxia's own witness conceded that the testing data Kioxia identified does not reflect real-world use; in fact, the drives were pre-production versions that never shipped to Kioxia's customers. *Id.* at 633:16-24. Kioxia also ignores that the testing data showed that variable ECC was used in 100% of the drives tested. *Id.* at 643:19-22; *see also id.* at 368:4-13.

**2. Dr. Mody Apportioned Her License-Based Royalty Rate to Claim 16**

Dr. Mody apportioned the 5.4% rate associated with the error-correction technology in the Semtech license to account for the value of Claim 16. As discussed below, Dr. Fuerst testified at length regarding the comparability of the technology in the Semtech license and the invention of the '700 patent, concluding that 5.4% of the Semtech license's 10% royalty rate was attributable to the error-correction technology. Tr. at 61:1-63:9, 76:22-77:10. He explained his rationale for each category of value that he removed from the base 10% royalty rate in the Semtech license to arrive at his 5.4% rate. *Id.* at 61:1-63:9, 76:22-77:10. Dr. Fuerst had been negotiating "these types of contracts [for Viasat and its predecessor] for over 20 years now, and I understand the value of our technology, the error correction technology, in the market." *Id.* at 63:2-9.[14]

[14] That detailed analysis is unlike the excluded analysis in *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012), where arbitrarily attributing one-third of the value

Dr. Mody then testified that "part of my charge was to isolate the licensing associated with a claim of a patent. So [the ultimate royalty] should be less than the 5.4 percent amount." *Id.* at 462:9-463:8. Based on Mr. Doller's cost-based and capacity-enabled approaches, the licensing approach informed by Dr. Fuerst, the comparable Cisco/Acacia license, and the other *Georgia-Pacific* factors, Dr. Mody concluded that the reasonable royalty for Claim 16 would be "3.5 percent or in that range," which the jury ultimately awarded. *Id.* at 462:9-463:8. This analysis is more than enough.[15] *Willis Elec. Co. v. Polygroup Ltd.*, 166 F.4th 1363, 1378 (Fed. Cir. 2026).

### C. The Court Correctly Prohibited Kioxia from Calling Claim 15 "Cancelled"

Kioxia next argues that it was prejudiced because the Court did not allow Kioxia to say that Claim 15 was "invalid or canceled," instead requiring the parties to refer to it as "unasserted" or "available to the public." Br. at 17. Kioxia says that this ruling created the impression in the jury's mind that "Claim 15 still had some vitality."

Kioxia waived any argument that it should have been allowed to call Claim 15 invalid. Its counsel told the Court before trial that "I will not tell the jury that Claim 15 is invalid." Ex. 16 at 4:21-5:9, 7:20-21. Regardless, the Court was right to hold that the parties could refer to Claim 15 as either unasserted or in the public domain. Both are true; Claim 15 was unasserted and it is in the public domain. And while the Patent Office cancelled Claim 15, it upheld the validity of asserted Claim 16. Inserting a discussion of claim validity—after Kioxia dropped its invalidity

---

to the patented features using qualitative factors had no "credible economic analysis" in support. The *LaserDynamics* assumption is akin to the "arbitrary" 25% "rule of thumb" that was improper in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).

[15] Kioxia cites its lawyer's argument to the Court during a sidebar to suggest Dr. Fuerst testified to the jury that he did not compare the '700 patent with "IP core development agreements." *See* Dkt. 313 at 18 (citing Tr. at 86:20-87:13). The '700 patent did not contribute to the royalty rate in the Semtech license because the license concerned fiberoptics, not flash. And of course, lawyer argument that the jury never heard cannot support a Rule 50(b) motion.

defenses in the lead-up to trial—would confuse the jury or invite a mini-trial to explain that the Patent Office found that Claim 16 remained valid. The Court drew the right line.

Finally, the jury could not have thought that Viasat was somehow seeking to recover for features of Claim 15. Viasat repeatedly made clear that it was not asserting Claim 15, that "anyone can use Claim 15," it is "free for the public to use," "everything [in Claim 15] is available to the public," "Claim 15 is available to everybody," and "Viasat is not accusing Kioxia of infringing Claim 15 by itself." Tr. at 17:21-24, 100:8-101:3, 285:3-10, 419:4-7. Mr. Doller and Dr. Mody testified that they apportioned damages to just Claim 16. *Id.* at 425:24-426:4, 462:9-463:8.

### D. The Court Did Not Err in Admitting the Testimony of Viasat's Experts

Kioxia repeats an undeveloped laundry-list of pre-trial decisions with which it disagrees as a basis for a new trial. These are addressed in separate sections. *See supra* pp. 11-13 (Dr. Fuerst's testimony was based on experience and value of company's product features), 15-16 (Mr. Doller considered and rejected Kioxia's cherry-picked testing data as indicative of actual use, and Kioxia's witness verified it did not reflect actual use), 12-17 (Dr. Mody explained how she arrived at her final royalty rate after considering licenses, Mr. Doller's approach, and other comparable licenses and did not "blend" any royalty rates); *infra* p. 20. None of them warrant a new trial.

### E. Viasat Apportioned the Infringing Features

Viasat properly used the sales of the accused infringing SSDs as the royalty base. Patentees can apportion the value of an infringed claim through either the royalty rate or the royalty base. *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (apportionment can be addressed through the base or the rate). As just discussed, Viasat's experts apportioned the value of the drives' features that infringe Claim 16 by fine-tuning the royalty rate to the scope of the claim. As such, Viasat is not seeking damages based on the unpatented features of the solid-state drives, and the entire market value rule is irrelevant. Notably,

Kioxia never sought an entire market value rule instruction, instead agreeing to the apportionment instruction the Court gave, which said that apportionment could be shown "by adjustment of the royalty rate so as to discount the value of a product's non-patented features." Tr. at 911:24-912:4.

Mr. Cohen's testimony is thus irrelevant because the entire market value rule has no applicability given Viasat's apportionment through the royalty rate. But regardless, he provided ample testimony that variable ECC was extremely valuable to Kioxia's customers. Far from being "unrebutted," Mr. Cohen rebutted himself. Br. at 18-19. For example, after saying on direct that error correction was unimportant, Mr. Cohen had to be impeached with his own prior deposition testimony where he said under oath that error correction was a "key aspect of the product design . . . Error recovery and data integrity are really the two primary requirements that customers look for." Tr. at 613:24-616:3, 619:22-620:16; *compare* Br. at 19 n.5. And he twice admitted after being impeached with his sworn testimony that Kioxia's presentations to customers contained detailed and specific information about product features either Kioxia or the customers selected as important, explicitly including variable ECC. Tr. at 620:3-16, 621:24-622:7.

Kioxia also appears to argue that Viasat somehow skewed the verdict by "repeatedly emphasizing" the allegedly "inflated base $6.6 billion revenue" at trial. Br. at 19. Not so. Viasat properly discussed it as an input into the jury's damages calculation because it was the proper royalty base. Kioxia never objected to that testimony.[16] On the contrary, Kioxia asked its own damages expert, Chris Bakewell, about the $6.6 billion figure—belying its claim that the jury had been prejudicially "bombard[ed]" with the revenue figure. Tr. at 781:14-782:4.

---

[16] Kioxia's claim that there was "repeated objection" to the discussion of the royalty base at trial is not accurate. Br. at 19. It cites (1) an exclusion motion from two years before trial concerning the comparability of the Semtech royalty base; and (2) a sentence from its Rule 50(a) arguments saying this was an improper royalty base. *Id.* Kioxia never objected at trial to the testimony it cites as "unfair." Kioxia waived this argument. *See* Fed. R. Evid. 103(a).

### F. Viasat Did Not Present a "Blended Damages Award"

Kioxia accuses Dr. Mody of providing a "blended" royalty rate, presumably referring to instances where experts average distinct rates. *See Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1257 (Fed. Cir. 2005). Dr. Mody did no such thing. Instead, Dr. Mody identified a royalty range that the parties would consider in the hypothetical negotiation. Mr. Doller's cost approach defined the lower bound, and the apportioned rate from the Semtech license defined the upper bound. Consistent with a *Georgia-Pacific* analysis, she then selected a royalty rate within that range consistent with the evidence of Claim 16's value. Tr. at 462:10-463:8. That is not blending, and Dr. Mody explained her selection of a 3.5% royalty rate. And for the reasons discussed elsewhere, each input into that calculation properly supported her ultimate-rate opinion. *Supra* pp. 12-17.[17]

### G. No New Trial Is Necessary, But Damages and Liability Are Severable

For the reasons discussed above, no new trial is warranted. Even so, Kioxia argues that the damages and liability verdicts must fall together because the damages analysis rested on theories that do not account for all limitations of Claim 16 (i.e., the same argument it makes for non-infringement). But Kioxia's premise is fundamentally incorrect. Mr. Doller valued the features that infringe Claim 16 against non-infringing alternatives that Kioxia and its experts identified in discovery. Tr. at 289:1-13, 390:14-391:5, 434:21-435:20. Kioxia's complaint is with the non-infringing alternatives it put forth, not any analytical failure from Mr. Doller and Dr. Mody. That complaint does not require a new trial on damages and liability.

## IV. Conclusion

The Court should deny Kioxia's motion for a new trial.

---

[17] Kioxia's cited authority does not hold otherwise. *See Uniloc*, 632 F.3d at 1318 (reliance on 25% rule of thumb improper, not blending).

Dated: October 2, 2026

Respectfully submitted,

/s/ *James Travis Underwood*
Melissa R. Smith, State Bar No. 24001351
James Travis Underwood, State Bar No. 24102587
GILLAM & SMITH, LLP
102 N College, Suite 800
Tyler, TX 75702
Telephone: (903) 934-8450
melissa@gillamsmithlaw.com
travis@gillamsmithlaw.com

J. Scott McBride (*Pro Hac Vice*)
Matthew R. Ford (*Pro Hac Vice*)
Nevin M. Gewertz (*Pro Hac Vice*)
Meg E. Fasulo (*Pro Hac Vice*)
Mac LeBuhn (*Pro Hac Vice*)
Jordan G. Golds (*Pro Hac Vice*)
BARTLIT BECK LLP
54 W. Hubbard Street, Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
scott.mcbride@bartlitbeck.com
matthew.ford@bartlitbeck.com
nevin.gewertz@bartlitbeck.com
meg.fasulo@bartlitbeck.com
mac.lebuhn@bartlitbeck.com
jordan.golds@bartlitbeck.com

Nosson D. Knobloch (*Pro Hac Vice*)
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
nosson.knobloch@bartlitbeck.com

*Counsel for Plaintiff Viasat, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on October 2, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System. A true and correct copy of the above and foregoing document has been sent to all counsel of record via electronic mail.

/s/ *James Travis Underwood*